# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | | |
|---|---|---|
| Jane Doe 1[1], Jane Doe 2, Jane Doe 3, Jane Doe 4, John Doe 1, John Doe 2, and John and Jane Does 1-100, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT** (Jury Trial Demanded) |
| Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Brands Holding Company, Inc.; U.S. All Star Federation; Charlesbank Capital Partners, LP; Bain Capital, LP; Rockstar Cheer & Dance, Inc. Scott Foster, Deceased; Kathy Foster, and other Unknown Defendants, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## STATEMENT OF THE CASE

Plaintiff files this Complaint by and through undersigned counsel of record against the above-named Defendants for money damages in connection with conduct: (1) in violation of the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, 18 U.S.C. §2255; (2) constituting a civil conspiracy in violation of the Racketeer Influenced and Corrupt Organization (RICO) Act, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §1962(c) and (d); (3) in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-20; and (4) giving rise to common law claims of gross negligence, negligent supervision, and assault/battery; and (5) constituting violations of contractual and/or equitable responsibilities owed to Plaintiffs.  As a direct and proximate result of Defendants' collective and

---

[1] Given the nature of the subject matter as well as the potential for harm that exists against those who come forward to inform against Defendants, the Plaintiffs in this matter will be identified only as Jane Does or John Does in conjunction with the factual underpinnings on this complaint. *See B.R. v. F.C.S.B.*, 17 F.4th 485 (4th Cir. 2021)

individual conduct, Plaintiffs sustained and will continue to sustain actual and ongoing injuries and damages, and in support thereof they allege as follows:

## **INTRODUCTION**

1.      For over 20 years, Scott Foster operated, managed, and coached young cheerleaders from across the United States.

2.      On August 22, 2022, Scott Foster died of a self-inflicted gunshot wound near his home in Greenville, South Carolina.

3.      At the time of his death, Foster, along with his wife, Kathy Foster, were the owners of a pre-eminent cheerleading gym and coaching empire in the upstate of South Carolina. Mr. Foster had recently learned of an investigation against him by the Department of Homeland Security related to allegations that he was sexually abusing underage athletes, as well as taking underage athletes across state lines for the purposes of engaging in sex.

4.      Foster's death opened a deluge of allegations against not only Scott Foster, but also against his wife Kathy Foster, their gym, Rockstar Greenville, and its affiliated Rockstar entities, as well as Varsity Spirit, LLC, its affiliated companies, its parent company Bain Capital, LP and its governing body, the United States All-Star Federation ("USASF") ( collectively, "the Defendants").

5.      Upon information and belief, at all times relevant to this complaint, Defendants Varsity Spirit, LLC, Bain Capital, LP and USASF, established a competitive environment soliciting young athletes to cross state lines with minimal parental or adult supervision, to converge at pre-scheduled locations where the athletes would then be exposed to drugs, alcohol, and predatory conduct by adults including coaches and choreographers, all while publicly representing that Defendants were providing a culture of safety at these same events.

6.      Upon information and belief, the Foster Defendants, Defendant Rockstar, and other gyms and coaches were empowered and placed in positions of trust and authority by Defendants Varsity Spirit, LLC, Bain Capital, LP and USASF, all while these Defendants knew or should have known that these same coaches and gyms were pervasively abusing their athletes.

7.      Upon information and belief, the scheme to anoint specific coaches and disregard safety protocols was part of an elaborate plan to create a pipeline of young athletes, each of whom represented a significant stream of revenue for the Varsity Defendants' business worth billions of dollars.

8.      As set forth in this complaint, the Defendants together and individually have created, organized, and propagated a system of young-athlete abuse against innocent victims including the John and Jane Doe Plaintiffs.

9.      This is a complaint for legal and equitable relief for the victims of Defendants' scheme.

## JURISDICTION, PARTIES, AND VENUE

10.     This action arises pursuant to, and involves questions requiring the interpretation of, the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

11.     Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

12.     At all times relevant to this complaint, Plaintiff Jane Doe 1 resided in San Diego, California..

13.     At all times relevant to this complaint, Plaintiff Jane Doe 2 resided in San Diego, California.

14.     At all times relevant to this complaint, Plaintiff John Doe 1 resided in Austell, Georgia.

15.     At all times relevant to this complaint, Plaintiff Jane Doe 3  resided in Fairview, North Carolina.

16.     At all times relevant to this complaint, Plaintiff John Doe 2 resided in Savannah, Georgia.

17.     At all times relevant to this complaint, Plaintiff Jane Doe 4 resided in Greenville, South Carolina.

18.     Upon information and belief, at all times relevant to this complaint, Defendant Scott Foster, deceased, was a resident of Greenville County, South Carolina, and owned and operated Defendant Rock Star Cheer and Dance, Inc.

19.     Upon information and belief, at all times relevant to this complaint, Defendant Kathy Foster was a resident of Greenville County, South Carolina, and owned and operated Defendant Rock Star Cheer and Dance, Inc.

20.     Defendant Rockstar Cheer and Dance, Inc. is incorporated under the laws of the State of South Carolina with its principal place of business and registered agent in Greenville County, South Carolina, and doing business in gyms located across the United States including in : Greenville County, South Carolina; Kershaw County, South Carolina; Berkeley County, South Carolina; Catawba County, North Carolina; Pasquotank County, North Carolina; Wake County, North Carolina; Cherokee County, Georgia; Henry County, Georgia; Kent County, Rhode Island; Franklin County, Pennsylvania; Cuyahoga County, Ohio; and Pinal County, Arizona.

21.     At all times relevant to this complaint, Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) (hereinafter "Defendant Varsity Brands") has been a for-profit entity

organized under the laws of Delaware with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation).

22.    At all times relevant to this complaint, Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) (hereinafter "Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee.

23.    At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. has been a for-profit entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas.

24.    The entities named in Paragraphs 21, 22, and 23 shall hereinafter collectively be referred to as "the Varsity Defendants" unless otherwise referred to individually.

25.    At all times relevant to this Complaint, either directly or through the affiliates it wholly owns and/or controls, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, and cheer competitions throughout the United States.

26.    Defendant U.S. All Star Federation, Inc. (hereinafter "Defendant USASF") is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. Defendant USASF is controlled and funded by the Varsity Defendants as described further herein.

27.    At all times relevant to this Complaint, Defendant USASF, either directly and/or through its affiliates, which it controls, has: (a) promulgated and/or enforced rules governing competitive cheer coaching, competitive cheer training, and cheer competitions throughout the United States; and (b) organized, promoted, produced, and/or managed cheer competitions throughout the United States and furthered the goals and purposes of the conspiracy as set forth herein.

28.     Defendant Charlesbank Capital Partners, LP (hereinafter "Defendant Charlesbank") has been a for-profit entity organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts.

29.     Defendant Bain Capital, LP (hereinafter "Defendant Bain Capital") is a for-profit, publicly traded entity organized under the laws of Massachusetts, with its principal place of business in Boston, Suffolk County, Massachusetts.

30.     Venue is proper in the United States District Court for the District of South Carolina, Greenville Division, pursuant to 28 U.S.C. §1391 as a substantial part of the events or omissions complained of occurred within Greenville County, South Carolina.

