# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| John Doe 3[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Varsity Brands, LLC, Varsity Spirit, LLC, | ) | |
| Varsity Brands Holding Company, Inc., | ) | **COMPLAINT** |
| U.S. All Star Federation, Inc. d/b/a U.S. | ) | **(JURY DEMAND)** |
| All Star Federation, USA Federation | ) | |
| for Sport Cheering d/b/a USA Cheer, | ) | |
| Charlesbank Capital Partners, LP, Bain | ) | |
| Capital, LP, Jeff Webb, individually, | ) | |
| Rockstar Cheer & Dance, Inc., Katherine | ) | |
| Anne Foster as the personal representative | ) | |
| of the Estate of Scott Foster, Kathy Foster, | ) | |
| Traevon Black a/k/a Trey Black n/k/a | ) | |
| Tracey Black, Jarred Carruba, and other | ) | |
| unknown defendants, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## STATEMENT OF THE CASE

Plaintiff files this complaint by and through undersigned counsel of record against the above-named Defendants for money damages in connection with conduct: (1) in violation of the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, 18 U.S.C. §2255; (2) constituting a civil conspiracy in violation of the Racketeer Influenced and Corrupt Organization (RICO) Act, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §1962(c) and (d); (3) in violation of the South Carolina Unfair Trade Practices Act, S.C. Code

---

[1] Given the nature of the subject matter as well as the potential for harm that exists against those who come forward to inform against Defendants, the Plaintiffs in this matter will be identified only as Jane Does or John Does in conjunction with the factual underpinnings on this complaint. *See B.R. v. F.C.S.B.*, 17 F.4th 485 (4th Cir. 2021).

Ann. §39-5-20; and (4) giving rise to common law claims of gross negligence, negligent supervision, and assault/battery; and (5) constituting violations of contractual and/or equitable responsibilities owed to Plaintiff. As a direct and proximate result of Defendants' collective and individual conduct, Plaintiff sustained and will continue to sustain actual and ongoing injuries and damages, and in support thereof he alleges as follows:

## INTRODUCTION

1.      For over 20 years, Scott Foster operated, managed, and coached young cheerleaders from across the United States.

2.      On August 22, 2022, Scott Foster died of a self-inflicted gunshot wound near his home in Greenville, South Carolina.

3.      At the time of his death, Foster, along with his wife, Kathy Foster, were the owners of a pre-eminent cheerleading gym and coaching empire in the upstate of South Carolina. Upon information and belief, Mr. Foster had recently learned of an investigation against him related to allegations that he was sexually abusing underage athletes, as well as taking underage athletes across state lines for the purposes of engaging in sex.

4.      Foster's death opened a deluge of allegations against not only Scott Foster, but also against his wife Kathy Foster, their gym, Rockstar Greenville and other Rockstar affiliated gyms, as well as Varsity Brands, LLC, Varsity Brands Holding Company, Varsity Spirit, LLC[2], parent company Bain Capital, LP and their governing bodies, the United States All-Star Federation ("USASF") and USA Cheer[3] (collectively "the Defendants").

---

[2] As used herein, Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, Inc., shall be referred to collectively as "the Varsity Defendants."
[3] USA Federation for Sport Cheering d/b/a USA Cheer

5.      Upon information and belief, at all times relevant to this complaint, Defendants established a competitive environment soliciting young athletes to cross state lines with minimal parental or adult supervision to converge at pre-scheduled locations where these athletes were then exposed to drugs, alcohol, and predatory conduct by adults, including coaches and choreographers, all while publicly representing that Defendants were providing a culture of safety at these same events.

6.      Upon information and belief, the Rockstar Greenville Defendants, along with other gyms and coaches were empowered and placed in positions of trust and authority by the Varsity Defendants, all while the Varsity Defendants knew or should have known that these same coaches and gyms were pervasively abusing their athletes.

7.      Upon information and belief, the scheme to anoint specific coaches and disregard safety protocols was part of an elaborate plan by the Varsity Defendants to create a pipeline of young athletes, each of whom represented a significant stream of revenue for the Varsity Defendants' business worth billions of dollars.

8.      As set forth in this complaint, the Rockstar Greenville Defendants, the Varsity Defendants, and Defendants Bain Capital and Charlesbank, together and individually have created, organized, and propagated a system of young-athlete abuse against innocent victims including Plaintiff John Doe 3.

9.      This is a complaint for legal and equitable relief for the victims of this scheme.

## JURISDICTION, PARTIES, AND VENUE

10.      This action arises pursuant to, and involves questions requiring the interpretation of, the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

11.     Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

12.     At all times relevant to this complaint, Plaintiff John Doe 3 was a citizen and resident of Clemson, South Carolina.

13.     Upon information and belief, at all times relevant to this complaint, Defendant Scott Foster, deceased, was a resident of Greenville County, South Carolina, and co-owned and co-operated Defendant Rock Star Cheer and Dance, Inc.

14.     At all times relevant to this complaint, Kathy Foster was the duly appointed personal representative of the Estate of Scott Tyler Foster, 2022-ES-23-02552, having been so appointed by the Greenville County Probate Court on September 7, 2022.

15.     Upon information and belief, at all times relevant to this complaint, Defendant Kathy Foster was a resident of Greenville County, South Carolina, and co-owned, co-operated, managed and/or controlled Defendant Rock Star Cheer and Dance, Inc.

16.     Upon information and belief, at all times relevant to this complaint, Defendant Jarred Carruba was a coach at Defendant Rockstar in Greenville, South Carolina, and a Scott Foster protégé, operating in the course and scope of his employment for Defendant Rockstar, as well as Defendants Scott and Kathy Foster.

17.     Upon information and belief, at all times relevant to this complaint, Defendant Trayvon a/k/a Tracey Black was a coach at Defendant Rockstar in Greenville, South Carolina, and a Scott Foster protégé, operating in the course and scope of his employment for Defendant Rockstar, as well as Defendants Scott and Kathy Foster.

18.     Defendant Rockstar Cheer and Dance, Inc. ("Defendant Rockstar") is incorporated under the laws of the State of South Carolina with its principal place of business and registered

4

agent in Greenville County, South Carolina, and doing business in gyms located across the United States including gyms in: Greenville County, South Carolina; Kershaw County, South Carolina; Berkeley County, South Carolina; Catawba County, North Carolina; Pasquotank County, North Carolina; Wake County, North Carolina; Cherokee County, Georgia; Henry County, Georgia; Kent County, Rhode Island; Franklin County, Pennsylvania; Cuyahoga County, Ohio; and Pinal County, Arizona.

19.     At all times relevant to this complaint, Defendant Jeff Webb ("Defendant Webb") was a citizen of Memphis, Tennessee, and created, owned, operated, and controlled Defendant Varsity Brands, LLC, Defendant Varsity Spirit, LLC, Defendant Varsity Brands Holding Company, Inc., Defendant USASF, and Defendant USA Cheer, all of which did business throughout the United States.

20.     At all times relevant to this complaint, Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) ("Defendant Varsity Brands") has been a for-profit entity organized under the laws of Delaware with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation).

21.     At all times relevant to this complaint, Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) ("Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee.

22.     At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. ("Defendant Varsity Brands Holding") has been a for-profit entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas.

23.     Throughout this complaint, Defendants Varsity Spirit, LLC, Varsity Brands, LLC and Varsity Brands Holding Company, Inc., shall be referred to as the Varsity Defendants. At all

times relevant to this Complaint, either directly or through its affiliates, including those it wholly owns and/or controls, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, cheer camps, and competitions throughout the United States including in South Carolina.

24.    Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation (hereinafter "Defendant USASF") is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. Defendant USASF is controlled and funded by the Varsity Defendants as described further herein.

25.    At all times relevant to this Complaint, Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer") has been a non-profit entity organized and existing in the state of Texas, and the governing body for sport cheering throughout the United States.

26.    At all times relevant to this Complaint, Defendants USASF and USA Cheer either directly and/or through their affiliates, which they control, have: (a) promulgated and/or enforced rules governing competitive cheer coaching, competitive cheer training, cheer camps and competitions throughout the United States; and (b) organized, promoted, produced, and/or managed cheer camps and competitions throughout the United States and furthered the goals and purposes of the conspiracy and conduct set forth herein.

27.    Defendant Charlesbank Capital Partners, LP (hereinafter "Defendant Charlesbank") has been a for-profit entity organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts. At all times relevant to this complaint, Defendant Charlesbank has been a minority and/or majority owner of the Varsity Defendants.

28.     Defendant Bain Capital, LP (hereinafter "Defendant Bain Capital") is a for-profit, publicly traded entity organized under the laws of Massachusetts, with its principal place of business in Boston, Suffolk County, Massachusetts. At all times relevant to this complaint, Defendant Bain Capital has been a majority owner of the Varsity Defendants.

29.     Venue is proper in the United States District Court for the District of South Carolina, Greenville Division, pursuant to 28 U.S.C. §1391 as at least one of the Defendants is a resident of Greenville, South Carolina, or corporation organized and existing, and with a principal place of business in Greenville, South Carolina, and a substantial portion of the acts and omissions complained of occurred in this district.

## FACTUAL ALLEGATIONS

### The Competitive Cheer World

30.     The cheer world has two primary aspects: scholastic, or school-based cheer, and private cheer, known as "All-stars."

31.     In competitive cheer in both private and school settings, athletes perform routines lasting for 2 minutes and 30 seconds that incorporate gymnastics/tumbling, stunts, pyramids, tossing, cheer, and dance routines all set to music.

32.     In contrast to traditional sideline cheer, which typically coincides with and supports a larger sporting event, competitive cheer is a focus unto itself.

33.     Competitive cheer requires an extreme amount of commitment from athletes and their families, with near constant training, cross-training, and frequent competition travel through multiple seasons throughout the year.

34.     This level of dedication is costly. A single season can, at minimum, cost between $3,000 to $7,000 per team member. Some families spend $20,000 or more for transportation,

7

lodging, membership and entrance fees, as well as merchandise, uniforms, and other accessories and incidentals, incurred in connection with the numerous competitions the athletes attend throughout the year.

35.    The competitive cheer industry is enormous, comprising an estimated four million athletes throughout the United States.

