# Exhibit H

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DIVISION OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| John Doe 1[1] by and through his mother, Mary Doe, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| Varsity Brands, LLC, Varsity Spirit, LLC,  Varsity Brands Holding Company, Inc., U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation, Jeff Webb, individually, Stingray Cheer Company, Inc., David S. Jones, II, Juan Carlos Realpe, Joel Kreider, and Robert Stone, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

**PROPOSED
FIRST AMENDED COMPLAINT
(JURY DEMAND)**

## <u>INTRODUCTION</u>

1.    Since 2002, Defendant Stingray Cheer Company, Inc., ("Defendant Stingray") has been a private All-star cheer and tumbling business with locations in

---

[1] Given the nature of the subject matter as well as the potential for harm that exists against those who come forward to inform against Defendants, the Plaintiff in this matter will be identified only as John Doe in conjunction with the factual underpinnings on this complaint.

Kennesaw and Marietta, Georgia offering coaching and training services for athletes of all ages including children as young as five years old.

2.      At all times relevant to this complaint, Defendant Stingray's motto has been   "[t]o create an environment where a young athlete will learn the value of teamwork, commitment, and hard work. We strive to produce a confident athlete that will consistently be an asset in the future."

3.      Yet, at all times relevant to this complaint, Defendant Stingray, by and through owner, Defendant David S. Jones, as well as its coaches and employees, allowed Plaintiff, a minor under its duty and obligation to protect to be emotionally, physically, and sexually exploited and abused by an adult coach and athlete.

4.      During the relevant timeframe, Defendant Stingray was a member club working on behalf of Defendants Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, (collectively "the Varsity Defendants") and the Varsity Defendants' owners and affiliates, including Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation ("Defendant USASF"), and Defendant Jeff Webb ("Defendant Webb") [together the "managing defendants"].

5.      During the relevant timeframe, Plaintiff was a paying member of Defendant USASF, and was required annually to renew his membership with USASF to compete on behalf of his Varsity-affiliated gym.

6.     Moreover, during the relevant timeframe, Plaintiff's individual abuser, Defendant Robert Stone, as well as Defendant Stingray and the other individual Stingray Defendants named herein were credentialed members of Defendant USASF.

7.     This credentialing process and certification of various entities by the Varsity Defendants signified to the All-star cheer community, including Plaintiff John Doe 1, that Defendant Stone, Defendant Stingray, and the other adults working for Defendant Stingray had been investigated and deemed safe for work around minor children.

8.     As such, at all times relevant to this complaint, these Defendants were vested with the authority and ability to accept minor participants on behalf of the Varsity Defendants' network of camps, competitions, and clinics, to access USASF member athletes, and to attend USASF "sanctioned" events.

9.     In addition, at all times relevant to this complaint, Defendant Stone was a "cheerlebrity" within the Varsity Defendants' network.

10.    As a "cheerlebrity" Defendant Stone was promoted by the Varsity Defendants.

11.     These promotional efforts by the Varsity Defendants included coupon codes Defendant Stone could disseminate to his many followers, which inured to the financial benefit of Defendant Stone as well as the Varsity Defendants.

12.     Defendant Stingray and individual Defendants Jones, Wilson, and Stone were empowered and placed in positions of trust and authority by the Varsity Defendants, Defendant USASF, and Defendant Webb.

13.     At the same time, these Defendants knew or should have known Defendant Robert Stone a prominent coach working on behalf of Defendant Stingray, and acting as an authorized representative of the managing Defendants, was abusing minor children and that Defendant Stingray was facilitating the abuse of minor children under its  duty of protection.

14.     As set forth in this complaint, the Defendants, individually and collectively have created, organized, and propagated a system o abuse against minor participants in their joint enterprise including Plaintiff John Doe 1.

15.     This is a complaint for legal and equitable relief for the victims of this scheme and joint enterprise.

## **JURISDICTION, PARTIES, AND VENUE**

16.     This action arises pursuant to, and involves questions requiring the interpretation of the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

17.     Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

18.     At all times relevant to this complaint, Plaintiff John Doe 1 has been a citizen and resident of Ohio.

19.     At all times relevant to this complaint, Defendant Stingray has been a for-profit corporation organized and existing pursuant to Georgia law, with its principal place of business at 1431 Cobb Parkway, North, Marietta, GA, 30062. At all times relevant to this complaint, Defendant Stingray was one of the largest Varsity All-star cheer gyms in the country, a USASF member club, and, by and through its employees, owners, agents, and authorized representatives, all within the course and scope of their responsibilities, did interact on a daily basis with minor children, both upon its premises, as well as at various camps, clinics, and competitions throughout the country.

305.    Upon information and belief, at all times relevant to this complaint, Defendant David S. Jones ("Defendant Jones") owned and operated Defendant Stingray, and was a citizen and resident of Cobb County, Georgia.

20.     Upon information and belief, and at all times relevant to this complaint, Defendant Juan Carlos Realpe ("Defendant Realpe") was a citizen and resident of Kennesaw, Georgia and has been employed by Defendant Stingray.

21.     Upon information and belief, and at all times relevant to this complaint, Defendant Joel Kreider ("Defendant Kreider") was a citizen and resident of Kennesaw, Georgia and has been employed by Defendant Stingray.

22.     Upon information and belief, at all times relevant to this complaint, Defendant Stone was a resident of Kennesaw, Georgia and was both an adult athlete for Defendant Stingray and was employed by Defendant Stingray.  Defendant Stone currently resides in Tennessee. During the timeframe of this complaint, Defendant Stone was credentialed by USASF, and was thereby expressly permitted to interact with minor children, such as Plaintiff John Doe 1.

23.     At all times relevant to this complaint, Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) ("Defendant Varsity Brands") has been a for-profit entity organized under the laws of Delaware with its principal place of business in Memphis, Tennessee.

24.     It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation).

25.     Defendant Varsity Brands has taken affirmative steps to promote the premise that competing on behalf of the Varsity Defendants was safe, including the creation of coaching and gym classes through "Varsity University," organizing a Varsity safety council, which publicly purported to focus on the threat of sexual abuse to All-star minor participants, and an adult certification process.

26.     At all times relevant to this complaint, Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) ("Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee.

27.     During the operative timeframe, Defendant Varsity Spirit has been the world's largest purveyor of merchandise, branding, camps, clinics, and competitions for the private All-star cheer community, encompassing as much as 90% of the industry's gyms, coaches, vendors, and athletes, including throughout the state of Georgia.

28.     Defendant Varsity Spirit has taken affirmative steps to represent to member minor participants that competing on behalf of a Varsity-affiliated gym would provide athletes with a uniquely safe experience free from sexual abuse.

29.     At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. ("Defendant Varsity Brands Holding") has been a for-profit

entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas.

30. Defendant Varsity Brands Holding is the corporate parent of Defendant Varsity Brands, and, upon information and belief, at all times relevant to this complaint, exercised a significant degree of control over the daily operations, management, budgeting, staffing, and training for Defendants Varsity Brands and Varsity Spirit, including Defendants' organization, control, and decision making over events, camps, and clinics in Georgia.

31. Defendants Varsity Spirit, LLC, Varsity Brands, LLC and Varsity Brands Holding Company, Inc., shall be referred to collectively as the "Varsity Defendants".

32. At all times relevant to this Complaint, either directly or through affiliates, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, cheer camps, clinics, exhibitions, and competitions throughout the United States including Georgia.

33. Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation (hereinafter "Defendant USASF") is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee.

34.     USASF is the self-proclaimed governing and regulatory body promulgating and enforcing rules for private All-star cheer, including throughout the state of Georgia.

35.     As set forth more fully in this Complaint, Defendant USASF was aware of the allegations of abuse against Defendant John Doe 1, and, in conjunction with the Varsity Defendants, had a duty to provide a safe environment and  protecting Plaintiff John Doe 1 from grooming, exploitation, harassment and/or abuse, yet failed to do so.

36.     At all times relevant hereto, Defendant USASF has been controlled and funded by the Varsity Defendants.

37.     At all times relevant to this complaint, Defendant Jeff Webb ("Defendant Webb") was a citizen of Memphis, Tennessee, and created, owned, operated, and controlled Defendant Varsity Brands, LLC, Defendant Varsity Spirit, LLC, Defendant Varsity Brands Holding Company, Inc., and Defendant USASF.

38.     As late as 2021, Defendant Webb publicly acknowledged the role of the leaders in the private All-star cheer universe he created to protect children from abuse.

39.     In an interview with Sportico, Webb was quoted as saying that it was "incumbent on [these] leaders to be forever vigilant as far as trying to protect

9

children," and that "[sexual abuse against children] is a problem and issue for all sports, and cheerleading is no different."[2]

40.    This statement regarding the protection of minor participants, was intended to and did encompass all participants throughout the United States, including in Georgia.