## FACTUAL ALLEGATIONS

### The Competitive Cheer World

31.     In competitive cheer, athletes perform routines lasting for 2 minutes and 30 seconds that incorporate gymnastics/tumbling, stunts, pyramids, tossing, cheer, and dance routines all set to music.

32.     In traditional sideline cheer, athletes perform in support of some other sport. In competitive cheer, the athletes performing the routines are the main event.

33.     Competitive cheer requires an extreme amount of commitment from athletes and their families, requiring near constant training or cross-training and frequent competition travel through multiple seasons throughout the year.

34.     This level of dedication is costly. A single season can, at minimum, cost between $3,000 and $7,000 per team member. Some families spend $20,000 or more for transportation, lodging, and entrance fee costs at the multiple competitions they attend throughout the year. It is estimated that about 4 million athletes participate in competitive cheer.

35.    Cheer competitions are highly structured events where teams are judged against one another. They are held locally, regionally, nationally, and even worldwide, requiring frequent travel by the athletes. These events are hosted and conducted under the guidance and certification of various companies in the United States.

36.    At all times relevant to this complaint, the Varsity Defendants have been one of the largest purveyors of these competitions and camps.

37.    At all times relevant to this complaint, the Varsity Defendants utilized Defendant USASF as its governing entity, including requiring each competitor at a Varsity competition to purchase a USASF membership.

38.    In All Star competitive cheer, athletes join teams that are affiliated with a private gym that has been certified by Defendant USASF as meeting certain standards related to the credentials of its coaches, and specifically warranting that these coaches have been determined to be safe for work around child athletes.

39.    In All Star, the athletes and their families pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories , and other related fees.

40.    In addition to the annual competition fee, all athletes participating in Varsity events must become paying members of USASF.

41.    As part of its solicitation to parents and participating gyms, and upon information and belief, the Varsity Defendants and their co-conspirators touted their internal policies, processes, guidelines, and procedures related to athlete safety including protection against sexual and/or physical harm.

42.    At all times relevant to this complaint, the Varsity Defendants and their co-

conspirators, use these private All Star cheer gyms, like Defendant Rockstar, to gain access to the paying parents of competitive cheer athletes who wish their young athletes to compete at the highest levels while believing they are part of a network of superior, trusted, and safe organizations.

43.     Once young athletes join USASF All Star cheer gyms and their families begin paying dues to the gym, as well as fees to Defendant USASF, upon information and belief, coaches and other gym staff require participation in Varsity competitions, and further begin to suggest one-on-one coaching time with the promise that they want to help the athlete rise to the next level, compete in higher divisions, and possibly become coaches themselves one day. This system of promoting intensive personal connection with the athletes gives coaches and staff increased access to young athletes, and corresponds to a pipeline of young athletes to fund the Varsity Defendants' system of camps and competitions.

44.     Because of the exorbitant expense for athletes to compete at Varsity events, families who find their finances strained are, upon information and belief, encouraged to let their child athletes travel to competitions in the care and custody of USASF certified coaches.

45.     The Varsity Defendants and Defendant USASF tout the safety and security of their competitions and camps, and their system to lull parents into comfort whereby they have no fear for the safety of their children traveling out of state to hotels with these coaches for competitions throughout the year.

46.     The Varsity Defendants and Defendant USASF also promote their reputation in the industry to encourage more child athletes to participate in their competitions.

47.     The Varsity Defendants and Defendant USASF rely heavily upon the network of coaches, going so far as to host conferences specifically for the coaches, providing tips and training in fundraising, athlete development, and business management.

48.     By representing a safe and superior competitive environment, Defendants collectively seek to create a rotating door of young athletes who will continue in the organization for years, spending tens of thousands of dollars per athlete for coaching, uniforms, camps, training, competitions, and other merchandise.

## The Organizational Structure

49.     At all times relevant to this complaint, the Varsity Defendants and Defendant USASF have relied upon access to child athletes who compete at Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

50.     In 2003, the Varsity Defendants created Defendant USASF through a $1.8 million interest free loan.

51.     From its foundation, USASF was purportedly established to provide guidelines, policies, procedures, and processes to ensure an environment that was safe for young athletes.

52.     As part of this responsibility, USASF was also supposed to operate as the governing body to enforce its guidelines, policies, procedures, and processes.

53.     Upon information and belief, this structure meant that the Varsity Defendants were entirely self-regulated and were not answerable to any independent entity.

54.     The Varsity Defendants controlled Defendant USASF from inception. The Varsity Defendants submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF."

55.     Defendant Varsity Spirit, LLC was listed as the owner.

56.     For at least the first 15 years of its existence, and upon information and belief, Defendant USASF's offices were located at Varsity's corporate address, a Varsity representative

answered the phone for USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

57.     During the operative timeframe of this complaint, the Varsity Defendants also controlled the Board of Directors for Defendant USASF. The USASF board is empowered to set policy for USASF. The Board is composed of 13 voting members, one seat each for the seven cheer competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of the USASF's founding event producers, it has continued to expand its control of the USASF Board. Presently, the Varsity Defendants have control of 75% of the seats on the Board of Directors. The seats that Varsity does not control do not have voting rights.

58.     Defendant USASF's website is located at www.usasf.net, a URL which was once openly owned by the Varsity Defendants.

59.     The Varsity Defendants eventually began concealing ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

60.     From 2014 to 2018, Defendant Charlesbank wholly owned the Varsity Defendants and/or Defendant USASF, and provided capital to the Varsity Defendants and Defendants USASF for the purpose of building the network of Varsity-affiliated private gyms and coaches throughout the United States.

61.     During this same timeframe, Defendant Charlesbank, as well as the Varsity Defendants, reaped massive financial benefits associated with the growing network of families who

came into Varsity-affiliated gyms, and who believed the Varsity Defendants' representations that they were providing safe and protective environments for families.

62.    In 2018, Defendant Bain Capital purchased the Varsity Defendants from Charlesbank for roughly $2.5 billion.

63.    Related to its purchase, Defendant Bain Capital stated: "This new partnership presents Varsity Brands with an exciting opportunity to continue to expand and improve our products and services while remaining steadfast to our commitment to improving student life and overall engagement….Bain Capital's extensive consumer and technology experience and their commitment to our mission of empowering young people will help us accelerate our growth to a new level."[2]

64.    In addition, Defendant Bain represented: "For over 50 years, Varsity Brands has served as an essential force for good as part of the academic and athletic student experience…We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[3]

65.    Upon information and belief, Defendant Bain's accelerated growth model for the Varsity Defendants depended upon access to an ever-expanding network of student athletes who would not only purchase Varsity branded merchandise, but who would continue to attend Varsity events.

---

[2] *See* "Varsity Brand, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity," June 19, 2018, available at: [Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity | Bain Capital](#).
[3] *Id.*

66.    In 2020, it came to light that former Varsity-affiliated coach Jerry Harris had been accused of soliciting sex from two children during the 2019 Varsity-competition season.

67.    Though Varsity purportedly reported Harris to legal authorities, upon information and belief, the Varsity Defendants made few if any modifications to the internal screening process for coaches, and made no modifications to the way in which it hosted competitions.