36.    Given the costs of participating and competing, the competitive cheer industry is worth billions of dollars annually.

37.    In fact, by its last estimate, Defendant Bain Capital reported Defendant Varsity Spirit's annual earning exceed $1.3 billion.

38.    In this world, cheer camps, clinics, and competitions are held locally, regionally, nationally, and even worldwide, and frequently require athletes to travel across state lines. These events are hosted and conducted under the guidance, certification, and rulemaking of a group of entities created, controlled, and funded by the Varsity Defendants.

39.    In 1971, Defendant Jeff Webb began his work in cheerleading as an employee at the National Cheerleaders Association working for Lawrence Herkimer, known as the original pioneer of cheer.

40.    During his work with Herkimer, Defendant Webb familiarized himself and began forming a plan to monetize the operation of cheerleading "camps" – days-long events where athletes would converge to learn new skills.

41.    In 1974, Defendant Webb left Herkimer and formed his own group, which he similarly named the Universal Cheerleaders Association. By and through Universal Cheerleaders Association, Defendant Webb grew his footprint in the cheer industry, promoting and showcasing his cheer camps, which grew throughout the 1980s.

42.     During the 1980s, Defendant Webb's cheer camp organization transformed into Varsity Spirit.

43.     As with Herkimer's association, Varsity Spirit began as a provider of cheer camps. The company would quickly expand into apparel, organizing competitions, and operating sanctioning boards in addition to the camps.

44.     Today, Varsity Spirit and its affiliates and subsidiaries, include branding and merchandise, competitions, and camps, as well as the regulatory side of cheer by and through USASF and USA Cheer.

45.     Through their various dealings in the cheer industry, at all times relevant to this complaint, the Varsity Defendants have controlled an estimated 80-90% of the market.

46.     In 2003, a group of All-Star cheerleading coaches formed an independent 501(c)(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for All-Star cheerleading. The group, which would promote both Varsity and non-Varsity events, met in Atlanta and created the first set of universal All-Star cheerleading rules.

47.     Within a week, Defendant Jeff Webb founded Defendant USASF.

48.     After forming Defendant USASF, Defendant Webb mandated that All-Star athletes cheering on behalf of Varsity-affiliated gyms purchase a USASF membership as a requirement to competing at Varsity-sponsored events.

49.     The NACCC found itself unable to compete with the Varsity Defendants based on this requirement. Defendant Webb proposed a merger, which informally took place in his board room in Memphis without the board of directors present. Reportedly, NACCC would become the "rules committee" of the USASF in perpetuity. However, despite this agreement, just a few years

after the merger, the NACCC arm of USASF was dissolved and all rulemaking for All-Star cheer becoming vested in USASF.

50.    At the same time, in or around 2006, the Varsity Defendants promoted certain All-Star member gyms as being "USASF Certified", a seal that the industry represented as synonymous with a warranty that the gym, its coaches, and its choreographers were safe, and followed best practices including to prevent athlete abuse.

51.    Meanwhile, athletes cheering for a Varsity-affiliated gym were required to buy their uniforms, accessories, and other apparel from their gym. The Varsity Defendants require gyms to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit, LLC for buying their merchandise and for sending athletes to Varsity events.

52.    The Varsity Defendants control every aspect of cheerleading at every level in the United States. The Varsity Defendants even own a number of gyms and cheer programs.

53.    All-Star athletes competing on behalf of Varsity-associated gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees.

54.    Gyms and coaches likewise pay monthly or annual fees to USASF, USA Cheer and the Varsity Defendants.

55.    Athletes are also unable to transfer from one Varsity-affiliated gym to another without permission. This restriction in the athlete's ability to select a gym of their choice after initially agreeing to cheer for a Varsity-gym inhibits athletes from reporting misconduct.

56.    To this day, Defendant Webb remains intimately involved and interested in the ongoing affairs of the Varsity Defendants. Jackie Kennedy, Varsity Spirit's VP of marketing, said of Defendant Webb in January of 2019, "Jeff is still teaching and leading camps alongside our

summer camp instructors. His passion permeates into all of the people here at Varsity Spirit, and Jeff cares about every single employee. He takes the time to meet every new employee. He learns their name, where they are from and what they are passionate about."

57.     At all times relevant to this complaint, the Varsity Defendants and their co-conspirators used private All Star cheer gyms like Defendant Rockstar to gain access to paying athletes and their families, marketing that membership in a USASF Certified gym will provide the athlete with access to the highest echelon competitions in the sport under strict safety standards.

58.     Meanwhile, membership in USASF, and with a Varsity-affiliated gym mandates competing in a specified number of annual varsity events.

59.     The Varsity Defendants encourage gyms to attend a minimum number of events annually in exchange for cash rebates and other incentives.

60.     When attending a Varsity event, members and their families are required to purchase rooms at a designated Varsity-chosen hotel at what many families complain are inflated prices. This scheme is referred to in the cheer community as a "stay-to-play" system. Failure to utilize the Varsity room rate subjects the athlete to disqualification from the Varsity competition.

61.     At most of these events, the Varsity Defendants sell alcohol.

62.     Moreover, and at all times relevant to this complaint, at most of these events, the Varsity Defendants know or have reason to know that minor athletes are being exposed to drugs and alcohol while attending the events.

63.     In addition to mandating exclusive participation in Varsity events, once young athletes join Varsity-supported, USASF All Star cheer gyms, coaches and other gym staff begin suggesting one-on-one coaching time, or closed choreography time where the parent is not allowed to attend.  This intensive personal training is offered with the promise to help the athlete rise to the

next level, compete in higher divisions, win prestige and celebrity status that will enable them to cheer at the collegiate level, and possibly become coaches themselves one day. This system of promoting intensive one-on-one time with the athletes gives coaches and staff increased access to young and impressionable athletes, and corresponds to a pipeline of young athletes to fund the Varsity Defendants' system of camps and competitions, and to create future generations of Varsity coaches and Varsity-backed gyms.

64.    The Varsity Defendants and their certified gyms encourage members to pay these fees, dues, and other expenses via auto-draft or credit card.

65.    The success and celebrity status promised to these athletes was further monetized in 2011 through "Cheerlebrity," created by Defendant Scott Foster, which became the impetus behind the Netflix show "Cheer" that propelled Jerry Harris to fame.

66.    Cheerlebrity was a competition created by the Varsity Defendants in the image of *American Idol* which sought to promote cheer, Varsity, and All-Star gyms through a social media presence by participating cheerleaders.

67.    Upon information and belief, Defendant Foster was well-known in the Varsity Spirit, LLC community, enjoying status and promotion on the Varsity Defendants' social media platforms. As such, and at all times relevant to this complaint, the Varsity Defendants, boosted Defendant Foster's reputation in the cheer community to obtain access to new crops of minor athletes, to boost revenues, and to boost their reputations and footprint in the cheer world.

68.    To further perpetuate this connection between athletes and coaches backed by the Varsity Defendants, upon information and belief, the Varsity Defendants encouraged parents to allow their children to travel to camps and competitions with only the coaches, choreographers, and gym owners, and further encouraged minor athletes to look up to these leaders in their sport.

69.     The Varsity Defendants, Defendant USA Cheer and Defendant USASF tout the safety and security of their gyms, competitions, and camps to lull parents into comfort whereby parents have no fear for the safety of their children who train with Varsity-supported coaches, at Varsity-affiliated gyms, and who travel out of state to hotels for competitions throughout the year.

70.     The Varsity gym network also encourages athletes to relocate to sponsor or host families who are either coaches, gym owners, or live near top-ranked Varsity sponsored gyms.

71.     The system is designed to disassociate the athletes from their families, and foster closeness with the Varsity-sponsored gyms, coaches, and gym owners.

72.     Thus, to perpetuate their scheme to create an unending pipeline of new athletes, coaches, and gym owners, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, Defendant USA Cheer and Defendant USASF rely heavily upon the network of gyms and coaches, going so far as to host conferences specifically for these gym owners and coaches, providing tips and training in fundraising, athlete development, and business management.

73.     At these conferences, upon information and belief, coaches, gym owners, and vendors are encouraged to drink alcohol, use drugs, and engage in debaucheries, and are inundated with promises of gifts, and financial gain if the coaches continue to produce young member-athletes who promote the Varsity brand.

74.     At all times relevant to this complaint, and upon information and belief, the Varsity Defendants have perpetuated an atmosphere at their affiliate gyms, as well as in camps and competitions, that encourages alcohol and drug use, and which does not adequately promote athlete safety including from emotional, or physical harm and abuse.

75.     Upon information and belief, and at all times relevant to this complaint, the Varsity Defendants' affiliated gyms and coaches, including Defendant Rockstar, Defendants Scott Foster

and Kathy Foster, and Defendants Carruba, and Black, contracted with schools for coaching services such as those services all in an effort to cultivate more All-star athletes.

76.     By representing a safe and superior environment, Defendants collectively sought to create a revolving door of young athletes to perpetuate the organization for years, spending tens of thousands of dollars per athlete for coaching, uniforms, camps, training, competitions, and other merchandise, until the athletes either came of age or became coaches and gym owners.

### The Varsity Defendants' Control Over the Gym Environment

77.     At all times relevant to this complaint, Defendant Webb exercised control over all aspects of All-Star cheer, including rulemaking. He was at the forefront of the conception and execution of the alleged unlawful conspiracy as set forth herein.

78.     At all times relevant to this complaint, and under the direction and control of Defendant Webb, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer have relied upon access to child athletes who compete at Varsity-affiliated gyms, and in Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

79.     The Varsity Defendants created Defendant USASF through a $1.8 million interest-free loan. The 2004 non-profit charter certificate lists USASF's address to be Varsity's address.

80.     At its inception, USASF was purportedly established to be the "sanctioning body" that would regulate All-Star cheer by setting guidelines, policies, procedures, and processes to ensure an environment that was safe for young athletes in the private gym sector.

81.     In 2006, Defendant USASF began "certifying" All-Star cheer gyms with a special seal of approval that warranted the gym and its coaching staff could be trusted for cheerleader safety.