41.    At all times relevant to this Complaint, Defendant Webb, the Varsity Defendants and Defendant USASF either directly and/or through their affiliates, which they control, have: (a) been responsible for promulgating and/or enforcing rules governing competitive cheer, including coaching, training, cheer camps and competitions throughout the United States; (b) organized, promoted, produced, and/or managed cheer camps and competitions throughout the United States and furthered the goals and purposes of the conduct set forth herein; (c) established guidelines and assessed whether to certify gyms and coaches, including those named herein, as members of USASF and to otherwise provide "credentials" for these members gyms and affiliates; (d) required that athletes, coaches, and clubs purchase annual memberships with Defendant USASF in order to participate in the Varsity Defendants' sanctioned events; and € promoted  certain gyms and coaches above

---

[2]  "A tangled Jeff Webb weaves cheerleading's Olympic dreams," Daniel Libit, September 16, 2021, available at: https://www.sportico.com/personalities/executives/2021/cheerleading-varsity-brands-webb-1234638714/

others, particularly those who were the most lucrative to the Varsity Defendants' network.

42.    Venue is proper in the United States District Court for the Northern District of Georgia, Atlanta Division, pursuant to 28 U.S.C. §1391 as at least one of the Defendants is a resident of Cobb County, Georgia, or a corporation organized and existing, and with a principal place of business in Marietta, Georgia, and a substantial portion of the acts and omissions complained of occurred in this district.

## FACTUAL ALLEGATIONS

### I.    Background of All-Star Cheer and Varsity Control

43.    Private All-star cheer is a competitive and dynamic sport where minor participants compete in a team setting, mixing a variety of disciplines including cheer, dance, and tumble.

44.    Because of its historically unregulated nature, All-star cheer is not subject to traditional seasonal limitations, or other restrictions, or oversight.

45.    As such, All-star cheer requires near constant training, cross-training, and frequent competition and clinic participation throughout the year under circumstances controlled entirely by a series of private entities, led by Defendant Jeff Webb and the Varsity Defendants.

46.     In this space of All-star cheer, the Varsity Defendants have emerged as the pre-eminent business.

47.     In 1971, Defendant Webb began his work in cheerleading as an employee at the National Cheerleaders Association working for Lawrence Herkimer, known as the original pioneer of cheer.

48.     In 1974, Defendant Webb left Herkimer and formed his own group, which he named the Universal Cheerleaders Association.

49.     By and through Universal Cheerleaders Association, Defendant Webb grew his footprint in the cheer industry, promoting and showcasing his cheer camps, which grew throughout the 1980s.

50.     During the 1980s, Defendant Webb's cheer camp organization transformed into Defendant Varsity Spirit.

51.     Defendant Varsity Spirit began as a provider of cheer camps and thereafter expanded into competitions, merchandising, branding, social media, and even gym ownership and management.

52.     Eventually, Defendant Webb re-branded Varsity Spirit as Defendant Varsity Brands, which included All-star cheer as well as dance.

53.     Defendant Varsity Brands remained integrally involved in the daily decision making related to Varsity All-star cheer.

54.     In addition, Defendant Jeff Webb remained at the helm both of Varsity Spirit, and of the growing Varsity Brands.

55.     By the early 2000's, Defendant Webb took Varsity Brands public, representing the corporation as:

        a.      The largest designer, marketer, and supplier of cheerleader dance team uniforms and accessories;

        b.      The biggest operator of cheerleading and dance team training camps and clinics;

        c.      A leading organizer of special events for extracurricular activities;

        d.      A major provider of studio dance conventions and competitions; and

        e.      A producer of studio dance apparent for studio dance competitions.[3]

56.     As early as 2002, the largest source of revenue for Defendant Varsity Brands came from Defendant Varsity Spirit.

---

[3]    *See* Varsity Brands, Inc., Form 10-K, (Apr. 1, 2002), available at: https://www.sec.gov/Archives/edgar/data/874786/000093041302001124/c23854_10k.txt

57. Through their various dealings in the cheer industry, the Varsity Defendants have controlled an estimated 80-90% of the market.

58. This domination over the Cheer market includes control over affiliated gyms, who are essentially prohibited from competing in or endorsing any other private event companies.

59. Instead, Varsity - affiliated gyms must abide by the Varsity Defendants policies, procedures, and guidelines, including the Varsity Defendants' mandate that athletes purchase annual memberships with Defendant USASF.

60. A substantial portion of the revenue from each minor participant who cheers for a Varsity-affiliate gym goes directly to the Varsity Defendants.

61. A single season competing with a Varsity-affiliate gym can, at minimum, cost between $3,000 to $7,000 per team member.

62. Some families spend $20,000 or more for transportation, lodging, memberships, entrance fees, music fees, choreography expenses, as well as merchandise, uniforms, and other accessories and incidentals, incurred in connection with the numerous competitions and clinics the athletes attend throughout the year.

63. These competitive events, and clinics, and those adults authorized to train and conduct these events and clinics are subject to the guidance, certification,

and rulemaking of Defendant USASF, which was created, controlled, and funded by Defendant Webb and the Varsity Defendants.

64.    Specifically, in or around 2003, in response to the formation of the National All-Star Cheerleading Coaches Congress ("NACCC"), the Varsity Defendants founded Defendant USASF to provide governance and regulatory support for Varsity All-star cheer.

65.    At inception, Defendant Webb and the Varsity Defendants touted Defendant USASF as the equivalent of a National Governing Body[4] whose responsibility included creating a safe and positive environment for minor child participants, including an environment free from abuse and misconduct[5].

66.    In reality, and as acknowledged by Defendant Webb, Defendant USASF was a further action by the Varsity Defendants to establish monopolistic control over the private All-star cheer industry to the exclusion of other event companies[6].

---

[4] "National Governing Body" refers to an amateur sports organization, high performance management organization, or a paralympic sports organization but is essentially created to provide oversight, governance, and protection against certain misconduct for an identifiable group of individuals.
[5] *See* USASF Athlete Protection & Abuse Prevention Policies, available at: Athlete Protection | USASF ; *see also* Varsity Athlete Protection, available at: Varsity Spirit - Athlete Protection - Varsity.com; with links to Defendant USASF's Athlete Protection and abuse website.
[6]         https://www.sportico.com/leagues/other-sports/2021/accused-monopolist-varsity-spirit-1234643664/

67.     After forming Defendant USASF, the Varsity Defendants mandated that All-star minor participants cheering on behalf of Varsity-affiliated gyms purchase annual USASF memberships as a requirement to compete with the Varsity-gym.

68.     Moreover, the Varsity Defendants mandated that gyms, coaches, and adult vendors who wished to interact with these Varsity-affiliated minor participants and to attend Varsity-sponsored events also become members of Defendant USASF.

69.     After forming Defendant USASF, around 2006, the Varsity Defendants created the title "USASF Certified,".

70.     This USASF seal denotes that the Varsity Defendants and Defendant USASF warranted a "certified" gym, coach, or adult member has been duly vetted and met Defendants' highest standards regarding safety practices and prevention of minor child abuse.[7]

71.     Upon information and belief, under the instruction of Defendant Webb, the Varsity Defendants and Defendant USASF used this credentialing and certification to signal to parents and athletes that USASF would continually monitor

---

[7] For instance, as it relates to USASF's "greenlight determination," USASF represents that "[b]ackground checks are a critical component of any athlete protection program. At USASF, we believe thorough a [sic] background check of all individuals who engage in regular contact with minor athletes is the first step toward protecting those athletes." *See* USASF Directory FAQs for 2022-2023, available at: <u>USASF Member Directory</u>.

and ensure compliance with minor child safety protections, policies, procedures and protocols by its member gyms, coaches, vendors, and other affiliates.

72. By 2010, credentialing and certification became paramount to the success of the Varsity network and the managing Defendants.

73. In a public statement, Defendant USASF represented: "[t]hrough credentialing, coaches are made aware of expectations as teachers and role models. It is the goal of the USASF to infuse good decisions into each and every credentialed coach so that they may expand the positive life experience of all-star cheerleading and dance[.]"[8]

74. Defendant Webb and the Varsity Defendants controlled Defendant USASF from inception.

75. The Varsity Defendants created Defendant USASF with a $1.8 million dollar interest free loan and submitted the original trademark application for Defendant USASF.

76. For at least the first fifteen years of its existence, Defendant USASF's offices were located at Defendant Varsity Spirit's corporate headquarters, and a Varsity representative would answer Defendant USASF's phone, and USASF

---

[8] The original quote appears in a 2010 edition of Cheer Coach and Advisor Magazine. At the time of publication, Defendant Webb served on the magazine's editorial board.

employees were paid directly by the Varsity Defendants and the Varsity Defendants were authorized to cash checks issued to Defendant USASF.

77.     In addition, during the operative timeframe of this complaint, the Varsity Defendants controlled Defendant USASF's Board of Directors, which sets policy for Defendant USASF.