68.    Upon information and belief, at the time of the Harris allegations, and since the Harris allegations, the Varsity Defendants, in conjunction with Defendant NSASF have hosted multiple competitive events throughout the United States, during which time affiliated teams from across the country converge at a pre-selected location, and using hotels, premises, and businesses hand-selected by the Varsity Defendants.

69.    Upon information and belief, during these events, underage student-athlete would comingle with other teams, including their coaches and choreographers, either without chaperones or minimally chaperoned, and would be exposed to environments where drugs and alcohol were readily available, and where the student athletes were subject to rampant solicitation and inappropriate sexual conduct, and innuendoes, including by coaches such as Jerry Harris and Scott Foster.

70.    At the same time individual gyms and coaches would receive substantial benefits from affiliation with the Varsity Defendants, including the reputational benefits of being affiliated with the Varsity Defendants' brands, and monetary benefits directly linked to the number of competitions in which a gym participated as well as the number of athletes the gym brough to the competition.

71.    In this way, the Varsity Defendants and the gyms and coaches had a symbiotic relationship, where the gyms and coaches supplied the Varsity Defendants with a continuous stream

of revenue through the child-athletes, and the coaches and gyms used the Varsity Defendants' reputation in order to bolster their own reputation with student athletes.

72.    Upon information and belief, the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital relied upon the gyms and coaches to offer an ever-expanding group of underage athletes to provide a guaranteed stream of revenue and support the Bain promise of accelerating Varsity's growth.

73.    As such, and upon information and belief, it was contrary to the Varsity Defendants' business model to ban coaches and gyms from their system, as every student athlete represented a stream of revenue worth tens of thousands of dollars.

74.    At all times relevant to this complaint, and upon information and belief, Defendants Bain Capital, LLC and Defendant Charlesbank knew or should have known that the Varsity Defendants and Defendant USASF were not appropriately enforcing policies, processes, and procedures related to athlete safety, and that the Varsity Defendants were hosting events without regard for and in contravention to the safety of student athletes.

75.    Moreover, and upon information and belief, to incentivize coaches and gyms, the Varsity Defendants offered significant monetary benefits to increase participation in events, including by providing cash rebates, as well as in creating event environments that comingled child-athletes with adult coaches, gym owners, and choreographers, while providing these same child-athletes with access to drugs and alcohol with minimal parental or adult supervision.

76.    Upon information and belief, this environment fostered and contributed to the sexual, mental, and physical abuse meted upon the athletes, and gave predators such as Scott Foster an easy avenue to find victims.

77.     During this timeframe, Plaintiffs are informed and believe that employees of the Varsity Defendants resigned their positions because of the abuse and systemic failures they saw within the system, including failures to uniformly apply policies and procedures related to athlete safety, rampant drug use within the leadership of the Varsity Defendants, as well as alcohol and drug use by athletes during competitions, and general favoritism and promotion of teams that chose to endorse or affiliate with the Varsity Defendants, disadvantaging independent teams.

78.     Defendant Scott Foster was a cheerleader at the University of Louisville and began coaching young cheerleaders in Kentucky in 1996.

79.     The University of Louisville is a pre-eminent name in the world of competitive cheerleading. Athletes who come out of the Louisville program have huge name recognition in the industry allowing them to easily recruit other young athletes.

80.     In fact, gym owners who are also alumni of the University of Louisville program have the ability to recruit athletes from across the country regardless of where their gym is located. Athletes regularly travel, or move, to be close to a premier gym and coach, going so far as to enroll in home school to provide additional hours for training.

81.     Defendant Scott Foster moved to Greenville, South Carolina in 1999 and shortly thereafter began operating an All Star cheer gym, along with his wife, Defendant Kathy Foster.

82.     Defendant Scott Foster and Defendant Kathy Foster created World Spirit Federation (WSF) for competition cheering before ultimately selling WSF to Defendant Varsity Brands in 2006.

83.     In 2007, Defendant Scott Foster and Defendant Kathy Foster started Rockstar Cheer & Dance, Inc., a gym to coach competition cheer, whose mission was: "To provide a structured environment of competitive cheerleading while accomplishing our goals […] to teach

dedication, commitment, self-confidence, teamwork, discipline, responsibility, and leadership in a family-friendly, safe and fun environment."

84.    Defendant Rockstar's cheer gym was certified by Defendant USASF as meeting certain All-Star standards with respect to coach credentials, program quality, and athlete safety that families could trust based on the branding and business model of the Varsity and USASF competition cheer world.

85.    Defendant Rockstar's team, Beatles, was known as one of the best teams in the country, and Defendants Scott and Kathy Foster were able to recruit athletes nationwide.

86.    In 2019, Beatles won Defendant Varsity's coveted World Championship title. This further elevated Rockstar's status and made the team one of the most lucrative to the Varsity Defendants.

87.    At all times relevant to this complaint, Defendant Rockstar remained in lock step with the Varsity Defendants, competing at the Varsity Defendants' events, purchasing the Varsity Defendants' merchandise, participating in the Varsity University training conferences, and, by virtue of competing in Varsity events, mandating that Defendant Rockstar athletes become members of Defendant USASF, including paying USASF annual dues.

88.    To provide the Varsity Defendants with a continuous supply of new athletes, as well as to ensure that Defendant Rockstar had a rotation of new athletes, and commensurate revenue, Defendants Scott Foster and Kathy Foster would offer their coaching services to local schools in the Greenville community.

89.    By so doing, and upon information and belief, Defendant Scott Foster would find a new class of victims, all while ensuring that he had the requisite number of new athletes to meet his agreements with the Varsity Defendants for competition attendance.

90.     Meanwhile, the Varsity Defendants and Defendant USASF, and, by virtue of their acquisition, ownership, and control, Defendant Bain Capital, were made aware of serious and disturbing allegations related to many of the Varsity coaches including Defendant Scott Foster.

91.     For instance, members of Scott Foster's gym brought to the attention of the Varsity Defendants that Defendant Scott Foster was engaging in illicit conduct with his underage athletes, offering them alcohol.

92.     In addition, during this same timeframe, Defendant Scott Foster was also paying for an apartment for his athletes where some of them would live, and where minor athletes would gather to do drugs and drink alcohol with and without Defendant Foster.

93.     Defendant Scott Foster also used his position of power within the Varsity Defendants' network to message underage athletes and to arrange meet-ups with these athletes at the Varsity competitions.

94.     During at least two of these competitions, Defendant Scott Foster engaged in illicit sexual acts with underage athletes who were not old enough to provide consent.

95.     Defendant Scott Foster's conduct was not isolated, nor unknown to the Varsity Defendants, or Defendant USASF. In fact, in or around 2019, Defendant Scott Foster was suspended when he was caught on video drinking with minor members of his teams.

96.     Despite his suspension, Defendant Foster was allowed to attend the Varsity Defendants' competitions, and further continued to coach in his gym although the suspension should have effectively prohibited him from doing so.

## **The Enterprise**

97.     Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

98.     The unlawful acts alleged against Defendants in this Complaint were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of Defendants' business or affairs.