82.     Defendant Webb would tell a blog years later that his best marketing advice was, "to differentiate your products from your competitors and develop a strong and trusting relationship with your customers. **The best branding results usually come from building and sustaining a culture that people trust.** It is also about consistency and authenticity." (Emphasis added.)

83.     Further, Defendant USASF created a central reporting mechanism for its member gyms, such as Defendant Premier Athletics. As such, if an athlete or their family member wished to report an incident or issue to the member gym, the athlete was directed to Defendant USASF.

84.     In 2007, Defendant Webb and Varsity Spirit, LLC formed USA Cheer, which was also established to provide guidelines, policies, procedures, and processes to ensure an environment safe for young athletes throughout the cheer industry, including the All-Star competitive cheer sector.

85.     Defendant USA Cheer was also created with an interest-free loan from the Varsity Defendants. The director of education and programs, Jim Lord, has listed Defendant USA Cheer's address to be the same as Varsity's.

86.     Defendants USASF and USA Cheer were responsible for creating and enforcing guidelines, policies, procedures, and processes for reporting coaches for misconduct and taking appropriate action for that misconduct.

87.     However, Defendants USASF and USA Cheer were both operated and controlled by the Varsity Defendants in their venture to earn massive revenue through cheerleading.

88.     The Varsity Defendants controlled Defendant USASF from inception. The Varsity Defendants submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF."

89.     For at least the first 15 years of its existence, and upon information and belief, Defendant USASF's offices were located at Defendant Varsity Spirit's s corporate address, a Varsity representative answered the phone for USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

90.     Defendant Varsity Spirit, LLC was listed as the owner of Defendant USASF.

91.     During the operative timeframe of this complaint, the Varsity Defendants also controlled the Board of Directors for Defendant USASF. The USASF board is empowered to set policy for USASF. The Board is composed of 13 voting members, one seat each for the seven cheer competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of Defendant USASF's founding event producers, it has continued to expand its control of the USASF Board. Presently, the Varsity Defendants have control of 75% of the seats on the Board of Directors. The seats that Varsity does not control do not have voting rights.

92.     Defendant USASF's website is located at www.usasf.net, a URL which was once openly owned by the Varsity Defendants.

93.     The Varsity Defendants eventually began concealing ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

94.     As with Defendant USASF, Defendant USA Cheer listed Defendant Varsity Spirit, LLC's Tennessee headquarters as its own headquarters, and Defendant USA Cheer's board included six Varsity employees.

95.    Under Defendant USA Cheer's bylaws, its thirteen-member board must include members from the following seven organizations: The Universal Cheerleaders Association, CheerSport, National Cheerleaders Association, United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest.

96.    Each of the seven aforementioned associations is owned by Defendant Varsity Spirit.

97.    John Patterson, a former staffer of the Nonprofit Risk Management Center who consulted on youth sports safety, said he has never heard of an arrangement quite like the one between Varsity Sprit, LLC and these non-profit governing bodies. He said Varsity Spirit, LLC's control of USASF meant, "whatever Varsity wants, Varsity can get" in terms of rules and regulation of the cheer world.

98.    Defendant Varsity's founder Jeff Webb, has publicly stated that teams performing at Varsity Competitions who wore a full uniform and accessories branded by Varsity received higher scores.

99.    Upon information and belief, this structure meant that the Varsity Defendants were entirely self-regulated and were not answerable to any independent entity.

100.    In 2010, in Cheer Coach & Advisor Magazine[4], Defendant USASF was officially quoted as saying, "Through credentialing, coaches are made aware of expectations as teachers and role models. It is the goal of the USASF to infuse good decisions into each and every credentialed coach so that they may expand the positive life experience of All-Star cheerleading and dance into

---

[4] At the time of this particular issue, Defendant Webb served on the editorial board of Cheer Coach & Advisor.

the lives of the youth they encourage. USASF is recognized as the baseline of education for each individual coach and also expect these standards to be met."

101.    Defendant USASF was promoted as a means to prevent athlete harm. Instead, USASF has failed in its obligation to appropriately investigate reports of misconduct, has failed to communicate with regard to misconduct, and has further failed to operate as intended.

102.    The Varsity Defendants, through Defendants USASF and USA Cheer, can and do enforce bans of athletes, coaches, and teams in competitions for minor rule infractions like the size of hairbows and the use of glitter. However, these Defendants have repeatedly failed to enforce suspensions or bans of coaches, choreographers, and music producers who are known to have committed child sexual abuse.

103.    Defendant Varsity Spirit, LLC, through Defendants USASF and USA Cheer, has created and is responsible for oversight and enforcement of their Professional Responsibility Codes, which specifically acknowledge the threat of harm or abuse by coaches in cheer. For instance, according to the USASF Professional Responsibility Code, "Once a coach-Athlete relationship is established, a Power imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the coach-Athlete relationship terminates until the Athlete reaches 20 years of age."

104.    According to its own literature, the Professional Responsibility Code is applicable to "all members," referring to Varsity-affiliated gyms.

105.    From 2014 to 2018, Defendant Charlesbank wholly owned the Varsity Defendants and thus owned Defendants USA Cheer and USASF, and provided capital to the Varsity Defendants and Defendants USA Cheer and USASF for the purpose of building the network of Varsity-affiliated private gyms and coaches throughout the United States.

18

106.    During this same timeframe, Defendant Charlesbank, as well as the Varsity Defendants, reaped massive financial benefits associated with the growing network of families who came into Varsity-affiliated gyms, and who believed the Varsity Defendants' representations that they were providing safe and protective environments for families.

107.    In 2018, Defendant Bain Capital purchased the Varsity Defendants from Charlesbank for roughly $2.8 billion. At the time of the sale, Defendant Charlesbank made a new investment in Varsity alongside Defendant Bain and retained a minority stake in the business.

108.    Related to its purchase, Defendant Bain Capital stated: "This new partnership presents Varsity Brands with an exciting opportunity to continue to expand and improve our products and services while remaining steadfast to our commitment to improving student life and overall engagement…. Bain Capital's extensive consumer and technology experience and their commitment to our mission of empowering young people will help us accelerate our growth to a new level."[5]

109.    In addition, Defendant Bain represented: "For over 50 years, Varsity Brands has served as an essential force for good as part of the academic and athletic student experience…We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[6]

---

[5] *See* "Varsity Brand, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity," June 19, 2018, available at: Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity | Bain Capital.
[6] *Id.*

110.   Upon information and belief, Defendant Bain's accelerated growth model for the Varsity Defendants depended upon access to an ever-expanding network of young athletes who would not only purchase Varsity branded merchandise, but would also continue to attend Varsity events. In that regard, during the operative timeframe, the Varsity Defendants issued annual invoices to members, including coaches, gyms, and athletes, payment of which was mandatory and ultimately profited Defendant Bain and its minority partner Defendant Charlesbank.

111.   Meanwhile, at the time of Defendant Bain's acquisition, the Varsity Defendants were embroiled in very public litigation arising not only out of the Varsity Defendants alleged anti-competitive tactics in acquiring gyms and curbing other event-companies, but also related to allegations of sexual misconduct by Varsity-affiliated coaches.

112.   In 2020, former Varsity-affiliated coach and "Cheerlebrity" Jerry Harris, star of the Netflix series "Cheer," was accused of soliciting sex from two children during the 2019 Varsity-competition season.

113.   In July 2022, a warrant was issued against another Varsity-affiliated coach, Erick Kristiansen, who was accused of exposing himself to his minor athletes.

114.   In August, 2022, Varsity-affiliated coach Defendant Scott Foster committed suicide amidst an ongoing investigation into allegations that he engaged in sexual misconduct with his minor athletes.

115.   Defendant Foster had previously been suspended by USASF when video-evidence came to light showing Defendant Foster drinking alcohol with his underage athletes.

116.   Despite his suspension, Defendant Foster was nevertheless openly allowed to continue coaching at Defendant Rockstar, continued to host clinics and camps, and was never barred from attending any Varsity-sponsored event.

117.    Upon information and belief, no one from Defendant USASF ever reported to law enforcement that Defendant Foster was drinking alcohol with his underaged athletes.

118.    After the Bain acquisition, on December 7, 2020, Defendants USASF and USA Cheer announced a universal system for reporting athlete safety concerns, as well as a central repository listing ineligible coaches and individuals. Defendants USASF and USA Cheer stated that these measures "will provide a robust athlete safety infrastructure readily available across the entire cheer community."

119.    This list, the "Unified Ineligibility List," is accessible online, lists the nature of the infraction, occasionally provides public documentation, and names the offender.

120.    As of the date of filing, this list included 152 names. The vast majority of the suspensions, both temporary and permanent, related to claims of sexual misconduct between minors and their coaches, choreographers, and other adults. Some of the alleged misconduct dates back more than ten years.

121.    Far from providing security for athletes, the list is replete with temporary suspensions where the only information provided is "Member policy violated related to athlete protection," with no records or other documentation.

122.    In addition, the list does not provide the status of the investigation, and, upon information and belief, is not updated on a regular basis.

123.    In fact, Defendant USASF admits on its own website that it does not include all decisions, but rather "only those that could pose a potential risk to the broader sport community." Whether an offense rises to the level of posing a potential risk to the broader sport community is left entirely to the discretion of USASF.

124.    The vast majority of instances of misconduct included on the USASF list arise out of sexual harm or misconduct. This repeated misconduct gave notice to all Defendants that a broader issue existed within the Varsity Defendants' cheer community.

125.    Yet, other than the list, and upon information and belief, the Varsity Defendants made few if any modifications to the internal screening process for coaches, and made no modifications to the gym and competition environment.

126.    Upon information and belief, during the interim of the allegations set forth above, the Varsity Defendants, in conjunction with Defendant USASF and Defendant USA Cheer have hosted multiple competitive events throughout the United States, during which time affiliated teams from across the country converge at a pre-selected location, and using hotels, premises, and businesses hand-selected by the Varsity Defendants.

127.    Upon information and belief, during these events, underage student-athletes would comingle with other teams, including their coaches and choreographers, either without chaperones or minimally chaperoned, and would be exposed to environments where drugs and alcohol were readily available, and where the student athletes were subject to rampant solicitation and inappropriate sexual conduct, and innuendoes, including by coaches such as Jerry Harris, Erick Kristiansen and Scott Foster.