78.     The Board was composed of thirteen voting members, and, as recently as 2022 at least 75% of the voting members have been controlled by the Varsity Defendants or companies controlled by the Varsity Defendants..

79.     By creating their own governing and regulatory body, USASF and mandating that all athletes competing with a Varsity-affiliated gym become members of that governing body, Defendant Webb and the Varsity Defendants ensured their control over every aspect of cheerleading at every level in the United States, including minor participants throughout Georgia such as Plaintiff John Doe 1.

80.     Defendant USASF, the so-called independent governing and regulatory body overseeing the Varsity network, purportedly established policies, procedures, and guidelines for everything from coaching credentials to boundaries for appropriate and inappropriate conduct[9].

---

[9] USASF Athlete Protection and Abuse Prevention Policies, *Id.* at FN 4.

81. In addition to this Code, in or around 2009, Defendant USASF also created its Professional Responsibility Code, applicable to all members.

82. Part of this Code recognized the role of Defendant USASF, and, more broadly, the Varsity Defendants, in protecting minor participants from grooming, exploitation, harassment or sexual abuse.

83. For instance, according to this Code, "Once a coach-Athlete relationship is established, a Power imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the coach-Athlete relationship terminates until the Athlete reaches 20 years of age."

84. While this Code stated its goal was to "maximize not only the integrity and legitimacy of the all-star industry, but to safeguard athletes who participate[,]" at the same time, the Code included significant guidelines to prevent movement of minor participants from one Varsity-member gym to another.

85. For example, as set forth in the Code:

    i. I pledge, as a member of the USASF, I will not initiate contact with another program's athletes and families in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical;

ii.    I pledge, as a member of the USASF, I will not encourage any of my athletes or family members to contact another program's athletes and families during the competitive season in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical.

iii.    I pledge, as a member of the USASF, I will honor and encourage everyone to respect all mutual agreements and/or contracts made between parties, whether formal or informal, by programs, coaches and athletes….

*See* USASF Professional Responsibility Code, Version 11.0, Process.

86.    By creating a Professional Responsibility Code requiring members to pledge against internal competition, Defendant USASF essentially guaranteed that gyms would enjoy uninfringed access to athletes and their families and discouraged these athletes and families from reporting potentially dangerous coaches and vendors.

87.    In addition to creating Codes of Conduct and Compliance, Defendant USASF, backstopped by the Varsity Defendants, also undertook investigations into allegations of misconduct within the Varsity network of credentialed coaches and

vendors.

88.     As such, when an athlete reported an incident to their gym or a certified coach within their gym, they were directed to Defendant USASF.

89.     Defendant USASF's oversight of the Varsity network was problematic from inception.

90.     In December 2020, USA Today broke a story revealing what it described as USASF's "inherently flawed process" in its oversight role, which allegedly allowed dozens of known sex-offenders to nevertheless access minor participants in Varsity All-star cheer.[10]

91.     In response to these accusations of flawed oversight and inherent conflicts of interest between his Varsity entities and Defendant USASF, Defendant Webb purportedly discounted any potential danger against his minor participants, instead chalking the accusations up to industry jealousy.[11]

92.     Meanwhile, on December 7, 2020, Defendant USASF announced a universal system for reporting athlete safety concerns, as well as a central repository listing ineligible coaches and individuals.

93.     Defendant USASF stated that these measures "will provide a robust

---

[10]  *See*  https://www.sportico.com/leagues/other-sports/2021/accused-monopolist-varsity-spirit-1234643664/

[11] *Id.*

athlete safety infrastructure readily available across the entire cheer community."[12]

94.    As stated in the release: "USASF adult members are required to pass a background screening, complete the *U.S. Center for SafeSport Trained* course, and follow the USASF Professional Responsibility Code, which establishes principles that guide member conduct and disciplinary consequences for non-compliance."[13]

95.    The combination of these purported safety measures - credentialing, Codes of Conduct and Professional Responsibility, and the Unified Ineligibility List - all failed to adequately protect young athletes from harm.

96.    In fact, the number of coaches included on the Unified Ineligibility List has swelled to over 230 adults.

97.    Upon information and belief, the failure of Defendant Webb's, the Varsity Defendants', and Defendant USASF's safety practices was not necessarily related to the failure of the written measures themselves, but, instead, a failure of execution, and systemic failures in the culture.

98.    As it relates to the Unified Ineligibility List, most suspected offenses relate to claims of sexual misconduct between minors and credentialed adults.

---

[12] *See* Press Release December 7, 2020, USA Cheer and U.S. All Star Federation Launch Unified Athlete Safety Infrastructure, available at: USA Cheer & U.S. All Star Federation Launch Unified Athlete Safety Infrastructure (usasfmain.s3.amazonaws.com).
[13] *Id.*

99.     Upon information and belief, many of these credentialed adults passed undetected through the Defendant USASF credentialing process. For example, and according to the 2020 expose in USA Today:

a.      A Virginia gym owner was convicted of sexual battery and assault and placed on the sex offender registry after three girls he coached at his Virginia gym came forward. As of 2020, this coach was still listed as the gym's owner and was still USASF certified. Varsity continued to invite his gym to competitions. One of his victims had to stop cheering competitively because her convicted abuser was allowed to stay involved around children and in proximity to her.

b.      A Charlotte coach who was arrested for two counts of sexual assault of a minor and lost his middle school teaching job continued to have access to minor participants afterward. Though the gym's owners claimed he was told he was no longer welcome to work with the gym's athletes after his arrest, he continued to appear in official social media accounts of the gym, was connected by the gym director to parents for private lessons and attended a Varsity event in Florida where he was photographed posing next to the gym's athletes in a gym uniform with the word "Coach" on his shorts.

c.      A coach who had been fired from a gym and charged with child pornography was discovered to still be working in the cheer industry by the gym owner who had originally fired him. The gym owner called Varsity, who told her his background check was fine. After she went to the courthouse to get the records of his conviction and sent them to Varsity, months passed and the man continued coaching children at Varsity events through USASF gyms.

d.      A Washington gym owner was not banned by USASF until more than a year after the organization received reports in 2018 that he had been accused of sexual misconduct with minors.

100.    During the operative timeframe Defendant USASF refused or failed to report non-member coaches and adults accused of misconduct to law enforcement – contravening its representation that USASF and its members are mandatory reporters[14].

101.    Upon information and belief, Defendant USASF has received hundreds of complaints against coaches, choreographers, videographers, and others accused of sexual misconduct.

---

[14] *See* USASF Terms and Conditions of Coach Membership, available at: Coach Membership (usasf.net)

102.    Until recently, however, Defendant USASF failed to dedicate fulltime staff to managing investigations of these complaints.

103.    Ginger Wilczak, the part-time contract employee USASF eventually hired to field reports of misconduct, stated that she worked 10 hours per week at most.[15]

104.    In an interview with Mary Carillo in an HBO Real Sports investigative segment, Ginger Wilczak reported that she had been actively prevented from taking the necessary actions to perform her job.

105.    Defendant USASF has also been slow to develop policies and procedures for keeping minor participants safe from sexual abuse.

106.    Defendant Webb, the Varsity Defendants, and Defendant USASF failed to adequately implement appropriate safety measures to protect minor participants from sexual abuse despite that fact that youth sports organizations such as the Varsity Defendants and USASF have been dogged for decades by allegations of sexual abuse and sexual exploitation of minor children.

107.    As set forth herein, the Varsity Defendants and Defendant USASF failed to execute an operable plan to fight the scourge of minor sexual abuse and

---

[15]      https://usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

sexual exploitation within the Varsity network despite knowledge of specific abuse and misconduct within their own organization, as well as knowledge of rampant abuse and misconduct invading other similar youth and youth sports organizations.

108. Meanwhile, according to its website: "USASF is the U.S. All Star Federation. It's about safety standards. It's about coaches' education. It's about providing a safe environment to allow for the continued growth of all-star cheerleading and dance across the country. ***It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care***. It's about standardization of rules from one competition to the next. It's about time." (Emphasis added).

109. Despite this public proclamation however, Defendant USASF's gym and coach training has focused almost exclusively on avoiding physical injury to athletes.

110. Meanwhile, Defendant USASF was not the only Defendant to make public representations and affirmations about its responsibility to keep minor participants safe.

111. For example, the Varsity Defendants have publicly represented that Defendant Varsity Brands empowered a Safety Council, to include outside,

independent experts, and to closely examine and evolve current minor participant safety guidance.

112. Defendant Varsity Brands directed questions and concerns to safety@varsity.com.

113. Defendant Varsity Brands also created "Varsity University," which is "an enterprise powered by Varsity Brands, [and which] offers comprehensive educational programming to schools and athletic programs,"[16] and consisting of a nine-course program that encompasses three specific areas: Life Skills, Social Media, and Leadership.