99.     The officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals.

100.     Each Defendant, and its respective subsidiaries, affiliates and agents operated as a single unified entity with the common goal of taking millions of dollars from families with minor athletes who wanted to be a part of the competitive cheer world Defendants oversee, as well as to perpetuate a pipeline of new child-athletes each one of whom represented a substantial stream of revenue to Defendants until the athlete "aged out". Defendants' Enterprise functioned as a continuing unit throughout the conspiracy and continues its operation through the filing of this Complaint.

101.     At all times relevant to the Complaint, Defendants times possessed and continue to possess an ongoing organizational structure with sufficient continuity related to the Enterprise.

102.     Each Defendant participated in the operation and management of the Enterprise.

103.     The Enterprise is separate and distinct from the pattern of racketeering activity as set forth below.

104.     Whenever in this Complaint reference is made to any act, deed, or transaction of any organization, the allegation means that the Defendants and each of them engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

105.    Individuals alleged to have engaged in misconduct in violation of the laws pleaded herein are alleged to have done so on behalf of all members of the enterprise between the Varsity Defendants, Defendant USASF, Defendant Charlesbank, Defendant Bain Capital, and Defendant Rockstar. Families who paid for their children to enter the competition cheer world did not know or did not distinguish between the corporate affiliations of different individuals. These organizations all affirmatively and collectively represent themselves as one All Star family, rather than separate parents and subsidiaries.

106.    Defendants' unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate commerce in the United States through the certification of private gyms and their coaches, as well as the organizing, promoting, and managing cheer competitions throughout the United States.

107.    The conduct alleged herein is tied to billions of dollars of interstate commerce, with the Varsity Defendants and their parents controlling at least 80% of the competitive cheer market through membership fees, gym and coaching fees, competition fees, insurance, apparel, and travel for training and competition events all over the United States and the world.

108.    During its ownership period from 2014-2018, Defendant Charlesbank conspired with the Varsity Defendants and Defendant USASF to attract young athletes throughout the United States into the competitive cheer world with the promise of a safe and superior coaching experience by joining a certified gym. Defendant Charlesbank has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so.

109.    Once ownership transferred to Defendant Bain Capital in 2018, Defendant Bain Capital conspired with the Varsity Defendants and Defendant USASF to attract young athletes throughout the United States into the competitive cheer world with the promise of a safe and

superior coaching experience by joining a certified gym. Defendant Bain Capital has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so and continues to do so as set forth herein.

110.    All Defendants were co-conspirators in a scheme to get as many families as possible to entrust their child athletes to these private gyms and coaches so that those coaches would bring the athletes to the moneymaking competitions throughout the United States during the year, knowing that they were: (a) failing to properly vet the coaches by investigating backgrounds; (b) failing to properly investigate complaints of inappropriate and criminal sexual conduct by the coaches against minors; (c) failing to report complaints of inappropriate and criminal sexual conduct against minors; (d) failing to enforce rules and regulations for chaperoning and supervision of minors; and (e) failing to enforce ineligibility due to complaints regarding athlete safety; (f) taking minor athletes across state lines for the purpose or with a reckless disregard for whether the athletes would be subjected to sexual and/or physical abuse; (g) taking minor athletes across state lines and then plying them with alcohol and drugs; (h) gathering at predetermined locations to discuss and exchange notes and information related to the enterprise including how to lure additional minor athletes and how to maximize profits; (i) creating images and videos of children under the influence of drugs and alcohol, and engaging in sex; (j) sending said images over the mails and wires.

## **The Abuse**

a.    *John Doe 1*

111.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

112.    Plaintiff John Doe 1 began to cheer in sixth grade for his All-star team in California.

113.    In addition to his gym fees, beginning in his sixth grade year, John Doe 1 was also responsible for paying an annual competition fee to the Varsity Defendants as well as an annual NSASF fee.

114.    During his 2017 to 2018 season, Plaintiff John Doe 1 moved to Las Vegas, where he joined a Level 4 BlackJacks team.

115.    During this season, Plaintiff John Doe 1's team won a number of competitions.

116.    During this same timeframe, Plaintiff John Doe 1 was aware of Scott Foster, through Foster's reputation in Defendant Varsity Spirit's community.

117.    Plaintiff John Doe 1 followed Defendant Scott Foster on social media.

118.    At the time, Plaintiff John Doe 1 was 15 years-old going on 16.

119.    Defendant Scott Foster followed Plaintiff John Doe 1 back, and began to directly message Plaintiff John Doe 1.

120.    Plaintiff John Doe 1 and Defendant Scott Foster exchanged messages for about one month before Defendant Varsity's NCA tournament. Sometime prior to the tournament, Defendant Scott Foster asked Plaintiff John Doe 1 for his phone number, and thereafter began to message Plaintiff John Doe 1 about meeting up at the NCA tournament.

121.    From the tone and tenor of the communications, Plaintiff John Doe 1 understood that Defendant Scott Foster was asking for Plaintiff John Doe 1 to engage in sexual acts.

122.    Plaintiff John Doe 1 felt uncomfortable with the exchange but also felt uncomfortable ceasing communications with such an important figure in the competitive cheer community.

123.    As the NCA tournament approached, Defendant Scott Foster asked Plaintiff John Doe 1 to send photographs of various parts of Plaintiff's body including Plaintiff's genitalia.

20

124.    Defendant Scott Foster also sent Plaintiff John Doe 1 pictures of his Defendant's body, including his penis.

125.    The Varsity tournaments, including NCA and Summit, are hosted around the country, and the Varsity Defendants set the entire agenda for the conferences including where the athletes stay when they are not competing.

126.    During Defendant Varsity's NCA tournament in 2019 Defendant Scott Foster and Plaintiff John Doe 1 had their first sexual encounter.

127.    In May of 2019, when Plaintiff John Doe 1 was sixteen years old and attending the Varsity Defendants' Summit competition in Florida, Defendant Scott Foster once again solicited sex from Plaintiff John Doe 1.

128.    When Plaintiff John Doe 1 traveled to Summit, he did not feel he could say no to Defendant Scott Foster. He performed oral sex on Defendant Scott Foster during the Summit Conference, and also received oral sex from Defendant Scott Foster.

129.    Plaintiff was sixteen years old when these incidents occurred.

130.    Following these incidents, Plaintiff John Doe Continued to attend Defendant Varsity's events, during which drugs and alcohol have always been readily available.

131.    Meanwhile, every year, Plaintiff John Doe 1 has continued to pay his membership to Defendant USASF, and has further paid his annual competition fees to the Varsity Defendants.

132.    In or around 2019, an incident came to light involving Jerry Harris, a former coach of a Varsity affiliated gym, where Harris, a Coach, was accused of soliciting sex from two fourteen-year old cheerleaders.

133.    Following this incident, the Varsity Defendants instated a requirement that any member of Defendant USASF over the age of eighteen to submit to a Varsity-sanctioned background check and watch a thirty-minute video on safety during competitions.

134.    Yet no other policies, processes, or procedures, changed. The competitions remained expositions putting together minor children with adult coaches, in unchaperoned environments with copious access to drugs and alcohol.

*b. John Doe 2*

135.    Plaintiff John Doe 2 began cheering in or around 2013 when he was in eighth grade.

136.    In 2014, Plaintiff John Doe 2 moved to Greenville, where he joined Defendant Rockstar.

137.    Almost immediately after Plaintiff John Doe 2 began to cheer for Defendant Rockstar, the male coaches began making inappropriate and vulgar comments to him.