128.    At the same time, individual gyms and coaches would receive substantial benefits from affiliation with the Varsity Defendants, including the reputational benefits of being affiliated with Defendant USASF, Defendant USA Cheer, the Varsity Defendants' brands, and monetary benefits directly linked to the number of competitions in which a gym participated as well as the number of athletes the gym brought to the competition.

129.    To perpetuate the popularity of certain gyms and coaches, the Varsity Defendants utilized social media, often liking posts and messages by specific athletes and coaches, such as Defendant Foster, and providing these same athletes and coaches with promotional codes to pass on to minor athletes to sell the Varsity Defendants' goods and services.

130.    In this way, the Varsity Defendants and the gyms and coaches had a symbiotic relationship, where the gyms and coaches supplied the Varsity Defendants with hundreds of millions of dollars of revenue from under-age athletes, and the coaches and gyms used the Varsity Defendants' reputation in order to bolster their own reputation with minor athletes.

131.    Upon information and belief, the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital relied upon the gyms and coaches to create a replenishing group of underage athletes, and future coaches, and gym owners, to provide a guaranteed stream of revenue.

132.    As such, and upon information and belief, it was contrary to the Varsity Defendants' business model for Defendants USASF and USA Cheer to ban coaches and gyms from their system, as every coach and gym represented a pipeline of current and future revenue for the Varsity Defendants.

133.    Rather, when allegations about a specific coach, or Varsity affiliate were made, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer either ignored the allegations, determined the allegations were not "credible" based upon arbitrary criteria, or allowed the would-be abuser to quietly exit the Varsity-affiliated program, with the result that the accused could relocate to a new gym or facility without parents knowing about the allegations of misconduct against minors.

134.    At all times relevant to this complaint, and upon information and belief, Defendants Bain Capital and Defendant Charlesbank knew or should have known that the Varsity Defendants,

Defendant USASF, and Defendant USA Cheer were not appropriately enforcing policies, processes, and procedures related to athlete safety, and that the Varsity Defendants were hosting events without regard for and in contravention to the safety of student athletes.

135.    Moreover, and upon information and belief, to incentivize coaches and gyms, Defendants Bain Capital, and Charles Bank authorized, and the Varsity Defendants offered, significant monetary benefits to increase sales of Varsity goods, and participation in Varsity events, including by providing cash rebates and promotional codes, as well as in creating event environments that comingled child-athletes with adult coaches, gym owners, and choreographers, while providing these same child-athletes with access to drugs and alcohol with minimal parental or adult supervision.

136.    Upon information and belief, this environment fostered and contributed to the sexual, mental, and physical abuse inflicted upon the athletes, and gave individuals such as Defendants Foster, Carruba, and Black unfettered access to potential victims.

137.    Upon information and belief, this competition environment was the brainchild of Defendant Jeff Webb, who used the competitions as a mechanism for his companies to establish dominance in the cheer market.

138.    During the  timeframe relevant to this complaint, Plaintiff is informed and believe that employees of the Varsity Defendants resigned their positions because of the abuse and systemic failures they saw within the system, including failures to uniformly apply policies and procedures related to athlete safety, rampant drug use within the leadership of the Varsity Defendants, as well as alcohol and drug use by athletes during competitions and at private gyms, and general favoritism and promotion of teams that chose to endorse or affiliate with the Varsity Defendants, disadvantaging independent teams.

139.    Defendant Webb is currently Chairman of the board of directors of Varsity Brands, LLC. He was previously Varsity's president but resigned in 2020 amid the Jerry Harris sex abuse scandal.

140.    During the operative timeframe of this complaint, Defendant USASF received numerous reports and allegations against coaches, choreographers, videographers, and music directors. Upon information and belief, the general response from Defendant USASF was to disregard these reports and accusations as attempts by disgruntled athletes and parents to get coaches and gyms in trouble if the athletes did not receive coveted team positions.

141.    A 2020 investigative series by journalists Marisa Kwiatkowski and Tricia L. Nadolny for USA Today revealed scores of repeat sex offenders active within USASF certified gyms and preferred vendor lists.[7] Some of the cases of which Defendants Bain Capital, Charlesbank, and the Varsity Defendants had knowledge included:

    a.    A Virginia gym owner was convicted of sexual battery and assault and placed on the sex offender registry after three girls he coached at his Virginia gym came forward. As of 2020, this coach was still listed as the gym's owner and was still USASF certified. Varsity continues to invite his gym to competitions. One of his victims had to stop cheering competitively because her convicted abuser was allowed to stay involved around children and in proximity to her.

    b.    A Charlotte coach who was arrested for two counts of sexual assault of a minor and lost his middle school teaching job continued to have access to minors afterward.

---

[7]    https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/

https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

Though the gym's owners claimed he was told he was no longer welcome to work with the gym's athletes after his arrest, he continued to appear in official social media accounts of the gym, was connected by the gym director to parents for private lessons and attended a Varsity event in Florida where he was photographed posing next to the gym's athletes in a gym uniform with the word "Coach" on his shorts.

    c.   A coach who had been fired from a gym and charged with child pornography was discovered to still be working in the cheer industry by the gym owner who had originally fired him. The gym owner called Varsity, who told her his background check was fine. After she went to the courthouse to get the records of his conviction and sent them to Varsity, months passed and the man continued coaching children at Varsity events through USASF gyms.

    d.   A Washington gym owner was not banned by USASF until more than a year after the organization received reports in 2018 that he had been accused of sexual misconduct with minors.

142.    Moreover, Defendant USASF refused or failed to report non-member coaches and adults accused of misconduct.

143.    Upon information and belief, Defendant USASF has received hundreds of complaints against coaches, choreographers, videographers, and others accused of sexual misconduct.

144.    Until recently, however, Defendant USASF failed to dedicate fulltime staff to managing investigation of these complaints.

145.    Defendant USASF has been excruciatingly slow to develop policies and procedures for keeping athletes safe from sexual abuse in an industry rife with it.

146.    Meanwhile, according to its website: "USASF is the U.S. All Star Federation. It's about safety standards. It's about coaches' education. It's about providing a safe environment to allow for the continued growth of All-Star cheerleading and dance across the country. **It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care**. It's about standardization of rules from one competition to the next. It's about time." (Emphasis added).

147.    In the years since this public representation, however, Defendant USASF's gym and coach training has focused almost exclusively on avoiding physical injury to the athletes.

148.    In fact, Defendant USASF's "Athletic Performance Standards" dealt only with things like hair accessories, makeup, uniforms, choreography, and music. The general message is that Defendant USASF concerns itself more with how its athletes look than how its coaches behave.

149.    In 2012, Defendant USASF reiterated their "image and appearance policy" to address "the increasing criticism about the general appearance of our athletes during competition and the unflattering media stories that have focused on how our sport is presenting its athletes, particularly those in the younger age groups."

150.    At the same time, Defendant USASF began offering, but not requiring, a $1 million sexual abuse/sexual molestation policy to gym owners through K&K Insurance.

151.    It took until 2015 for Defendant USASF to implement background checks on certified coaches and gym owners. However, Defendant USASF failed to uniformly apply the process.

152.    Defendant USASF also created the "Triple A" challenge as part of its response to the SafeSport Act that became law in 2018, shifting responsibility for reporting abuse and

exploitation from the corporate entities empowered to oversee the sport onto minors and their families by telling them they should ask when posting photos to social media: "Is it Athletic? Is it Age Appropriate? What does it Amplify?" They asked for "thoughtful" social media posts to be hash-tagged with "#ThisIsAllStar and "#usasfATHLETES1st" as part of their safety plan.

153.    Meanwhile, Defendant USASF failed to follow its own procedures with respect to rampant child sexual abuse, allowing complaints to stall or delaying action when their policies clearly call for a person to be suspended or banned.

154.    At other times, Defendant USASF's policies have contradicted each other. In its complaint resolution process, Defendant USASF said its jurisdiction was only over members. But in its Safe Sport policy manual, it said it had authority and jurisdiction to investigate anyone employed by a USASF program even if they were not a member.

155.    Jim Lord, Defendant USA Cheer's director of education and programs, said in 2020 that the organization's banned list is one of the tools they use to keep athletes safe. The manner in which this oversight was performed, according to Lord, was that he had it on his "weekly checklist" to visit search engines and use terms like "cheer coach", "athlete abuse, and "sexual assault" to find people to ban[8]. Between June and September that year, Lord had identified five (5) names. Investigative reporters with USA Today managed to find 180 people during that same time frame. More than 140 of those had been convicted of a child sex crime and more than half of those were registered sex offenders.

156.    Also in 2020, W. Scott Lewis, partner at legal and risk management firm TNG criticized Defendant USASF's handling of reports and complaints in that they often sat on their

---

[8] It is telling of the problem that Lord used words related to sexual abuse when looking for coaches, gym owners, and affiliates who violated USASF policy. This very specific search criteria demonstrates that USASF understood the risks of harm inherent to the sport.

hands and did nothing, assuming law enforcement had been contacted by someone else. He said it was not typical for organizations to wait for law enforcement action before taking their own action unless they've explicitly been asked to do so. He said, "You don't want to be on the sideline saying, 'Well, we can't do anything because law enforcement's doing it,'" Lewis said. "You want them to have the ability to engage in interim measures or your own investigation, or both." In May of 2021, Defendant USASF hired TNG to consult on its athlete safety practices.

157.     Well after the very public conviction of Jerry Harris, Defendants USASF and USA Cheer finally began offering risk and safety training to member gyms and personnel.

158.     However, instead of mandating this risk and safety training for all members, and providing that training free of charge, the Varsity Defendants allow members to access Defendant USASF and Defendant USA Cheer's safety training only for a fee.

159.     Defendant USASF also began "requiring" that all member programs "have clear, written guidelines that prohibit adults who have contact with minors from engaging in conduct that is either inappropriate and/or illegal."

160.     Defendant USASF failed however, to provide oversight on reviewing or approving those policies, or even verifying that gyms had, in fact, enacted guidelines.

161.     Around this same timeframe, Defendant USASF created an online reporting mechanism for receiving complaints. Experts have raised concerns over the burden of this reporting process. When printed, the required forms are over 15 pages long.