114. Varsity University hosts annual conferences during which the adults are indoctrinated into the Varsity Defendants' culture.

115. At these conferences, known as Varsity University events, upon information and belief, coaches, gym owners, and vendors are encouraged to drink alcohol and engage in debaucheries, and are inundated with promises of gifts and financial gain if the coaches continue to produce young member-athletes who promote the Varsity brand.

116. Defendant Varsity Spirit has represented that it provides "training to

---

[16] Information is available at Varsity University Online Education Programs Athletic Programs & Schools.

27

Varsity Spirit instructors and staff regarding abuse and reporting."[17]

117.   As set forth on its website, "Varsity Spirit enforces its own policies that prohibit abuse and misconduct and are designed to reduce, monitor and govern the areas where potential abuse and misconduct might occur, in addition to the policies implemented by USA Cheer and USASF addressing certain types of abuse and misconduct.

118.   The following types of misconduct are specifically prohibited in these policies: (i) sexual abuse and misconduct; (ii) physical abuse and misconduct; (iii) emotional abuse and misconduct; (iv) bullying, threats, and harassment; (v) hazing."[18]

119.   By creating their own internal policies and procedures aimed at mitigating and preventing minor participant sexual abuse, the Varsity Defendants not only undertook such a responsibility, but acknowledge their community-wide responsibility to protect minor participants within the Varsity network from sexual abuse.

120.   Defendant Webb has also acknowledged not only the known threat of harm against minor athletes in sports, but that it is the responsibility of the adults in

---

[17] *See* Varsity Spirit - Athlete Protection - Varsity.com
[18] *Id.*

charge to protect those minor participants.[19]

121.　At all times relevant to this Complaint, Plaintiff John Doe 1 was one such minor participant.

122.　In addition to these affirmative representations related to safety compliance within the Varsity network, Defendant USASF and the Varsity Defendants have also made numerous misrepresentations about their affiliation with the U.S. Center for SafeSport[20], the Congressionally authorized independent non-profit charged with overseeing National Governing Bodies and other affiliates to prevent minor athlete sexual abuse and misconduct.

123.　At no point either during the timeframe relevant to this Complaint or since, have the Varsity Defendants or Defendant USASF actually participated in U.S. Center for SafeSport.

124.　Instead, the Varsity Defendants and Defendant USASF created their own version of SafeSport, Safe@allstar[21], using similar labeling, terminology, and even icons.

125.　The choice to continue operating completely independent from any

---

[19]　https://www.sportico.com/personalities/executives/2021/cheerleading-varsity-brands-webb-1234638714/

[20]　*See* Preventing and Addressing Abuse | U.S. Center for SafeSport (uscenterforsafesport.org).

[21]　*See* Athlete Protection (usasf.net)

outside oversight at a time when a Congressionally backed alternative existed was a reckless response by Defendant Webb, Defendants USASF and the Varsity Defendants.

126. Moreover, these Defendants intended for parents and minor participants to rely on the public representations about Safe@allstar and its role in fortifying the Varsity network against the risk of grooming, exploitation, harassment, or sexual abuse.

127. Plaintiffs Mary Doe and Plaintiff John Doe 1 relied on these representations.

128. Outside observers acknowledged the Varsity Defendants' system was fraught with conflicts and pitfalls that favored the Varsity Defendants over participating minor child athletes.

129. John Patterson, a former staffer of the Nonprofit Risk Management Center who consulted on youth sports safety, said he has never heard of an arrangement quite like the one between Defendant Varsity Sprit and Defendant USASF.

130. He said Varsity Spirit, LLC's control of USASF meant, "whatever Varsity wants, Varsity can get" in terms of rules and regulation of the cheer world.

131.    According to Jeff Webb, establishing unimpeded control was exactly what he and the Varsity Defendants wanted when they formed Defendant USASF.

132.    Les Stella, the former executive director of the International All-Star Federation once recalled that Defendant Webb said the following about founding Defendant USASF: "It wasn't because we wanted some governing body to f-ing tell us what to do. It was our strategy to take over all-star cheerleading. And it f-ing worked too."[22]

133.    In 2020, W. Scott Lewis, partner at legal and risk management firm TNG, criticized Defendant USASF's handling of reports and complaints in that they often sat on their hands and did nothing, assuming law enforcement had been contacted by someone else.

134.    He said it was not typical for organizations to wait for law enforcement action before taking their own action unless they've explicitly been asked to do so.

135.    He said, "You don't want to be on the sideline saying, 'Well, we can't do anything because law enforcement's doing it,'" Lewis said. "You want them to have the ability to engage in interim measures or your own investigation, or both."

136.    At all times relevant to this complaint, and by virtue of the closed

---

[22] https://www.sportico.com/leagues/other-sports/2023/varsity-backed-usa-cheer-1234699831/

network they created, the Varsity Defendants obtained access to minor USASF members, including John Doe 1.

137. The Varsity Defendants represented to minor child athletes, including Mary Doe and John Doe 1, that participation with a USASF Certified gym and certified coaches would provide access to the highest echelon safety standards in the sport.[23]

138. Yet, at all times relevant to this Complaint, Defendant Webb, the Varsity Defendants and Defendant USASF knew, or should have known, that the environment created by the Varsity network fostered intimacy between the USASF-minor participants and member coaches who had access to the USASF minor participants.

139. Moreover, Defendant Webb, the Varsity Defendants, and Defendant USASF, knew or should have known that this continued personal contact between adults and minors posed a risk of sexual abuse of exploitation and a real risk for grooming behavior, and this risk was, at all times relevant to this complaint, well understood.

---

[23] *See* "Sanctioned Competitions," USASF available at: [Sanctioned Competitions - Cheer & Dance | USASF](#) ("When All Star clubs attend USASF Sanctioned Competitions, they can be assured their athletes, coaches, and parents are attending events that comply with the sport's best safety practices.").

140.    Defendant Webb, the Varsity Defendants, Defendant USASF, and Defendant Stingray, as a participant in the Varsity network, knew or it was foreseeable that the USASF adult member coaches would develop friendships and relationships with minor participants and their families, and that these coaches would thereafter contact these member-athletes including through social media.

141.    During the timeframe of this Complaint, it was foreseeable and in fact known that the USASF approved adults would co-mingle with the minor participants including at the gym, during camps, and competitions, and after hours.

142.    At all times relevant to this Complaint, the Varsity network promoted an unparalleled level of access between adults and minor participants within the Varsity network in intimate settings and in intimate scenarios.

143.    Any responsible person or entity should have known that this type of system, which was specifically engineered by Defendant Webb, the Varsity Defendants and Defendant USASF, and implemented by Defendant Stingray would foster an environment where abuse and misconduct was likely if not entirely foreseeable.

144.    Any entity participating or allowing such unfettered access was unreasonable, negligent, grossly negligent, and reckless.

145.    In addition, at all times relevant to this complaint, Defendant Stingray,

33

Defendant Webb, the Varsity Defendants and Defendant USASF know or have reason to know that minor athletes are being exposed to drugs and alcohol during training and at times when minor participants and credentialed adults interact after-hours.

146.   To encourage even greater minor participation, the Varsity Defendants, in conjunction with their member gyms, coaches, and vendors, in 2011 created "Cheerlebrity," whereby the Varsity Defendants used their online, social media, and significant industry influence to promote coaches, vendors, athletes and gyms.

147.   "Cheerlebrity" became the impetus behind the Netflix show "Cheer" that propelled Jerry Harris[24] to fame.

148.   "Cheerlebrity" was a competition created by the Varsity Defendants in the image of *American Idol* which sought to promote Varsity All-star gyms and cheerleaders through social media presence.

149.    "Cheerlebrity" is one example of the Varsity Defendants' marketing and branding[25] that catered specifically to minor participants and was intended to

---

[24] In 2020, Jerry Harris was arrested on charges stemming from sexual abuse against two minor cheer athletes who he accessed by virtue of his influence in the All-star cheer community. In July, 2022, Harris was sentenced to twelve years in prison. *See* Jerry Harris of 'Cheer' fame gets 12 years for sex charges : NPR.

[25] Big industries have long used targeted marketing to "hook" young participants. For example, one of the most notorious practices undertaken by the tobacco industry was to place ads and print campaigns in popular youth magazines and other media. *See* 10 Really Bad Things the Tobacco

increase youth participation.

150.    Upon information and belief, Defendant Stone was a Cheerlebrity, enjoying status and promotion on the Varsity Defendants' website and social media.

151.    Moreover, at all times relevant to this Complaint, Defendant Stingray was one of the Varsity Defendants most profitable and highly regarded gyms.

152.    As such, and at all times relevant to this complaint, the Varsity Defendants boosted the reputations of Defendant Stingray and Defendant Stone in the cheer community, enabling these Defendants' access to new crops of unsuspecting minor athletes.