138.    When Plaintiff John Doe 2 was sixteen, the conduct escalated to the point where two of the Rockstar coaches working for Defendant Scott Foster, and under Scott Foster's control, pressured Plaintiff John Doe 2 to send nude photographs.

139.    Eventually, Plaintiff John Doe 2 relented and sent the photos.

140.    In addition, Plaintiff John Doe 2 received nude photographs from one of his male coaches.

141.    After this, Defendant Rockstar's coaches also began to pressure Plaintiff John Doe 2 to come to the "Rockstar house," which was a house paid for by Defendant's Scott and Kathy Foster.

142.    Upon information and belief, the Rockstar house was funded in part through rebates and cash Defendant's Scott and Kathy Foster received from the copious funds paid to the Varsity Defendants by the Rockstar athletes.

143.    At all times relevant to this complaint, and to the extent of Plaintiff John Doe 2's knowledge, the Rockstar athletes and coaches, including Defendants Scott and Kathy Foster, used the "Rockstar House" to host parties, do drugs, and drink alcohol with the minor athletes.

144.    On the one occasion when Plaintiff John Doe 2 went to the Rock Star house at the request of a coach, the coach tried to engage in oral sex with Plaintiff John Doe 2 and forced Plaintiff John Doe 2 to watch pornographic videos.

145.    Plaintiff John Doe 2 was just sixteen at the time.

146.    In addition to the encounter at the Rockstar House, and receiving nude photographs from one of Defendant Scott Foster's coaches, another Rockstar coach who was at least twice Plaintiff John Doe 2's age would often invite Plaintiff John Doe 2 over and offer marijuana and alcohol.

147.    Plaintiff John Doe 2 is informed and believes that Defendants Scott Foster and Kathy Foster knew and condoned this behavior and that this behavior was actually encouraged as a way of ensuring that the athletes remained at Rockstar.

148.    In addition to the sexual abuse Plaintiff John Doe 2 endured, he also had to undergo sadistic and brutal conditioning work-outs any time that his team did not perform to the caliber that Defendant Kathy Foster expected. These work-outs would last for hours, and would leave Plaintiff John Doe 2 physically weak.

149.    These conditioning work-outs were so severe that Plaintiff John Doe 2 and his team members performed in constant fear of making Defendant Kathy Foster angry

150.    At the same time that Plaintiff John Doe 2 was improperly solicited and subjected to sexual and physical abuse, he continued to pay his annual competition fees and membership dues to the Varsity Defendants and Defendant USASF.

c. *Plaintiff Jane Doe 1*

151.    Plaintiff Jane Doe 1 began cheering in the seventh grade with Carolina All-stars.

152.    When Plaintiff Jane Doe 1 turned 15, Defendant Scott Foster came to work at Carolina All-Stars.

153.    Plaintiff Jane Doe 1 was on Defendant Scott Foster's team and he immediately began grooming her. Defendant Scott Foster would sit with Plaintiff Jane Doe 1 in his gym for hours talking to her about other athletes' sex lives. Defendant Scott Foster also asked Plaintiff Jane Doe 1 whether she had ever or had any interest in engaging in certain sexual activity, including anal sex. These sexual discussions made Plaintiff Jane Doe 1 extremely uncomfortable, but at the same time created an artificial sense of closeness with Defendant Scott Foster.

154.    When Plaintiff Jane Doe 1 was seventeen, Defendant Scott Foster told Plaintiff Jane Doe 1 he wanted to use his connections to facilitate her recruitment by University of Louisville.

155.    Before a Varsity competition, Plaintiff Jane Doe 1 traveled to University of Louisville a day early with Defendants Scott Foster and Kathy Foster.

156.    Defendants Scott Foster, Kathy Foster, and Plaintiff Jane Doe 1 arrived at the hotel a day earlier than the rest of the team. When Plaintiff Jane Doe 1 realized she forgot to pack a toothbrush, she called Defendant Scott Foster, who brought a toothbrush to her room. He then entered her room and proceeded to sit on her bed and come onto Plaintiff Jane Doe 1.

157.    During the entirety of this timeframe, Plaintiff Jane Doe 1 continued to pay competition fees to the Varsity Defendants.

d. *Plaintiff Jane Doe 2*

158.    Plaintiff Jane Doe 2 has cheered since she was 5 years old.

159.    In the 2018 season, while attending Worlds, a Varsity event, Plaintiff Jane Doe 2 was fifteen years old, when she was introduced to a male coach who was over eighteen years old.

160.    Throughout the competition, the male coach repeatedly attempted to force Plaintiff Jane Doe 2 to engage in sexual acts with him, despite the fact that she was clearly underage, and despite the fact that she repeatedly told him no.

161.    During the 2018 to 2019 season, when she was 16 years old, Plaintiff Jane Doe 2 moved to Georgia to join Stingrays and began home-schooling to keep up with her rigorous training schedule.

162.    In 2019, Plaintiff Jane Doe 2 moved to North Carolina, and began to commute to train at Rockstar Greenville.

163.    During one of her earliest practices, Plaintiff Jane Doe 2 trained with Defendant Scott Foster, who complimented her on her looks, and began almost immediately to touch her inappropriately.

164.    In the months that followed, Defendant Scott Foster, with Defendant Kathy Foster's knowledge, began to invite Plaintiff Jane Doe 2 to his house. Ultimately Plaintiff Jane Doe 2 spent the night twice. Each time, Defendant Scott Foster gave Plaintiff Jane Doe 2, a minor, drugs and alcohol.

165.    Plaintiff Jane Doe 2 was provided alcohol and drugs on numerous occasions while she cheered with Rockstar, including during competitions hosted by the Varsity Defendants and overseen by Defendant USASF.

166.    During one NCA competition, Plaintiff Jane Doe 2 recalls going to a party with other athletes at the penthouse of one of the Varsity-selected hotels. At the party, Plaintiff Jane Doe 2 drank alcohol with Defendant Scott Foster, and the other athletes, all of whom were under-age.

167.    While Plaintiff Jane Doe 2 was cheering with Defendant Rockstar, Defendant Scott Foster and his other coaches commonly gave underage athletes drugs and alcohol. This created an environment where the athletes' inhibitions were down, and also created a sense of sexual availability between the adult coaches and the child-athletes.

168.    In 2021, Plaintiff Jane Doe 2 returned to Stingrays.

169.    During the entirety of her time cheering with Defendant Rockstar, and while she was supplied alcohol and drugs by Defendant Scott Foster, she was a member of Defendant USASF, and competed at competitions sponsored, organized, and overseen by the Varsity Defendants.

170.    At no point during any Varsity competition has Plaintiff Jane Doe 2 ever been made aware of where or to whom she should go to report conduct that makes her feel unsafe or uncomfortable.

171.    Even in instances where Plaintiff Jane Doe 2 is aware of a victim making a report, the general response by the Varsity Defendants has been to dismiss the report as lacking sufficient foundation.