162.     Moreover, the reporter must cite to the alleged rule or regulation their attacker violated, referring to a slew of different sources.  By so doing, Defendant USASF shifted its mandatory duty to report child abuse to the victim and their family.

163.    In addition, the cumbersome nature of the reporting process, coupled with the fear that many felt in coming forward against coaches and gym owners who would not immediately be ousted effectively chilled reporting.

164.    Kelli Hughes, the director of the Center for Child Policy, found Defendant USASF's reporting process to be unnecessarily complicated and burdensome.

165.    For the 2021 USASF Worlds at Disney World in Florida held in May of 2021, the organization sent out an information packet which contained athlete conduct rules but did not address coach conduct. The policy mandated one (1) adult chaperone, defined as anyone 21 of years of age or older, for every nine (9) child athletes.

166.    Webinars on athlete safety listed at the site in November 2021 included topics like "tumbling drills", "coed stunting", "building transitions", "choreography", "twisting skills theory", and "flyer stability and flexibility". Conspicuously absent at this crucial time was any training on preventing or reporting child sexual abuse or molestation.

167.    In short, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, and Defendants USASF and USA Cheer, have created an elaborate illusion of a safe system in order to draw more members in so they could sell more merchandise and collect more fees for events and camps, knowing their young vulnerable members were at risk and that they were doing nothing about removing the criminal coaches, affiliates, gym owners, and administrators creating that risk.

## ROCKSTAR CHEER AND THE FOSTER DEFENDANTS

168.    As stated herein, at all times relevant to this complaint, Defendant Rockstar was a private cheer, dance, and tumbling gym offering its services to children as well as adults in South Carolina and nationwide.

169.    Defendant Scott Foster was a cheerleader at the University of Louisville and began coaching young cheerleaders in Kentucky in 1996.

170.    The University of Louisville is a pre-eminent name in the world of competitive cheerleading. Athletes who come out of the Louisville program have huge name recognition in the industry allowing them to easily recruit other young athletes.

171.    In fact, gym owners who are also alumni of the University of Louisville program have the ability to recruit athletes from across the country regardless of where their gym is located. Athletes regularly travel, or move, to be close to a premier gym and coach going so far as to enroll in home school to provide additional hours for training.

172.    Defendant Scott Foster moved to Greenville, South Carolina in 1999 and shortly thereafter began operating an All-Star cheer gym, along with his wife, Defendant Kathy Foster.

173.    Defendant Scott Foster and Defendant Kathy Foster created World Spirit Federation (WSF) for competition cheering before ultimately selling WSF to Defendant Varsity Brands in 2006.

174.    In 2007, Defendant Scott Foster and Defendant Kathy Foster started Rockstar Cheer & Dance, Inc., a gym to coach competition cheer.

175.    Rockstar's mission was: "**To provide a structured environment of competitive cheerleading while accomplishing our goals […] to teach dedication, commitment, self-confidence, teamwork, discipline, responsibility, and leadership in a family-friendly, safe and fun environment.**"

176.    Defendant Rockstar's cheer gym was certified by Defendant USASF as meeting All-Star standards with respect to coach credentials, program quality, and athlete safety.

177.    As such, at all times relevant to this complaint, the Varsity Defendants warranted to athletes and families that Defendant Rockstar and its coaches, including Defendants Scott Foster, Kathy Foster, Jarred Carruba, and Tracey Black could be trusted with minor children.

178.    The Varsity Defendants promoted one of Defendant Rockstar's teams, Beatles, as a premier team nationwide. This status allowed Defendants Scott and Kathy Foster to recruit athletes nationwide not only to compete on Beatles, but also to join other teams within Defendant Rockstar.

179.    In 2018, Beatles won Defendant Varsity's coveted World Championship title. This further elevated Rockstar's status and made the team one of the most lucrative to the Varsity Defendants.

180.    At all times relevant to this complaint, Defendant Rockstar remained in lock step with the Varsity Defendants, competing at the Varsity Defendants' events, purchasing the Varsity Defendants' merchandise, participating in the Varsity University training conferences, and, by virtue of competing in Varsity events, mandating that Defendant Rockstar athletes become members of Defendant USASF, including paying USASF annual dues.

181.    To provide the Varsity Defendants with a continuous supply of new athletes, as well as to ensure that Defendant Rockstar had a rotation of new athletes, and commensurate revenue, Defendants Scott Foster and Kathy Foster also offered their coaching services to local schools in the Greenville community.

182.    By so doing, and upon information and belief, Defendant Scott Foster would find a new class of victims, all while ensuring that he had the requisite number of new athletes to meet his agreements with the Varsity Defendants for competition attendance.

183.    Meanwhile, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and, by virtue of their acquisition, ownership, and control, Defendant Bain Capital, were made aware of serious and disturbing allegations related to many of the Varsity coaches including Defendant Scott Foster.

184.    In 2017, video footage emerged of Defendant Scott Foster drinking alcohol with his underage athletes.

185.    In addition, during this same timeframe, Defendant Scott Foster was also paying for an apartment for his athletes where some of them would live, and where minor athletes would gather to do drugs and drink alcohol with and without Defendants Scott and Kathy Foster.

186.    For example, Plaintiff John Doe 3 would regularly go to Defendant Rockstar's apartment, known as the "Rockstar house," where Defendant Rockstar's coaches would give illicit drugs and alcohol to Plaintiff John Doe 3 and other underage athletes.

187.    Defendant Scott Foster also used his position of power within the Varsity Defendants' network to message underage athletes and to arrange meet-ups with these athletes at the Varsity competitions.

188.    Defendant Scott Foster's conduct was not isolated, nor unknown to the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank and Defendant Bain Capital.

189.    During the operative timeframe of this complaint, Defendant USASF received numerous reports and allegations related to Defendant Foster as well as other Rockstar coaches. Upon information and belief, the general response from Defendant USASF was to disregard these reports and accusations as attempts by disgruntled athletes and parents to get coaches and gyms in trouble if the athletes did not receive coveted team positions.

190.    During the timeframe he owned and operated Defendant Rockstar, Defendant Foster, along with his wife, Defendant Kathy Foster, enjoyed elevated status among the Varsity Defendants' network. The Varsity Defendants frequently posted about Defendant Scott Foster and his group of Rockstar gyms, and encouraged young athletes to seek out Defendant Foster for skills camps, and coaching opportunities.

191.    In addition, when Scott and Kathy Foster created the World Spirit Federation brand of events, which was later purchased by Varsity, they touted that they were getting rid of identification/entry tags for the children's shoes while at the competition in favor of just providing a special coach's credential that permitted entry to a "coaches lounge" at their events which provided "food, drinks, and massages." They also touted that at their events, unlike others, anybody could walk in off the street and pay cash to come watch the cheerleaders, a move which was heavily criticized due to concerns for athlete safety from predators.

192.    Varsity purchased this competition model from the Fosters and, upon information and belief, have replicated it at other competitions to create and foster a party atmosphere at what were essentially children's events.

### The Enterprise

193.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

194.    The unlawful acts alleged against the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, as well as against Defendant Charlesbank and Defendant Bain Capital in this Complaint were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

195.    The unlawful acts alleged against Defendant Rockstar, Defendant Scott Foster, Defendant Kathy Foster, Defendant Carruba, and Defendant Black, and other Unknown Defendants who coached and owned gyms and perpetrated abuse upon minor athletes were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

196.    The officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals.

197.    Each Defendant, and any respective subsidiaries, affiliates and agents operated as a single unified entity with the common goal of taking millions of dollars from minor athletes who wanted to be a part of the competitive cheer world Defendants oversee, as well as to perpetuate a pipeline of new child-athletes, coaches and gyms. Defendants' Enterprise functioned as a continuing unit throughout the conspiracy and continues its operation through the filing of this Complaint.

198.    At all times relevant to the complaint, Defendants possessed and continue to possess an ongoing organizational structure with sufficient continuity related to the Enterprise.

199.    Each Defendant participated in the operation and management of the Enterprise.

200.    The Enterprise is separate and distinct from the pattern of racketeering activity as set forth below.

201.    Whenever in this Complaint reference is made to any act, deed, or transaction of any organization, the allegation means that the Defendants and each of them engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives

while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

202.    Individuals alleged to have engaged in misconduct in violation of the laws pleaded herein are alleged to have done so on behalf of all members of the enterprise between the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, Defendant Bain Capital, and Defendant Rockstar. The athletes who paid to enter the competition cheer world did not know or did not distinguish between the corporate affiliations of different individuals. These organizations all affirmatively and collectively represent themselves as one All-Star family, rather than separate parents and subsidiaries.

203.    Defendants' unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate commerce in the United States through the certification of private gyms and their coaches, as well as the organizing, promoting, and managing cheer competitions throughout the United States.

204.    The conduct alleged herein is tied to billions of dollars of interstate commerce, with the Varsity Defendants, their governing bodies, and their parents controlling at least 80% of the competitive cheer market through membership fees, gym and coaching fees, competition fees, insurance, apparel, and travel for training and competition events all over the United States and the world.

205.    During its ownership period from 2014-2018, Defendant Charlesbank conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the competitive cheer world with the promise of a safe and superior coaching experience by joining a certified gym. Defendant Charlesbank has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from

having done so. When it sold to Defendant Bain Capital in 2018, rather than walk away from the Enterprise, Defendant Charlesbank made the conscious business decision to reinvest and retain an ownership interest in the Varsity Defendants in order to continue reaping the financial benefits of Varsity's Enterprise with the Rockstar Defendants.

206.     Once ownership transferred to Defendant Bain Capital in 2018, Defendant Bain Capital conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity universe of competitive cheer with the promise of a safe and superior coaching experience by USASF and USA Cheer certified gyms, coaches, and instructors.

207.     Defendant Bain Capital has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so through Varsity, USASF, and USA Cheers business Enterprise with the Rockstar Defendants and continues to do so as set forth herein.