153.    The Varsity Defendants and Defendant USASF have touted the safety and security of their affiliate-gyms, coaches, and vendors, and the Varsity Defendants' competitions, camps, and clinics to lull parents into complacency regarding the safety of their children when cheering for a Varsity-sanctioned gym or with a USASF member adult.

154.    The Varsity Defendants have perpetuated an atmosphere at their member gyms, as well as at camps and competitions, that encourages alcohol and drug use, and inappropriate contact between minor participants and adults, which

---

Industry Has Done to Entice Kids to Start Smoking, available at: 10 Really Bad Things the Tobacco Industry Has Done to Entice Kids to Start Smoking | State of Tobacco Control | American Lung Association

does not adequately protect minor participants from harm.

155.    Meanwhile, Defendant Webb, the Varsity Defendants and Defendant USASF have relied upon access to these children who compete at Varsity-affiliated gyms, and in Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

156.    Defendant USASF outwardly undertook responsibility for creating and enforcing guidelines, policies, procedures, and processes for protecting Varsity-affiliated minor participants from sexual abuse and for reporting and investigating coaches and other certified adults accused of misconduct.

157.    Meanwhile, as designed by the Varsity Defendants were entirely self-regulated and were not answerable to any independent entity.

158.    Athletes and their families, including John Doe 1, understood Defendant USASF was responsible for protecting athletes from harm.

159.    The Varsity Defendants, through Defendant USASF, enforced bans of athletes, coaches, vendors, affiliates, and teams in competitions for minor rule infractions like the size of hairbows and the use of glitter.

160.    Yet Defendants repeatedly ignored or attempted to avoid disciplinary action against credentialed adults suspected of misconduct with minor participants.

161.   During the interim of the allegations set forth in this Complaint related to Plaintiff John Doe 1, the Varsity Defendants, in conjunction with Defendant USASF, have hosted multiple competitive events, and have sponsored or endorsed camps and clinics throughout the United States including in Georgia.

162.   In addition, during the relevant timeframe of the Complaint, the Varsity Defendants promoted Defendants Stingray and Stone.

163.   Moreover, during the relevant timeframe of the Complaint, Defendant USASF continued to credential and accept membership dues from Defendants Stone, Jones, Realpe, and Stingray.

164.   Defendants Stingray and the Varsity Defendants also required Plaintiff John Doe 1 to maintain his membership with Defendant USASF all during the interim of the allegations herein including Defendant Stone's abuse.

165.   Plaintiff's USASF membership should have offered him protection by Defendants USASF, Webb, Stingray and the Varsity Defendants against abuse and misconduct by member adults.

166.   Instead, Plaintiff John Doe 1 was a victim of abuse all while continuing to pay his membership dues.

167.   As set forth herein, it was contrary to the Varsity Defendants' business model for Defendant USASF to ban adult members from their system since every

adult member represented a pipeline of current and future revenue for the Varsity Defendants.

168. At all times relevant to this Complaint, Defendant Stingray, the Varsity Defendants and Defendant USASF were not appropriately enforcing policies, processes, and procedures related to athlete safety.

169. Upon information and belief, the policies, processes, failures, and general environment created and perpetuated by Defendant Webb, the Varsity Defendants, and Defendant USASF, fostered and contributed to the sexual, mental, and physical abuse inflicted upon athletes in the Varsity network including Plaintiff John Doe 1.

## II.   **DEFENDANT STINGRAY**

170. As stated herein, for over two decades, Defendant Stingray has been a private cheer, dance, and tumbling gym offering its services to children as well as adults in Georgia.

171. Throughout the relevant timeframe, Defendant Stingray has been owned and operated by prominent USASF credentialed coach, Defendant David S. Jones II (known as Casey Jones).

172. At present, and according to its own representations, Defendant Stingray has approximately 24 competitive cheer teams.

38

173.   Upon information and belief, Defendant Stingray is one of the most highly awarded and profitable programs in the Varsity Defendants' community.

174.   At all times relevant to this complaint, Defendant Stingray has provided the following pricing, representing a fraction of the half-year costs for a single athlete:[26]

a.   $49.99 USASF fee (as of 2021-2022 season);

b.   $50 uniform rental fee, which can be purchased at the end of the season for an additional $150;

c.   11 annual tuition installments of $334;

d.   $405 full uniform;

e.   Additional cost of practice wear, cheer shoes, backpacks, and other items from the pro-shop (by way of example, warm-ups $175; shoes $90-$130; bows $20-$30; backpacks $85-105);

f.   Additional cost of any clinics, private lessons, or specialty classes such as Jump ($40/month), Flex ($40/month); and Stunt ($75/month);

---

[26] This information is approximate. For 2022-2023, Stingray team cost estimate *see* the StingrayAnnual informational packet, available at: The Stingray Allstars 2022-2023.

g. Summit fee of $125-$535

h. Stunt camp in Orlando;

i. Hotel cost for stunt camp in Orlando;

j. Competition fees;

k. Travel costs, including hotels at Varsity mandated locations (i.e. "stay-to-play").

175. As such, the minimum a single athlete pays annually to compete on behalf of Defendant Stingray vastly exceeds $5,000, a substantial portion of which goes directly to the Varsity Defendants.

176. At all times relevant to this complaint, Defendant Stingray's cheer gyms were certified by Defendant USASF as meeting all-star standards with respect to coach credentials, program quality, and athlete safety.

177. As such, at all times relevant to this complaint, through the structure these Defendants created, Defendant Webb, the Varsity Defendants, and Defendant USASF warranted to athletes and families that Defendant Stingray and its owners and coaches, employees, and adult athletes, including Defendant Stone could be trusted with minor children.

178.   At all times relevant to this complaint, Defendants Stone, Realpe, and Kreider were employees of Defendant Stingray, working on behalf of Defendant Stingray and in the course and scope of their employments.

179.   As a condition of employing Defendants Stone, Realpe, and Kreider, and pursuant to agreements with the Varsity Defendants, Defendant Stingray required Defendants Stone, Realpe, and Kreider to become coaching members of Defendant USASF.

180.   Moreover, at all times relevant to this complaint, Defendant Stingray represented that Defendants Stone, Realpe, and Kreider were credentialed members of USASF, adhering to Defendant USASF's policies and procedures protecting minors, including John Doe 1, from physical, sexual, and mental abuse

181.   At the same time, and upon information and belief, throughout his employment with Defendant Stingray, Defendant Stone was considered a "Cheerlebrity," and a celebrated Varsity athlete, well-known in the All-star community.

182.   As such, Defendant Stone represented a significant benefit to Defendant Stingray, Defendant USASF, and the Varsity Defendants.

183.   At all times relevant to this complaint, and upon information and belief, Defendant Stingray authorized, allowed, and represented that Defendant Stone was

qualified to serve as a coach and mentor for minor athletes, including Plaintiff John Doe, and so gave Defendant Stone exclusive access to said minor.

184.   In this capacity as a credentialed member of Defendant USASF, Defendant Stone was allowed to interact with minor participants, coach minor participants, form relationships and bonds with minor participants, and to otherwise communicate with minor participants all in the course and scope of his employment and as a credentialed coach.

185.   Moreover, at all times relevant to this complaint, and upon information and belief, Defendant Stingray represented that Defendant Stone was credentialed and therefore a member of Defendant USASF's authorized all-star community.

186.   Defendant Stone is a cheerleader out of the Navarro College program.

187.    Navarro College is widely known as one of the elite cheerleading institutions in the United States and, in fact, has been the college affiliated with many of the Varsity Defendants "cheerlebrities."

188.   Recently, Navarro College has become embroiled in scandal, following the public arrest of Jerry Harris in 2020 related to allegations of sexual misconduct with two minor cheer participants.

189.   Harris was another of the Varsity Defendants' "cheerlebrities."

190.   At all times relevant to this complaint, Defendant USASF and the Varsity Defendants knew, or had reason to know, by virtue of Defendant Stone's credentialed status, as well as his Cheerlebrity status, that Defendant Stone was in contact with minor athletes, such as Plaintiff John Doe 1.

191.   During the operative timeframe of this complaint, Defendant Stone was a coach, mentor, and authorized representative of Defendants Stingray, USASF, and the Varsity Defendants, responsible for training and interacting with minor children, including Plaintiff John Doe 1, who was considered one of the premier athletes in Defendant Stingray's club.

192.   Moreover, and at all times relevant to this Complaint, Defendants Jones, Realpe, and Krieder were credentialed members of the Varsity network, certified by Defendant USASF, and representatives of Defendant Stingray responsible for monitoring, managing and controlling the interaction between minor participants and coaches.

193.   At all times relevant to this complaint, Defendants Stingray, Jones, Realpe, Krieder, USASF, and the Varsity Defendants put Defendant Stone in a position of particular trust, and represented to the All-star community, including Plaintiff John Doe 1 that Defendant Stone was safe to provide coaching services to minor athletes.