172.    In Plaintiff Jane Doe 2's experience, the attitude from the Varsity Defendants has been to ignore or discount victims who come forward.

e. *Plaintiff Jane Doe 3*

173.    Plaintiff Jane Doe 3 began cheering for Carolina All-Stars when she was roughly 9 years old.

174.     Beginning around the age of 11, Defendant Scott Foster became Plaintiff Jane Doe 3's coach.

175.     The abuse that is the subject of this complaint began around the time Plaintiff Jane Doe 3 was 15 or 16 years old.

176.     Plaintiff Jane Doe 3 recalls one competition where Defendant Scott Foster arranged transportation to the hotel for certain members of the team.

177.     When the team arrived at the hotel the night before the competition, Plaintiff Jane Doe 3 recalls that multiple people stayed in a single room per Defendant Scott Foster's arrangement.

178.     One such person assigned to stay in Plaintiff Jane Doe 3's room was an adult coach who climbed into bed with Plaintiff Jane Doe 3 and groped and fondled her, and digitally penetrated her. She was 16 years old at the time.

179.     Thereafter Defendant Scott Foster arranged for Plaintiff Jane Doe 3 to receive a private lesson from the same coach.

180.     Instead of training, however, the other coach took Plaintiff Jane Doe 3 to his apartment, where he gave her alcohol and marijuana, before transporting Plaintiff Jane Doe 3 to a secondary location, where he raped her.

181.     Plaintiff Jane Doe 3 did not try out the next season and ultimately dropped out of the sport because of these incidents.

182.     After she was raped by one of Defendant Foster's coaches, Defendant Foster would comment on the interaction while Plaintiff Jane Doe 3 trained at the gym, insinuating that Defendant Foster knew what happened.

183.    While Plaintiff Jane Doe 3 was still cheering for Defendant Foster, she would regularly spend time at the home of Defendants Scott and Kathy Foster, where they would all get in a hot tub together and the Fosters would provide Plaintiff Jane Doe 3 with alcohol.

184.    Plaintiff Jane Doe 3 also recalls parties that took place at the Varsity competitions where she and the other young athletes were given alcohol.

f. *Plaintiff Jane Doe 4*

185.    Plaintiff Jane Doe 4 was 9 years old when she started cheer.

186.    Around 2019, when Plaintiff Jane Do 4e was 18 years old, she left her smaller gym in Alabama to try out for Rockstar Greenville.

187.    Plaintiff Jane Doe 4 first became familiar with Rockstar Greenville because of its success at the Varsity tournaments. Varsity promoted Rockstar on its social media platforms through photos, and videos of the athletes, and interviews with coaches from the gym.

188.    When she first arrived at Rockstar Greenville, Plaintiff Jane Doe 4 she was placed on a Worlds' level team.

189.    Plaintiff Jane Doe 4 attended her first competition on behalf of Rockstar Greenville, Varsity's Battle Under the Bigtop, in December of 2019 when she traveled from Greenville to Atlanta.

190.    During this event, Plaintiff Jane Doe 4 was not staying with the rest of the room block for Rockstar, but, ordinarily, each gym is assigned specific blocks of rooms at a given hotel.

191.    After the first day of the competition, Defendant Scott Foster approached Plaintiff Jane Doe 4 and asked her to go back to his hotel room, where he proceeded to serve Plaintiff alcohol.

28

192.    On the last night of the competition, Plaintiff Jane Doe 4 once again returned to Defendant Scott Foster's room, this time accompanied by Rockstar staff as well as other underage athletes. Defendant Scott Foster served alcohol to all of the underage athletes.

193.    At some point, Defendant Foster asked Plaintiff Jane Doe 4 to go outside with him to smoke a cigarette. When they were on the staircase going outside, Defendant Foster kissed Plaintiff Jane Doe 4.

194.    Within several months, Defendant Foster and Plaintiff Jane Doe 4 were seeing one another several times a week during which time Defendant Foster would serve Plaintiff Jane Doe 4 alcohol and have sex.

195.    During this time, Defendant Scott Foster regularly solicited sex from Plaintiff Jane Doe 4, including when the team traveled across state lines for Varsity competitions. On numerous occasions, Plaintiff Jane Doe 4 would go into Defendant Scott Foster's hotel room and they would engage in sex.

196.    At the same time, Plaintiff Jane Doe 4 felt that she could not deny Defendant Foster sex, or she would be punished professionally. For instance, in one text message sent shortly before Defendant Foster's death, when Jane Doe 4 declined to travel out of town with Defendant Foster, he threatened to change her employment status from salary to hourly.

197.    This type of threat to Plaintiff Jane Doe 4's professional livelihood happened on more than one occasion.

198.    As such, Plaintiff's financial well-being was intrinsically linked with giving in to Defendant Scott Foster's demands, including engaging in sexual conduct with him.

199.    During nearly every encounter Plaintiff had with Defendant Foster outside of the gym, including during the time she was not yet 21, Defendant Scott Foster served her alcohol.

200. In addition, Plaintiff Jane Doe 4 regularly saw Defendant Scott Foster serve alcohol to minor athletes.

201. During the entire time that Plaintiff Jane Doe 4 was cheering and working for Defendant Scott Foster, and competing at the Varsity Defendants' events, she was a member of the USASF.

## JOINT AND SEVERAL LIABILITY

202. Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiffs, as Defendants' individual and collective actions and omissions actually and proximately caused his death. Plaintiffs are entitled to damages pursuant to the laws of the State of South Carolina and the United States of America, including but not limited to the following:

    a. Compensatory, actual, and consequential damages;

    b. Punitive damages;

    c. Reasonable attorneys' fees and costs;

    d. Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT I
### VIOLATION OF THE PROTECTING YOUNG VICTIMS FROM SEXUAL ABUSE ACT, 18 U.S.C. §2255
### (ALL DEFENDANTS)

203. Plaintiff hereby realleges the preceding paragraphs as if repeated verbatim herein.

204. This claim is brought against all Defendants, with the specific acts complained of performed against minors by Defendant Scott Foster and other Unknown Defendants, with the specific knowledge and aid of Defendant Kathy Foster, and enabled by the ongoing certification of the Varsity Defendants, Defendant USASF, Defendant Charlesbank, and Defendant Bain Capital.

205.    Under the statue, a covered individual means an adult who is authorized, by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization."

206.    Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

207.    Defendant Scott Foster, Defendant Kathy Foster, and the other Unknown Defendants, qualify as covered individuals and the facts of this case bear out that abuse occurred at events defined by the statute. These Defendants were held out by the Varsity Defendants, Defendant USASF, Defendant Charlesbank, and Defendant Bain Capital as being part of a network of safe and trustworthy cheer coaching gyms.

208.    Plaintiffs were minors at the time they were sexually abused and assaulted, sexually exploited, transported across state lines for illegal sexual activity, and used in creating illegal and obscene digital materials in contravention of 18 U.S.C §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223, thus constituting violations of 18 U.S.C. §2255.