208.     All Defendants were co-conspirators in a scheme to get as many families as possible to entrust their child athletes to these private gyms and coaches in a scheme to generate massive revenue from these athletes all while Defendants were: (a) failing to properly vet the coaches by investigating backgrounds; (b) failing to properly investigate complaints of inappropriate and criminal sexual conduct by the coaches against minors; (c) failing to report complaints of inappropriate and criminal sexual conduct against minors; (d) failing to enforce rules and regulations for chaperoning and supervision of minors; (e) failing to enforce ineligibility due to complaints regarding athlete safety; (f) taking minor athletes across state lines for the purpose or with a reckless disregard for whether the athletes would be subjected to sexual and/or physical abuse; (g) plying minor athletes with alcohol and drugs, including by taking said minors across

state lines and giving them alcohol and drugs; (h) gathering at predetermined locations to discuss and exchange notes and information related to the Enterprise including how to lure additional minor athletes and how to maximize profits; (i) creating images and videos of children under the influence of drugs and alcohol, and engaging in sex; (j) sending said images over the mails and wires; (k) sending and collecting bills and invoices across the mails and wires despite the fraud perpetrated by Defendants; and (l) disseminating fraudulent misrepresentations through the mails and wires as to the safety they guaranteed through a sham certification process.

## **THE ABUSE**

209.    Plaintiff John Doe 3 began cheering at Defendant Rockstar in 2014, when Plaintiff John Doe 3 was fifteen (15) years old.

210.    Plaintiff John Doe 3 became interested in coming to Rockstar Greenville due to its clout in the cheer world and the caliber of its coaches. Plaintiff John Doe 3 wanted to advance his cheer career, improve his skillset and become a cheer coach himself one day. Plaintiff John Doe 3 believed that transferring to Rockstar would be instrumental in helping him achieve those goals.

211.    Following a private try-out with Defendant Scott Foster, Plaintiff John Doe 3 was offered a spot on the Level 5 team Chili Peppers. Plaintiff John Doe 3 continued to cheer at Rockstar under the coaching of Defendant Scott Foster until 2015.

212.    When Plaintiff John Doe 3 was fifteen years old, he met Defendant Traevon "Trey" n/k/a Tracey Black, who was twenty years old and a coach at Defendant Rockstar at the time.

213.    Defendant Traevon "Trey" n/k/a Tracey Black engaged in sexual intercourse with Plaintiff John Doe 3 on numerous occasions in 2014 and 2015.

214.    Defendant Traevon "Trey" n/k/a Tracey Black knew that John Doe 3 was only fifteen years old at the time of their sexual encounters.

215.    The sexual conduct between Defendant Traevon "Trey" n/k/a Tracey Black and Plaintiff John Doe 3 was well known to the Defendant Rockstar coaches and staff, yet at no point did any of the other adult coaches attempt to intervene.

216.    Defendant Jared Carruba, another adult coach at Defendant Rockstar, did on several occasions, send sexually explicit messages and photos via Snapchat to Plaintiff John Doe 3, who was fifteen years old at the time.

217.    Defendant Jared Carruba would often make comments about these messages to Plaintiff John Doe at the gym in front of other athletes and coaches. Defendant Jared Carruba would also openly discuss knowing that Plaintiff John Doe was only fifteen years old at the time.

218.    Defendant Scott Foster provided alcohol and cigarettes to Plaintiff John Doe 3 while at Disney World for the Worlds competition in 2015.

219.    Defendant Scott Foster provided cocaine to Plaintiff John Doe 3 on at least one occasion.

220.    Plaintiff John Doe 3 has participated in sexual abuse therapy to cope with the trauma associated with the years of abuse at the hands of Defendant Traevon "Trey" n/k/a Tracey Black.

221.    Defendant Rockstar is now permanently closed, but was at all times relevant to this Complaint, a USASF-member gym. As such, while Plaintiff John Doe 3 cheered for Defendant Rockstar, if he wanted to cheer at another gym, he would still be required to pay membership dues to Defendant Rockstar Cheer unless Rockstar expressly authorized the transfer.

222.    Moreover, Defendant Rockstar would regularly check on Plaintiff John Doe 3's status as a USASF member and remind Plaintiff John Doe 3 to renew or update his membership if Plaintiff John Doe 3 had not done so.

## JOINT AND SEVERAL LIABILITY

223.      Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiff, as Defendants' individual and collective actions and omissions actually and proximately caused Plaintiff's past, present, and ongoing injuries. Plaintiff is entitled to damages pursuant to the laws of the State of South Carolina and the United States of America, including but not limited to the following:

      a.  Compensatory, actual, and consequential damages;

      b.  Statutory damages;

      c.  Punitive damages;

      d.  Reasonable attorneys' fees and costs;

      e.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

### COUNT I
### VIOLATION OF THE PROTECTING YOUNG VICTIMS
### FROM SEXUAL ABUSE ACT, 18 U.S.C. §2255
### (ALL DEFENDANTS)

224.      Plaintiff hereby realleges the preceding paragraphs as if repeated verbatim herein.

225.      This claim is brought against all Defendants, with the specific acts complained of performed against minors by Defendant Scott Foster and other Unknown Defendants, with the specific knowledge and aid of Defendant Kathy Foster, and enabled by the ongoing certification and ratification of the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital.

226.      Under the statute, a covered individual means an adult who is authorized by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact

with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization."

227.    Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

228.    Defendant Scott Foster, Defendant Kathy Foster, and the other Unknown Defendants, qualify as covered individuals and the facts of this case bear out that abuse occurred at events defined by the statute.

229.    Defendant Scott Foster and Defendant Kathy Foster were held out by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital as being part of a network of safe and trustworthy cheer coaching gyms.

230.    Plaintiff was a minor at the time he was sexually abused and assaulted, sexually exploited, transported across state lines for illegal sexual activity, and/or used in creating or receiving illegal and obscene digital materials in contravention of 18 U.S.C §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223, thus constituting violations of 18 U.S.C. §2255.

231.    Plaintiff has suffered personal injuries as a result of these violations of law.

232.    Plaintiff is entitled to damages pursuant to the laws of United States of America, including but not limited to the following:

      a.  Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

      b.  Reasonable attorneys' fees and costs;

      c.  Punitive damages; and

d.   Any and all other and further relief as this Court may deem appropriate including

pre and post judgment interest.

**COUNT II**
**FOR CIVIL CONSPIRACY IN VIOLATION OF THE RICO ACT PURSUANT**
**TO 18 U.S.C. §1962(c) and §1962(d)**
**(ALL DEFENDANTS)**

233.    Plaintiff hereby realleges the preceding paragraphs as if repeated verbatim herein.

234.    This count is brought against all Defendants.

235.    United States law makes it "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity…" 18 U.S.C. §1962(c).

236.    Each Defendant, at all relevant times, is and has been a "person" within the meaning

of 18 U.S.C. § 1961(3) because each of them is capable of holding, and does hold, "a legal or

beneficial interest in property."

237.    Defendants' activities include at least two (2) acts of racketeering activity since at

least 2003. Accordingly, Defendants' conduct constitutes a pattern of racketeering activity. 18

U.S.C. § 1961(5).

238.    The racketeering activity is set forth in paragraphs 36-48; 49-96; 97-110; 111-201

and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud)[9], and 18 U.S.C §§

---

[9] As referred to herein, the following paragraphs set forth factual allegations that constitute mail
fraud and/or wire fraud: 34, 38, 50, 51, 53, 54, 55, 57, 58, 59, 60, 62-70, 72, 73, 75, 79, 81, 83,
107, 110, 111, 117, 118, 119, 120, 124, 126, 128, 133, 134, 135, 138, 140, 141, 146, 152, 154,
160, 161, 181, 182, 183, 185, 194-208, 216, 221, 222.

2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223 (sexual exploitation of minors and creating obscene materials) as set forth in paragraph 185.

239.    In or around 2003, the Varsity Defendants, Defendant USASF, Defendant Rockstar, Defendant Scott Foster, and Defendant Kathy Foster formed an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4).

240.    Defendant Charlesbank and Defendant Bain Capital agreed to facilitate this Enterprise by funding its ongoing operation in order to obtain financial benefit of its revenues.

241.    This Enterprise as previously described in this Complaint, consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiff as a minor athlete by exposing him to illegal sexual abuse and exploitation of children while assuring his parents he was particularly safe in order to take their money.

242.    The Defendants, and all of them in concert with the Enterprise, were engaging in misleading and fraudulent messaging to children and their families which they knew or should have known was endangering children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

243.    In 2014, Defendant Charlesbank funded the purpose of this Enterprise.

244.    In 2018, Defendants Bain Capital took over a role in funding the purpose of this Enterprise in place of Defendant Charlesbank.

245.    The Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the Rockstar Defendants acted in concert to commit the predicate acts of child sexual exploitation,

kidnapping, dealing in obscene materials involving minors, mail fraud and wire fraud as set forth in the preceding paragraphs.

246.    The funding, materials, and premises provided by the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital and the communication of particular trust and safety carried out by Defendant USASF facilitated the commission of these predicate acts by Defendant Rockstar, Defendant Scott Foster, Defendant Kathy Foster, and other Unknown Defendants in the commission of crimes against children.