43

194.   Yet, at all times relevant to this complaint, Defendant Stone posed a danger to minor athletes including Plaintiff John Doe 1, including a danger from improper communications, exposure to unlawful substances, sexual harassment, exploitation, and abuse.

195.   Moreover, and as set forth more fully herein, other members of Defendant Stingray's organization knew of the abuse perpetrated upon Plaintiff John Doe 1 yet did nothing.

196.   At all times relevant to this complaint, Defendants Stingray, Jones, Realpe, and Krieder benefited from their relationship with Defendants Stone, USASF, and the Varsity Defendants, competing at the Varsity Defendants' events, purchasing the Varsity Defendants' merchandise, participating in the Varsity University training conferences, and mandating that Defendant Stingray's athletes become members of Defendant USASF, including paying USASF annual dues.

197.   Meanwhile, the Varsity Defendants, Defendant USASF, Defendant Stingray, and Defendant Webb knew or should have known of the abuse being perpetrated by their credentialed coaches, such as Defendant Stone.

### III.   THE ABUSE

198.   Plaintiff John Doe 1 began cheering when he was around 12 years old.

199.   Sometime in or around 2020, when Plaintiff John Doe 1 was 15 years old, Plaintiff John Doe 1 reached out to Defendant Stingray because of its well-known reputation for developing cheerleaders.

200.   After Defendant Stingray received Plaintiff John Doe 1's inquiry and had a zoom call with Plaintiff John Doe 1, they invited him to come to a recruiting visit on or around October2020.

201.   Via zoom, Defendant Stingray represented to Plaintiff John Doe 1 that it would support and grow his skill set.

202.   After being recruited in 2020, when Plaintiff John Doe 1 was fifteen, he moved to the Atlanta Metro area to live with Defendant Realpe, a coach with Defendant Stingray.

203.   Defendant Realpe obtained Defendant Stingray's approval for the temporary living arrangement because Defendant Realpe needed John Doe 1 for upcoming competitions.

204.   On December 4, 2020, Defendant Stone, a cheerleader and coach at Defendant Stingray, contacted John Doe 1 and requested that John Doe 1 come to his apartment. Defendant Stone was eighteen years old at the time.  Defendant Realpe authorized this unsupervised encounter.

205.   Defendant Stone raped John Doe 1. Defendant Stone knew John Doe 1 was a minor.

206.   Upon information and belief, Defendant Realpe knew of the sexual assault and failed to report it to law enforcement.

207.   The sexual assault then became widely known within Defendant Stingray's gym.

208.   Following this assault, other athletes learned of what occurred, and began to solicit Plaintiff John Doe 1 for sex.

209.   To cope with the trauma, John Doe 1 began abusing alcohol.

210.   Defendant Krieder became aware that fifteen-year-old John Doe 1 was abusing alcohol.

211.   Rather than offering support services, Defendant Kreider told Plaintiff John Doe 1 to stop drinking, mentioning that John Doe 1 had a "bad reputation" in the gym because of "you know what happened with you know who." Plaintiff John Doe 1 understood this to mean the sexual assault perpetrated by Defendant Stone.

212.   Defendant Kreider failed to report the incident to law enforcement.

213.   Upon information and belief, Defendant Kreider and Defendant Realpe did not report the sexual assault because Defendant Stone was regarded as one of the

best male cheerleaders in the All-star world and to have him removed from competition would detrimentally impact Defendant Stingray.

214. Plaintiff John Doe 1 also received unwanted photos of another adult cheerleader's genitals.

215. Defendant Stingray willfully failed to report and remove coaches and cheerleaders that knowingly committed sexual assault.

216. These incidents were finally reported to law enforcement by Mary Doe, John Doe 1's mother, immediately after Mary Doe became aware of the incidents on September 19, 2022.

217. Only after Plaintiff John Doe 1's mother learned of the misconduct and reported same to law enforcement did Defendant Stingray or Defendant USASF become involved despite the fact that both had knowledge of the assault, and despite the fact that both were charged with protecting Plaintiff John Doe 1.

218. In November 2022, a warrant was issued for Defendant Stone's arrest related to his raping Plaintiff John Doe 1.

219. He is currently listed on Defendant USASF's ineligibility list but his suspension is temporary.

220. His details include "Member policy violation related to athlete protection."

221.   Defendant Stone's affiliated states include Georgia, Texas, and Tennessee.

222.   During this timeframe, Plaintiff John Doe 1 has always been a member of USASF and paid his dues annually as well as the other fees required by Defendant Stingray and the Varsity Defendants. As of the date of this filing, Plaintiff John Doe 1 currently maintains his membership.

## JOINT AND SEVERAL LIABILITY

223.   Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiff, as Defendants' individual and collective actions and omissions actually and proximately caused Plaintiff's past, present, and ongoing injuries. Plaintiff is entitled to damages pursuant to the laws of the State of Georgia and the United States of America, including but not limited to the following:

   a.   Compensatory, actual, and consequential damages;

   b.   Statutory damages;

   c.   Punitive damages;

   d.   Reasonable attorneys' fees and costs;

   e.   Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT I

## VIOLATION OF THE CHILD A
## BUSE VICTIMS RIGHTS ACT ("CAVRA"), 18 U.S.C. §2255
## (DEFENDANTS STONE, STINGRAY, REALPE, JONES, KRIEDER, USASF, AND THE VARSITY DEFENDANTS)

224.  Plaintiff hereby realleges the preceding paragraphs as if repeated verbatim herein.

225.  CAVRA provides a private right of action to minor participants in amateur sports and other settings who is the victim of child abuse.

226.  Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

227.  At all times relevant to this Complaint, Defendants Stingray, Jones, Realpe, Krieder, and Stone, qualify as covered individuals and abuse occurred at events defined by the statute.

228.  Moreover, at all times relevant to this complaint, Defendant USASF and the Varsity Defendants constituted covered individuals under the statute.

229.  At all times relevant to this complaint, Defendant Stingray and Defendant Stone, Defendant Realpe, Defendant Jones, and Defendant Krieder were advertised, marketed, and held up by the Varsity Defendants and Defendant USASF as certified adult members within the Varsity network specifically and uniquely qualified to provide coaching services to children.

230.    At all times relevant to this Complaint, Defendant Stone was one of the Varsity Defendants' "cheerlebrities," meaning the Varsity Defendants specifically promoted Defendant Stone, exalted him over other similarly aged coaches and athletes, and gave him financial benefits in order to promote the Varsity brand to minor participants including Defendant John Doe 1.

231.    At all times relevant to this Complaint, Defendant Stingray was one of the Varsity Defendants' most lucrative member gyms, which over twenty teams of participants, most of which were composed of minor children, including Plaintiff John Doe 1.

232.    In December 2020, when Plaintiff John Doe 1 was sixteen years old and a minor under the age of eighteen, Plaintiff John Doe 1 was raped by Defendant Stone.

233.    At the time of the rape, Defendants Jones, Krieder, Realpe, and Stingray knew Defendant Stone was engaged in one-on-one contact with Plaintiff John Doe 1, that same constituted unauthorized practices under the guidelines, policies, and procedures that Defendants were required to abide by, and that this one-on-one interaction would most likely result in unlawful sexual conduct against Plaintiff.

234.     Thereafter, in 2021, Plaintiff John Doe 1 received nude graphic images of another adult coach of Defendant Stingray, and received sexual solicitation from other athletes within Defendant Stingray.

235.     At the point in time that Plaintiff John Doe 1 received nude images and sexual solicitations from other athletes, Defendants Jones, Realpe, and Krieder, as well as Defendants USASF and Defendant knew of the sexual abuse and battery against Plaintiff and yet had done nothing to investigate, protect, or otherwise preclude Plaintiff from being inundated with additional unwanted sexual images and advances, to say nothing of these Defendants' failures regarding the original abuse.

236.     Plaintiff was a minor at the time he was sexually abused and assaulted in contravention of 18 U.S.C § 2422, thus constituting violations of 18 U.S.C. §2255.

237.     Plaintiff has suffered personal injuries as a result of these violations of law.

238.     Plaintiff is entitled to damages pursuant to the laws of United States of America, including but not limited to the following:

      a.     Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

      b.     Reasonable attorneys' fees and costs;

      c.     Punitive damages; and

d.    Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT II
## NEGLIGENCE AND/ORGROSS NEGLIGENCE
## (ALL DEFENDANTS)

239.   Plaintiff hereby realleges the preceding paragraphs as though repeated verbatim herein.

240.   At all times relevant to this complaint, Defendants have been responsible for the safety, health, and welfare of minor athletes, such as Plaintiff John Doe 1, who were members of Defendant USASF, the Varsity Defendants, and Varsity-affiliated gyms and under the care, custody, and control of each of the Defendants, respectively.