209.    Plaintiffs have suffered personal injuries as a result of these violations of law.

210.    Plaintiffs are entitled to damages pursuant to the laws of United States of America, including but not limited to the following:

    a.    Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

    b.    Reasonable attorneys' fees and costs;

    c.    Punitive damages; and

d.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT II
### FOR CIVIL CONSPIRACY IN VIOLATION OF THE RICO ACT PURSUANT TO 18 U.S.C. §1962(c) and §1962(d)
### (ALL DEFENDANTS)

211.  Plaintiffs hereby reallege the preceding paragraphs as if repeated verbatim herein.

212.  This count is brought against all Defendants.

213.  United States law makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…" 18 U.S.C. §1962(c).

214.  Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each of them is capable of holding, and does hold, "a legal or beneficial interest in property."

215.  Defendants' activities include at least two (2) acts of racketeering activity since at least 2003. Accordingly, Defendants' conduct constitutes a pattern of racketeering activity. 18 U.S.C. § 1961(5).

216.  The racketeering activity is set forth in paragraphs 36-48; 49-96; 97-110; 111-201 and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 18 U.S.C §§ 2241©, 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223 (sexual exploitation of minors and creating obscene materials) as set forth in paragraph 185.

217.  In or around 2003, the Varsity Defendants, Defendant USASF, Defendant Rockstar, Defendant Scott Foster, and Defendant Kathy Foster formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

218.    This enterprise as previously described in this Complaint, consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiffs as minor athletes while assuring their parents they were particularly safe in order to take their money.

219.    In 2014, Defendant Charlesbank joined this enterprise and funded its purpose.

220.    In 2018, Defendants Bain Capital took over a role in this enterprise in place of Defendant Charlesbank and continued to fund its purpose.

221.    These Defendants committed the predicate acts of child sexual exploitation, kidnapping, dealing in obscene materials involving minors, and wire fraud as set forth in paragraphs 36-48; 49-96; 97-110; 111-201, *supra.*

222.    The funding, materials, and premises provided by the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital and the communication of particular trust and safety carried out by Defendant USASF facilitated the commission of these predicate acts by Defendant Rockstar, Defendant Scott Foster, Defendant Kathy Foster, and other Unknown Defendants in the commission of crimes against children.

223.    The Defendants knew or should have known that inappropriate contact was occurring between coaches and minor athletes based on the one-on-one coaching being marketed and the travel of these children across state lines with the coaches who stayed in hotel rooms with them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

224.    The Defendants owed a duty to the minor Plaintiffs, and their families, to disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

225.    The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

226.    Plaintiff is entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

  e.    Compensatory, actual, and consequential damages, trebled in accordance with the statute;

  f.    Reasonable attorneys' fees and costs;

  g.    Punitive damages; and

  h.    Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## COUNT III
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §39-5-20
(VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT ROCKSTAR, DEFENDANT SCOTT FOSTER, AND DEFENDANT KATHY FOSTER)**

227.    Plaintiffs hereby reallege the preceding paragraphs as if repeated verbatim herein.

228.    At all times relevant to this complaint, the above-named Defendants entered into a contractual relationship with the Plaintiffs and their families, taking fees for membership, training, competition and travel, while promising safe environments and vetted coaches.

229.    The safety and trust touted by these Defendants to Plaintiffs and their families was a material facet of their business model, causing Plaintiffs and their families to pay copious fees for years, all while their children were knowingly being sexually abused and exploited.

230.    When the Defendants obtained knowledge of complaints about certain inappropriate or illegal activity with minors, they failed to report those acts or to take corrective

actions while continuing to tout safety and trust to support an ongoing stream of financial benefit from families whose children, unbeknownst to them, were being sexually abused and exploited.

231.    S.C. Code Ann. § 39-5-20 prohibits unfair or deceptive acts related to consumers.

232.    The conduct set forth above and herein is capable of repetition, as evidenced by the fact that numerous Plaintiffs have come forward with similar information related to Defendants' conduct, failures, acts, and/or omissions in overseeing, enforcing, and providing a secure and safe environment for Plaintiffs and other child-athletes.

233.    The foregoing constitutes deceptive acts under the Unfair Trade Practices Act statute.

234.    Plaintiff is entitled to damages pursuant to the laws of the State of South Carolina, including but not limited to the following:

      i.    Compensatory, actual, and consequential damages, trebled in accordance wirth the statute;

      j.    Reasonable attorneys' fees and costs;

      k.    Punitive damages; and

      l.    Any and all other and further relief as this Court may deem appropriate including pre and post-judgment interest.

**COUNT IV**
**GROSS NEGLIGENCE**
**(ALL DEFENDANTS)**

235.    Plaintiffs hereby reallege the preceding paragraphs as though repeated verbatim herein.

236.    Plaintiffs bring this claim for gross negligence against all Defendants.

237.     Defendants are aware that there are dangers to one-on-one training by coaches of minor athletes. They have created rules about one-on-one training being inappropriate and unsafe and a policy about not being out of the line of sight of another adult.

238.     Despite this, they are all aware that one-on-one coaching happens every day among USASF certified coaches at private gyms.

239.     Defendants know, in fact, that one-on-one coaching is an enhanced feature of private gym cheer coaching that generates a great deal of money for all Defendants in the enterprise with the promise of greater success for the minor athlete.

240.     Defendants are also aware of the close personal relationships many of these coaches form with the minor athletes that are entrusted to them based on their promises of coach vetting, trust, and safety.

241.     Defendants are further aware that, despite the known dangers, coaches routinely travel alone with minors across state lines, even staying in the same hotel rooms with no other chaperone, during these moneymaking cheer competition events which enrich the enterprise.

242.     And when complaints or reports have surfaced, or social media images and videos circulated depicting illegal activity with minors, the Defendants sweep it under the rug, do not report to any agencies, do not strip coaches of their eligibility, and often rally around coaches who have been accused of illegal conduct with minors, even ostracizing families who have complained or reported.

243.     Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiffs, and actually and proximately contributed to and/or caused damages.

244.    Defendants' actions and omissions as described above, by and through its authorized agents, were in violation of its own policies.

245.    Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

246.    Plaintiff is entitled to damages pursuant to the laws of South Carolina, including but not limiting to the following:

a.    Compensatory, actual, and consequential damages;

b.    Punitive damages; and

c.    Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

### COUNT V
### NEGLIGENT SUPERVISION
### (VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT ROCKSTAR, DEFENDANT KATHY FOSTER)

247.    Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

248.    This claim is brought on behalf of the individual Plaintiffs who have been subjected to sexual abuse, assault and battery, and transportation across state lines for the purpose of sexual exploitation.

249.    Despite claiming to check backgrounds and remove eligibility certification from coaches or gyms where complaints or reports of the foregoing conduct have been made, Defendants continue to let these gyms and coaches operate in order to generate income for the enterprise.

250.    Furthermore, Defendants fail to report these criminal activities to law enforcement agencies in favor of preserving the reputation of the enterprise so that trust in its safety continues to generate income for the enterprise.

251.    Defendants, in making it their business model to tout trust and safety of private gyms and coaches they certify to bring cheer athletes into their world of competition, specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network they oversaw.

252.    Defendants breached this duty by allowing gyms where reports of abuse of minors were occurring to continue to operate under their flag, and even allowing coaches who were accused of such conduct to remain working with minor athletes.