247.    The Defendants knew or should have known that inappropriate contact was occurring between coaches and minor athletes based on the one-on-one coaching being marketed and the travel of these children across state lines with the coaches who stayed in hotel rooms with them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

248.    The Defendants owed a duty to the minor Plaintiff, and his family, to disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

249.    The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

250.    The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

251.    The fraudulent mail and/or wire messages include, for specificity, but are not limited to the following:

     a.    USASF Athlete Protection Messaging at the website and via email on November 16, 2017.

b.  The 2020 Uniform Ineligible List, which Defendants falsely represented was a mechanism by which Defendants were properly patrolling and purging the sport of potentially dangerous adults;

c.  Social media posts and images either promoted by or shared by Defendants, where Defendants supported the proliferation of Defendants Rockstar, Scott Foster, and individual coaches;

d.  Annual billing and/or invoices to Plaintiff for his USASF membership renewal;

e.  In 2021, USASF's website falsely claimed that they were requiring background checks in 2015 of "all coaches and adult members". However, this was untrue. Background checks were only required for entry into the "warm up room" at competitions. It was never implemented with respect to coaching children or being around them in any capacity outside their competition routine.

f.  In 2021, USASF also falsely claimed that "two years earlier" in 2017 they made SafeSport's athlete protection education a mandatory requirement for all coaches and adult members. However, this is impossible since the SafeSport Act was not signed into law until February of 2018.

g.  Consecutively, on May 10, 2018 and May 16, 2019, the period just before Worlds at Disney, USASF disseminated the following messaging: "Athlete Safety is our #1 Priority! Our mission includes 'strive for a safe environment for our athletes.' To the USASF, safety extends beyond our Cheer or Dance safety rules for performance. We're committed to helping our members create the safest overall environment for every All Star athlete, so we've made resources available for use in gyms and studios."

h.  However, in these resources, USASF continued to provide messaging that child sexual abuse and exploitation by predators was an outside problem that could be prevented by paying more attention to how cheerleaders were presenting themselves on social media.

i.  In July of 2019, USASF shifted the blame to child athletes warning them the "risk and responsibility" of sexual exploitation and objectification required them to "make better choices" about their appearance to "minimize the risk[.]" It did this with full knowledge of repeated reports that the industry was rife with abuse among its own coaching and gym owner ranks and that they were actively concealing these predators so that they could continue to feed the revenue stream.

j.  USASF's athlete protection messaging continued at this time to primarily address athlete safety from sexual exploitation and abuse from the perspective of how athletes were presenting themselves through appearance and how that might affect the brand's image through an "image and appearance policy".

k.  USASF and USA Cheer codes of conduct and other policy statements, which operated across all Varsity-affiliated gyms, which touted that athlete safety was a priority, when, in fact, neither entity had uniform methods by which to ensure athlete safety.

l.  Materials associated with Varsity University, a gym and coaching conference;

m.  Such additional statements, messages, and/or materials as may be revealed during discovery in this matter.

252.    Plaintiff had a property interest in his membership dues paid as set forth above and in the continued ability to cheer competitively, which Defendants had repeatedly used to enticed

him to do in order to obtain social media fame which he could monetize, obtain scholarships to cheer and/or stunt at the college level, to become a cheer coach himself and obtain the "legend status" his coaches boasted of, to become a gym owner, or to become an event promoter.

253.    Plaintiff was falsely imprisoned by his abusers, who threatened him if he would not continue allowing the abuse or reported it that his abusers would tell his parents, teammates, and others in the cheer community what he had done.

254.    The actions of the Enterprise and its conspirators were the direct and proximate cause of these injuries to the Plaintiff.

255.    But for the fraudulent assurances to parents that the gyms and coaches were certified safe, the abuse would not have occurred causing the injuries described above.

256.    Plaintiff is entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

     e.    Compensatory, actual, and consequential damages, trebled in accordance with the statute;

     f.    Reasonable attorneys' fees and costs;

     g.    Punitive damages; and

     h.    Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

### COUNT III
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §39-5-20
(VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT USA CHEER, DEFENDANT ROCKSTAR, DEFENDANT SCOTT FOSTER, AND DEFENDANT KATHY FOSTER)**

257.    Plaintiff hereby realleges the preceding paragraphs as if repeated verbatim herein.

258.    At all times relevant to this complaint, the above-named Defendants entered into a contractual relationship with the Plaintiff and his family, taking fees for membership, training, competition and travel, while promising safe environments and vetted coaches.

259.    The safety and trust touted by these Defendants to Plaintiff and his family was material to Defendants' business model, causing Plaintiff and his family to pay copious fees for years, all while Defendants knowingly subjected Plaintiff to sexual and financial abuse and exploitation.

260.    When the Defendants obtained knowledge of complaints about certain inappropriate or illegal activity with minors, they failed to report those acts or to take corrective actions while continuing to tout safety and trust to support an ongoing stream of financial benefit from child athletes who were being sexually abused and exploited.

261.    S.C. Code Ann. § 39-5-20 prohibits unfair or deceptive acts related to consumers.

262.    The conduct set forth above and herein is capable of repetition, as evidenced by the fact that numerous Plaintiffs have come forward with similar information related to Defendants' conduct, failures, acts, and/or omissions in overseeing, enforcing, and providing a secure and safe environment for Plaintiff and other child-athletes.

263.    The foregoing constitutes deceptive acts under the Unfair Trade Practices Act statute.

264.    Plaintiff is entitled to damages pursuant to the laws of the State of South Carolina, including but not limited to the following:

      i.    Compensatory, actual, and consequential damages, trebled in accordance with the statute;

      j.    Reasonable attorneys' fees and costs;

k.  Punitive damages; and

l.  Any and all other and further relief as this Court may deem appropriate including pre and post-judgment interest.

## COUNT IV
## GROSS NEGLIGENCE
## (ALL DEFENDANTS)

265.    Plaintiff hereby realleges the preceding paragraphs as though repeated verbatim herein.

266.    Plaintiff brings this claim for gross negligence against all Defendants.

267.    At all times relevant to this Complaint, Defendants have been responsible for the safety, health, and welfare of minor athletes, such as Plaintiff, who were members of Defendants USASF, and USA Cheer, participants in Defendant Varsity events, competing for Varsity-affiliated gyms, and under the care, custody, and control of each of the Defendants, respectively.

268.    Defendants are aware that there are dangers associated with training by coaches of minor athletes, including risks associated with inappropriate, and non-consensual sexual touching, emotional, and physical abuse.

269.    At all times relevant to this Complaint, Defendants represented that they had rules, policies and/or procedures specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches, and adults who come into contact with the athletes by virtue of the adults' position of power.

270.    Despite this, at all times relevant to this Complaint, Defendants have been aware that violations to their internal policies, processes, procedures, and guidelines related to athlete safety, and, in particular, safety against harm from sexual, physical, and emotional abuse and

exploitation has happened on a regular and continuous basis by and through USASF and USA Cheer certified coaches at private All-star gyms, including Defendant Rockstar.

271.    Defendants know, in fact, that one-on-one coaching is an enhanced feature of private gym cheer coaching that generates a great deal of money for all Defendants in the enterprise with the promise of greater success for the minor athlete.

272.    Defendants are also aware of the close personal relationships many of these coaches form with minor athletes who the coaches gain access to by virtue of their USASF and USA Cheer certification.

273.    Defendants are further aware that, despite the known dangers of one-on-one contact, coaches routinely engage in intimate and exclusive contact with minor athletes, as well as travel with minors across state lines, even staying in the same hotel rooms with no other chaperone, during these moneymaking cheer competition events which enrich the enterprise.

274.    And when complaints or reports have surfaced, or social media images and videos circulate depicting illegal activity with minors, the Defendants disregard or ignore same, do not report to any agencies, do not permanently strip coaches of their eligibility, and often rally around coaches who have been accused of illegal conduct with minors, even ostracizing families who have complained or reported.

275.    Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiff, and actually and proximately contributed to and/or caused damages.

276.    Defendants' actions and omissions as described above, by and through authorized agents, were in violation of Defendants' own policies, procedures, and what would be reasonable under the circumstances.

277.    Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

278.    Plaintiff is entitled to damages pursuant to the laws of South Carolina, including but not limiting to the following:

a.    Compensatory, actual, and consequential damages;

b.    Punitive damages; and

c.    Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT V
## NEGLIGENT SUPERVISION
## (VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT USA CHEER, DEFENDANT ROCKSTAR, DEFENDANT KATHY FOSTER AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF SCOTT FOSTER, AND DEFENDANT KATHY FOSTER INDIVIDUALLY)

279.    Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

280.    This claim is brought on behalf of the individual Plaintiff who was subjected to sexual abuse, assault and battery, and who was taken advantage of physically and financially.

281.    Despite claiming to conduct background checks and remove eligibility certification from coaches or gyms where complaints or reports of the foregoing conduct have been made, Defendants continue to let these gyms and coaches operate in order to generate income for the enterprise.

282.    Furthermore, Defendants failed to report these criminal activities to law enforcement agencies in favor of preserving the reputation of the enterprise so that trust in its safety continues to generate income for the enterprise.

283.    Defendants' business model relies upon certifying private gyms and coaches pursuant to the USASF standard, which purports to place athlete health and safety above all else.

284.    In perpetuating a business model built on trust and athlete safety, Defendants specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network Defendants oversaw.

285.    Defendants breached this duty in a number of particulars including by failing to act or otherwise disregarding reports of abuse of minors going so far as to allow coaches who were accused of such conduct to remain working with minor athletes or to transfer to other gyms without notifying their current gym of the allegations.

286.    In addition, and upon information and belief, at all times relevant to this complaint, Defendant USASF allowed gyms to unilaterally change owners when an athlete safety issue is reported. Defendant USASF further fails to follow up on who is actually operating the gym, and whether or not a noneligible coach, even one under criminal investigation, is continuing to work with minor cheer competitors.

287.    Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein directly and proximately caused Plaintiff's injuries.

288.    As a direct and proximate result of Defendants' conduct, the Plaintiff has been damaged.

289.    Plaintiff is therefore entitled to a judgment against Defendants, and for such actual and consequential damages in an amount to be determined by a jury trial.

**COUNT VI**
**ASSAULT/BATTERY**
**(DEFENDANT ROCKSTAR, DEFENDANT SCOTT FOSTER, DEFENDANT BLACK, DEFENDANT CARRUBA, UNKNOWN DEFENDANTS)**

290.        Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

291.        Defendant Scott Foster, as owner and operator of Defendant Rockstar, along with Defendants Black and Carruba, who Defendant Foster allowed to access minor athletes including Plaintiff did illegally commit unwanted and nonconsensual sexual touching of the Plaintiff and others.

292.        Said touching constituted sexual assault and sexual battery on these named Plaintiff and others.

293.        As a direct and proximate result of these Defendants' conduct, set forth more expressly above, Plaintiff experienced bodily injury, physical pain and suffering, and mental anguish and is entitled to an award of actual damages in an amount to be determined through a trial of this matter.

## COUNT VII
## BREACH OF CONTRACT
## (AS TO THE VARSITY DEFENDANTS AND DEFENDANTS USASF)

294.        Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

295.        At all times relevant to this complaint, Plaintiff had duly executed contracts with the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiff, Defendants agreed to provide a competitive environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

296.        As set forth herein, during the course of these contractual agreements, Plaintiff was subjected to severe and oppressive abuse, physically and mentally, including during competitions hosted by the Varsity Defendants under the governance of Defendant USASF.