241.   At all times relevant to this complaint, Defendant Webb, Defendant Stingray, Defendant USASF and the Varsity Defendants made numerous representations and misrepresentations regarding their roles in safeguarding athletes against the threat of sexual abuse, and have also taken affirmative steps toward these representations including creating codes of conduct, policies, procedures, guidelines, and instating certain training and councils specifically geared toward protecting athletes within the Varsity network from sexual abuse.

242. In addition, and as set forth herein, at all times relevant to this complaint, Defendant Webb, Defendant USASF and the Varsity Defendants created the system of coach and vendor certification, and have held out to the All-star community, which included Plaintiff John Doe 1, that this credentialing was intended to and did in fact amount to a seal that Defendant USASF and the Varsity Defendants had specifically vetted and determined that coaches and vendors, including Defendant Stone were safe for interacting with minor athletes, including Plaintiff John Doe 1.

243. As evidenced by Defendant Webb's, Defendant USASF and the Varsity Defendants' representations, acts, and affirmative steps, at all times relevant to this complaint, Defendants have been aware that there are dangers associated with coaches training minor athletes, including risks associated with inappropriate, and non-consensual sexual touching, emotional, and physical abuse.

244. At all times relevant to this complaint, and as set forth above, Defendants USASF, the Varsity Defendants, and Defendant Stingray represented that they had rules, policies and/or procedures specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches who interact with these athletes by virtue of the adults' positions of power. These policies, procedures, rules, and/or guidelines included representations related to SafeSport,

and that Defendants USASF were uniquely situated to help govern and regulate All-star cheer.

245. At all times relevant to this complaint, Defendants Webb, Stingray, and the Varsity Defendants have represented that competing on behalf of the Varsity network, governed by Defendant USASF, was a means to maximize athlete protection for minor athletes such as Plaintiff John Doe 1.

246. At all times relevant to this complaint, Defendants owed special duties to protect minor children, such as Plaintiff John Doe 1, a USASF-member athlete competing on behalf of a credentialed member club affiliated with the Varsity Defendants.

247. Moreover, at all times relevant to this complaint, Defendant USASF, Defendant Stingray, the Varsity Defendants, and Defendants Jones, Realpe, and Krieder held out Defendant Stone as a "cheerlebrity," encouraged other athletes to be like Defendant Stone, and further held Defendant Stone our as a certified coach safe for interaction with minor participants.

248. At all times relevant to this complaint, Defendants owed special duties to protect minor children, such as Plaintiff John Doe 1, who was an athlete competing on behalf of a credentialed member club. Plaintiff John Doe 1 by and through his mother Plaintiff Mary Doe entrusted Defendants with Plaintiff John Doe

1's physical, mental, and emotional care and well-being, and Defendants held themselves out as being uniquely able to protect minors such as Plaintiff John Doe 1 from harm caused by physical or other abuse.

249.  Despite this, at all times relevant to this complaint, Defendants have been aware that violations to their internal policies, processes, procedures, and guidelines related to athlete safety, and, in particular, safety against harm from sexual, physical, and emotional abuse and exploitation has happened on a regular and continuous basis by and through USASF and USA Cheer certified coaches at private all-star gyms, including Defendant Stingray.

250.  Defendants violated their responsibilities and duties to Plaintiff John Doe 1 in one or more of the following particulars:

a.  Allowing Defendant Stone access to Plaintiff John Doe 1 when Defendants knew or reasonably should have known that Defendant Stone posed a threat of harm to Plaintiff John Doe 1;

b.  Permitting Defendant Stone to remain in a position of power and particular trust over minor athletes, such as Plaintiff John Doe 1;

c.  Allowing Defendant Stone to isolate Plaintiff John Doe 1 despite the known dangers associated with one-on-one coaching and interactions;

d.     Failing to enforce social media and other communications policies and procedures related to inappropriate conduct between minor athletes and coaches such as Plaintiff John Doe 1 and Defendant Stone;

e.     Failing to report known instances of abuse or misconduct;

f.     Failing to adhere to SafeSport policy or procedure;

g.     Failing to investigate potential misconduct, including among and between Defendant Stone and Plaintiff John Doe 1, despite knowledge that such inappropriate contact had occurred;

h.     Blaming Plaintiff John Doe 1 for engaging in inappropriate conduct, communications, or interactions with an adult coach in a position of power;

i.     Failing to train, supervise, monitor, or implement policies and procedures related to Defendants' employees and/or authorized representatives and their interactions with minors such as Plaintiff John Doe 1;

j.     Failing to provide safe premises;

k.     Failing to protect Plaintiff John Doe 1 from the foreseeable harm inflicted on him by a third party;

l.    Condoning or otherwise ratifying the behavior engaged in by and between Plaintiff John Doe 1 and Defendant Stone;

m.    Continuing to hold Defendant Stone out as a credentialed, and thus trustworthy, adult in the enterprise; and

n.    Such other conduct as may be revealed.

251.  At all times relevant to this complaint, Defendants have known that one-on-one coaching, and intimate coach contact is an enhanced feature of private gym cheer coaching that generates a great deal of money for Defendants.

252.  Defendants are also aware of the close personal relationships many of these coaches form with minor participants.

253.  Defendants are further aware that, despite the known dangers of one-on-one contact, coaches routinely engage in intimate and exclusive contact with minor participants, as well as travel with minors across state lines, and inappropriate messages and communications.

254.  Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiff, and actually and proximately contributed to and/or caused damages.

255.   Defendants' actions and omissions as described above, by and through authorized agents, were in violation of Defendants' own policies, procedures, and what would be reasonable under the circumstances.

256.   Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

257.   Plaintiff is entitled to damages pursuant to the laws of Georgia, including but not limiting to the following:

a.      Compensatory, actual, and consequential damages;

b.      Punitive damages; and

c.      Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT III
### NEGLIGENT SUPERVISION
**(VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT STINGRAY, AND DEFENDANT JONES)**

258.   Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

259.   This claim is brought on behalf of the individual Plaintiff who was subjected to sexual abuse, assault and battery, and who was taken advantage of physically and financially.

260. Throughout the relevant timeframe of this complaint, Defendant USASF, the Varsity Defendants, and Defendants Stingray and Jones continued to employ, credential, and place Defendant Stone, Defendant Realpe, and Defendant Kreider in particular and unique positions of trust associated with minor participants.

261. As set forth herein, Defendants Stingray, USASF, and the Varsity Defendants failed to enforce policies, procedures, and guidelines, including allowing for a minor participant to live in an isolated setting with an adult coach, allowing another adult coach to have one-on-one access to Plaintiff John Doe 1, failing to appropriately intervene when Defendants were aware that Plaintiff John Doe 1 was abusing alcohol to cope with the trauma of his injuries, failing to curb or otherwise protect Plaintiff John Doe 1 from unwanted sexual advances, and from graphic digital imagery, and such other failures as may have occurred during the ordinary course of Defendants' business.

262. The threats and actual conduct complained of herein was foreseeable given the overall history of youth sports and activities, particularly those involving adult coaches.

263. At all times relevant to this complaint, Defendants USASF and the Varsity Defendants have continued to let these Defendant gyms and coaches operate in order to generate income for the enterprise.

264.   As set forth herein, these Defendants failed to report criminal activities to law enforcement agencies in favor of preserving the reputation of a lucrative "cheerlebrity," and the prestige of Defendant Stingray within the All-star community.

265.   Defendants' business model relies upon certifying private gyms and coaches pursuant to the USASF standard, which purports to place athlete health and safety above all else.

266.   Moreover, Defendant Stingray's business model relies upon access to credentialed coaches, and coaches who are extremely popular in the sport in order to attract and perpetuate new athletes.

267.   In perpetuating a business model built on trust and athlete safety, Defendants specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network Defendants oversaw.

268.   Defendants breached this duty in a number of particulars including by credentialing Defendant Stone when Defendants knew or should have known he posed a significant threat of harm, authorizing and facilitating one-on-one conduct by and between credentialed coaches and minor participants, failing to act or otherwise disregarding reports of abuse, discounting or otherwise ignoring specific

information about Defendant Stone and his inappropriate interaction with Plaintiff John Doe 1, among other particulars.

269. Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein, directly and proximately caused Plaintiff's injuries.

270. As a direct and proximate result of Defendants' conduct, the Plaintiff has been damaged.

271. Plaintiff is therefore entitled to a judgment against Defendants, and for such actual and consequential damages in an amount to be determined by a jury trial.

## COUNT IV
## ASSAULT/BATTERY
## (DEFENDANT STONE)

272. Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

273. On or around December, 2020, Defendant Stone unlawfully held Plaintiff John Doe 1 against his will and forced him to engage in unwanted sex.

274. Said touching by Defendant Stone constituted sexual assault and sexual battery on these named Plaintiff and others.

275. As a direct and proximate result of these Defendant's conduct, set forth more expressly above, Plaintiff experienced bodily injury, physical pain and

suffering, and mental anguish and is entitled to an award of actual damages in an amount to be determined through a trial of this matter.