253.    Defendant USASF allows gyms to unilaterally change owners of its certified gyms when there has been an athlete safety issue reported against one of its coaches. It further does not follow up on the reasoning why these changes are made, who is actually operating the gym, and whether or not a noneligible coach, even those under criminal investigation, is continuing to work with minor cheer competitors.

254.    The injury to Plaintiffs was caused directly and proximately by Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein.

255.    As a direct and proximate result of Defendants' conduct, the Plaintiffs have been damaged.

256.    Plaintiffs are therefore entitled to a judgment against Defendants, and for such actual and consequential damages in an amount to be determined by a jury trial.

## COUNT VI
## ASSAULT/BATTERY
## (DEFENDANT ROCKSTAR, DEFENDANT SCOTT FOSTER, UNKNOWN DEFENDANTS)

257.    Plaintiffs hereby reallege the foregoing paragraphs as though repeated verbatim herein.

258.    Defendant Scott Foster, as owner and operator of Defendant Rockstar, along with other Unknown Defendants who he provided access to minor athletes who joined his gym and hired him for coaching, did illegally commit unwanted and nonconsensual sexual touching of the Plaintiffs and others.

259.    Said touching constituted sexual assault and sexual battery on these named Plaintiffs and others.

260.    As a direct and proximate result of these Defendants' conduct, set forth more expressly above, Plaintiffs experienced bodily injury, physical pain and suffering, and mental anguish and are entitled to an award of actual damages in an amount to be determined through a trial of this matter.

### COUNT VII
### BREACH OF CONTRACT
### (AS TO THE VARSITY DEFENDANTS AND DEFENDANTS USASF)

261.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

262.    At all times relevant to this complaint, Plaintiffs had duly executed contracts with the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiffs, Defendants agreed to provide a competitive environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

263.    As set forth herein, during the course of these contractual agreements, Plaintiffs were subjected to severe and oppressive abuse, physically and mentally, including during competitions hosted by the Varsity Defendants under the governance of Defendant USASF.

264.    During the term of these agreements, the Varsity Defendants and Defendant USASF failed to provide Plaintiffs with a safe and secure environment, including by enforcing the policies, procedures, and policies expressly adopted by Defendant USASF.

265.    These failures on the parts of the Varsity Defendants and Defendant USASF constitute violations of the fundamental and material terms of the agreements between Plaintiffs, and the Varsity Defendants and Defendant USASF.

266.    The Varsity Defendants' and Defendant USASF's failures were so egregious and unconscionable as to render the agreements null and void.

267.    As such, Plaintiffs seek an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants' and Plaintiffs, rescinding said contracts, and remitting the valuable consideration Plaintiffs paid to Defendants during the relevant timeframe, as well as for all such attorney's fees, costs, and interest to which Plaintiff's may be entitled.

## COUNT VIII
## UNJUST ENRICHMENT
### (AS TO DEFENDANTS ROCKSTAR, VARSITY, BAIN CAPITAL, AND USASF)

268.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

269.    As set forth herein, the cheer industry represents a multi-billion dollar enterprise where each young athlete spends tens of thousands of dollars during the length of their student-athlete career toward gym memberships, private lessons, uniforms, accessories, competition fees, and membership with USASF.

270.    At all times relevant to this complaint, Plaintiffs conferred non-gratuitous benefits upon Defendants including annual competition and membership fees, as well as continuous revenue toward uniforms, accessories, private training, and other monetary benefits.

271.    Defendants realized the value of these benefits, including steady annual revenue per athlete.

272.     To date, none of the benefits Defendants realized have been returned or otherwise disgorged.

273.     Under the circumstances set forth herein and above, it would be inequitable for Defendants to retain the benefits conferred by Plaintiffs including through Plaintiffs' annual membership fees and competition fees.

274.     Plaintiffs are therefore entitled as a matter of equity to recover these benefits from Defendants and for all such additional relief as this Court deems proper.

## COUNT IX
### FRAUD
### (AS TO DEFENDANTS ROCKSTAR, THE VARSITY DEFENDANTS, AND DEFENDANT USASF)

275.     Plaintiff realleges the preceding paragraphs as though repeated verbatim.

276.     At all times relevant to this complaint, Plaintiffs were parties to numerous annual contracts whereby Plaintiffs agreed to pay Defendants annual and recurring fees in exchange for a safe competitive environment and training facility.

277.     As part of the agreements, Defendants represented to Plaintiffs that Defendants would be responsible for ensuring a sage environment for Plaintiffs including an environment free from sexual, physical, and mental harm and exploitation.

278.     Defendants' promises were material to Plaintiffs' agreements, without which no agreements would have existed.

279.     Plaintiffs had a right to rely upon Defendants' promises.

280.     As set forth herein, even at the time they entered into the agreements with Plaintiff, Defendants knew or had a reckless disregard for whether the environment they provided at competitions was safe and free from harm and sexual, physical and mental abuse.

281.   In fact, at all times relevant to this complaint, Defendants knew that the environment they provided actually facilitated access to underage athletes by predators, including coaches, choreographers, and other adults.

282.   Yet, with knowledge or a reckless disregard for whether Defendants' were providing safe environments for child athletes, Defendants nevertheless entered into the agreements and began collecting fees from Plaintiff.

283.   Upon information and belief, Defendants' misrepresentations included, without limitation:

a.   Certifying to Plaintiffs that they were responsible for providing safe competitive environments;

b.   Certifying to Plaintiffs and their families that the adults involved in the competitions, including coaches who were allowed to participate in competitions, had been duly vetted;

c.   Allowing coaches to continue participating and accessing child-athletes even after Defendants' knew the coaches had exhibited disturbing behavior, such as providing alcohol and drugs to minors;

d.   Facilitating an unchaperoned environment for child-athletes;

e.   Fostering a party culture for child athletes, including an environment where alcohol and drugs were readily available;

f.   Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

g.   Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

h.  Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

i.  Such additional conduct as may be revealed during discovery and the trial of this case.

284.  As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain significant injuries and damages.

285.  Plaintiff now seeks an order from this court setting aside the agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiffs for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award the following damages, jointly and severally against Defendants, as provided by United States law and South Carolina law, including but not limited to the following:

a.  Compensatory, actual, and consequential damages to Plaintiffs, trebled where permitted by statute;

b.  Costs of this action and attorneys' fees to Plaintiffs;

c.  Punitive damages where permitted by statute; and,

d.  Any and all other and further relief as this Court may deem appropriate.

## TRIAL BY JURY

WHEREFORE, Plaintiff hereby demands a trial by jury on all issues so triable.

STROM LAW FIRM, LLC

*s/ Bakari T. Sellers*

Bakari T. Sellers (SC Fed. ID No. 11099)
Joseph Preston Strom (SC Fed. ID No. 4354)
Mario A. Pacella (SC Fed. ID No. 7538)
Amy E. Willbanks (SC Fed. ID No. 13537)
Jessica L. Fickling (SC Fed. ID No. 11403)
Alexandra Benevento (SC Fed. ID No. 10734)
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone:  (803) 252-4800
Email: bsellers@stromlaw.com
        petestrom@stromlaw.com
        mpacella@stromlaw.com
        awillbanks@stromlaw.com
        jfickling@stromlaw.com
        abenevento@stromlaw.com

*Attorneys for Plaintiffs*

September 1, 2022