297.     During the term of these agreements, the Varsity Defendants and Defendant USASF failed to provide Plaintiff with a safe and secure environment, including by failing to enforce the policies, procedures, and standards expressly adopted by Defendant USASF.

298.     These failures on the parts of the Varsity Defendants and Defendant USASF constitute violations of the fundamental and material terms of the agreements between Plaintiff, and the Varsity Defendants and Defendant USASF.

299.     The Varsity Defendants' and Defendant USASF's failures were so egregious and unconscionable as to render the agreements null and void.

300.     As such, Plaintiff seeks an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants' and Plaintiff, rescinding said contracts, and remitting the valuable consideration Plaintiff paid to Defendants during the relevant timeframe, as well as for all such attorney's fees, costs, and interest to which Plaintiff may be entitled.

## COUNT VIII
## UNJUST ENRICHMENT
## (AS TO DEFENDANT ROCKSTAR, THE VARSITY DEFENDANTS, DEFENDANT BAIN CAPITAL, AND DEFENDANT CHARLESBANK)

301.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

302.     As set forth herein, the cheer industry represents a multi-billion-dollar enterprise where each young athlete spends tens of thousands of dollars during the length of his or her student-athlete career toward gym memberships, private lessons, uniforms, accessories, competition fees, and membership with USASF.

303.     At all times relevant to this complaint, Plaintiff conferred non-gratuitous benefits upon Defendants including annual competition and membership fees, as well as continuous revenue toward uniforms, accessories, private training, and other monetary benefits.

304.     Defendants realized the value of these benefits, including steady annual revenue per athlete.

305.     To date, none of the benefits Defendants realized have been returned or otherwise disgorged.

306.     Under the circumstances set forth herein and above, it would be inequitable for Defendants to retain the benefits conferred by Plaintiff including through Plaintiff's annual membership fees and competition fees.

307.     Plaintiff is therefore entitled as a matter of equity to recover these benefits from Defendants and for all such additional relief as this Court deems proper.

## COUNT IX
### FRAUD
### (AS TO DEFENDANTS ROCKSTAR, THE VARSITY DEFENDANTS, AND DEFENDANT USASF)

308.     Plaintiff realleges the preceding paragraphs as though repeated verbatim.

309.     At all times relevant to this complaint, Plaintiff was a party to numerous annual contracts whereby Plaintiff agreed to pay Defendants annual and recurring fees in exchange for a safe competitive environment and training facility.

310.     As part of these agreements, Defendants represented to Plaintiff that Defendants would be responsible for ensuring a safe environment for Plaintiff including an environment free from sexual, physical, and mental harm and exploitation.

311.     Defendants' promises were material to Plaintiff's agreements, without which no agreements would have existed.

312.     Plaintiff had a right to rely upon Defendants' promises.

313.    As set forth herein, even at the time they entered into the agreements with Plaintiff, Defendants knew or had a reckless disregard for whether the environment they provided at competitions was safe and free from harm and sexual, physical and mental abuse.

314.    In fact, at all times relevant to this complaint, Defendants knew that the environment they provided actually facilitated access to underage athletes by predators, including coaches, choreographers, and other adults.

315.    Yet, with knowledge or a reckless disregard for whether Defendants were providing safe environments for child athletes, Defendants nevertheless entered into the agreements and began collecting fees from Plaintiff.

316.    Upon information and belief, Defendants' misrepresentations included, without limitation:

  a. Certifying to Plaintiff that Defendants were responsible for providing safe competitive and practice environments;

  b. Certifying to Plaintiff and his family that the adults involved in the competitions, including coaches who were allowed to participate in competitions, had been duly vetted;

  c. Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior, such as providing alcohol and drugs to minors;

  d. Facilitating an unchaperoned environment for child-athletes;

  e. Fostering a party culture for child athletes, including an environment where alcohol and drugs were readily available;

f.  Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

g.  Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

h.  Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

i.  Such additional conduct as may be revealed during discovery and the trial of this case.

317.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain significant injuries and damages.

318.    Plaintiff now seeks an order from this court setting aside the referenced agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiff for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## <u>COUNT X</u>
## NEGLIGENT SECURITY
## (AS TO THE VARSITY DEFENDANTS, DEFENDANT ROCKSTAR, DEFENDANT BAIN CAPITAL & DEFENDANT CHARLEBANK)

319.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

320.    At all times relevant to this complaint, the Varsity Defendant, Defendant Bain Capital, Defendant Rockstar, and Defendant Charlesbank sponsored, created, hosted, and oversaw private all-star gyms, camps, and competitions where young adult athletes would converge at pre-determined locations, established and governed by Defendants, and under the supervision of Defendants.

321.    At all times relevant to this complaint, if athletes competed at the private all-star gyms, camps and competitions hosted by Defendant Rockstar, the Varsity Defendants, and Defendants Bain Capital and Charlesbank, the athletes had no meaningful choice but to attend at the locations, and under conditions, established by Defendants.

322.    The Varsity Defendants, Defendant Rockstar, and Defendants Bain Capital and Charlesbank received substantial revenue from these events.

323.    As part of their promotion of these events, the Varsity Defendants, Defendant Rockstar, and Defendants Bain Capital and Charlesbank undertook a responsibility to ensure that the locations and events were safe for attendees, minor athletes who were likely to encounter adult coaches, choreographers, videographers, and attendees.

324.    The Varsity Defendants, Defendant Rockstar, and Defendants Bain Capital and Charlesbank violated their responsibility to provide safe premises free from harm from third parties in one or more of the following particulars:

     a.  Disparate enforcement of policies, procedures, and guidelines related to coaching suspension, with the result that coaches such as Scott Foster were still allowed to attend Varsity Competitions and represent Varsity-affiliated private all-star gyms;

     b.  Failure to provide adequate monitoring;

     c.  Failure to provide sufficient background checks, with the result that hundreds of potential threats were allowed to gain access to underage athletes;

     d.  Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol at all-star Gyms, and while attending Varsity events;

    e.   Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic images while competing on behalf of Varsity-affiliated gyms, and attending Varsity events;

    f.   Failing to ensure that adult coaches were not forcing themselves upon minor athletes at hotels hand selected by these Defendants for the Varsity events;

    g.   Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults affiliated with Defendants;

    h.   Such additional conduct as may be revealed during discovery.

325.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain significant injuries and damages.

326.    Plaintiff now seeks an order from this court setting aside the agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiff for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## COUNT XI
## CIVIL CONSPIRACY
## (AS TO ALL DEFENDANTS)

327.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

328.    At all times relevant to this complaint, Defendants were a collective group of individuals working in concert and individually toward a common plan.

329.    As described more fully herein, Defendants, acting as a collective group and individually, and at all times relevant to this complaint, were engaged in the process of recklessly, intentionally, and willfully endangering the Plaintiff, a minor athlete, by exposing him to illegal

substance abuse, sexual abuse and exploitation while assuring him and his family that Defendants were providing safe conditions and premises for the athletes to compete.

330.    As described more fully herein, Defendants' conduct included misleading and fraudulent messaging to children and their families which Defendants knew or should have known would endanger children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

331.    At all times relevant to this complaint, Defendants were motivated by the substantial revenue, profits, and funding paid by the athletes and their families in exchange for the fraudulent messages and misrepresentations made by Defendants.

332.    In 2014, Defendant Charlesbank funded this scheme, providing additional capital for Defendants to perpetuate their misrepresentations.

333.    In 2018, Defendants Bain Capital took over the primary role in funding the purpose this scheme. Defendant Charlesbank retained an interest however in the misrepresentations and resultant monetary benefits.

334.    Defendants acted in concert to perpetuate this scheme.

335.    In addition, Defendants knew or should have known that the funding, materials, and premises provided by Defendants were material to the abuses and harm suffered by the minor athletes, as well as the continued perpetuation of revenue from these athletes.

336.    The Defendants knew or should have known that inappropriate contact was occurring between coaches, choreographers, videographers, and other adults and minor athletes based on the one-on-one coaching being marketed and the travel of children across state lines with

their coaches who stayed in hotel rooms with them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

337.    The Defendants owed a duty to the minors affiliated with Defendants, including Plaintiff John Doe 3, and their families, to disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

338.    The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

339.    The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

340.    But for the fraudulent assurances to their parents that the gyms and coaches were certified safe, the abuse would not have occurred, and Plaintiff would not have suffered continued economic harm derived from paying substantial dues and fees predicated in large part on promises of a safe environment for the minor athletes.

341.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to damages including but not limited to the following:

    a.    Compensatory, actual, and consequential damages, trebled in accordance with the statute;

    b.    Punitive damages; and

    c.    Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court award the following damages, jointly and severally against Defendants, as provided by United States law and South Carolina law, including but not limited to the following:

    a.    Compensatory, actual, and consequential damages to Plaintiff, trebled where permitted by statute;

    b.    Alternatively, liquidated damages as to Count I;

    c.    Costs of this action and attorneys' fees to Plaintiff;

    d.    Punitive damages where permitted; and,

    e.    Any and all other and further relief as this Court may deem appropriate.

**TRIAL BY JURY**

WHEREFORE, Plaintiff hereby demands a trial by jury on all issues so triable.

        **STROM LAW FIRM, LLC**

        *s/ Bakari T. Sellers*
        Bakari T. Sellers (SC Fed. ID No. 11099)
        Joseph Preston Strom (SC Fed. ID No. 4354)
        Mario A. Pacella (SC Fed. ID No. 7538)
        Amy E. Willbanks (SC Fed. ID No. 13537)
        Jessica L. Fickling (SC Fed. ID No. 11403)
        Alexandra Benevento (SC Fed. ID No. 10734)
        6923 N. Trenholm Road, Suite 200
        Columbia, South Carolina 29206
        Phone:  (803) 252-4800
        Email: bsellers@stromlaw.com
              petestrom@stromlaw.com
              mpacella@stromlaw.com
              awillbanks@stromlaw.com
              jfickling@stromlaw.com
              abenevento@stromlaw.com
        *Attorneys for Plaintiff*

October 11, 2022