## COUNT V
## RESPONDEAT SUPERIOR
## (AS TO DEFENDANTS USASF, THE VARSITY DEFENDANTS, STINGRAY, AND JONES)

276. Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

277. At all times relevant to this complaint, Defendant USASF employed and retained certain individuals to provide safety and regulatory services, including, without limitation, conducting investigations intended to prevent and mitigate athlete harm in USASF cheer.

278. At all times relevant to this complaint, agents, employees, and/or authorized representatives of Defendant USASF were acting in the course and scope of their employment.

279. At all times relevant to this complaint, Defendant Stingray employed Defendants Stone, Realpe, Jones, and Krieder as coaches and managers and authorized Defendants' access to minor athletes including Plaintiff John Doe 1, and further entrusted these individuals with the daily operations and decision making of

Defendant Stingray's business, which was promulgated on contact with minor participants.

280.   During timeframes in this complaint, including when they first met Plaintiff John Doe 1, Defendants Jones, Realpe, Krieder, and Stone familiarized themselves with Plaintiff John Doe 1, and grew close to Plaintiff John Doe 1 to ensure his trust in Defendants.

281.   As Defendants Jones, Realpe, Krieder, and Stone were cultivating Plaintiff John Doe 1's trust, they were acting in the course and scope of their employment, as authorized representatives of Defendant Stingray, Defendant USASF and the Varsity Defendants.

282.   At all times relevant to this complaint, the Varsity Defendants empowered and/or authorized Defendant USASF to operate as the Varsity Defendants' agent and/or representative with respect to athlete safety measures.

283.   As such, at all times relevant to this complaint, the Varsity Defendants, Defendants USASF and Stingray were as responsible for the actions, inactions, omissions and failures of their employees, agents, and/or representatives as though they undertook the actions themselves.

284.   As set forth herein, these Defendants failed to properly train, supervise, provide monitoring, and/or to implement the policies, procedures, and guidelines,

including those against one-on-one communications and interactions, greatly increasing the likelihood of bodily injury and harm to athletes such as Plaintiff John Doe 1.

285.   As set forth herein, Defendant Stone improperly contacted, committed sexual battery, non-consensual touching, and inappropriate acts against Plaintiff John Doe 1 all while in the course and scope of his role as a certified coach of Defendant Stingray, which was organized and overseen by Defendant USASF and the Varsity Defendants at a Varsity-affiliate gym.

286.   As set forth herein, the Varsity Defendants and Defendant USASF, by and through employees, representatives, and/or agents failed to appropriately monitor, report, and implement policies or procedures in All-star cheer, increasing the likelihood of harm against minor athletes, such as Plaintiff John Doe 1.

287.   This conduct directly and proximately caused Plaintiff John Doe 1 to sustain continuing and ongoing injuries, including physical and emotional damages.

288.   Plaintiff John Doe 1 therefore seeks an order from this court against Defendants, and is further entitled to actual, consequential, and such additional damages, including punitive damages as this court deems just and proper.

## COUNT VI
## BREACH OF CONTRACT

**(AS TO THE VARSITY DEFENDANTS, DEFENDANTS USASF, AND DEFENDANT STINGRAY)**

289. Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

290. At all times relevant to this complaint, Plaintiff had duly executed contracts with Defendant Stingray, the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiff, Defendants agreed to provide a competitive and gym environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

291. As set forth herein, during the course of these contractual agreements, Plaintiff was subjected to severe and oppressive abuse, physically and mentally, all while under the care, control, and governance of the Varsity Defendant, Defendant USASF, and Defendant Stingray.

292. During the term of these agreements, Defendant Stingray, the Varsity Defendants and Defendant USASF failed to provide Plaintiff with a safe and secure environment, including by failing to enforce the policies, procedures, and standards expressly adopted by Defendant USASF related to credentialed coaches.

293. These failures on the parts of Defendant Stingray, the Varsity Defendants and Defendant USASF constitute violations of the fundamental and

material terms of the agreements between Plaintiff, and the Varsity Defendants and Defendant USASF.

294.    The Varsity Defendants', Defendant Stingray, and Defendant USASF's failures were so egregious and unconscionable as to render the agreements null and void.

295.    As such, Plaintiff seeks an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants and Plaintiff, rescinding said contracts, and remitting the valuable consideration Plaintiff paid to Defendants during the relevant timeframe, as well as for all such attorney's fees, costs, and interest to which Plaintiff may be entitled.

<u>COUNT VII</u>
**UNJUST ENRICHMENT**
**(AS TO DEFENDANT STINGRAY, THE VARSITY DEFENDANTS, DEFENDANT WEBB, AND DEFENDANT USASF)**

26.Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

297.    As set forth herein, the cheer industry represents a multi-billion-dollar enterprise where each young athlete spends tens of thousands of dollars during the length of his or her athlete career toward gym memberships, private lessons, uniforms, accessories, competition fees, and other fees owed to the Varsity Defendants in addition to membership with USASF.

298.     At all times relevant to this complaint, Plaintiff conferred non-gratuitous benefits upon Defendants Webb, Stingray, USASF, and the Varsity Defendants, including annual competition and membership fees, as well as continuous revenue toward uniforms, accessories, private training, and other monetary benefits.

299.     Defendants realized the value of these benefits, including steady annual revenue associated with Plaintiff John Doe 1.

300.     To date, none of the benefits Defendants realized have been returned or otherwise disgorged.

301.     Under the circumstances set forth herein and above, it would be inequitable for Defendants to retain the benefits conferred by Plaintiff including through Plaintiff's annual membership fees and competition fees.

302.     Plaintiff is therefore entitled as a matter of equity to recover these benefits from Defendants and for all such additional relief as this Court deems proper.

**COUNT VIII**
**NEGLIGENT SECURITY**
**(AS TO THE VARSITY DEFENDANTS, DEFENDANT STINGRAY,**
**DEFENDANT USASF)**

303.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

304.     At all times relevant to this complaint, the Varsity Defendants, Defendant USASF, and Defendant Stingray, sponsored, created, hosted, and oversaw young athletes affiliated with Defendant Stingray's All-star cheer program.

305.     At all times relevant to this complaint, if athletes competed at the private all-star gyms, camps and competitions hosted by Defendant Stingray and the Varsity Defendants, and overseen by Defendant USASF, these athletes had no meaningful choice but to attend at the locations, and under conditions, established by these Defendants.

306.     The Varsity Defendants, Defendant Stingray, and Defendant USASF allegedly established policies and procedures and guidelines associated with the administration of this All-star network that were intended to ensure the safety of minor participants.

307.     At all times relevant to this complaint, Defendants Stingray, Defendant USASF, and the Varsity Defendants received substantial revenue from this All-star network and associated with each minor participant.

308. At all times relevant to this complaint, the threat of sexual abuse against minor participants was a foreseeable threat known within youth sports and youth events for over a decade by the time of Plaintiff's abuse.

309. At all times relevant to this complaint, the Varsity Defendants, Defendant Stingray, and Defendant USASF undertook a responsibility to ensure that the locations, gyms, and events were safe for minor participants.

310. The Varsity Defendants, Defendant Stingray, and Defendant USASF violated their responsibility to provide safe premises free from harm from third parties in one or more of the following particulars:

      a.      Failure to enforce policies, procedures, and guidelines related to participant safety;

      b.      Failure to create policies, procedures, and guidelines to address foreseeable risks of harm including harm from athlete sexual abuse;

      c.      Failure to provide adequate monitoring;

      d.      Failure to provide sufficient background checks;

      e.      Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol at all-star gyms, and while attending Varsity events;

f. Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic images while competing on behalf of Varsity-affiliated gyms, and attending Varsity events;

g. Failing to ensure that Varsity member coaches were not forcing themselves upon minor athletes;

h. Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults affiliated with Defendants;

i. Such additional conduct as may be revealed during discovery.

311. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain significant injuries and damages.

312. Plaintiff now seeks an order from this court setting aside the agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiff for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court award the following damages, jointly and severally against Defendants, as provided by the laws of the United States and Georgia, including but not limited to the following:

  a.  Compensatory, actual, and consequential damages to Plaintiff, trebled where permitted by statute;

  b.  Alternatively, liquidated damages as to Count I;

  c.  Costs of this action and attorneys' fees to Plaintiff;

  d.  Punitive damages where permitted; and,

  e.  Any and all other and further relief as this Court may deem appropriate.

## **TRIAL BY JURY**

WHEREFORE, Plaintiff hereby demands a trial by jury on all issues so triable.

        **STROM LAW FIRM, LLC**

        *s/ Mario A. Pacella*
        Mario A. Pacella GA Bar No. 558519
        P.O. Box 1635
        Brunswick, Georgia 31521
        Tel: 912.264.6465

71

Fax: 912.264.6470
Email: mpacella@stromlaw.com