# Exhibit I

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

Jane Does 1, and 2[1] by and through
their mother, Mary Doe, and Jane
Doe 3, by and through her father,
Joseph Doe[2],

        Plaintiff,

v.

Varsity Brands, LLC, Varsity Spirit,
LLC, Varsity Brands Holding
Company, Inc., U.S. All Star
Federation, Inc. d/b/a U.S. All
Star Federation, USA Federation
for Sport Cheering d/b/a USA
Cheer, Charlesbank Capital Partners,
LP, Bain Capital, LP, Jeff Webb,
individually, Champion Elite Legacy
Ashley Hughes,
and Erick Kristianson,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT
(DEMAND FOR A JURY TRIAL)**

## STATEMENT OF THE CASE

---

[1] Given the nature of the subject matter as well as the potential for harm that exists against those who come forward to inform against Defendants, the Plaintiff in this matter will be identified only as Jane Doe in conjunction with the factual underpinnings on this complaint.

[2] These cases were previously filed as separate matters under Civil Action Numbers: 6:22-cv-02146; 6:22-cv-02147, and 6:22-cv-02149 and consolidated thereafter for all purposes.

Plaintiffs file this complaint by and through undersigned counsel of record against the above-named Defendants for money damages in connection with conduct: (1) in violation of the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, 18 U.S.C. §2255; (2) constituting a civil conspiracy in violation of the Racketeer Influenced and Corrupt Organization (RICO) Act, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §1962(c) and (3) giving rise to common law claims of gross negligence, negligent supervision, and assault/battery; and (4) constituting violations of contractual and/or equitable responsibilities owed to Plaintiffs. As a direct and proximate result of Defendants' collective and individual conduct, Plaintiffs sustained and will continue to sustain actual and ongoing injuries and damages, and in support thereof, they allege facts as follows at all times relevant to this Complaint:

## **INTRODUCTION**

1.      Champion Elite Legacy ("Defendant Champion Elite") was a private All-star cheer and tumbling business in South Daytona, Florida, offering coaching and training services for athletes of all ages, including the three Plaintiffs.

2.      Defendant Champion Elite, by and through its owner, Defendant Ashley Hughes, employed and empowered an All-star coach, Erick Kristianson

("Defendant Kristianson"), to train young athletes, providing him with access to these same athletes, and opportunities to create relationships and connections with these athletes.

3.    Defendant Champion Elite was considered a certified member club working in a consortium with the other Defendants, including – Jeff Webb, Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, (collectively "the Varsity Defendants") and the Varsity Defendants' owners and affiliates, including Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation ("Defendant USASF"), Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer"), Defendant Bain Capital, and Defendant Charlesbank (collectively "the PE Defendants"), which sole specific promises of a safe sport to expand the Varsity Defendants' network of minor athletes and prop up the Varsity Defendants' billion-dollar business.

4.    Similarly, Defendant Kristianson was considered a certified coach by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the PE Defendants, a classification that essentially identified Kristianson as a duly vetted and safe coach for working with minor children, such as Plaintiffs.

5.     Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson were part of a network of gyms, owners, coaches and vendors empowered and placed in positions of trust and authority by Defendant Webb and the other Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the PE Defendants.

6.     At the same time, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Webb, Defendant Charlesbank and Defendant Bain Capital knew or had the opportunity to know that Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson were either engaged in significant misconduct with or abuse of minor athletes or were allowing pervasive abuse and misconduct against minor athletes.

7.     The scheme to anoint specific gyms and coaches at the expense of safety best practices occurred as the Varsity Defendants were creating and expanding a business model reliant upon a pipeline of young athletes, each of whom was a participant of a member gym, such as Defendant Champion Elite, and each of whom represented a significant financial contribution to the Varsity Defendants' and PE Defendants' business worth billions of dollars.

8.      The Defendants, together and individually have knowingly, or with a reckless disregard, created, organized, and propagated a system of young athlete abuse against innocent victims including Plaintiff Jane Doe 1, Plaintiff Jane Doe 2, and Plaintiff Jane Doe 3.

9.      This is a complaint for legal and equitable relief for the victims of this scheme.

## JURISDICTION, PARTIES, AND VENUE

10.      This action arises pursuant to, and involves questions requiring the interpretation of the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

11.      Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

12.      Plaintiff Jane Doe 1 is a citizen residing in Volusia County, Florida.

13.      Plaintiff Jane Doe 2 is a citizen residing in Volusia County, Florida.

14.      Plaintiff Jane Doe 3 is a citizen residing Volusia County, Florida.

15.      Defendant Champion Elite Legacy, LLC ("Defendant Champion Elite") was a for-profit Limited Liability Company organized and existing pursuant to Florida law, with a principal place of business at 2330 S Nova Road

#15, South Daytona, Florida 32119. Defendant Champion Elite was a premier All-star cheer program, a USASF member club, and, by and through its employees, owners, agents, and authorized representatives, all within the course and scope of their responsibilities, did interact on a daily basis with minor children, both upon its premises, as well as at various camps, clinics, and competitions throughout the country.

16.     Defendant Ashley Hughes ("Defendant Hughes") owned and operated Defendant Champion Elite, and was a citizen and resident of Volusia County, Florida. As the owner and operator of a business providing All-star training and competition services to minor athletes, which necessarily included the transport of these minor athletes across state lines, Defendant Hughes had a responsibility to provide safe premises, personnel, and modes of training to minor athletes, including, without limitation the three Jane Doe Plaintiffs.

17.     Defendant Erick Kristianson was a citizen and resident of South Daytona, Florida and was employed by Defendant Champion Elite. During the timeframe of this complaint, Defendant Kristianson was a credentialed member of USASF and USA Cheer, and, as such, he was expressly permitted to interact with minor children.

18.     Defendant Jeff Webb ("Defendant Webb") was a citizen of Memphis, Tennessee, and created, owned, operated, and/or controlled Defendant Varsity Brands, LLC, Defendant Varsity Spirit, LLC, Defendant Varsity Brands Holding Company, Inc., Defendant USASF, and Defendant USA Cheer, all of which did business throughout the United States, to include substantial business in Florida.

19.     Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) ("Defendant Varsity Brands") has been a for-profit entity organized under the laws of Delaware with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation). At all times relevant to this complaint, Defendant Varsity Brands retained significant control over the decision making, daily operations, and was the public face of Varsity Spirit, LLC, and "Varsity All-star."

20.     Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) ("Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee. Throughout the relevant timeframe of this Complaint, Defendant Varsity Spirit, LLC has organized, participated in, promoted, and fostered Varsity Brand's private All-star cheer business, including by facilitating camps, competitions, and

clinics, and coordinating contracts with member gyms and coaches designed to exclusively funnel the athletes in these gyms to the Varsity network.

21.     Defendant Varsity Brands Holding Company, Inc. ("Defendant Varsity Brands Holding") is a for-profit entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas. At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. has been the parent company of Varsity Brands, Inc., and has retained significant control over the decision making, hiring, firing, training, and supervision of Defendants Varsity Brands and Varsity Spirit.

22.     Throughout this complaint, Defendants Jeff Webb, Varsity Spirit, LLC, Varsity Brands, LLC and Varsity Brands Holding Company, Inc., shall be referred to as the "Varsity Defendants". At all times relevant to this Complaint, either directly or through affiliates, including those wholly owned and/or controlled, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, social media campaigns, acquisitions, cheer camps, gyms and competitions throughout the United States including Florida.

23.     Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation (hereinafter "Defendant USASF") is a Tennessee non-profit corporation with its

principal place of business in Memphis, Tennessee, and was created and funded by Defendant Webb and the other Varsity Defendants as the self-proclaimed governing and regulatory body promulgating and enforcing rules for all of private All-star cheer. As set forth more fully in this complaint, Defendant USASF "certifies" coaches and gyms and promotes athlete participation in "sanctioned" events, which are almost entirely hosted by the Varsity Defendants and/or their subsidiaries. Defendant USASF has been controlled by the Varsity Defendants and does business throughout the United States, including Florida. (See attached as Exhibit 1, the USASF Code of Conduct).

24.     Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer") is a non-profit entity also created and funded by Defendant Jeff Webb, is organized and existing in the state of Texas, and is the governing body for sport cheering throughout the United States. Defendant USA Cheer has been likewise controlled by the Varsity Defendants as described further herein. (See attached as Exhibit 2, the USA Cheer Bylaws).

25.     The Varsity Defendants and Defendants USASF and USA Cheer either directly and/or through the Varsity Defendants and their affiliates, which they control, have been charged with the duty and authority to: (a) promulgate

and/or enforce rules governing competitive cheer coaching, competitive cheer training, cheer camps and competitions throughout the United States; (b) organize, promote, produce, and/or manage cheer camps, clinics, and competitions throughout the United States in furtherance of the goals and purposes of the conspiracy and conduct set forth herein; (c) establish guidelines and assess whether to certify gyms, coaches, and vendors, including without limitation those named herein, as members of USASF and/or USA Cheer, qualify to work with children and to otherwise provide "credentials" for these member gyms and affiliates; and (d) require that athletes, coaches, and clubs purchase annual memberships in order to participate in the Varsity Defendants' sanctioned events.

26.     Defendant Charlesbank Capital Partners, LP (hereinafter "Defendant Charlesbank") has been a for-profit entity organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts. As set forth herein, and during the relevant timeframe, Defendant Charlesbank has been a minority and/or majority owner of the Varsity Defendants. During the relevant time period, Defendant Charlesbank has done significant business in Florida.[3]

---

[3] For instance, the Florida State Board of Administration invested hundreds of millions of dollars on behalf of the state's public pension fund in Charlesbank Funds VII, VIII, and IX. https://flauditor.gov/pages/pdf_files/2020-089.pdf; https://employer.frs.fl.gov/forms/2019-20_CAFR.pdf. And in November of 2021, Charlesbank acquired Empire Today, a portfolio company of H.I.G. Capital

27.     Defendant Bain Capital, LP (hereinafter "Defendant Bain Capital") has been a for-profit entity organized under the laws of Massachusetts, with its principal place of business in Boston, Suffolk County, Massachusetts. Since 2018, Defendant Bain Capital has been the majority owner of the Varsity Defendants. During the relevant time period, Defendant Bain Capital has done significant business in Florida.[4]

28.     This complaint involves abuse perpetrated upon minor athletes in and around Daytona, Florida, across state lines, and via electronic communications, and was perpetrated because of Defendant Kristianson's access to the minor Jane Doe Plaintiffs, which was enabled by, precipitated upon, and intrinsically linked to the network of cheering gyms, camps and competitions created by Defendant Jeff Webb, marketed by the Varsity Defendants and

---

based in Miami. https://www.williamblair.com/News/Empire-Today-and-Charlesbank-Capital-Partners-Transaction

[4] For instance, in November of 2021, Bain acquired a majority share in InnovaCare Health, based in Orlando, for an undisclosed amount (https://www.baincapital.com/news/innovacare-health-value-based-healthcare-leader-announces-majority-investment-bain-capital), and also launched Enhance Health LLC, headquartered in Fort Lauderdale, with a $150M capital investment led by Bain. (https://www.baincapital.com/news/enhance-health-new-digital-health-insurance-distribution-and-care-navigation-platform-launches). Furthermore, Defendant Bain Capital's Private Credit products are available in Florida. https://baincapitalprivatecredit.com/investor-resources/investor-documents

Defendants Bain and Charlesbank, and nominally regulated by Defendants USASF and USA Cheer.

29.     As set forth herein, all Defendants together created a nationwide and interconnected network. Even as set forth in internal guidance, policies, and procedures, the jurisdiction of the Varsity network extended over all members, including Defendants Hughes and Kristianson, as well as the gyms clinics, camps, and competitions where they coached, and those places where it was foreseeable that these Defendants would interact with minor athletes.

30.     Venue is proper in the United States District Court for the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. §1391 because: at least one of the Defendants is a resident of Volusia County, Florida, or is a corporation organized and existing, and with a principal place of business in South Daytona, Florida; each of the Defendants, by and through their role in the Enterprise, as described herein, had significant and pervasive contacts with Florida and this district, including through the flow of funds in interstate commerce, as well as the daily management, operation, control, training, and supervision of employees, and agents within the enterprise, and minor athletes who Defendants were

obligated to protect; and a substantial portion of the acts and omissions complained of occurred in this district.

## FACTUAL ALLEGATIONS

### The Competitive Cheer World

31.    Private All-star cheer is a competitive and dynamic sport where athletes compete in a team setting mixing a variety of disciplines including cheer, dance, and tumble.

32.    In contrast to traditional sideline cheer, where athletes are generally a complement to another sport, such as football or basketball, All-star competitive cheer is a focus unto itself.

33.    Because of its unregulated nature, All-star cheer is not subject to traditional seasonal limitations, or other restrictions against year-round performance and training.

34.    As such, All-star cheer requires an extreme amount of commitment from athletes and their families, with near constant training, cross-training, and frequent competition travel through multiple seasons throughout the year.

35.    This level of dedication is costly. A single season can, at minimum, cost between $3,000 to $7,000 per team member. Some families spend $20,000 or

more for transportation, lodging, membership dues and entrance fees, as well as merchandise, uniforms, and other accessories and incidentals, incurred in connection with the numerous competitions the athletes attend throughout the year.

36.     While other private companies exist in All-star cheer, over the past two decades the Varsity Defendants have emerged as the pre-eminent business as the result of a focused initiative by Defendant Webb to monopolize all aspects of the industry to advance its market dominance.

37.     In 1971, Defendant Jeff Webb began his work in cheerleading as an employee at the National Cheerleaders Association working for Lawrence Herkimer, known as the original pioneer of cheer.

38.     During his work with Herkimer, Defendant Webb familiarized himself with the business and began forming his own plan to monetize the operation of cheerleading "camps" – days-long events where athletes would converge to learn new skills.

39.     In 1974, Defendant Webb left Herkimer and formed his own company, which he similarly named the Universal Cheerleaders Association. By and through Universal Cheerleaders Association, Defendant Webb grew his

footprint in the cheer industry, promoting and showcasing his cheer camps, which grew throughout the 1980s.

40. During the 1980s, Defendant Webb's cheer camp organization transformed into Varsity Spirit.

41. As with Herkimer's association, Varsity Spirit began as a provider of cheer camps.

42. Defendant Varsity Spirit, LLC, thereafter expanded into competitions, merchandising, branding, social media, and even gym ownership and management.

43. By the early 2000's, Varsity Brands, Inc. publicly represented itself as:

a. The largest designer, marketer, and supplier of cheerleader dance team uniforms and accessories;

b. The biggest operator of cheerleading and dance team training camps and clinics;

c. A leading organizer of special events for extracurricular activities;

d. A major provider of studio dance conventions and competitions; and

e. A producer of studio dance apparent for studio dance competitions.[5]

---

[5] *See* Varsity Brands, Inc., Form 10-K, (Apr. 1, 2002), available at: https://www.sec.gov/Archives/edgar/data/874786/000093041302001124/c23854_10k.txt

44. As early as 2002, the largest source of revenue for Varsity Brands, Inc. came from its connection with All-star cheer.

45. To encourage and increase revenue, the Varsity Defendants created "Varsity University," an "enterprise powered by Varsity Brands, [and which] offers comprehensive educational programming to schools and athletic programs."[6]

46. The nine-course Varsity University Program encompasses three specific areas: Life Skills, Social Media, and Leadership. By and through Varsity University, organized by Varsity Brands, the Varsity Defendants annually bring together gym owners, coaches, and other certified and green-lit professionals, during which these adults, who pay into the Varsity network, become indoctrinated into the culture.

47. Through their various dealings in the cheer industry, at all times relevant to this complaint, the Varsity Defendants have controlled an estimated 80-90% of the market.

48. As the Varsity Defendants' footprint in the All-star cheer world expanded, so too, did its ability to obtain revenue from its affiliate gyms.

---

[6] *See* Varsity University Online Education Programs Athletic Programs & Schools.

16

49.     As of today, and as set forth more fully herein, a substantial portion of the revenue from each individual athlete who cheers for a Varsity affiliate goes directly to the Varsity Defendants.

50.     The total competitive cheer industry is estimated to include as many as four million athletes throughout the United States, and is further estimated to generate billions of dollars of revenue annually.

51.     Defendant Champion Elite was a Varsity affiliated gym and represented a substantial financial contributor to the Varsity Defendants by training minor athletes and taking them to compete in Varsity events both within and outside of Florida.

52.     In or around 2021, Defendant Bain Capital reported that Defendant Varsity Spirit's annual earnings exceeded $1.3 billion.

53.     A huge source of revenue in the All-star world are the cheer camps, clinics, and competitions held locally, regionally, nationally, and even worldwide. These events frequently require athletes to travel across state lines.  These camps, clinics, and competitions provide significant revenue for the Defendants, either directly, or indirectly through increased exposure bringing in new crops of athletes.

54.     Today, these events are hosted and conducted under the guidance, certification, and rulemaking of a group of entities created, controlled, and funded by the Varsity Defendants.

55.     In 2003, a group of All-star cheerleading coaches formed an independent 501©(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for all-star cheerleading. The group, which would promote both Varsity and non-Varsity events, met in Atlanta and created the first set of universal all-star cheerleading rules.

56.     Within a week, Defendant Jeff Webb founded Defendant USASF in response, a move he intentionally calculated to absorb and eliminate this competitor group in order to retain complete control of the All-star cheer world.

57.     From inception, Defendant USASF was touted as the equivalent of a National Governing Body whose purpose was to oversee and provide specific safety mechanisms for member athletes.

58.     After forming Defendant USASF, Defendant Webb mandated that All-star athletes cheering on behalf of Varsity-affiliated gyms must purchase a USASF membership as a requirement to compete at Varsity-sponsored events.

Moreover, gyms and coaches who wished to compete at and attend Varsity-sponsored events were also required to become members of USASF.

59.     Within just a few years after the merger, USASF became the exclusive body providing regulatory oversight and enforcement for All-star cheer.

60.     At the same time, in or around 2006, the Varsity Defendants created the "USASF Certified" seal, a brand that the Varsity Defendants represented was synonymous with a warranty that the gym, the coach, the choreographer, and any other adult certified by USASF was held to the highest standards, followed best practices, including to prevent athlete abuse, and had been vetted as safe for working with children.

61.     The Varsity Defendants and Defendant USASF also mandated that any certified gym or member annually renew their certification. By so doing, Defendant USASF and the Varsity Defendants correspondingly vouched for these certified entities on an annual basis.

62.     Credentialing served as a signal to parents and athletes that USASF would continually monitor and ensure compliance by its member gyms, coaches, and affiliates.

63.     Meanwhile, the Varsity Defendants also required child athletes

cheering at USASF member gyms to pay for USASF membership, to buy their uniforms, accessories, and other apparel from the Varsity Defendants through their member gym, and to compete in a minimum number of Varsity All-star events each year.

64.    The Varsity Defendants require gyms to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit, LLC both for buying Varsity merchandise and for sending their athletes to Varsity events.

65.    The Varsity Defendants control every aspect of cheerleading at every level in the United States. The Varsity Defendants even own several gyms and cheer programs, many of which were failing or mismanaged before Varsity's takeover.

66.    All-star athletes competing on behalf of Varsity-member gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees.

67.    To encourage the purchase of Varsity apparel, Defendant Jeff Webb has publicly stated that teams performing at Varsity competitions who wore a full Varsity uniform and accessories received higher scores.

68.    Gyms and coaches likewise pay monthly or annual fees to USASF,

USA Cheer and the Varsity Defendants.

69.     The Varsity Defendants and their certified gyms encourage members to pay these fees, dues, and other expenses via auto-draft or credit card.

70.     Athletes who compete on behalf of a Varsity-affiliated gym are precluded from transferring from one Varsity-affiliated gym to another without permission. This restriction in the athlete's ability to select a gym of their choice after initially agreeing to cheer for a Varsity-gym inhibits athletes from reporting misconduct.

71.     To this day, Defendant Webb remains intimately involved and interested in the competitive cheer world.

72.     In 2019, Jackie Kennedy, Varsity Spirit's VP of marketing, said of Defendant Webb, who was then chairman of the board at Varsity, "Jeff is still teaching and leading camps alongside our summer camp instructors. His passion permeates into all of the people here at Varsity Spirit, and Jeff cares about every single employee. He takes the time to meet every new employee. He learns their name, where they are from and what they are passionate about."

73.     When Defendant Webb left Varsity in December of 2020, he told the media he would still be acting in a consulting role for the company.

74.     Defendant Webb also created and currently still controls the International Cheer Union, which is actively ushering competitive cheer into Olympic competition worldwide.

75.     The Varsity Defendants and their co-conspirators used private All-star cheer gyms like Defendant Champion Elite to gain access to paying athletes and their families, marketing to them that membership in a USASF Certified gym will provide the athlete with access to the highest echelon competitions in the sport under strict safety standards.[7]

76.     Membership in USASF, and with a Varsity-affiliated gym mandates competing in a specified number of annual Varsity events.

77.     The Varsity Defendants financially incentivize gyms to attend as many of their events as possible each year in the form of cash rebates and other enticements.

78.     When attending a Varsity event, members and their families are required to purchase rooms at a designated Varsity-chosen hotel at reportedly inflated prices. Varsity dubs this the "stay-to-play" system.

---

[7] *See* "Sanctioned Competitions," USASF available at: [Sanctioned Competitions - Cheer & Dance | USASF](#) ("When All Star clubs attend USASF Sanctioned Competitions, they can be assured their athletes, coaches, and parents are attending events that comply with the sport's best safety practices")

79.　　Failure by an athlete to stay at the Varsity designated hotel could subject the entire team to disqualification.

80.　　Alcohol is either made available or sold at many of Varsity's All-star events.

81.　　At each of the events, the Varsity Defendants are aware that minor athletes are staying in the same hotels, and sometimes the same rooms, as USASF certified adult coaches, choreographers, and vendors.

82.　　Moreover, at most of these events, the Varsity Defendants know or have reason to know that minor athletes are being exposed to drugs and alcohol.

83.　　In addition to mandating exclusive participation in Varsity events, once young athletes join Varsity-affiliated, USASF All-Star cheer gyms, coaches and other gym staff begin suggesting one-on-one coaching time, or closed choreography time where the parent is not allowed to attend.

84.　　This intensive personal training is represented as necessary for an athlete to rise to the next level, compete in higher divisions, win prestige and celebrity status that will enable them to cheer at the collegiate level, and possibly become coaches themselves one day.

85.　　This system of promoting intensive one-on-one time with the athletes

gives coaches and staff increased access to young and impressionable athletes and corresponds to increased funding for the Varsity Defendants' system of camps and competitions, and which creates future generations of Varsity coaches and Varsity-backed gyms.

86.     To inspire greater and more dedicated athlete participation, the Varsity Defendants, in conjunction with their member gyms, coaches, and vendors, in 2011 created "Cheerlebrity," whereby the Varsity Defendants used their online, social media, and significant industry influence to promote certain gyms, coaches, and athletes as celebrity role models.

87.     "Cheerlebrity" became the impetus behind the Netflix show "Cheer" that propelled Jerry Harris to fame.

88.     "Cheerlebrity" was a competition created by the Varsity Defendants in the image of *American Idol* which sought to promote Varsity All-star gyms and cheerleaders through social media presence.

89.      "Cheerlebrity" is one example of marketing and branding that catered specifically to young athletes and was intended to increase young athlete participation and desire to participate in the industry.

90.     Moreover, the popularity of "Cheerlebrity," began a concerted

campaign by the Varsity Defendants and Defendant USASF to reach droves of young potential athletes online, and these Defendants encouraged their member athletes, coaches and gyms to similarly utilize social media, and online branding and content to increase athlete participation.

91.     Defendants Champion Elite and Hughes were well-known in the Varsity Spirit, LLC community, enjoying status and promotion on the Varsity Defendants' marketing platforms and branding content, including social media materials. As such, the Varsity Defendants boosted the reputations of Defendants Champion Elite, Hughes, and Kristianson in the cheer community to obtain access to new crops of minor athletes, to boost revenues, and to boost Defendant Champion Elite and Defendants Hughes' reputations and footprints in the Varsity world.

92.     To further perpetuate this connection between Varsity-backed athletes and coaches, parents were encouraged to allow their children to travel to gyms, camps and competitions, and to stay with host-families, choreographers, and gym owners, and the children were encouraged to look up to these leaders in their sport.

93.     As a critical part of their scheme, Defendants, including the Varsity

Defendants, Defendant USA Cheer and Defendant USASF, tout the safety and security of their affiliate-gyms and coaches through the sale and marketing of their "certified" status to lull parents into comfort whereby they have no fear for the safety of their children to train and compete with them.

94. Through this certification, or credentialing Defendant USASF, by way of authority conferred by the Varsity Defendants, "credentials coaches, certifies legality officials, sanctions events and maintains and adjusts (as needed) safety guidelines, all with the goal of providing the safest possible environment for cheer and dance athletes to train and compete."

95. This message from Defendant USASF's website was the impetus behind Plaintiffs' participation and annual membership renewals. Plaintiffs relied upon messages such as this from Defendants about the safety of the Varsity network over other cheer networks.

96. The Varsity gym network also encourages athletes to relocate to sponsor or host families who are either coaches, gym owners, or live near top-ranked Varsity-sponsored gyms.

97. This feature of the system serves to disassociate the athletes from their families, and foster a familial closeness with the Varsity-sponsored gyms, coaches,

and gym owners.

98.     Tho perpetuate their scheme to create an unending pipeline of new athletes, coaches, and gym owners, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, Defendant USA Cheer and Defendant USASF rely heavily upon constant representations that the network of gyms and coaches, such as Defendants Champion Elite, Hughes, and Kristianson, are safe for interacting with children.

99.     At the Varsity University conferences, while learning about the Varsity network and how to expand its influence to more children and their families, coaches, gym owners, and vendors experience a party atmosphere which encourages alcohol consumption and reports of resulting debaucheries are widespread.

100.    The coaches and gym owners are also inundated with promises of gifts and financial gain if they continue to produce young member-athletes and continue promoting the Varsity brand.

101.    The Varsity Defendants have perpetuated a party atmosphere at their member gyms, as well as in camps and competitions, where minor athletes are knowingly exposed to alcohol and drug use, and which does not adequately

promote athlete safety including from emotional or physical harm and abuse.

102. By representing a safe and superior environment, Defendants collectively sought to create a revolving door of young athletes to perpetuate the Enterprise for years whereby these athletes spend tens of thousands of dollars apiece for their membership, coaching, uniforms, camps, training, competition fees, travel fees, and other merchandise, until the athletes "come of age" and become coaches and gym owners themselves, perpetuating the abuse cycle.

## The Varsity Defendants' Control Over the Gym Environment

103. Under the direction and control and/or supervision of Defendant Webb, Defendant Bain Capital, and Defendant Charlesbank, to perpetuate the business of the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, Defendants have relied upon access to child athletes who will pay regular dues and fees to compete at Varsity-affiliated gyms, and in Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

104. To gain advantage over other private All-star cheer event companies and brands, the Varsity Defendants specifically promised that their network of coaches, gyms, trainers, choreographers and videographers provided superior

safety and was, "the gold standard" for athlete safety, encouraging athletes and their families to trust in the network.

105.   For example, on the Varsity website, which is applicable to Defendants Varsity Spirit, Varsity Brands, LLC, and Varsity Brands Holding Company, the Varsity Defendants make numerous representations about the importance of participant safety, including safety from abuse and misconduct.

106.   Varsity has also posted: "At Varsity Spirit and Varsity All-star, the health and safety of athletes is top priority. Varsity Spirit is committed to creating a safe and positive environment for its participants' physical, emotional, and social development and promoting an environment free from abuse and misconduct."

107.   Varsity also made specific representations about how it would implement this promise to patrol the sport, stating: "Varsity Brands, Varsity Spirit's parent company, has formed a Safety Council to include outside, independent experts who will help to closely examine and evolve current athlete safety guidance – including with respect to detecting and preventing sexual misconduct against minors – while incorporating best safety practices. Please direct all questions and concerns regarding safety to safety@varsity.com."

108. The Varsity Defendants have also represented: "Varsity Spirit provides training to Varsity Spirit Instructors and Staff regarding abuse and reporting. Varsity Spirit enforces its own policies that prohibit abuse and misconduct and are designed to reduce, monitor and govern the areas where potential abuse and misconduct might occur, in addition to the policies implemented by USA Cheer and USASF addressing certain types of abuse and misconduct. The following types of misconduct are specifically prohibited in these policies: (i) Sexual Abuse and Misconduct; (ii) Physical Abuse and Misconduct; (iii) Emotional Abuse and Misconduct; (iv) Bullying, Threats, and Harassment; (v) Hazing."

109. The Varsity Defendants concluded, "these policies contain proactive measures such as restrictions on one-on-one interactions with minor athletes, travel policies, and communication policies." [8]

110. On September 20, 2022, Varsity Spirit president Bill Seely sent a message to gym owners and coaches "reaffirming Varsity All-star's long-standing commitment to athlete safety," and touting Varsity Brands and Varsity Spirit as the "gold standard" for cheer and dance.

---

[8] Information available at: <u>Varsity Spirit - Safety</u>

111.    The Varsity Defendants intended for parents and athletes to rely on these specific promises when deciding whether to participate in the Varsity All-Star network over other private All-star networks, and used the power of this messaging, as well as enforcement bodies USASF and USA Cheer to completely overwhelm the industry, and each of the Jane Doe Plaintiffs and their families did rely on these specific promises about safety when choosing to participate with Varsity network gym Champion Elite, and Varsity members, Defendants Hughes and Kristianson.

112.    The Defendants also intended for the athletes and their parents to rely on these specific assurances of safety in order to continue collecting membership dues and fees from athletes in exchange for protection through Defendants USASF and USA Cheer band the Varsity Defendants.

113.    The Varsity Defendants, specifically through personal actions by Defendant Webb, created Defendant USASF through a $1.8 million interest-free loan. The 2004 non-profit charter certificate lists USASF's address to be Varsity's address.

114.    At its inception, USASF was purportedly established to be the "sanctioning body" that would regulate all-star cheer by setting guidelines,

policies, procedures, and processes to ensure an environment that was safe for young athletes in the All-star cheer arena.

115.   In 2006, Defendant USASF began "certifying" All-star cheer gyms with a special seal of approval, a credential that warranted the gym and its coaching staff could be trusted for cheerleader safety.

116.   Defendant USASF also credentialed coaches of certified gyms, requiring that these coaches register with USASF, and, by and through the USASF seal, certifying that the coaches were safe and green-lighting the coaches as participants in USASF-sanctioned events, camps, clinics, and competitions.

117.   As a further demonstration of its authority, in 2009, Defendant USASF created the "Professional Responsibility Code," which purportedly applied to all members and established guidelines to "maximize not only the integrity and legitimacy of the all-star industry, ***but to safeguard the athletes who participate***." (Emphasis added).

118.   Yet, according to its parameters, the ethics that the USASF community strive to achieve are geared more toward discouraging members from internal poaching or solicitation than respecting the bodily integrity of young athletes. For

instance, the ethical standards outlined in the Professional Responsibility Code include the following:

    i.   I pledge, as a member of the USASF, I will not initiate contact with another program's athletes and families in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical;

    ii.   I pledge, as a member of the USASF, I will not encourage any of my athletes or family members to contact another program's athletes and families during the competitive season in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical.

    iii.   I pledge, as a member of the USASF, I will honor and encourage everyone to respect all mutual agreements and/or contracts made between parties, whether formal or informal, by programs, coaches and athletes….

*See* USASF Professional Responsibility Code, Version 11.0, Process.

    119.   By creating a Professional Responsibility Code requiring members to pledge against internal competition, USASF essentially guaranteed that gyms would enjoy uninfringed access to and control over athletes and their families.

    120.   Defendant USASF also took over the reporting and investigation into allegations of misconduct at member gyms, and by individual members, creating a central reporting mechanism. As such, if an athlete or their family member

wished to report an incident or issue to the member gym, the athlete was directed to Defendant USASF.

121.    In 2007, Defendant Webb personally, and on behalf of the other Varsity Defendants, also formed USA Cheer, which was established to provide guidelines, policies, procedures, and processes to ensure a safe environment for young athletes in competitive cheer, including All-star.

122.    Defendant USA Cheer was also created with an interest-free loan from the Varsity Defendants. The director of education and programs, Jim Lord, has listed Defendant USA Cheer's address to be the same as Varsity's.

123.    Defendants USASF and USA Cheer were responsible for creating and enforcing guidelines, policies, procedures, and processes for reporting coaches for misconduct and taking appropriate action for that misconduct.

124.    However, Defendants USASF and USA Cheer were both operated and controlled by the Varsity Defendants.

125.    The Varsity Defendants controlled Defendant USASF from inception. The Varsity Defendants submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF."

126. For at least the first 15 years of its existence, and upon information and belief, Defendant USASF's offices were located at Defendant Varsity Spirit's corporate address, a Varsity representative answered the phone for USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

127. Defendant Varsity Spirit, LLC was listed for a time as the owner of Defendant USASF.

128. During the operative timeframe of this complaint, the Varsity Defendants also controlled the Board of Directors for Defendant USASF, which sets policy for USASF. The Board is composed of 13 voting members, one seat each for the seven cheer competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of USASF.

129. As Varsity has acquired more and more of the previously independent event producers who made up a portion of Defendant USASF's board, it has expanded its influence over the USASF Board, with as much as 75%

of the seats on the Board of Directors being attributable to Varsity and its numerous entities. The seats that Varsity does not control do not have voting rights.

130.    Defendant USASF's website is located at www.usasf.net, a URL which was once openly owned by the Varsity Defendants.

131.    Upon information and belief, the Varsity Defendants eventually began concealing ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

132.    As with Defendant USASF, Defendant USA Cheer listed Defendant Varsity Spirit, LLC's Tennessee headquarters as its own headquarters, and Defendant USA Cheer's board included six Varsity employees.

133.    Under Defendant USA Cheer's bylaws, its thirteen-member board must include members from the following seven organizations: The Universal Cheerleaders Association, CheerSport, National Cheerleaders Association, United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest.

134.    Each of the seven aforementioned entities is owned by the Varsity Defendants and the PE Defendants.

135.    John Patterson, a former staffer of the Nonprofit Risk Management Center who consulted on youth sports safety, said he has never heard of an arrangement quite like the one between Varsity and these non-profit governing bodies. He said Varsity's control of USASF meant, "whatever Varsity wants, Varsity can get" in terms of rules and regulation of the cheer world.

136.    This structure meant that the Varsity Defendants were entirely self-regulated and were not accountable to any independent entity.

137.    In the 2010s, and amidst reports of sexual abuse against young athletes competing in a variety of sports, Congress authorized the creation of the U.S. Center for SafeSport, whose goal is to end sexual, emotional, and physical abuse on behalf of athletes.

138.    Around the same time, in 2010, in Cheer Coach & Advisor Magazine[9], Defendant USASF was officially quoted as saying, "Through credentialing, coaches are made aware of expectations as teachers and role models. It is the goal of the USASF to infuse good decisions into each and every credentialed coach so that they may expand the positive life experience of all-star cheerleading and dance into the lives of the youth they encourage. USASF is recognized as the

---

[9] At the time of this particular issue, Defendant Webb served on the editorial board of Cheer Coach & Advisor.

baseline of education for each individual coach and also expect these standards to be met."

139.   Since its founding, USASF has supported the SafeSport mission, and has recognized the importance of protecting athletes from sexual, physical, and emotional abuse within the sport.

140.   Despite insinuating to members that Defendant USASF participated in SafeSport, Defendant USASF has never provided any compliance reporting regarding All-star to the U.S. Center for SafeSport. Instead, Defendant USASF operates its own version of SafeSport, Safe@Allstar, purposefully misleading families into thinking that this internal reference to SafeSport is the same thing.

141.   Athletes and their families, including Jane Does 1, 2, and 3, , understood the Varsity Defendants, and Defendants USASF and USA Cheer were responsible for protecting athletes from harm and paid these entities in part for this service. Instead, these entities failed to actively protect these athletes, and appropriately investigate reports of misconduct, to communicate internally and with law enforcement about misconduct, and has further failed to operate as intended.

142.    The Varsity Defendants, through Defendants USASF and USA Cheer, can and do enforce bans of athletes, coaches, and teams in competitions for minor rule infractions like the size of hairbows and the use of glitter. However, these Defendants have repeatedly failed to enforce suspensions or bans of coaches, choreographers, and music producers who are known or suspected to have committed child sexual abuse.

143.    Defendant Varsity Spirit, LLC, through Defendants USASF and USA Cheer, has created and is responsible for oversight and enforcement of their Professional Responsibility Codes, which in addition to discouraging competition among members, specifically acknowledges the threat of harm or abuse by coaches in cheer. For instance, according to the USASF Professional Responsibility Code, "Once a coach-Athlete relationship is established, a Power imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the coach-Athlete relationship terminates until the Athlete reaches 20 years of age."

144.    According to its own literature, the Professional Responsibility Code is applicable to "all members," referring to Varsity-affiliated gyms.

145. In addition, according to Defendant USA Cheer's bylaws, a primary purpose of Defendant USA Cheer was to "[e]ncourage and support safety in Cheer, including (i) providing and coordinating technical information on physical training, equipment design, coaching, and performance analysis in Cheer…". (USA Cheer Bylaws as p. 6).

146. At the same time that Defendant USASF and Defendant USA Cheer, and even the Varsity Defendants, publicly supported the mission of SafeSport, the Varsity Defendants were simultaneously lobbying against the inclusion of cheer as a sport.

147. The Varsity Defendants' effort to preclude cheer from being considered a sport is directly in line with Defendant Varsity Spirit's business model. If cheer were considered a sport, it would necessarily increase athlete oversight and regulation, and would diminish the times, methods, and places that the athletes would be allowed to compete.

148. From 2014 to 2018, Defendant Charlesbank wholly owned the Varsity Defendants and thus owned Defendants USA Cheer and USASF and provided capital to the Varsity Defendants and Defendants USA Cheer and USASF for the

purpose of building the network of Varsity-affiliated private gyms and coaches throughout the United States.

149. During this same timeframe, Defendant Charlesbank, as well as the Varsity Defendants, reaped massive financial benefits associated with the growing network of families who came into Varsity-affiliated gyms, and who believed the Varsity Defendants' representations that they were providing safe and protective environments for families.

150. In fact, Defendant Charlesbank initially purchase the Varsity Defendants for about $1.2 billion, but nearly doubled this value when it sold the majority of the company to Defendant Bain Capital less than four years later.

151. In 2018, Defendant Bain Capital purchased the Varsity Defendants from Charlesbank for roughly $2.8 billion. At the time of the sale, Defendant Charlesbank made a new investment in Varsity alongside Defendant Bain and retained a minority stake in the business.

152. Related to its purchase, Defendant Bain Capital stated: "This new partnership presents Varsity Brands with an exciting opportunity to continue to expand and improve our products and services while remaining steadfast to our commitment to improving student life and overall engagement…. Bain Capital's

extensive consumer and technology experience and their commitment to our mission of empowering young people will help us accelerate our growth to a new level."[10]

153.    In addition, Defendant Bain represented: "For over 50 years, Varsity Brands has served as an essential force for good as part of the academic and athletic student experience…We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[11]

154.    Upon information and belief, Defendant Bain's accelerated growth model for the Varsity Defendants depended upon access to an ever-expanding network of young athletes who would not only purchase Varsity branded merchandise, but would also continue to attend Varsity events. In that regard, during the operative timeframe, the Varsity Defendants issued annual invoices to members, including coaches, gyms, and athletes, payment of which was

---

[10] See "Varsity Brand, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity," June 19, 2018, available at: Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity | Bain Capital.
[11] Id.

mandatory and ultimately profited Defendant Bain and its minority partner Defendant Charlesbank.

155.    According to publicly available information, Defendant Bain's strategy was to leverage the Varsity Defendants' monopoly over services in the All-star industry (i.e. the gyms, camps, clinics, and member services) to support product sales.[12]

156.    This was not the first acquisition by Defendant Bain of a company purporting to offer camps and other services to youth. In 2006, Defendant Bain purchased CRC, a company providing therapy services to troubled youth in Utah and California.

157.    Following the Bain acquisition, and application of its accelerated growth model, CRC experienced a drastic increase in reports of abuse, including six wrongful death lawsuits related to children in its care.[13]

158.    Notably, Defendant Bain was not a mere investor in CRC. Rather, members of CRC actually sat on Defendant Bain's board.

---

[12] See "Bain to Acquire Varsity Brands, a top maker of cheerleader uniforms and school spirit items, for roughly $2.5 billion," Lauren Hirsch (Jun. 19, 2018), available at Bain in a reported $2.5B deal for school spirit company Varsity Brands (cnbc.com). As set forth in the article, "[t]he bet is [Varsity's] service-focused business [i.e. camps, competitions, and clinics] will help support product sales and fend off online competitors."

[13] See Dark side of a Bain success | Salon.com.

159. Defendant Bain enjoyed a similar relationship with Defendant Varsity Brands after the 2018 acquisition, taking seats on Defendant Varsity's Board, and ingraining itself into the decision-making of the company, including its decisions surrounding athlete safety.

160. Meanwhile, at the time of Defendant Bain's acquisition, the Varsity Defendants were embroiled in very public litigation arising out of the Varsity Defendants' alleged anti-competitive tactics in acquiring gyms and curbing other event-companies.

161. In 2020, former Varsity-member coach and "Cheerlebrity" Jerry Harris, star of the Netflix series "Cheer," was accused of soliciting sex from two children during the 2019 Varsity-competition season. Harris plead guilty in February, 2022, and was sentenced in July, 2022 on two counts, one of which included traveling across state lines with the intent of soliciting sex from a minor. This travel occurred in conjunction with a cheer competition.

162. After the Bain acquisition, on December 7, 2020, Defendants USASF and USA Cheer announced a universal system for reporting athlete safety concerns, as well as a central repository listing ineligible coaches and individuals. Defendants USASF and USA Cheer stated that these measures "will provide a

robust athlete safety infrastructure readily available across the entire cheer community."

163.   This list, the "Unified Ineligibility List," is accessible online, lists the nature of the infraction, occasionally provides public documentation, and names the offender.

164.   According to a December 7, 2020 press release issued by Defendants USASF and USA Cheer related to the Unified Ineligibility List: "We took these latest steps to ensure that our processes for reporting abuse are clear and consistent throughout the cheer community, and to facilitate the identification of individuals deemed a threat to participants."

165.   As of the date of filing of Plaintiffs' initial complaints, this list included roughly 230 names and entities, including Defendant Erick Kristianson. The vast majority of the suspensions, both temporary and permanent, are related to claims of sexual misconduct between minors and their coaches, choreographers, and other adults. Some of the alleged misconduct dates back more than ten years.

166.   Far from providing security for athletes, the list is replete with temporary suspensions where the only information provided is "Member policy violated related to athlete protection," with no records or other documentation.

167.    In addition, the list does not provide the status of the investigation, and is not updated on a regular basis.

168.    For instance, as it relates to Defendant Kristianson, and despite public reporting and news articles related to the allegations of sexual misconduct against him, Defendant USASF's website lists him only as temporarily suspended, and provides that this suspension is based on "[m]ember policy violation related to athlete protection."

169.    Any USASF member who is suspended has the right to appeal the decision. Yet, the affected athletes never receive notice that the suspended coach has invoked their appellate rights, nor are the athletes otherwise involved in this appellate process or decision.

170.    Defendant USASF admits on its own website that it does not include all decisions, but rather "only those that could pose a potential risk to the broader sport community." Whether an offense rises to the level of posing a potential risk to the broader sport community is left entirely to the discretion of USASF, the Varsity Defendants and the PE Defendants.

171.    The majority of instances of misconduct included on the USASF list arise out of sexual harm or misconduct. This repeated misconduct gave notice to

all Defendants that a broader issue existed within the Varsity Defendants' cheer community.

172.  Yet, other than the list, the Varsity Defendants made few if any modifications to the internal screening process for coaches, and made no modifications to the gym and competition environment.

173.  During the interim of the allegations set forth above, the Varsity Defendants, under the ownership and control of Defendant Bain and Defendant Charlesbank, and in conjunction with Defendant USASF and Defendant USA Cheer, have hosted multiple competitive events throughout the United States including the annual Worlds' competition in Orlando, Florida, during which time affiliated teams from across the country converge at a pre-selected location using hotels, premises, and businesses hand-selected by the Varsity Defendants.

174.  During these events, underage student athletes comingle with other teams, coaches, choreographers, and authorized Varsity vendors either without chaperones or minimally chaperoned, and are exposed to environments where drugs and alcohol were readily available, and where the student athletes were subject to rampant solicitation and inappropriate sexual conduct and innuendoes, including by coaches such as Jerry Harris and Scott Foster.

175.    At the same time, individual gyms and coaches would receive substantial benefits from affiliation with the Varsity Defendants, including the reputational benefits of being affiliated with Defendant USASF, Defendant USA Cheer, the Varsity Defendants' brands, and monetary benefits directly linked to the number of competitions in which a gym participated as well as the number of athletes the gym brought to the competition.

176.    Moreover, the individual gyms serve as platforms selling additional Varsity branded merchandise, such as sweatshirts, tops, hats, and jewelry.

177.    To perpetuate the popularity of certain gyms and coaches, the Varsity Defendants utilized social media, often liking posts and messages by specific athletes and coaches, such as Defendant Champion Elite, and Defendant Kristianson, and providing these same athletes and coaches with promotional codes to pass on to minor athletes to sell the Varsity Defendants' goods and services.

178.    In this way, the Varsity Defendants and the gyms and coaches had a symbiotic relationship, where the gyms and coaches supplied the Varsity Defendants with hundreds of millions of dollars of revenue from under-age

athletes, and the coaches and gyms used the Varsity Defendants' reputation to bolster their own reputation with minor athletes.

179.   The Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital relied upon the gyms and coaches to create a replenishing group of underage athletes, and future coaches, and gym owners, to provide a guaranteed stream of revenue.

180.   As such, it was contrary to the Varsity Defendants' business model for Defendants USASF and USA Cheer to ban coaches and gyms from their system, as every coach and gym represented a pipeline of current and future revenue for the Varsity Defendants.

181.   Rather, when allegations about a specific coach or Varsity affiliate were made, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer either ignored the allegations, determined the allegations were not "credible" based upon arbitrary criteria, or allowed the would-be abuser to quietly exit the Varsity-affiliated program, with the result that the accused could relocate to a new gym or facility without parents knowing about the allegations of misconduct.

182.   The PE Defendants knew or should have known that the Varsity Defendants, Defendant USASF, and Defendant USA Cheer were not appropriately

enforcing policies, processes, and procedures related to athlete safety, and that the Varsity Defendants were hosting events without regard for, and in contravention to the safety of child athletes.

183.    Moreover, to incentivize coaches and gyms, the PE Defendants continued to authorize the Varsity Defendants offering significant monetary benefits to increase sales of Varsity goods, and participation in Varsity events, including by providing cash rebates and promotional codes, as well as in creating event environments that comingled child-athletes with adult coaches, gym owners, and choreographers.

184.    In these environments, it was reasonably foreseeable that the athletes would be minimally supervised, and that the athletes would be exposed to drugs and alcohol. his environment fostered and contributed to the sexual, mental, and physical abuse inflicted upon the athletes.

185.    This competition and gym network  was the brainchild of Defendant Jeff Webb, who used the competitions as a mechanism for his companies to establish dominance in the cheer market.

186.    Plaintiffs are informed and believe that certain employees of the Varsity Defendants resigned their positions because of the abuse and systemic

failures they saw within the system, including failures to uniformly apply policies and procedures related to athlete safety, rampant drug use within the leadership of the Varsity Defendants, alcohol and drug use by coaches and athletes during competitions, and general favoritism and promotion of teams that chose to endorse or affiliate with the Varsity Defendants, disadvantaging independent teams.

187.    Defendant Webb was previously Varsity's president but resigned in 2020 amid the Jerry Harris sex abuse scandal.

188.    During the operative timeframe of this complaint, Defendant USASF received numerous reports and allegations against coaches, choreographers, videographers, and music directors. The general response from Defendant USASF was to disregard these reports and accusations as attempts by disgruntled athletes and parents to get coaches and gyms in trouble if the athletes did not receive coveted team positions.

189.    A 2020 investigative series by journalists Marisa Kwiatkowski and Tricia L. Nadolny for USA Today revealed scores of repeat sex offenders active within USASF certified gyms and preferred vendor lists.[14] Some of the cases of

---

[14]    https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/

which Defendants Bain Capital, Charlesbank, and the Varsity Defendants had or should have had knowledge include:

a.  A Virginia gym owner was convicted of sexual battery and assault and placed on the sex offender registry after three girls he coached at his Virginia gym came forward. As of 2020, this coach was still listed as the gym's owner and was still USASF certified. Varsity continued to invite his gym to competitions. One of his victims had to stop cheering competitively because her convicted abuser was allowed to stay involved around children and in proximity to her.

b.  A Charlotte, North Carolina coach who was arrested for two counts of sexual assault of a minor and lost his middle school teaching job continued to have access to minors afterward. Though the gym's owners claimed he was told he was no longer welcome to work with the gym's athletes after his arrest, he continued to appear in official social media accounts of the gym, was connected by the gym director to parents for private lessons, and attended a Varsity event in Florida

---

https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

where he was photographed posing next to the gym's athletes in a gym uniform with the word "Coach" on his shorts.

c. A coach who had been fired from a gym and charged with child pornography was discovered to still be working in the cheer industry by the gym owner who had originally fired him. The gym owner called Varsity, who told her his background check was fine. After she went to the courthouse to get the records of his conviction and sent them to Varsity, months passed and the man continued coaching children at Varsity events through USASF gyms.

d. A Washington gym owner was not banned by USASF until more than a year after the organization received reports in 2018 that he had been accused of sexual misconduct with minors.

190. Moreover, Defendant USASF refused or failed to report non-member coaches and adults accused of misconduct to law enforcement – contravening its representation that USASF and its members are mandatory reporters. (*see* USASF Terms and Conditions of Coach Membership);

191.    Defendant USASF has received hundreds of complaints against coaches, choreographers, videographers, and others accused of sexual misconduct.

192.    Until recently, however, Defendant USASF failed to dedicate fulltime staff to managing investigation of these complaints.

193.    Ginger Wilczak, the part-time contract employee USASF eventually hired to field reports of misconduct, stated that she worked 10 hours per week at most.[15] In an interview with Mary Carillo in an HBO Real Sports investigative segment, she reported that she had been actively prevented from taking the necessary actions to perform the job function for which she was purportedly hired.

194.    Former Varsity executive Marlene Cota has also publicly stated her impression that Defendant Varsity placed its brand over the safety of its athletes.[16]

195.    Defendant USASF has been excruciatingly slow to develop policies and procedures for keeping athletes safe from sexual abuse in an industry which was known to them to be rife with it.

---

[15] . https://usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

[16] *See* "Cheerleading Antitrust suit spurs brawl over ex exec's documents," Daniel Libit, Sportico (Jan. 12, 2022) available at: http://www.sportico.com/law/news/2022/varsity-spirits-antitrust-accusers-1234658119.

196.    Meanwhile, according to its website: "USASF is the U.S. All Star Federation. It's about safety standards. It's about coaches' education. It's about providing a safe environment to allow for the continued growth of all-star cheerleading and dance across the country. ***It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care***. It's about standardization of rules from one competition to the next. It's about time." (Emphasis added).

197.    In the years since this public representation, however, Defendant USASF's gym and coach training has focused almost exclusively on avoiding physical injury to the athletes.

198.    In fact, Defendant USASF's "Athletic Performance Standards" dealt only with things like hair accessories, makeup, uniforms, choreography, and music. The general message is that Defendant USASF concerns itself more with how its athletes look than how its coaches behave.

199.    In 2012, Defendant USASF reiterated its "image and appearance policy" to address "the increasing criticism about the general appearance of our athletes during competition and the unflattering media stories that have focused

on how our sport is presenting its athletes, particularly those in the younger age groups."

200.  At the same time, Defendant USASF began offering, but not requiring, a $1 million sexual abuse/sexual molestation policy to gym owners through K&K Insurance.

201.  It took until 2015 for Defendant USASF to implement background checks on certified coaches and gym owners. However, Defendant USASF failed to uniformly apply the process.

202.  In 2018, the SafeSport Act was ratified as an amendment to the Child Abuse Victim's Right Act, creating a private right of action for minor athletes who had been abused and creating the U.S. Center for SafeSport, a central regulatory body and clearinghouse for investigation of reports of sexual abuse of minors through their sports.

203.  Defendant USASF, while knowingly failing to perform their own self-regulating functions, which Plaintiffs funded, began fraudulently misrepresenting that Defendant Webb's All-star cheer industry had submitted to the jurisdiction of the U.S. SafeSport Center.

204. Defendant USASF took multiple affirmative steps to misrepresent that it was affiliated with the U.S. Center for SafeSport on its website, which this Complaint alleges was owned and maintained, at least for a time, by Varsity.

205. In December of 2019, almost a year after the SafeSport Act became law, the Defendants, rather than submitting cheerleading to the authority of SafeSport's oversight and reporting requirements, continued to oversee themselves.[17]

206. However, in January of 2019, Defendant USASF began linking to the U.S. Center for SafeSport on its website, going so far as to use the Safesport logo.[18]

207. By May 31, 2019, Defendant USASF had added a "SafeSport" tab to its website, but the information under it was still only USASF's former internal athlete protection resource.[19]

208. As of November 20, 2020, Defendant USASF was still including a "SafeSport" tab on its website, but suddenly stopped linking to the U.S. Center for SafeSport.[20]

---

[17] https://web.archive.org/web/20181202034012/http://usasf.net/home/
[18]
https://web.archive.org/web/20190120173539/http://www.usasf.net/programs/resources/athleteprotection/
[19] https://web.archive.org/web/20190531215354/http://www.usasf.net/safesport/about/
[20] https://web.archive.org/web/20201130044317/https://www.usasf.net/

209.     Then, in early December of 2020, around the time Defendant Webb left Varsity, Defendant USASF changed the tab to "Safe Sport" (with a space) on its site.[21]

210.     To this day, neither Defendant USASF nor the Varsity Defendants has ever actually participated with the U.S. Center for SafeSport program.

211.     Around this same time, Defendant USASF also created the "Triple A" challenge as part of its response to the SafeSport Act, but in so doing, effectively shifted responsibility for reporting abuse and exploitation from the corporate entities empowered to oversee the sport onto minors and their families telling athletes they should consider their appearance and how they present themselves, and when posting photos to social media, they should first ask themselves: "Is it Athletic? Is it Age Appropriate? What does it Amplify?" The Varsity Defendants asked for "thoughtful" social media posts to be hash-tagged with "#ThisIsAllStar and "#usasfATHLETES1st" as part of their safety plan.

212.     Meanwhile, Defendant USASF continued to fail to follow its own procedures with respect to rampant reports of child sexual abuse, allowing

---

[21] https://web.archive.org/web/20201228081625/https://www.usasf.net/

complaints to stall or delaying action when their policies clearly call for an adult member to be suspended or banned.

213. Jim Lord, Defendant USA Cheer's director of education and programs, said in 2020 that the organization's banned list is one of the tools they use to keep athletes safe. The manner in which this oversight was performed, according to Lord, was that he had it on his "weekly checklist" to visit search engines and use terms like "cheer coach", "athlete abuse", and "sexual assault" to find people to ban[22]. Between June and September that year, Lord had identified five (5) names.

214. Investigative reporters with USA Today managed to find 180 people during that same time frame. More than 140 of those had been convicted of a child sex crime and more than half of those were registered sex offenders.

215. Also in 2020, W. Scott Lewis, partner at legal and risk management firm TNG, criticized Defendant USASF's handling of reports and complaints in that they often sat on their hands and did nothing, assuming law enforcement had been contacted by someone else. He said it was not typical for organizations to

---

[22] It is telling of the problem that Lord used words related to sexual abuse when looking for coaches, gym owners, and affiliates who violated USASF policy. This very specific search criteria demonstrates that USASF understood the risks of harm inherent to the sport.

wait for law enforcement action before taking their own action unless they've explicitly been asked to do so. He said, "You don't want to be on the sideline saying, 'Well, we can't do anything because law enforcement's doing it,'" Lewis said. "You want them to have the ability to engage in interim measures or your own investigation, or both." In May of 2021, Defendant USASF hired TNG to consult on its athlete safety practices.

216.   Well after the very public arrest of Jerry Harris, Defendants USASF and USA Cheer finally began offering risk and safety training to member gyms and personnel.

217.   However, instead of mandating this risk and safety training for all members, and providing training free of charge, the Varsity Defendants require members to pay an additional fee to access Defendant USASF and Defendant USA Cheer's safety training.

218.   Defendant USASF also began "requiring" that all member programs "have clear, written guidelines that prohibit adults who have contact with minors from engaging in conduct that is either inappropriate and/or illegal."

219.    Defendant USASF failed however, to provide oversight on reviewing or approving those policies, or even verifying gyms had, in fact, enacted guidelines.

220.    Defendant USASF has previously stated that it does not have the ability to enforce its own policies and procedures, referring to these as "recommendations" rather than requirements.[23]

221.    Eventually, Defendant USASF created an online reporting mechanism for receiving complaints. Experts have raised concerns over the burden of this reporting process. When printed, the required forms are over 15 pages long.

222.    Moreover, the victim must cite to the alleged rule or regulation their attacker violated, requiring them to study codes in various places on the website from a slew of different sources in order to make a valid report.  By so doing, Defendant USASF shifted its mandatory duties to investigate and report child abuse to the victim and their family, and adding an unnecessary layer of complexity in the process of reporting a predator.

---

[23] *See* "Varsity Brands Owns Cheerleading and Fights to Keep it From Becoming an Official Sport," Leif Regstad, Houston Press (Jul. 21, 2015) available at: https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

223.    The cumbersome nature of the reporting process, coupled with the fear many kids feel in coming forward against coaches and gym owners who would not immediately be ousted, as Defendant Kristianson bragged to one of his victims in this case, effectively chilled reporting.

224.    Kelli Hughes, the director of the Center for Child Policy, asserted she found Defendant USASF's reporting process to be unnecessarily complicated and burdensome.

225.    For the 2021 Worlds at Disney World in Florida held in May of 2021, Defendant USASF sent out an information packet which contained athlete conduct rules but did not address coach conduct. The policy mandated a ratio of one (1) adult chaperone, defined as anyone 21 years of age or older, for every nine (9) child athletes.

226.    In an October 2021 hearing before the Federal Trade Commission, David Owens, the director of events for Open Championship Series, another private All-star company, told regulators that the power the Varsity Defendants

hold over USASF and USA Cheer presented an "immediate threat to the health, well-being, and safety of the children and the sport."[24]

227. Webinars on athlete safety listed at the site in November 2021 included topics like "tumbling drills", "coed stunting", "building transitions", "choreography", "twisting skills theory", and "flyer stability and flexibility". Conspicuously absent at this crucial time was any training on preventing or reporting child sexual abuse or molestation.

228. Defendant USASF has repeatedly disseminated public messages about its role in ensuring athlete safety and protection, for instance:

    A. On August 23, 2022, USASF posted: "From requiring background screenings for adults in All-star to creating and enforcing safety standards at all USASF Sanctioned competitions and developing tools for clubs to train young athletes, the highest priority for the USASF is the safety and protection of athletes in All Star."

---

[24] *See* "Accused Cheer Monopolist Varsity Squares Off Against Ex-Employees," Daniel Libit, Sportico (October 13, 2021), available at: http://sportico.com/leagues/other-sports/2021/accused-monopolist-varsity-spirit-1234643664/.

> B. On August 13, 2022, USASF posted: "Our athletes deserve our best and everything the USASF does is to help them succeed. Setting the highest standards for coaches and helping them stay at the top of our sport is crucial for that success. That's why more than 7,000 coaches are credentialed each year to demonstrate their abilities to coach All Star. Additionally, the USASF coaches must complete background checks and athlete protection training as basic membership requirements."

229. These repeated and continuous messages about athlete protection from Defendant USASF, at a time when Defendant USASF knew or should have known it was offering no such protective measures, created a heightened risk because abusers like Defendant Kristianson became emboldened to continue sexual conduct with minors confident in the knowledge that Defendants USASF and USA Cheer took no action against them even in the face of reports of abuse.

230. Moreover, the "USASF sanctioned events" referred to throughout these near-daily messages were all events created by the Varsity Defendants, and the gyms and coaches Defendant USASF promoted as safe were all affiliated with and in direct relationships with the Varsity Defendants.

231.    The messages and representations about how athlete safety and protection were paramount to the Varsity network experience were created and promulgated under the guidance and instruction of Defendants Bain Capital and Charlesbank, both of whom expanded the Varsity network's reach by billions of dollars.

232.    In short, the PE Defendants, the Varsity Defendants, and Defendants USASF and USA Cheer have created an elaborate illusion of a safe system in order to draw more members in so they could sell more merchandise and collect more fees for events and camps, knowing their young vulnerable members were at risk and that they were doing nothing about removing the criminal coaches, affiliates, gym owners, and administrators creating that risk.

## The Champion Elite Legacy Gym

233.    Defendant Champion Elite was a private cheer, dance, and tumbling gym offering its services to children as well as adults in Florida.

234.    Defendant Champion Elite was owned by and operated by Defendant Ashley Hughes.

235.    Defendant Champion Elite was a highly awarded and profitable program within the Varsity Defendants' community.

236.    Defendant Champion Elite was certified by Defendant USASF as meeting All-star standards with respect to coach credentials, program quality, and athlete safety.

237.    As such, the Varsity Defendants warranted to athletes and families that Defendant Champion Elite and its owners and coaches, employees, and adult athletes, including Defendant Kristianson, could be trusted with minor children while training for and attending Varsity events.

238.    Defendant Kristianson was an employee of Defendant Champion Elite, working on behalf of Defendant Champion Elite and in the course and scope of his employment.

239.    As a condition of employing Defendant Kristianson, Defendant Champion Elite required Defendant Kristianson to become a coaching member of Defendant USASF.

240.    Moreover, Defendant Champion Elite represented that Defendant Kristianson was a credentialed member of USASF, adhering to Defendant USASF's policies and procedures protecting minors, including Jane Does 1, 2, and 3, from physical, sexual, and mental abuse.

241.    Defendant Champion Elite authorized, allowed, and represented that Defendant Kristianson was qualified to serve as a coach and mentor for minor athletes, including Plaintiffs, and thus provided Defendant Kristianson wide access to said minor.

242.    Defendant Champion Elite represented that Defendant Kristianson was credentialed and therefore a member of Defendant USASF's and the Varsity Defendants' authorized All-star community.

243.    Defendant USASF and the Varsity Defendants knew, or had reason to know, that Defendant Kristianson was in contact with minor athletes, including Plaintiffs Jane Doe 1, Jane Doe 2, and Jane Doe 3, and expressly and repeatedly authorized this contact.

244.    In fact, because Plaintiffs were members of Defendant USASF and were participants in and consumers of the Varsity network, Defendants not only knew of Plaintiffs' memberships, but also had the ability to know the approximate revenue each of them represented to the network.

245.    Defendants Hughes and Kristianson were also members of Defendant USA Cheer.

246.     Defendant Kristianson was a coach, mentor, and authorized representative of Defendants Champion Elite, USASF, and the Varsity Defendants, responsible for training and interacting with minor children, including Plaintiffs.

247.     Defendants Champion Elite, USASF, and the Varsity Defendants put Defendant Kristianson in a position of particular trust, and represented to the cheer community, including Plaintiffs, that he was safe to provide coaching services to minor athletes.

248.     However, Defendant Kristianson posed a known danger to minor athletes including Plaintiffs including risks of sexual harassment, exploitation, and abuse. Moreover, other members of Defendant Champion Elite's organization knew or had reason to know of the abuse perpetrated upon Plaintiffs by Defendant Kristianson and did nothing.

249.     Defendant Champion Elite remained in lock step with the Varsity Defendants, competing at the Varsity Defendants' events, purchasing the Varsity Defendants' merchandise, participating in the Varsity University training conferences, and mandating that Defendant Champion Elite's athletes become members of Defendant USASF, including paying USASF annual dues.

250. All the while, Defendant Champion Elite was receiving financial incentives from the Varsity Defendants and PE Defendants for doing so.

251. Even today, Defendant USASF has only temporarily suspended Defendant Kristianson, and no action seems to have been taken against Defendant Champion Elite or Defendant Hughes.

252. Meanwhile, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and, by virtue of their acquisition, ownership, and control, the PE Defendants, knew or should have known of the abuse being perpetrated by their credentialed coaches such as Defendant Kristianson.

### The Enterprise

253. Plaintiffs reallege the factual recitations from the preceding paragraphs as though repeated verbatim herein.

254. The unlawful acts alleged against Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson, who coached, choreographed, and perpetrated abuse upon minor athletes were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

255.   The alleged unlawful acts likewise performed and facilitated by, or aided and abetted by, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, and the PE Defendants, were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

256.   Plaintiffs allege Defendant Jeff Webb had a very personal role in decision-making and directing of the affairs of the entire Varsity network, including its rulemaking bodies.

257.   Defendants' officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals.

258.   Each Defendant, and any respective subsidiaries, affiliates and agents operated as a single unified entity with the common goal of taking billions of dollars from minor athletes by selling a specific promise of a safe competitive private cheer world, overseen and administered by Defendants,. At all times relevant to this Complaint, these Defendants, and each of them, knew this promise of a uniquely safe sport was false and that Plaintiffs were in fact in jeopardy of

being sexually and physically harassed and abused. Defendants' Enterprise functioned as a continuing unit throughout the conspiracy and continues its operation through the filing of this Complaint.

259. Defendants possessed and continue to possess an ongoing organizational structure with sufficient continuity related to the Enterprise either on an ad hoc or formal basis.

260. Each Defendant participated in the operation and management of the Enterprise by, among other actions, promoting the Varsity network as uniquely safe for minor athletes, empowering governing bodies, inundating athletes with messages about safety, misleading athletes about the connection between the Varsity network, and the U.S. Center for Safe Sport, promoting the use of credentialing, certification, and the Unified Ineligibility List, restricting athlete movement, and requiring athletes to travel in pre-determined manners selected by the Varsity and PE Defendants, among other particulars.

261. The Enterprise is separate and distinct from the pattern of racketeering activity as set forth below.

262. Whenever in this Complaint reference is made to any act, deed, or transaction of any organization, the allegation means that the Defendants and each

of them engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

263. Individuals alleged to have engaged in misconduct in violation of the laws pleaded herein are alleged to have done so on behalf of all members of the Enterprise between the Varsity Defendants, Defendant USASF, Defendant USA Cheer, the PE Defendants, Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson.

264. The athletes who paid to enter the competition cheer world did not know or did not distinguish between the corporate affiliations of different individuals. These organizations all affirmatively and collectively represent themselves as one All-star family, rather than separate parents and subsidiaries.

265. Defendants' unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate commerce in the United States through the certification of private gyms and their coaches, as well as the organizing, promoting, and managing of gyms, certifications, and cheer

competitions throughout the United States, and the sale of memberships that guaranteed the safety of children.

266.    During its ownership period from 2014-2018, Defendant Charlesbank conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity network with the promise of a safe and superior coaching experience by joining a certified gym.

267.    Defendant Charlesbank provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so.

268.    When Defendant Charlesbank sold to Defendant Bain Capital in 2018, rather than walk away from the Enterprise, Defendant Charlesbank made the conscious business decision to reinvest and retain an ownership interest in the Varsity Defendants to continue reaping the financial benefits of Varsity's business with Defendants Champion Elite, Hughes, and Kristianson.

269.    Once ownership transferred to Defendant Bain Capital in 2018, Defendant Bain Capital conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity universe of competitive cheer with the promise of a safe and

superior coaching experience by USASF and USA Cheer certified gyms, coaches, and instructors.

270.    Defendant Bain Capital has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so through Varsity, USASF, and USA Cheer's business Enterprise with Defendant Champion Elite and continues to do so as set forth herein.

271.    All Enterprise Defendants were co-conspirators in a scheme to get as many families as possible to entrust their child athletes to these private gyms and coaches in order to generate massive revenue from these athletes, all while these Defendants were collectively:

(a) Fraudulently misrepresenting that the Varsity network was the "gold standard" in athlete safety;

(b) failing to properly vet the coaches through adequate background checks;

(c) failing to provide sufficient oversight and monitoring of the member gyms;

(b) failing to properly investigate complaints of inappropriate and criminal sexual conduct by the coaches against minors;

(c) failing to report complaints of inappropriate and criminal sexual conduct against minors;[25]

(d) failing to enforce rules and regulations for chaperoning and supervision of minors;[26]

(e) failing to enforce ineligibility due to complaints regarding athlete safety;[27]

(f) facilitating the transfer of minor athletes across state lines for the purpose of or with a reckless disregard for whether the athletes would be subjected to sexual and/or physical abuse;[28]

(g) facilitating the transfer of minor athletes across state lines for the purpose of or with a reckless disregard for whether the minors would be served drugs and alcohol by other affiliated adults;

---

[25] (*see* USASF Terms and Conditions of Coach Membership);

[26] *See* "Sex Offender allegedly skirted ban to continue coaching cheerleaders," Jesse O'Neil, January 11, 2021, NYPost, available at: https://nypost.com/2021/01/11/sex-offender-allegedly-skirted-ban-to-continue-coaching-cheerleaders/; *see also* "Accused Cheer Monopolist Varsity Squares Off Against Ex-Employees," Daniel Libit, Sportico (Oct. 13, 2021) (Commenting before the Federal Trade Commission during an open meeting, David Owens, available at: https://www.sportico.com/leagues/other-sports/2021/accused-monopolist-varsity-spirit-1234643664/.

[27] *See* "Cheerleading's Ban List Skips 74 Sex Offenders," Marisa Kwiatkowski & Tricia L. Nadolny, Sep. 22, 2020 USAToday.

[28] *See United States v. Jeremiah Harris*, C/A No. 20-CR-637, Plea Agreement available at: https://www.justice.gov/d9/press-releases/attachments/2022/02/10/harris_plea_agreement_0.pdf

(h) gathering at predetermined locations to discuss and exchange notes and information related to the Enterprise including how to lure additional minor athletes and how to maximize profits;

(i) sending and collecting bills and invoices across the mails and wires despite the fraud perpetrated by Defendants;

(j) using Defendant Champion Elite's platform to obtain access to significant financial resources of Plaintiff and other member-athletes, both for annual invoices and fees, as well as for merchandise, both mandatory and otherwise;

(k) disseminating fraudulent misrepresentations through mail and wire as to the safety Defendants guaranteed through a sham certification process;

(l) collecting money from minor athletes related to the above referenced scheme;

(m) requiring memberships of all minor athletes competing on behalf of member gyms, which, in part, allowed Defendants to track and monitor the number of minor athletes under their care;

(n) creating the "stay-to-play" system whereby Defendants mandated member gyms bring their minor athletes across state lines to competitions

and stay only at pre-selected hotels registered through them to allow Defendants to track these athletes and exercise control over their physical locations;

(o) disseminating fraudulent misrepresentations about Defendants' gym and coach certification process through the mails and wires so as to perpetuate the image of a safe environment for minor athletes;

(p) promoting certain coaches and athletes on social media who Defendants knew or should have known had engaged in illicit, predatory behavior and sexual misconduct with minors, all while authorizing these same individuals to sell goods for Defendants on Defendants' platforms, or with Defendants' endorsements;

(q) mandating annual membership in Defendant USASF by athletes, member coaches, and clubs creating a conflict wherein the USASF received monetary benefits from certified coaches who USASF was also obligated to investigate for misconduct;

(r) prohibiting athletes from transferring out of certain gyms so as to chill reporting and control competition;

(s) chilling athletes from coming forward with allegations by promising that

athletes who stayed in the system might achieve additional goals including collegiate opportunities;

(t) creating marketing materials and personas specifically intended to target and attract young children to the sport, including by using certain color schemes, wording, and imagery (*e.g.* Varsity All-star Instagram page, Varsity Spirit Instagram Page);

(u) failing to employ reasonable policies, procedures, guidelines and safeguards consistent with the purported "standard of care" Defendants have represented in their materials;[29]

(v) failing to properly staff, fund, resource, train, and otherwise enable the implementation of the instruments by which Defendants promised to police and govern the sport;[30] and

(w) interfering by the Varsity Defendants with the safety and regulatory

---

[29] *See* September 18, 2020 article in the USA Today, and commenting on the arrangement between Defendants USASF and Varsity Spirit. In the article, former Risk Management Center staffer John Patterson says that "Whatever Varsity wants, Varsity gets [from USASF]."

[30] *See* Commentary from Ginger Wilczak, former USASF Safesport Manager and part-time contract employee on the perpetual understaffing and lack of resources in USASF's office tasked with investigating reports of misconduct, "A huge slap in the face': Frustrations Grow Over Cheerleading's mishandled sexual misconduct cases," Tricia L. Nadolny, Marisa Kwiatkowski, USA Today (Dec. 23, 2020), available at: https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

operations of Defendants USA Cheer and USASF;[31]

## **The Abuse**

### *Jane Doe 1*

272.    Plaintiff Jane Doe 1 began cheering when she was around 11 years old.

273.    At the time she began her cheer career, Plaintiff Jane Doe 1 cheered at Defendant Champion Elite Legacy, an all-star cheer and tumbling gym in South Daytona Beach, Florida.

274.    At all times relevant to this complaint, Plaintiff Jane Doe 1 was a member of USASF and paid her dues annually.

275.    At all times relevant to this complaint, Defendant Champion Elite was owned by Defendant Dr. Ashley Hughes, a chiropractor, and managed by Defendant Erick Kristianson, a 43-year-old man who also coached at the gym.

276.    Plaintiff Mary Doe and Plaintiff Jane Doe 1 met Defendant Kristianson in or around 2019 when he joined the coaching staff at Champion Elite.

---

[31] *See* "Cheerleading Antitrust suit spurs brawl over ex exec's documents," Daniel Libit, Sportico (Jan. 12, 2022) (available at: https://www.sportico.com/law/news/2022/varsity-spirits-antitrust-accusers-1234658119/). In the article, ex-Varsity executive Marlene Cota bluntly states her impression that Varsity placed its brand over the safety of athletes. Cota was also featured in an episode of HBO's Real Sports.

277.    Over the next several months, Defendant Kristianson introduced his mother to Plaintiff Mary Doe, Plaintiff Jane Doe 1, and their family and shared details about his religious upbringing.

278.    Knowing that Plaintiff Mary Doe, her husband and children described themselves as a faith-based family, Defendant Kristianson took great care to emphasize his lifelong connections to religious organizations and his religious upbringing. This commonality helped Defendant Kristianson form a swift and meaningful bond with Plaintiff Mary Doe, Plaintiff Jane Doe 1, and their family.

279.    Beginning in or around 2020, Plaintiff Mary Doe and her family began to see Defendant Kristianson in social settings outside of the gym. Over time, Plaintiff Mary Doe and her family, including her minor daughter, Plaintiff Jane Doe 1, grew to love and trust Defendant Kristianson, welcoming him as part of their family.

280.    Plaintiff Mary Doe noticed that other parents at the gym similarly trusted and cared for Defendant Kristianson. Several families relied on Defendant Kristianson to transport their children to and from cheer, and some families even included him in their social gatherings and events.

281. Defendant Kristianson would often transport Plaintiff Jane Doe 1 and her sister to and from cheer practices and other cheer competition events.

282. Defendant Kristianson accompanied Plaintiff Mary Doe, her husband, and children (including Plaintiff Jane Doe 1) on several weekend trips, including trips to Tampa, Universal Studios, and Busch Gardens. By all accounts, Defendant Kristianson became like family to Plaintiff Mary Doe, her husband and children.

283. In or around 2022, Defendant Kristianson notified Plaintiff Mary Doe that he needed a place to stay. Plaintiff Mary Doe offered for Defendant Kristianson to temporarily move into a detached apartment on her property.

284. During this time, Defendant Kristianson continued to transport Plaintiff Jane Doe 1 and her sister to cheer practices and continued to accompany the family on trips and to events. In or around March of 2022, Plaintiff Mary Doe allowed Plaintiff Jane Doe 1 and her sister to travel with Defendant Kristianson to the home of another cheer coach in South Carolina.

285. Around the same time, Plaintiff Mary Doe observed special attention Defendant Kristianson was paying to her daughter, Plaintiff Jane Doe 1, complimenting her skill and offering additional tumbling classes.

286.    Plaintiff Mary Doe also noticed a rift between Plaintiff Jane Doe 1 and Plaintiff Mary Doe's other daughter, Plaintiff Jane Doe 1's sister.

287.    Around this time, Plaintiff Mary Doe noticed a change in her daughter's dress, mood, and overall demeanor. Despite the warm Florida climate, Plaintiff Jane Doe 1 would only wear baggy, oversized sweatpants and sweatshirts. Plaintiff Jane Doe 1, who was normally outgoing and upbeat, was suddenly aloof, reclusive, and behaving strangely.

288.    In late June or early July of 2022, Mary Doe asked Plaintiff Jane Doe 1 about what was troubling her. At this time, Plaintiff Jane Doe presented Mary Doe with video recordings of Defendant Kristianson engaged in sexually abusive behavior with Plaintiff Jane Doe 1 and others.

289.    Plaintiff Jane Doe 1 told Mary Doe that she created these recordings because she feared without solid proof, nobody would believe her if she disclosed the abuse.

290.    One of the videos showed Defendant Kristianson naked in a shower stall, masturbating with a small blue massage device while talking to Plaintiff Jane Doe 1 and other minor children. During this recording, Defendant Kristianson is

heard asking Plaintiff Jane Doe 1and the other minor children to retrieve items for him and bring them to him in the shower.

291.   The second recording was a FaceTime call from Defendant Kristianson to Plaintiff Jane Doe 1 and a friend. In the recording, Defendant Kristianson is lying nude with his penis exposed to the camera. At several points throughout the recording, Defendant Kristianson points the camera towards the wall to reveal a shadow image of his erect penis. Defendant Kristianson is seen masturbating at several points throughout the video. The video also clearly shows in the "caller box" at the top right side of the screen, the faces of Plaintiff Jane Doe 1 and her minor friend, who are on the receiving end of the call by Defendant Kristianson.

292.   Plaintiff Mary Doe confronted Defendant Kristianson with the video recordings, at which time Defendant Kristianson attempted to delete the recordings from Plaintiff Mary Doe's device before leaving Plaintiff Mary Doe's home.

293.   After Plaintiff Jane Doe 1 disclosed the existence of the videos, she also disclosed to Plaintiff Mary Doe that Defendant Erick Kristianson had exposed

his penis to her on numerous occasions, and touched her inappropriately while stunting, including on her buttocks and upper thigh areas.

294.   Plaintiff Jane Doe 1 would tell Defendant Kristianson to stop, but he would continue to touch her and grab her. Defendant Kristianson would ask Jane Doe if she had taken a shower or if she was wearing underwear.

295.   On one occasion in 2022, Defendant Kristianson instructed Plaintiff Jane Doe to retrieve a photo from his printer. When Plaintiff Jane Doe got to Defendant Kristianson's printer, she saw that the photograph Defendant Kristianson asked her to retrieve depicted his erect penis.

296.   Plaintiff Jane Doe 1 and another friend reported to Plaintiff Mary Doe that they saw Defendant Kristianson's penis on multiple occasions at the gym and at social events. Upon further questioning by Plaintiff Mary Doe, Plaintiff Jane Doe 1 and her friend stated that they "always see [Defendant] Erick [Kristianson]'s penis" and that Defendant Kristianson is known as "creepy Erick" around the gym.

297.   Only after learning of Defendant Kristianson's inappropriate sexual behavior towards Plaintiff Jane Doe 1 and others did Plaintiff Mary Doe became aware that there were complaints made by other parents at Defendant Champion

Elite about Defendant Kristiansen going to practice with short shorts and no undergarments, exposing his penis to the children.

298.    Plaintiff Mary Doe further learned that at least one other parent at the gym instructed Defendant Hughes to keep Defendant Kristianson away from her child.

299.    Defendant Hughes addressed these complaints with Defendant Kristianson by instructing him to wear proper undergarments during practices, but did not take any further action to confirm compliance or deter the behavior.

300.    A former co-owner of Defendant Champion Elite left the gym in part over Defendant Hughes' inaction and mishandling of complaints about Defendant Kristianson's inappropriate sexual behavior with athletes.

301.    Reports of Defendant Kristianson exposing his penis to underaged athletes were made to Florida Department of Children and Families and Defendant USASF in October of 2021 and February of 2022, but no action was taken.

302.    In early July of 2022, within one day of Plaintiff Jane Doe 1's disclosure, Mary Doe reported the sexual abuse of her daughter, Plaintiff Jane Doe

1 and the sexually explicit videos of Defendant Kristianson to the Daytona Beach Police Department.

303.   On or about July 12, 2022, a warrant was issued for the arrest of Defendant Kristianson for the felonies of Lewd and Lascivious Exhibition to a victim under the age of sixteen, Lewd and Lascivious Molestation of a person under the age of sixteen, Lewd and Lascivious Exhibition via Computer to a person under the age of eighteen, and Lewd and Lascivious Molestation of a person between the ages of 12-16.

304.   Defendant Kristianson was arrested in Kansas on August 4, 2022. He was extradited to Florida and arraigned on the charges. Bond was set at $300,000 surety. Defendant Kristianson posted bond and was released on August 5, 2022.

305.   As of the date of this filing, the criminal cases against Defendant Kristianson are pending in the Volusia County Circuit Court.

306.   During this timeframe, Plaintiff Jane Doe 1 has always been a member of USASF and has paid her dues annually as well as the other fees required by Defendant Champion Elite and the Varsity Defendants.

307.   Plaintiff Jane Doe 1 and Mary Doe reasonably relied on representations from Defendants that the Varsity network and its certified gyms

and coaches were uniquely safe because of the Defendant USASF and USA Cheer's rigorous vetting.

### *Jane Doe 2*

308.   Plaintiff Jane Doe 2 began cheering in or around 2019 when she was 10 years old.

309.   Plaintiff Jane Doe 2 began cheering at Champion Elite Legacy, an all-star cheer and tumbling gym in South Daytona Beach, Florida.

310.   At all times relevant to this complaint, Plaintiff Jane Doe 2 was a member of USASF and paid her dues annually.

311.   Defendant Champion Elite Legacy was owned by Dr. Ashley Hughes, a chiropractor, and managed by Erick Kristianson, a 43-year-old man who also coached cheer at the gym.

312.   Mary Doe and Plaintiff Jane Doe 2 met Defendant Erick Kristianson in or around 2019 when he joined the coaching staff at Champion Elite.

313.   Over the next several months, Defendant Erick Kristianson introduced his mother to Mary Doe, Plaintiff Jane Doe 2 and their family and shared details about his religious upbringing out of state.

314.    Knowing that Mary Doe, her husband and children described themselves as a faith-based family, Defendant Erick Kristianson took great care to emphasize his lifelong connections to religious organizations and his religious upbringing. This commonality helped Defendant Kristianson form a swift and meaningful bond with Mary Doe, Plaintiff Jane Doe 2 and their family.

315.    Beginning in or around 2020, Mary Doe and her family began to see Defendant Erick Kristianson in social settings outside of the gym. Over time, Mary Doe and her family, including her minor daughter, Plaintiff Jane Doe 2, grew to love and trust Defendant Kristianson, welcoming him as part of their family.

316.    Mary Doe noticed that other parents at the gym trusted and cared for Defendant Erick Kristianson. Several of the families relied on Defendant Erick Kristianson to transport their children to and from cheer, and several of the families also included him in their social gatherings and events. Mary Doe and her family, including Plaintiff Jane Doe 2, grew to love and trust Defendant Erick Kristianson.

317.    Defendant Erick Kristianson would often transport Plaintiff Jane Doe 2 and her sister to and from cheer practices and other cheer competition events.

318.    Defendant Erick Kristianson accompanied Mary Doe, her husband, and children (including Plaintiff Jane Doe 2) on several weekend trips, including trips to Tampa, Universal Studios, and Busch Gardens. By all accounts, Defendant Erick Kristianson became like family to Mary Doe, her husband and children.

319.    In or around 2022, Defendant Erick Kristianson notified Mary Doe that he needed a place to stay. Mary Doe offered for Defendant Erick Kristianson to temporarily move in to a detached apartment on her property.

320.    During this time, Defendant Kristianson continued to transport Jane Doe 2 and her sister to cheer practices and continued to accompany the family on trips and to events. In or around March of 2022, Mary Doe allowed Plaintiff Jane Doe 2 and her sister to travel with Defendant Erick Kristianson to the home of another cheer coach in South Carolina.

321.    In or around early 2022, Defendant Erick Kristianson played a "game" with Plaintiff Jane Doe 2 that he called, "Jeepers Creepers," where he would discuss sexual content, grope and fondle Plaintiff Jane Doe 2. Defendant Erick Kristianson would initiate this "Jeepers Creepers" "game" in the car while Plaintiff Jane Doe 2 was riding in the front seat. (Defendant Erick Kristianson would insist that Plaintiff Jane Doe 2 ride with him in the front seat as opposed to the back seat

of the vehicle). During this "game" Defendant Erick Kristianson would run his hands up Plaintiff's leg and thighs and place his fingers and hands on her vagina. Plaintiff Jane Doe 2 was 13 years old at the time.

322.    Defendant Erick Kristianson kept a vibrator in the front seat of his vehicle that he would point out and discuss with Plaintiff Jane Doe 2 and other minor children. The existence and purpose of the vibrator was known to Plaintiff Jane Doe 2 and others.

323.    Defendant Erick Kristianson exposed his penis to Plaintiff Jane Doe 2 on numerous occasions both in and outside of the gym.

324.    Defendant Erick Kristianson once entered Mary Doe's home while he knew Plaintiff Jane Doe 2 was home alone and fondled Plaintiff Jane Doe 2's breasts.

325.    In or around late 2021 – early 2022, Defendant Erick Kristianson took Plaintiff Jane Doe 2, her sister, and other minors to a hot tub at a local resort. While in the hot tub, Defendant Erick Kristianson began to rub Plaintiff Jane Doe 2's leg. Plaintiff Jane Doe 2 told Defendant Erick Kristianson to stop, but he refused and instead escalated the assault, moving his hands to her vaginal area. Defendant Kristianson continued to grope Plaintiff Jane Doe 2's private area until she stood

up and told one of her friends that she was ready to leave. Defendant Kristianson overheard Jane Doe 2's comments and berated her, claiming that they had just arrived and leaving so soon would have rendered the entire trip a waste of time.

326.    In or around April of 2022, while at the EOC cheer competition in Orlando, Florida, Plaintiff Jane Doe 2, who has no history of seizures or a seizure disorder, experienced unexplained seizures and was transported three times by ambulance to a local hospital for evaluation and treatment. She was hospitalized for three days.

327.    In the summer of 2022, Mary Doe learned of Defendant Erick Kristianson's sexual abuse of her other daughter, including a video call wherein Defendant Erick Kristianson exposed his erect penis to two minors. Mary Doe reported this incident, along with the abuse of Plaintiff Jane Doe 2 to local law enforcement.

328.    After learning of Defendant Erick Kristianson's inappropriate sexual behavior towards Plaintiff Jane Doe 2 and others, Mary Doe became aware that there were complaints made by other parents at Champion Elite about Defendant Kristiansen going to practice with short shorts and no undergarments, exposing his penis to the children.

329.    A former co-owner of Defendant Champion Elite Legacy left the gym in part over Ashley Hughes' inaction and mishandling of complaints about Defendant Kristianson's inappropriate sexual behavior with athletes.

330.    On or about July 12, 2022, a warrant was issued for the arrest of Defendant Kristianson for the felonies of Lewd and Lascivious Exhibition to a victim under the age of sixteen, Lewd and Lascivious Molestation of a person under the age of sixteen, Lewd and Lascivious Exhibition via Computer to a person under the age of eighteen, and Lewd and Lascivious Molestation of a person between the ages of 12-16.

331.    Defendant Kristianson was arrested in Kansas on August 4, 2022. He was extradited to Florida and arraigned on the charges. Bond was set at $300,000 surety. Defendant Kristianson posted bond and was released on August 5, 2022.

332.    As of the date of this filing, the criminal cases against Defendant Kristianson are pending in the Volusia County Circuit Court.

333.    Another parent at the gym instructed Defendant Ashley Hughes to keep Defendant Erick Kristianson away from her child.

334.    Defendant Ashley Hughes addressed these complaints with Defendant Kristianson by instructing him to wear proper undergarments during

practices, but did not take any further action to confirm compliance or deter the behavior.

335.   Reports of Defendant Kristianson exposing his penis to underaged athletes were made to Florida Department of Children and Families and Defendant USASF in October of 2021 and February of 2022, but no action was taken.

336.   Plaintiff Jane Doe 2 has been diagnosed with Conversion Disorder and continues to experience seizures and other trauma-related symptoms as a result of Defendant Erick Kristianson's sexual abuse. She is prescribed medication and treats with a psychotherapist.

337.   Plaintiff Jane Doe 2 and Mary Doe reasonably relied on representations from Defendants that the Varsity network and its certified gyms and coaches were uniquely safe because of the Defendant USASF and USA Cheer's rigorous vetting.

338.   During this timeframe, Plaintiff Jane Doe 2 has always been a member of USASF and has paid her dues annually as well as the other fees required by Defendant Champion Elite and the Varsity Defendants.

### *Jane Doe 3*

339.    Plaintiff Jane Doe 3 began cheering in or around 2017 when she was 8 years old.

340.    Plaintiff Jane Doe 3 began cheering at Champion Elite Legacy, an all-star cheer and tumbling gym in South Daytona Beach, Florida.

341.    At all times relevant to this complaint, Plaintiff Jane Doe 3 was a member of USASF and paid her dues annually.

342.    Defendant Champion Elite Legacy was owned by Dr. Ashley Hughes, a chiropractor, and managed by Erick Kristianson, a 43-year-old man who also coached cheer at the gym.

343.    Joseph Doe and Plaintiff Jane Doe 3 met Defendant Erick Kristianson in or around 2019 when he joined the coaching staff at Champion Elite.

344.    Over the next several months, Defendant Erick Kristianson took a special interest in developing a friendship with Joseph Doe, taking great care to point out their common interests and hobbies.

345.    This commonality helped Defendant Kristianson form a bond with Joseph Doe and Plaintiff Jane Doe 3. Joseph Doe and Plaintiff Jane Doe 3 grew to love and trust Defendant Kristianson.

346.    In or around 2022, Defendant Erick Kristianson moved into an apartment on the property of one of Plaintiff Jane Doe 3's friends. Around this time, Defendant Kristianson spent a lot of time with Plaintiff Jane Doe 3 and her friends, both in and outside of the gym.

347.    Defendant Erick Kristianson accompanied Jane Doe 3 and others to Busch Gardens. During this trip, Defendant Erick Kristianson masturbated in Plaintiff Jane Doe 3's presence, and in the presence of other minor athletes.

348.    Defendant Erick Kristianson kept a vibrator in his vehicle. Defendant Kristianson would point it out to Plaintiff Jane Doe 3 and other minor athletes. Upon information and belief, the existence of the vibrator was common knowledge to Plaintiff Doe 3, her friends, and other minor athletes at Defendant Champion Elite.

349.    Plaintiff Jane Doe 3 and another friend reported to a parent that they saw Defendant Erick Kristianson's penis at a pool party. Upon further questioning by the parent, Plaintiff Jane Doe 3 and her friend stated that they "always see Erick [Kristianson]'s penis" and that Defendant Erick Kristianson is known as "creepy Erick" around the gym.

350.    Defendant Erick Kristianson would occasionally drive Plaintiff Jane Doe 3 and friends to events in his vehicle. Defendant Kristianson would insist that Plaintiff Jane Doe 3 ride in the front seat next to him. During these drives, Defendant Kristianson would grope and fondle her.

351.    Defendant Erick Kristianson would frequently inappropriately touch and hug Plaintiff Jane Doe 3 without her consent.

352.    On July 10, 2022, in the evening hours, Defendant Erick Kristianson reached out to Joseph Doe via text message and asked if he could come over to Joseph Doe's home to speak to him about something.

353.    Joseph Doe agreed to allow Defendant Kristianson to come over. When Defendant Kristianson arrived, he began to speak very quickly and in a panicked manner about a FaceTime exchange between Defendant Kristianson and Joseph Doe's daughter, Plaintiff Jane Doe 3, and another minor child. Defendant Kristianson told Joseph Doe that he was careless and accidentally exposed his genitals to Plaintiff Jane Doe 3. Defendant Kristianson told Joseph Doe that he had a recording of the call on his phone and proceeded to show Joseph Doe portions of the call, but retained total control of the playback function such that Joseph Doe

was unable to view the entire call and unable to ascertain any context of or conversation from the call itself.

354.   During this time, Defendant Kristianson was sweating profusely, behaving in a nervous manner and speaking rapidly to Joseph Doe. Defendant Kristianson told Joseph Doe that he was worried about his career and reputation being damaged as a result of the recording, which Defendant Kristianson characterized as being a misunderstanding or an accident.

355.   When Joseph Doe approached his daughter about the recording, Plaintiff Jane Doe 3 informed him that the recording was neither accidental nor a misunderstanding, but that she and friend created the recording of Defendant Kristianson to show the abuse and make a record of it because they feared that without such proof, they would not be believed.

356.   The recording was a FaceTime call from Erick Kristianson to Plaintiff Jane Doe 3 and a friend. In the recording, Defendant Erick Kristianson is seen lying nude with his penis exposed to the camera. At several points throughout the recording, Defendant Erick Kristianson pointed the camera towards the wall to reveal a shadow image of his erect penis. Defendant Erick Kristianson is seen masturbating at several points throughout the video. The video also clearly shows

in the "caller box" at the top right side of the screen, the faces of Plaintiff Jane Doe 3 and her minor friend, who are on the receiving end of the call by Defendant Erick Kristianson.

357.    After Plaintiff Jane Doe 3 disclosed the existence of the videos, she also reported that Defendant Erick Kristianson had exposed his penis to her on numerous occasions, and touched her inappropriately on several occasions, including on her breasts and legs.

358.    Plaintiff Jane Doe 3 would tell Defendant Erick Kristianson to stop, but he would continue to fondle her.

359.    After learning of Defendant Erick Kristianson's inappropriate sexual behavior towards Plaintiff Jane Doe 3 and others, Joseph Doe became aware that there were numerous prior complaints made by other parents at Champion Elite about Defendant Kristiansen going to practice with short shorts and no undergarments, exposing his penis to the children.

360.    On July 11 2022, Joseph Doe reported the sexual abuse of his daughter, and the sexually explicit videos of Defendant Kristianson to the Daytona Beach Police Department.

361.   On or about July 12, 2022, a warrant was issued for the arrest of Defendant Kristianson for the felonies of Lewd and Lascivious Exhibition to a victim under the age of sixteen, Lewd and Lascivious Molestation of a person under the age of sixteen, Lewd and Lascivious Exhibition via Computer to a person under the age of eighteen, and Lewd and Lascivious Molestation of a person between the ages of 12-16.

362.   Defendant Kristianson was arrested in Kansas on August 4, 2022. He was extradited to Florida and arraigned on the charges. Bond was set at $300,000 surety. Defendant Kristianson posted bond and was released on August 5, 2022.

363.   As of the date of this filing, the criminal cases against Defendant Kristianson are pending in the Volusia County Circuit Court.

364.   Plaintiff Jane Doe 3 and Joseph Doe reasonably relied on representations from Defendants that the Varsity network and its certified gyms and coaches were uniquely safe because of the Defendant USASF and USA Cheer's rigorous vetting.

365.   During this timeframe, Plaintiff Jane Doe 3 has always been a member of USASF and has paid her dues annually as well as the other fees required by Defendant Champion Elite and the Varsity Defendants.

## JOINT AND SEVERAL LIABILITY

366.   Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiffs, as Defendants' individual and collective actions and omissions actually and proximately caused Plaintiff's past, present, and ongoing injuries. Plaintiff is entitled to damages pursuant to the laws of the State of Florida and the United States of America, including but not limited to the following:

    a.  Compensatory, actual, and consequential damages;

    b.  Statutory damages;

    c.  Punitive damages;

    d.  Reasonable attorneys' fees and costs;

    e.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## THE COUNTS

## COUNT I
### VIOLATION OF THE PROTECTING YOUNG VICTIMS FROM SEXUAL ABUSE ACT, 18 U.S.C. §2255 (ALL DEFENDANTS)

367.   Plaintiffs hereby reallege the factual recitations in the paragraphs 1-366 as if repeated verbatim herein.

368.  This claim is brought against all Defendants, with the specific acts complained of performed against minors by Defendants Champion Elite, Hughes and Kristianson and enabled, aided and abetted, and assisted by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the PE Defendants through a variety of acts including certification, promotion, and credentialing, and continued access.

369.  Under the statute, a covered individual means an adult who is authorized by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization.

370.  Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

371.  Defendants Champion Elite, Hughes, and Kristianson, qualify as covered individuals and the facts of this case bear out that abuse occurred at events defined by the statute.

372. Defendant Champion Elite and Defendant Hughes were held out by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital as being duly vetted members of a network marketed as safe and trustworthy for work with children, a certification for which Plaintiffs paid.

373. In making these representations as a marketing tool and revenue source, but then failing to provide the service or abide by their own rules, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital aided and abetted the abusive conduct toward the minors by the covered individuals described above.

374. Plaintiffs were minors at the time she was sexually abused and assaulted in contravention of 18 U.S.C § 2422, thus constituting violations of 18 U.S.C. §2255.

375. Plaintiffs have suffered personal injuries as a result of these particular violations of law.

376. Plaintiffs are entitled to damages pursuant to the laws of United States of America, including but not limited to the following:

a.  Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

b.  Reasonable attorneys' fees and costs;

c.  Punitive damages; and

d.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT II
## FOR CIVIL CONSPIRACY IN VIOLATION OF THE RICO ACT
## PURSUANT TO 18 U.S.C. §1962(c) and §1962(d)
## (ALL DEFENDANTS)

377.  Plaintiffs hereby reallege the factual recitations contained in paragraphs 1-366 as if repeated verbatim herein.

378.  This count is brought against all Defendants.

379.  United States law makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…" 18 U.S.C. §1962(c).

380.    Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each of them is capable of holding, and does hold, "a legal or beneficial interest in property."

381.    Defendants' activities include at least two (2) acts of racketeering activity as described above and herein since at least 2003. Accordingly, Defendants' conduct constitutes a pattern of racketeering activity. 18 U.S.C. § 1961(5).

382.    The racketeering activity is set forth in paragraphs 1-365_ and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud)[32] and 18 U.S.C § and 2422, (sexual exploitation of minors).

383.    In or around 2002, the Varsity Defendants, Defendant USASF, Defendant Champion Elite and Defendant Hughes formed an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4).

384.    Defendant Charlesbank and Defendant Bain Capital agreed to join and facilitate this Enterprise with massive investments funding its ongoing

---

[32] As referred to herein, the following paragraphs set forth factual allegations that constitute mail fraud and/or wire fraud: 66, 68, 69, 78, 86, 93, 94, 99, 104, 106, 107, 108, 109, 110, 117, 118, 138, 140, 143, 145, 152, 153, 155, 162, 164, 170, 196, 199, 204-209, 211, 213, 218, 228(a)-(b).

operation in order to obtain significant financial benefits for their investors worth billions of dollars.

385.   This Enterprise, as previously described in this Complaint, and more specifically detailed in paragraphs 246-264, consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiffs as minor athletes by exposing them to illegal sexual abuse and exploitation while continuously and repeatedly taking money from them in exchange for assurances of safety which were being fraudulently misrepresented by the Enterprise.

386.   Each Defendant, in concert with the Enterprise, engaged in misleading and fraudulent messaging to children and their families which they knew or should have known endangered children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

387.   In 2014, Defendant Charlesbank funded the purpose of this Enterprise.

388.    In 2018, Defendants Bain Capital took over a role in funding the purpose of this Enterprise in place of Defendant Charlesbank.

389.    The Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the Defendants Champion Elite and Hughes acted in concert to commit the predicate acts of mail fraud and wire fraud as set forth in the preceding paragraphs.

390.    The funding, materials, and premises provided by the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital and the communication of particular trust and safety carried out by Defendant USASF facilitated the commission of these predicate acts by Defendant Champion Elite and Defendant Hughes, which allowed for Defendant Kristianson to commit sexual crimes against Plaintiffs without consequences.

391.    The Defendants knew or should have known that inappropriate contact was occurring between credentialed coaches and minor athletes based on seeing reports and evidence of inappropriate contact and/or misconduct, as well as the existence of one-on-one coaching being marketed and the travel of these children across state lines with coaches, as well as rumors of misconduct, some of

which has even been captured on camera, engaging in illegal and inappropriate acts with the minors.

392. The Defendants owed a duty to the minor Plaintiffs, which they specially undertook based on known dangers, to disclose reports of inappropriate behavior and sexual relationships with children, to report crimes alleged against them, and to take steps to prevent alleged abusers from coming into contact with more minor children while under investigation.

393. The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

394. The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

395. In addition to those messages set forth herein and above, the fraudulent mail and/or wire messages include, for specificity, but are not limited to the following:

    a. Defendant Jeff Webb's personal creation of governing bodies which fraudulently held themselves out as independent authorities for rulemaking, safety assurance, and abuse investigation in order to

market Varsity business, charge minor children for membership to receive those services, and then recklessly failing to assert any control over them when they failed to perform the functions with which he vested them.

b. USASF 2009 Professional Responsibility Code and annual updates;

c. USASF Athlete Protection Messaging at the website and via email on November 16, 2017;

d. The 2020 Uniform Ineligible List, which Defendants falsely represented was a mechanism by which Defendants were properly patrolling and purging the sport of potentially dangerous adults;

e. Social media posts and images either promoted by or shared by Defendants, where Defendants supported the proliferation of Defendants Champion Elite and Jones, and individual coaches;

f. Marketing targeted toward minors and child athletes and specifically recruiting these athletes to travel over state lines to member gyms, and for camps, and competitions;

g. The creation of "Cheerlebrity," as a means to attract new minor athletes;

h.   Annual coach credentialing for Defendant Kristianson;

i.   Annual credentialing for Champion Elite's owner Ashley Hughes;

j.   Annual gym credentialing for Defendant Champion Elite;

k.   Fees accepted by USASF and/or the Varsity Defendants from Defendant Hughes;

l.   Fees accepted by USASF and/or the Varsity Defendants from or on behalf of Defendant Kristianson;

m.   Fees accepted by USASF and/or the Varsity Defendants from or on behalf of Defendant Champion Elite;

n.   Annual billing and/or invoices to Plaintiff for her USASF membership renewal;

o.   Billing and/or continuing to receive payment from Plaintiff for uniforms, and other requisites of competition;

p.   Billing, invoicing, and/or fees for music, choreography, travel, and hotels;

q.   Explicit imagery sent to Plaintiffs while they were minors depicting nude adults;

r.  In 2021, USASF's website falsely claimed that they were requiring background checks in 2015 of "all coaches and adult members." However, this was untrue. Background checks were only required for entry into the "warm up room" at competitions. It was never implemented with respect to coaching children or being around them in any capacity outside their competition routine.

s.  For years, USASF repeatedly misrepresented that it was partnering with the U.S. Center for SafeSport ("SafeSport") as part of its responsibility to athletes to prevent sexual abuse;

t.  Consecutively, on May 10, 2018 and May 16, 2019, the period just before Worlds at Disney, USASF disseminated the following messaging: "Athlete Safety is our #1 Priority! Our mission includes 'strive for a safe environment for our athletes.' To the USASF, safety extends beyond our Cheer or Dance safety rules for performance. We're committed to helping our members create the safest overall environment for every all-star athlete, so we've made resources available for use in gyms and studios."

u. Defendants' concerted efforts to prevent all-star cheer from being designated a "sport," which would have interrupted the Varsity Defendants' profits through independent regulation;

v. The Varsity Defendants' representations related to USASF and adoption of SafeSport;

w. USASF's representations related to the benefits of competing at "sanctioned events," which was a proxy for Varsity events;

x. Continued messaging by USASF that child sexual abuse and exploitation by predators was an outside problem that could be prevented by paying more attention to how cheerleaders were presenting themselves on social media.

y. In July of 2019, USASF shifted the blame to child athletes warning them the "risk and responsibility" of sexual exploitation and objectification required them to "make better choices" about their appearance to "minimize the risk[.]" It did this with full knowledge of repeated reports that the industry was rife with abuse among its own coaching and gym owner ranks and that they were actively

concealing these predators so that they could continue to feed the revenue stream.

z.  USASF's athlete protection messaging continued at this time to primarily address athlete safety from sexual exploitation and abuse from the perspective of how athletes were presenting themselves through appearance and how that might affect the brand's image through an "image and appearance policy."

aa. USASF and USA Cheer codes of conduct and other policy statements, which operated across all Varsity-affiliated gyms, which touted that athlete safety was a priority, when, in fact, neither entity had uniform methods by which to ensure athlete safety;

bb. Materials associated with Varsity University, a gym and coaching conference;

cc. Such additional statements, messages, and/or materials as may be revealed during discovery in this matter.

396.  Each of the Plaintiffs had a property interest in their membership dues paid as set forth above and other fees and costs, and in the continued ability to cheer competitively.

397. Defendants induced Plaintiffs, through promises of social media notoriety, "Cheerlebrity" status, scholarship opportunities, and, to one day become famous cheerleaders or coaches themselves one day and obtain the "legend status" their coaches boasted of, to become a gym owner, or to become an event promoter.

398. The actions of the Enterprise and its conspirators were the direct and proximate cause of these injuries to the Plaintiffs.

399. But for the Enterprise's fraudulent assurances to Plaintiffs and their parents that the gyms, coaches, and events were certified safe, the abuse would not have occurred causing the injuries described above.

400. But for the Enterprise's failure to investigate, report, or act upon reports of sexual abuse, Defendant Kristianson would not have been so emboldened to continue abusing minors, and taunting his victims that nothing would happen to him.

401. Plaintiffs are entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

     a. Compensatory, actual, and consequential damages, trebled in accordance with the statute;

b. Reasonable attorneys' fees and costs;

c. Punitive damages; and

d. Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## COUNT III
## GROSS NEGLIGENCE
## (ALL DEFENDANTS)

402. Plaintiffs hereby reallege the factual recitations in the paragraphs 1-366 as though repeated verbatim herein.

403. Plaintiffs bring this claim for gross negligence against all Defendants.

404. Defendants have been responsible for the safety, health, and welfare of minor athletes, such as Plaintiffs, who were members of Defendants USASF and USA Cheer, participants in Defendant Varsity events, competing for Varsity-affiliated gyms, and under the care, custody, and control of each of the Defendants, respectively.

405. As alleged above, Defendant Webb, on behalf of the Varsity Defendants, specially undertook this duty when he created Defendants USASF and USA Cheer with the primary purpose of retaining control over the industry he created so that competitors could not make rules that would affect his revenues.

406. Moreover, and as alleged herein, the PE Defendants expressly represented that they undertook affirmative steps to enhance the safety features of the Varsity network, by, for example, institution of the Unified Ineligibility List, and further emphasis on credentialing and coaching certification.

407. Defendant USASF, the Varsity Defendants, the PE Defendants, and Defendant Champion Elite have represented that credentialing generally, and specifically related to coaches, provided superior safety for athletes like Plaintiffs.

408. Defendants have been aware that there are dangers associated with the operation of their Varsity network where adult coaches train minor athletes, including risks associated with inappropriate social contact, touching and other sexual contact, and emotional abuse.

409. Defendants represented that they had rules, policies and/or procedures specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches, and adults who interact with these athletes by virtue of the adults' position of power. These policies, procedures, rules, and/or guidelines included fraudulent representations related to SafeSport, and that Defendants USASF and USA Cheer were uniquely situated to help govern and regulate All-star cheer.

410. Defendants have represented that participating in the Varsity network governed by Defendant USASF and USA Cheer is the means to maximize athlete protection for minor athletes.

411. Defendants owed special duties to protect Plaintiffs while they paid dues and competed on behalf of a credentialed member club and under a certified coach. Plaintiffs entrusted Defendants with their physical, mental, and emotional care and well-being, and Defendants held themselves out as being uniquely able to protect Plaintiffs from harm caused by physical or other abuse.

412. Defendants knew or should have known that violations to their internal policies, processes, procedures, and guidelines related to athlete safety, and, in particular, safety against harm from sexual, physical, and emotional abuse and exploitation were occurring on a regular and continuous basis by and through certified coaches at private all-star gyms, including Defendant Champion Elite.

413. Defendants violated their responsibilities and duties to Plaintiffs in one or more of the following particulars:

   a. Allowing Defendant Kristianson access to Plaintiffs when Defendants knew or reasonably should have known that he posed a threat of harm to children;

116

b. Permitting Defendant Kristianson to remain in a position of power and particular trust over Plaintiffs;

c. Allowing Defendant Kristianson to isolate Plaintiffs despite the known dangers associated with one-on-one coaching and interactions;

d. Failing to enforce social media and other communications policies and procedures related to inappropriate conduct between Plaintiffs and Defendant Kristianson;

e. Failing to report known instances of abuse or misconduct;

f. Failing to adhere to SafeSport policy or procedure while fraudulently misrepresenting that they did;

g. Failing to investigate potential misconduct, including among and between Defendant Kristianson and Plaintiffs despite knowledge that such inappropriate contact had occurred;

h. Failing to train, supervise, monitor, or implement policies and procedures related to Defendants' employees and/or authorized representatives and their interactions with Plaintiffs;

i. Failing to provide safe premises;

j. Failing to protect Plaintiffs from the foreseeable harm inflicted on them  by third parties contemplated in their rules and certification process;

k. Continuing to hold Defendant Kristianson out as a credentialed, and thus trustworthy, adult in the Enterprise; and

l. Such other conduct as may be revealed.

414. Defendants have known that one-on-one coaching, and intimate coach contact is an enhanced feature of private gym cheer coaching that generates a great deal of money for all Defendants in the enterprise.

415. Defendants are also aware of the close personal relationships many of these coaches form with minor athletes who the coaches gain access to by virtue of their USASF and USA Cheer credentials.

416. Defendants are further aware that, despite the known dangers of one-on-one contact, coaches routinely engage in intimate and exclusive contact with minor athletes, as well as travel with minors across state lines, even staying in the same hotel rooms with no other chaperone, during these moneymaking cheer competition events which enrich the Enterprise.

417. When complaints or reports have surfaced, or social media images and videos circulate depicting illegal activity with minors, the Defendants disregard or ignore same, do not report to any agencies, do not permanently strip coaches of their eligibility, and often rally around coaches who have been accused of illegal conduct with minors, even ostracizing families who have complained or reported.

418. Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiff, and actually and proximately contributed to and/or caused damages.

419. Defendants' actions and omissions as described above, by and through authorized agents, were in violation of Defendants' own policies, procedures, and what would be reasonable under the circumstances.

420. Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

421. Plaintiffs are entitled to damages pursuant to the laws of Florida, including but not limiting to the following:

    a. Compensatory, actual, and consequential damages;

b. Punitive damages; and

c. Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT IV
## NEGLIGENT SUPERVISION
## (VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT USA CHEER, DEFENDANT CHAMPION ELITE, AND DEFENDANT HUGHES)

422. Plaintiff hereby realleges the factual recitations contained in the paragraphs 1-366 as though repeated verbatim herein.

423. Defendant USASF, the Varsity Defendants, and Defendants Champion Elite and Hughes continued to employ, credential, and place Defendant Kristianson in a particular and unique position of trust by allowing him access to Plaintiffs.

424. Despite claiming to conduct background checks and having the authority to revoke eligibility certification from coaches or gyms where complaints or reports of misconduct have been made, Defendants continued to let Defendant Kristianson operate and manage Defendant Champion Elite and to provide coaching services in order to generate income for the Enterprise.

425. Furthermore, when Defendants became aware of allegations against Defendant Kristianson, either of sexual misconduct, or that he had engaged in

inappropriate behavior in the gym, Defendants failed to report these activities to law enforcement agencies, or to take any other corrective action, instead preserving the reputation of the Defendants so that trust in its safety continued to generate income for all members of the Enterprise.

426.    The Varsity Defendants' business model, designed and implemented personally by Defendant Webb, relies upon certifying private gyms and coaches pursuant to the USASF standard, which purports to place athlete health and safety above all else.

427.    Moreover, Defendant Champion Elite's business model relies upon access to credentialed coaches, and coaches who are extremely popular in the sport, to attract and perpetuate new athletes.

428.     In outwardly creating the appearance of a brand built on trust and athlete safety, and as part of the business model to charge for those assurances, Defendants specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network Defendants oversaw.

429.    Defendants breached this duty in a number of particulars including by credentialing Defendant Kristianson, and allowing him to remain in a gym

setting with regular access to minor athletes, when Defendants knew or should have known he posed a significant threat of harm, failing to act or otherwise disregarding reports of abuse, discounting or otherwise ignoring specific information about Defendant Kristianson and his inappropriate interaction with Plaintiffs as described above in the Complaint.

430. Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein, directly and proximately caused injuries to Plaintiffs.

431. As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained physical, mental, and financial damages.

432. Plaintiffs are therefore entitled to a judgment against Defendants, and for such actual and consequential damages in an amount to be determined by a jury trial.

<u>COUNT V</u>
**ASSAULT/BATTERY**
**(DEFENDANT CHAMPION ELITE, DEFENDANT HUGHES, AND DEFENDANT KRISTIANSON)**

433. Plaintiffs hereby reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim herein.

434. Defendant Hughes, as owner and operator of Defendant Champion Elite, allowed an adult coach to access the minor Plaintiffs to illegally commit

illegal dissemination of obscene materials to minors and the nonconsensual sexual touching of the Plaintiffs.

435.   Said touching by Defendant Kristianson constituted sexual assault and sexual battery on the Plaintiffs.

436.   As a direct and proximate result of these Defendants' conduct, set forth more expressly above, Plaintiffs experienced bodily injury, physical pain and suffering, and mental anguish; and are thus entitled to awards of actual damages in an amount to be determined through a trial of this matter.

<u>COUNT VI</u>
**BREACH OF CONTRACT**
**(AS TO THE VARSITY DEFENDANTS, DEFENDANT USASF, AND DEFENDANT CHAMPION ELITE)**

437.   Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim herein.

438.   At all times relevant to this complaint, Plaintiffs had duly executed contracts with Defendant Champion Elite, the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiffs, Defendants agreed to provide a competitive and gym environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

439.   During the course of these contractual agreements, Plaintiffs were subjected to severe and oppressive abuse, physically and mentally, including during competitions hosted by the Varsity Defendants under the governance of Defendant USASF, and which Plaintiffs were required to attend by Defendant Champion Elite and the Varsity Defendants.

440.   During the term of these agreements, Defendant Champion Elite, the Varsity Defendants and Defendant USASF failed to provide Plaintiffs with the safe and secure environment they paid for, including by failing to enforce the policies, procedures, and standards expressly adopted by Defendant USASF related to credentialed coaches.

441.   These failures on the parts of Defendant Champion Elite, the Varsity Defendants and Defendant USASF constituted violations of the fundamental and material terms of the agreements between them and Plaintiffs.

442.   As such, Plaintiffs seek an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants and Plaintiffs, rescinding said contracts, and remitting the valuable consideration Plaintiff paid to Defendants during the relevant timeframe, as well

as for all such attorney's fees, costs, and pre-judgment interest to which Plaintiffs may be entitled.

## COUNT VII
## UNJUST ENRICHMENT
## (AS TO DEFENDANT CHAMPION ELITE, THE VARSITY DEFENDANTS, DEFENDANT BAIN CAPITAL, AND DEFENDANT CHARLESBANK)

443.   Plaintiffs reallege the factual recitations in the paragraphs 1-366 as though repeated verbatim herein.

444.   As set forth herein, the cheer industry represents a multi-billion-dollar enterprise where each young athlete annually spends thousands of dollars toward gym memberships and private lessons, uniforms, accessories, competition fees to the Varsity Defendants, and membership with USASF.

445.   At all times relevant to this complaint, Plaintiffs conferred non-gratuitous benefits upon Defendants including annual competition and membership fees, as well as continuous revenue toward uniforms, accessories, private training, and other monetary benefits.

446.   Defendants realized the value of these benefits, including steady annual revenue per athlete which precipitated massive capital investments from the PE Defendants.

447.     To date, none of the benefits Defendants realized have been returned or otherwise disgorged.

448.     Under the circumstances set forth herein and above, it would be inequitable for Defendants to retain the benefits conferred by Plaintiffs including through their annual USASF membership fees and Varsity competition fees and apparel and travel costs.

449.     Plaintiffs are therefore entitled as a matter of equity to recover these benefits from Defendants and for all such additional relief as this Court deems proper.

**COUNT VIII**
**FRAUD**
**(AS TO DEFENDANT CHAMPION ELITE, THE VARSITY DEFENDANTS, AND DEFENDANT USASF)**

450.     Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

451.     At all times relevant to this complaint, Plaintiffs were parties to numerous annual contracts whereby they agreed to pay Defendants annual and recurring fees in exchange for a safe competitive environment and training facility, and further agreed to pay substantial additional consideration and fees to

Defendants for a service Defendants did not provide while fraudulently misrepresenting that they did.

452.   As part of these agreements, and as alleged herein and above including in paragraphs contained at Footnote 33, Defendants represented to Plaintiffs that Defendants would be responsible for ensuring a safe environment and access to safe adults for Plaintiffs including an environment free from, and coaches who would not engage in, sexual, physical, and mental harm and exploitation.

453.   Defendants' promises were material to Plaintiffs' agreements, without which no agreements would have existed.

454.   Plaintiffs had a right to rely upon Defendants' representations, and did so rely.

455.   In addition, Defendants intended for Plaintiffs to rely on Defendant'' myriad representations and specific promises about the safety of the Varsity network through certification and credentialing.

456.   As set forth herein, even at the time they entered into the agreements with Plaintiffs, Defendants knew or had a reckless disregard for or willful blindness toward whether the environment they provided at competitions, in the

gym environment, and through certified coaches, was safe and free from harm and sexual, physical and mental abuse.

457.    In fact, Defendants knew that the environment they provided actually facilitated access by predators, including coaches, to underage athletes by predators, including coaches, choreographers, and other adults.

458.    Yet, with knowledge or a reckless disregard or willful blindness for whether Defendants were providing safe environments for child athletes, Defendants nevertheless entered into the agreements and collected fees from Plaintiffs.

459.    Defendants' misrepresentations included, without limitation:

a.  Certifying to Plaintiffs that Defendants were responsible for providing safe competitive and training environments;

b.  Certifying to Plaintiffs and their families that the adults involved in the gyms, and competitions, including coaches, had been duly vetted;

c.  Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior;

d.  Facilitating an unchaperoned environment for child-athletes;

e.  Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

f.  Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

g.  Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

h.  Such additional conduct as may be revealed during discovery and the trial of this case.

460.  As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain significant mental, physical, and emotional injuries and damages.

461.  Plaintiffs now seek an order from this court for damages in an amount to compensate them for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## COUNT IX
## NEGLIGENT SECURITY
## (AS TO THE VARSITY DEFENDANTS, DEFENDANT CHAMPION ELITE, DEFENDANT BAIN CAPITAL & DEFENDANT CHARLESBANK)

462.    Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

463.    The Varsity Defendants, the PE Defendants, and Defendant Champion Elite sponsored, created, hosted, and oversaw private All-star gyms, camps, coaches, and competitions where young adult athletes would converge at pre-determined locations, all established and governed by Defendants, and under the supervision of Defendants.

464.    When athletes competed at the private All-star gyms, camps and competitions hosted by Defendant Champion Elite, the Varsity Defendants, and the PE Defendants, the athletes had no meaningful choice but to attend at the locations, and under conditions, established by Defendants.

465.    The Varsity Defendants, Defendant Champion Elite, and the PE Defendants received substantial revenue from these events.

466.    As part of their promotion of these events, the Varsity Defendants, Defendant Champion Elite, and the PE Defendants undertook a responsibility to ensure that the locations and events were safe for attendees, minor athletes who were likely to encounter adult coaches, choreographers, videographers, and attendees.

467. The Varsity Defendants, Defendant Champion Elite, and the PE Defendants violated their responsibility to provide safe premises free from harm from third parties in one or more of the following particulars:

a. Disparate enforcement of policies, procedures, and guidelines related to coaching suspension, with the result that coaches were still allowed to attend Varsity Competitions and represent Varsity-affiliated private all-star gyms;

b. Failure to provide adequate monitoring;

c. Failure to provide sufficient background checks, with the result that hundreds of potential predators were allowed to gain access to underage athletes;

d. Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol at all-star Gyms, and while attending Varsity events;

e. Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic

images while competing on behalf of Varsity-affiliated gyms, and attending Varsity events;

f.  Failing to ensure that Varsity member coaches were not forcing themselves upon minor athletes, including at Varsity member gyms and Varsity events;

g.  Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults affiliated with Defendants;

h.  Such additional conduct as may be revealed during discovery.

468.  As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain significant mental, physical, and emotional injuries and damages.

469.  Plaintiffs now seeks an order from this court for damages in an amount to compensate Plaintiff for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

**COUNT X**
**CIVIL CONSPIRACY**
**(AS TO ALL DEFENDANTS)**

470. Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

471. Defendants were a collective group of individuals working in concert and individually toward a common plan.

472. Defendants, acting as a collective group and individually, were engaged in the reckless, intentional, or willful endangerment of the minor Plaintiffs, by exposing them to sexual abuse and exploitation while assuring them and their families that Defendants were providing safe conditions and premises for the athletes to compete.

473. Defendants' conduct included misleading and fraudulent messaging to children and their families which Defendants knew or should have known would endanger children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, and acting in reckless indifference to the safety of the children in the name of growing profits.

474. Defendants were motivated by the substantial revenue, profits, and funding paid by the athletes and their families in exchange for the fraudulent messages and misrepresentations made by Defendants.

475.    Defendant Webb personally, on behalf of the Varsity Defendants, created the safety regulatory bodies with the primary purpose of retaining control free from outside regulation or competitor interference but recklessly and willfully failed to ensure Defendants USASF and USA Cheer were performing the roles he marketed to Varsity participants and which USASF and USA Cheer charged for.

476.    In 2014, Defendant Charlesbank further funded this scheme, providing additional capital for Defendants to perpetuate their misrepresentations.

477.    In 2018, Defendant Bain Capital took over the primary role in continuing to fund the purpose this scheme, with Defendant Charlesbank retaining an interest as they continued their dangerous misrepresentations and accepted the resultant monetary benefits.

478.    Defendants acted in concert to perpetuate this scheme, and it would not have been possible for them to carry it out without unique elements of participation by each of them.

479.    Defendants knew or should have known that the funding, materials, and premises provided by Defendants were material to the abuses and harm

suffered by the minor athletes, as well as the continued perpetuation of revenue from these athletes.

480.    The Defendants knew or should have known that inappropriate contact was occurring between coaches, choreographers, videographers, and other adults and minor athletes based on the one-on-one coaching being marketed and the travel of children across state lines with their coaches, some of whom stayed in hotel rooms with them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

481.    The Defendants owed a duty to Plaintiffs to make reports or disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

482.    The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

483.    The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

484.    But for the fraudulent assurances to Plaintiffs that the gyms and coaches were certified safe, the abuse would not have occurred, and Plaintiffs

would not have suffered continued economic harm derived from paying substantial dues and fees predicated in large part on promises of a safe environment for minor athletes.

485.    As a direct and proximate result of Defendants' conduct, Plaintiffs are entitled to damages including but not limited to the following:

     a. Compensatory, actual, and consequential damages, trebled in accordance with the statute;

     b. Punitive damages; and

     c. Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## COUNT XI
## RESPONDEAT SUPERIOR/VICARIOUS LIABILITY
## (AS TO DEFENDANT CHAMPION ELITE)

486.    Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

487.    Defendant Champion Elite employed and retained Defendant Hughes, as well as Defendant Kristianson as a coach, and authorized Defendant Kristianson's access to minor athletes including Plaintiffs.

488.    Defendants Hughes and Kristianson were acting in the course and scope of their employment and/or agency, in the furtherance of the business of

Defendant Champion Elite, and as authorized representatives of Defendant Champion Elite.

489.  As such, Defendant Champion Elite was as responsible for the actions, inactions, omissions and failures of Defendants Hughes and Kristianson as though they undertook the actions of the Defendant coaches themselves.

490.  Defendant Hughes failed to properly train, supervise, provide monitoring, and/or to implement the policies, procedures, and guidelines of Defendant Champion Elite, greatly increasing the likelihood of bodily injury and harm to Plaintiffs.

491.  Defendant Kristianson committed grotesque criminal acts against Plaintiffs including physical, mental, and emotional abuse, sexual exploitation, assault, and other battery.

492.  This conduct directly and proximately caused Plaintiffs to sustain continuing and ongoing injuries, including physical and emotional damages.

493.  Plaintiffs therefore actual, consequential, and such additional damages, including punitive damages as this court deems just and proper against Defendant Champion Elite for the acts of Defendant Kristianson.

## COUNT XII
## RESPONDEAT SUPERIOR/VICARIOUS LIABILITY
### (AS TO DEFENDANTS USASF, USA CHEER & THE VARSITY DEFENDANTS)

494.    Plaintiffs reallege the factual recitations contained in the paragraphs 1-366 as though repeated verbatim.

495.    At all times relevant to this complaint, Defendant USASF and Defendant USA Cheer, in conjunction with and under the control of the Varsity Defendants, granted memberships and credentials to adults seeking to work as certified coaches within Varsity network gyms.

496.    At all times relevant to this complaint, Defendant Champion Elite was a Varsity gym, and therefore any adult working within the gym was required to be an authorized representative and strictly certified by Defendants USASF and USA Cheer.

497.    As expressly set forth herein, membership within Defendant USA Cheer and Defendant USASF and credentials from these organizations signaled to child athletes cheering for gyms within the authorized Varsity network that the adult coach had been expressly vetted by Defendants USASF, USA Cheer, and the Varsity Defendants and that the coach was an authorized representative on behalf of Defendants USASF, USA Cheer, and the Varsity Defendants.

498.    At all times relevant to this Complaint, Defendants USASF, USA Cheer, and the Varsity Defendants certified and represented Defendants Hughes and Kristianson were expressly authorized to work with children within the Varsity network, and the promotion of the same through the Varsity Defendants' social media and marketing content, created an apparent and/or implied agency.

499.    Defendants Hughes and Kristianson were acting in the course and scope of their employment and/or agency, in the furtherance of the business of Defendants USASF, USA Cheer, and the Varsity Defendants, and as authorized representatives of Defendants USASF, USA Cheer, and the Varsity Defendants.

500.    As such, at all times relevant to this Complaint, the Varsity Defendants, and Defendants USASF and USA Cheer held out Defendants Kristianson and Hughes as authorized representatives, and intended for Plaintiffs to rely upon these representations.

501.    Plaintiffs did in fact so rely, coming to Defendants USASF, USA Cheer, and the Varsity Defendants network gym because of Defendants Hughes and Kristianson's association with the Varsity network.

502.    As such, Defendants USASF, USA Cheer, and the Varsity Defendants were responsible for the actions, inactions, omissions and failures of Defendants

Hughes and Kristianson as though they undertook the actions of the Defendant coaches themselves.

503. Defendant Hughes failed to properly train, supervise, provide monitoring, and/or to implement the policies, procedures, and guidelines of Defendants USASF, USA Cheer, and the Varsity Defendants, greatly increasing the likelihood of bodily injury and harm to Plaintiffs.

504. Defendant Kristianson committed grotesque criminal acts against Plaintiffs including physical, mental, and emotional abuse, sexual exploitation, assault, and other battery.

505. This conduct directly and proximately caused Plaintiffs to sustain continuing and ongoing injuries, including physical and emotional damages.

506. Plaintiffs therefore actual, consequential, and such additional damages, including punitive damages as this court deems just and proper against Defendants USASF, USA Cheer, and the Varsity Defendants for the acts of Defendant Kristianson.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court award the following damages, jointly and severally against Defendants, as provided by the laws of the United States and Florida, including but not limited to the following:

a.      Compensatory, actual, and consequential damages to Plaintiff, trebled where permitted by statute;

b.      Alternatively, liquidated damages as to Count I;

c.      Costs of this action and attorneys' fees to Plaintiffs;

d.      Punitive damages where permitted; and,

e.      Any and all other and further relief as this Court may deem appropriate.

## TRIAL BY JURY

WHEREFORE, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: April 28, 2023

**OSBORNE & FRANCIS**

*s/ J. Robert Bell III*
J. Robert Bell III (FL Bar 115918)
Gregorio Francis (FL Bar No: 008478)
Joseph A. Osborne (FL Bar No: 880043)

141

925 S Federal Highway, Suite 175
Boca Raton, FL 33432
Phone: (561) 293-2600
Email:      rbell@realtoughlawyers.com
              gfrancis@realtoughlawyers.com
              josborne@realotughlawyers.com

*Attorneys for Plaintiff*

**STROM LAW FIRM, LLC**

*s/ Bakari T. Sellers*
Bakari T. Sellers (SC Fed. ID No. 11099)*
Jessica L. Fickling (SC Fed. ID No. 11403)*
Alexandra Benevento (SC Fed. ID No. 10734)*

6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone: (803) 252-4800
Email:      bsellers@stromlaw.com
              jfickling@stromlaw.com
              abenevento@stromlaw.com

*Attorneys for Plaintiff*

* PHV Petitions Forthcoming

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)**  County of Residence of First Listed Plaintiff _____<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☐ 2  U.S. Government
       Defendant

☐ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                                         *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>    & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>    Student Loans<br>    (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>    of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>    Liability<br>☐ 320 Assault, Libel &<br>    Slander<br>☐ 330 Federal Employers'<br>    Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>    Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>    Product Liability<br>☐ 360 Other Personal<br>    Injury<br>☐ 362 Personal Injury -<br>    Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>    Product Liability<br>☐ 367 Health Care/<br>    Pharmaceutical<br>    Personal Injury<br>    Product Liability<br>☐ 368 Asbestos Personal<br>    Injury Product<br>    Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>    Property Damage<br>☐ 385 Property Damage<br>    Product Liability | ☐ 625 Drug Related Seizure<br>    of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>    28 USC 157<br>**INTELLECTUAL<br>PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>    New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets<br>    Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>    3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>    Corrupt Organizations<br>☐ 480 Consumer Credit<br>    (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer<br>    Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>    Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR**<br>☐ 710 Fair Labor Standards<br>    Act<br>☐ 720 Labor/Management<br>    Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>    Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>    Income Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>    or Defendant)<br>☐ 871 IRS—Third Party<br>    26 USC 7609 | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>    Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>    Act/Review or Appeal of<br>    Agency Decision<br>☐ 950 Constitutionality of<br>    State Statutes |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>    Accommodations<br>☐ 445 Amer. w/Disabilities -<br>    Employment<br>☐ 446 Amer. w/Disabilities -<br>    Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>    Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>    Conditions of<br>    Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>    Actions | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☐ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       Another District
       *(specify)*

☐ 6  Multidistrict
       Litigation -
       Transfer

☐ 8  Multidistrict
       Litigation -
       Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____

Brief description of cause:
_____

## VII.  REQUESTED IN
## COMPLAINT:

☐  CHECK IF THIS IS A **CLASS ACTION**
    UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:        ☐ Yes    ☐ No

## VIII.  RELATED CASE(S)
## IF ANY

*(See instructions):*
JUDGE _____     DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____     AMOUNT _____     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  (b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  (c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
  United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
  United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
  Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
  Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: <u>Nature of Suit Code Descriptions.</u>

V. **Origin.** Place an "X" in one of the seven boxes.
  Original Proceedings. (1) Cases which originate in the United States district courts.
  Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
  Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
  Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
  Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
  Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
  Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
  **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
  Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
  Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| Varsity Brands, LLC, et al. | ) ) |
| *Defendant(s)* | ) ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Ashley Hughes
6202 West Fallsgrove Lane
Port Orange, FL 32128-6827

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) Civil Action No. |
| Varsity Brands, LLC, et al. | ) ) ) |
| *Defendant(s)* | ) ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Bain Capital, LP
c/o Corporation Creations Network, Inc.
225 Cedar Hill Street, Suite 200
Marlborough, MA 01752

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00 .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                                  *Server's signature*

                                        _____
                                                  *Printed name and title*

                                        _____
                                                  *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, <br><br> *Plaintiff(s)* <br><br> v. <br><br> Varsity Brands, LLC, et al. <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Champion Elite Legacy, LLC
c/o Lankford Law Firm, PA
140 South Beach Street, Suite 310
Daytona Beach, FL 32114

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____            _____
                                                           *Server's signature*

                                                _____
                                                           *Printed name and title*


                                                _____
                                                           *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

Jane Does 1, and 2 by and through Their mother,
Mary Doe, and Jane Doe 3, by and through
her father, Joseph Doe,

——————————————————————
*Plaintiff(s)*

v.

Varsity Brands, LLC, et al.

——————————————————————
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Charlesbank Capital Partners, LP
c/o C.T. Corporation System
155 Federal Street, Suite 700
Boston, MA  02116

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| Varsity Brands, LLC, et al. | ) ) |
| *Defendant(s)* | ) ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Erick Kristianson
216 East Fourth Street
Strong City, Kansas 66869

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| Varsity Brands, LLC, et al. | ) ) ) ) ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Jeff Webb, Individually
c/o International Cheer Union
2574 Sam Cooper Boulevard
Memphis, TN  38112

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, _____ *Plaintiff(s)* v. Varsity Brands, LLC, et al. _____ *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation
c/o C.T. Corporation System
300 Montvue Road
Knoxville, TN  37919-5546

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, <br><br> *Plaintiff(s)* <br><br> v. <br><br> Varsity Brands, LLC, et al. <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  USA Federation for Sport Cheering d/b/a USA Cheer
c/o C.T. Corporation System
1999 Bryan Street, Suite 900
Dallas, TX  75201-3136

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____                  _____
                                              *Server's signature*

                                         _____
                                              *Printed name and title*


                                         _____
                                              *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) ) |
| Varsity Brands, LLC, et al. | ) ) ) ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Varsity Brands Holding Company, Inc.
1901 Diplomat Drive
Farmers Branch, TX 75234

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| Varsity Brands, LLC, et al. | ) ) |
| *Defendant(s)* | ) ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Varsity Brands, LLC
c/o Corporate Creations Network, Inc.
205 Powell Place
Brentwood, TN 37027-7522

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*




My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                              *Server's signature*

                                              _____
                                              *Printed name and title*


                                              _____
                                              *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| Jane Does 1, and 2 by and through Their mother, Mary Doe, and Jane Doe 3, by and through her father, Joseph Doe, | ) ) ) ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| Varsity Brands, LLC, et al. | ) ) |
| *Defendant(s)* | ) ) ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Varsity Spirit, LLC
c/o Corporate Creations Network, Inc.
205 Powell Place
Brentwood, TN  37027-7522

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

J. Robert Bell III, Esq. (FL Bar No: 115918)
OSBORNE & FRANCIS, PLLC,
925 S Federal Highway, Suite 175,
Boca Raton, FL 33432
Tel: (561) 293-2600

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                          *Server's signature*

                                                          _____
                                                          *Printed name and title*


                                                          _____
                                                          *Server's address*

Additional information regarding attempted service, etc:

# Exhibit "1"

U.S. ALL STAR FEDERATION



The **Code**

of Conduct & Compliance



2022-23 MEMBERSHIP TERM

JUNE 1, 2022-MAY 31, 2023



# INTRODUCTION

The U.S. All Star Federation, Inc. ("USASF") is a membership organization that sets standards and expectations for its Members as outlined in this Code of Conduct and Compliance (the "Code"). The purpose of the USASF is to foster a community and culture of health, safety, and excellence where Athletes and other participants can thrive in All Star Cheerleading and All Star Dance. Membership is a privilege bestowed on those who align with the USASF mission which seeks to promote a safe, positive environment for USASF Athletes and other Members; to support and grow the sports of All Star Cheerleading and All Star Dance; and to empower Athletes to achieve sustained competitive excellence in competition. This Code outlines USASF's framework to promote the protection of our Members.

We are committed to fostering a culture that actively works to prevent the opportunity for abuse to occur. This Code provides a blueprint to reach that aim, as well as potential tools for its execution. All USASF Members must know the Code and understand its components. The safety and well-being of All Star athletes is dependent upon our whole All Star community.

This Code includes three main sections with policies and regulations and applies to all Members and Functions. Specifically, it includes: (1) Conduct Regulations; (2) Abuse Prevention Policies; and (3) Compliance Policies.

This Code is effective June 1, 2022. USASF may update this Code at any time, unless otherwise stated, changes are effective immediately upon publication.

# Table of Contents

GLOSSARY ................................................................................................................ 4

CONDUCT REGULATIONS ..................................................................................... 12

  ARTICLE 1: JURISDICTION ................................................................................. 12

    Section 1.1: Jurisdiction of the USASF ................................................................ 12

    Section 1.2: Jurisdiction of the Member Club ...................................................... 12

  ARTICLE 2: PROHIBITED CONDUCT ................................................................. 13

    Section 2.1: What Is Prohibited Conduct? ............................................................ 13

    Section 2.2: Criminal Charge or Disposition ........................................................ 13

    Section 2.3: Sex Offender Registry ....................................................................... 14

    Section 2.4: Child Abuse ....................................................................................... 15

    Section 2.5: Sexual Misconduct ............................................................................ 15

    Section 2.6: Emotional and Physical Misconduct ................................................. 16

    Section 2.7: Aiding and Abetting ........................................................................... 19

    Section 2.8: Misconduct Related to Reporting and Process .................................. 19

    Section 2.9: Retaliation ......................................................................................... 20

    Section 2.10: Other Inappropriate Conduct .......................................................... 20

  ARTICLE 3: ABUSE PREVENTION POLICIES ................................................... 21

ABUSE PREVENTION POLICIES (APP) ................................................................. 22

  INTRODUCTION .................................................................................................... 22

  PART I: EDUCATION AND TRAINING POLICY ................................................. 24

    Abuse Prevention Education ................................................................................... 24

    Mandatory Reporter Training ................................................................................ 25

    Abuse Prevention Policy Notifications & Education ............................................. 25

    Concussion Education ............................................................................................ 25

    Exemptions & Accommodations ........................................................................... 25

  PART II: ABUSE PREVENTION POLICIES .......................................................... 27

    Model Policy 1: One-On-One Interaction .............................................................. 27

    Model Policy 2: Electronic Communications And Social Media .......................... 29

    Model Policy 3: Locker Room ............................................................................... 32

    Model Policy 4: Lodging ....................................................................................... 33

    Model Policy 5: Transportation ............................................................................. 34

PART III: RECOMMENDED POLICIES ............................................................... 35

COMPLIANCE POLICIES ..................................................................................... 36

    ARTICLE 1: MEMBERSHIP AGREEMENTS.................................................. 36

        Section 1.1: Club Membership ....................................................................... 36

        Section 1.2: Individual Memberships ............................................................ 36

        Section 1.3: Member Club Owners ................................................................ 37

        Section 1.4: Event Producer Members ........................................................... 37

        Section 1.5: All Members ............................................................................... 37

    ARTICLE II: SANCTIONED EVENTS ............................................................ 38

        Section 2.1: Rosters ....................................................................................... 38

        Section 2.2: Soliciting and/or Recruiting ....................................................... 39

        Section 2.3: Worlds Release ........................................................................... 39

APPENDICES ......................................................................................................... 40

# GLOSSARY

**Adult Athlete:** Any individual who is a USASF Member who is or will be on a team representing a USASF Club Member and is, or will be 18 years of age, on or before the end of the current membership term (collectively, with Minor Athlete, referred to as "Athlete").

**Adult Member:** Any individual who is 18 years of age or older who is a USASF Member under the following Membership categories: Athlete, Coach, Club Owner, Personnel, and/or Associate.

**Adult Participant:** Any individual who is 18 years of age or older that is authorized, approved, or appointed by a Member Club to have Regular Contact with or Authority over Minor Athletes. This may include, but is not limited to, Coaches, volunteers, medical staff, trainers, chaperones, monitors, contract personnel, bus/van drivers, officials, Adult Athletes, staff, or board members, regardless of their Membership status with the USASF.

**Affiliate:** Any United States based entity that is a USASF Member and (1) supplies products and/or services to the All-Star Cheer and/or Dance industries, or (2) is a corporate sponsor or official partner of USASF.

**Applicant:** An individual or entity who has applied for Membership of USASF but has not yet completed all eligibility requirements for the applied-for Membership category.

**Associate:** Any individual or entity that is a USASF Member whose services do not fit into any other Membership categories.

**Authority:** When one person's position over another person is such that, based on the totality of the circumstances, they have the power or right to direct, control, give orders to, or make decisions for that person. Also see the Power Imbalance.

**Banned:** An individual or entity permanently prohibited from participating in any capacity in any Function or Event authorized by, organized by, or under the auspices of the USASF.

**Bullying**: Repeated or severe behavior(s) that are (a) aggressive (b) directed at a Minor, and (c) intended or likely to hurt, control, or diminish the Minor emotionally, physically, or sexually. Bullying-like behaviors directed at adults are addressed under other forms of misconduct, such as hazing or harassment.

**Child Abuse:** The term "child abuse" has the meaning set forth in Section 203 of the Victims of Child Abuse Act of 1990 (34 U.S.C. § 20341) or any applicable state law.

**Claimant:** The person who is alleged to have experienced conduct that constitutes a USASF policy or Code violation.

**Close-in-Age Exception:** An exception applicable to certain policies when an Adult Participant does not have Authority over a Minor Athlete *and* is not more than four years older than the Minor Athlete (e.g., a 19-year-old and a 16-year-old) at the time of the interaction.

**Club:** Any United States based company or organization who is a USASF Member that trains Adult and/or Minor Athletes in cheer and/or dance from which one or more teams that may attend USASF sanctioned and/or sponsored Events.

**Club Owner:** An individual who is also a Coach Member of USASF, regardless of whether their coaching status, and owns, either in whole or in part, a Member Club or is a managing director of a Club that is owned by an entity that is not closely held.

**Coach:** Individuals who are USASF Members who are Club owners and/or who coach Athlete(s) in cheer and/or dance.

**Code:** The USASF Code of Conduct and Compliance as it may be updated from time-to-time.

**Consent:** Informed and voluntary agreement demonstrated by clear words or actions, indicating a person who is legally and functionally competent has indicated approval or permission to engage in a mutually agreed upon activity. Consent to any one form of activity does not automatically imply Consent for any other forms of activity. Once given, Consent can be withdrawn. Previous relationships or prior Consent does not imply Consent to future sexual activity. Consent cannot be obtained: (a) by force, (b) by taking advantage of the Incapacitation of another, (c) from someone who lacks Legal Capacity, (d) when a Power Imbalance exists.

**Days:** Unless expressly provided otherwise, the term "days" shall mean business days, which excludes weekends and national holidays.

**Dual Relationships:** An exception applicable to certain policies when an Adult Participant has a dual role or relationship with a Minor Athlete and the Minor Athlete's parent/guardian has provided written consent during the current Member term authorizing the exception.

**Event Producer:** Any United States based company or organization who is a USASF Member that hosts one or more competitive events in the United States and have All Star Cheer and/or Dance Divisions.

**Event:** Any competitive event in the United States that is sponsored, sanctioned, affiliated, or produced by a USASF Member that contains one or more competitive events and has an All Star Cheer and/or Dance Division(s).

**Force** includes (a) the use of physical violence, (b) threats, (c) intimidation, and (d) coercion.

a.      Physical violence means that a person is exerting control over another person using physical force. Examples of physical violence include hitting, punching, slapping, kicking, restraining, strangling, and brandishing or using any weapon.

b.      Threats are words or actions that would compel a reasonable person to engage in unwanted sexual activity. Examples include threats to harm a person physically, to reveal private information to harm a person's reputation or to deny a person's ability to participate in sports.

c.      Intimidation is an implied threat that menaces or causes reasonable fear in another person. A person's size, alone, does not constitute intimidation; however, a person's size may be used in a way that constitutes intimidation (e.g., blocking access to an exit).

d.      Coercion is the use of an unreasonable amount of pressure to gain intimate or sexual access. Coercion is more than an effort to persuade, entice, or attract another person to engage in sexual activity. When a person makes clear their decision not to participate in a form of Sexual Contact or Sexual Intercourse, their decision to stop, or their decision not to go beyond a certain sexual interaction, continued pressure can be coercive. Whether conduct is coercive may depend on: (i) the frequency of the application of the pressure, (ii) the intensity of the pressure, (iii) the degree of isolation of the person being pressured, and (iv) the duration of the pressure.

**Function:** All travel, lodging, practice, competition, exhibitions, and/or any other All Star related activity or Event.

**Grooming**: The process whereby a person engages in a series or pattern of behaviors with a goal of engaging in Sexual Misconduct. Grooming is initiated when a person seeks out a vulnerable Minor. Once selected, offenders will then earn the Minor's trust, and potentially the trust of the Minor's family. After the offender has engaged the Minor in sexually inappropriate behavior, the offender seeks to maintain control over him/her. Grooming occurs through direct, in-person, or online contact.

**Harassment:** Repeated or severe conduct that (a) causes fear, humiliation, or annoyance, (b) offends or degrades, (c) creates a Hostile Environment (as defined herein), or (d) reflects discriminatory bias in an attempt to establish dominance, superiority, or power over an individual or group based on age, race, ethnicity, culture, religion, national origin, or mental or physical disability; or (e) any act or conduct described as harassment under federal or state law.

**Hostile Environment:** Exists when, from a subjective and objective perspective, conduct is sufficiently severe, persistent, or pervasive such that it interferes with, limits, or deprives any individual of the opportunity to participate in any program, activity, Function, and/or Event.

**Incapacitation:** Incapacitation means that a person lacks the ability to make informed, reasonable judgments about whether to engage in sexual activity. A person who is incapacitated is unable, whether temporarily or permanently, to give Consent because of mental or physical helplessness, sleep, unconsciousness, or lack of awareness that sexual activity is taking place. A person may be incapacitated because of consuming alcohol or other drugs, or due to a temporary or permanent physical or mental health condition.

Incapacitation is a state beyond drunkenness or intoxication. A person is not necessarily incapacitated merely because of drinking or using drugs. The impact of alcohol and other drugs from person to person and is evaluated under the specific circumstances of a matter.

A Respondent's being impaired by alcohol or other drugs is not a defense to any violation of the Code.

The Consent construct can also be applied to other forms of non-sexual conduct, such as hazing or other forms of Physical or Emotional misconduct. It is a violation of the Code for a Member to engage in Sexual Contact or Sexual Intercourse without Consent.

**In-Program Contact:** Any contact (including communications, interactions, or activities) between an Adult Participant and any Athlete(s) related to participation in All Star Cheer and/or Dance. Examples of In-Program Contact include, but are not limited to competition, practices, camps/clinics, training/instructional sessions, meals or outings, team travel, team- or sport-related relationship-building activities, celebrations, award ceremonies, banquets, team- or sport-related fundraising or community service, sport education, or competition site visits.

**Intimate or Romantic Relationship:** A close personal relationship—other than a familial relationship—that exists independently and outside of the All-Star Cheerleading and Dance relationship. Whether a relationship is intimate is based on the totality of the circumstances, including: Regular Contact or interactions outside of or unrelated to the All Star Cheerleading and Dance relationship (electronically or in person), the parties' emotional connectedness, significant travel together sharing the same room, the exchange of gifts, ongoing physical or intimate contact or sexual activity, identify as a couple, the sharing of sensitive personal information, or intimate knowledge about each other's lives outside the All-Star Cheerleading and Dance relationship.

**Junior Personnel:** Any individual Member under the age of 18 years associated with and serves in an official capacity for the Member Club, who serves under the direct supervision of an adult.

**Jurisdiction**: Includes any sanctioned Event or Functions (including all travel and lodging in connection with the Event) by USASF or a Member Club, or any facility that the Member Club or Member owns, leases, or rents for practice, training, or competition.

**Legal Capacity:** Minors, any individual under the age of 18, cannot Consent to conduct of a sexual nature. While the legal age of Consent varies under state and federal law, the age of capacity under the USASF policies and codes is 18.

**Mandatory Reporter:** An individual required by law to report, to the appropriate federal, state, or local agencies, if they know, suspect, or have reason to believe that Child Abuse is occurring. The list of "Mandatory Reporters" now includes any adult authorized to interact with a Minor Athlete at a sports organization, facility, Event, or treatment.

**Member:** Any individual or entity that has completed all eligibility requirements for the Member category. Any reference to "Member" in any USASF policy or code applies to all Membership categories, unless otherwise specified.

**Member Organization:** Any entity who is a USASF Member under the following Membership categories: Event Producer, Club, Affiliate, and/or Associate.

**Minor Athlete:** Any individual who is a USASF Member who is or will be on a team representing a USASF Club Member and is under the age of 18 years old during the current Membership term (collectively, with Adult Athlete, referred to as "Athlete").

**Minor or Child:** An individual who is, or is believed to be, under the age of 18.

**Observable and Interruptible**: Able to be seen and/or heard by another adult and another adult must be able to interrupt the interaction easily.

**Official Warning:** Written communication that the USASF found the Respondent violated one or more USASF policies and/or codes. The Member has no eligibility restrictions.

**One-on-One Interaction/Contact**: Interactions, meetings, and/or training between a Minor Athlete and one Adult Participant (who is not the Minor Athlete's parent/guardian), which is not within an Observable and Interruptible distance from another adult.

**Out-of-Program Contact:** Any One-on-One contact between an unrelated Adult Participant and Minor Athlete, which is not pertaining to In-Program activities, Functions, or Events (e.g., trips, meals, or gifts without any direct correlation to All Star Cheer and/or Dance activities).

**Personnel:** Any individual non-coaching Member who is 18 years of age or older associated with and serves in an official capacity for the Member Club.

**Power Imbalance:** A power imbalance may exist where, based on the totality of the circumstances, one person has supervisory, evaluative, or other Authority over another. Whether there is a power imbalance depends on several factors, including but not limited to: the nature and extent of the supervisory, evaluative, or other Authority over the person; the actual relationship between the parties; the parties' respective roles; the nature and duration of the relationship; the age of the parties involved; whether there is an aggressor, whether there is a significant disparity in age, size, strength, or mental Capacity.

> Once a Coach-Athlete relationship is established, a Power Imbalance is presumed to exist throughout the Coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the Coach-Athlete relationship terminates until the Athlete reaches 20 years of age.

> A Power Imbalance may exist, but is not presumed, when an Intimate Relationship existed before the sport relationship (e.g., a relationship between two spouses or life partners that preceded the sport relationship).

**Probation:** There is sufficient cause for the Member to remain under review for a defined period; the Member's eligibility is not restricted while under Probation. Any violations committed while under Probation are subject to additional review by USASF and may be cause for Revocation of Membership.

**Regular Contact:** Ongoing interactions during a 12-month period wherein an Adult Participant is in a role of direct and active engagement with any Athlete(s).

**Reporter:** Any individual, other than the Claimant, who submits a Report alleging violations of a USASF policy and/or code against a Member.

**Respondent:** A Member who is alleged to have violated a USASF policy or code.

**Retaliation**: Adverse action against any individual or entity for making a good faith report of a possible Code violation to the USASF or other relevant organization or for participating in any process under this Code; retaliation includes, but is not limited to, threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging or participating in the USASF's processes when the action is reasonably related to the report or engagement with the USASF.

**Revocation of Membership:** Removal of Membership from an individual or entity, including any rights and privileges associated with Membership.

**Sanctions:** Steps taken in response to a violation of a USASF policy and/or code. Sanctions may include, but are not limited to, an Official Warning, monetary fine, Membership Suspension, Probation, and/or Revocation of Membership.

**Sexual Contact:** Any intentional touching of a sexual nature, however slight, with any object or body part, by a person upon another person. Sexual Contact includes but is not limited to: (a) kissing, (b) intentional touching of the breasts, buttocks, groin, or genitals, whether clothed or unclothed, or intentionally touching of another with any of these body parts; and (c) making another touch themselves, the Member, or someone else with or on any of these body parts.

**Sexual Exploitation:** A Member purposely or knowingly:

   **a.**    Engages in voyeurism (e.g., watching private sexual activity or viewing another person's intimate parts when that person would have a reasonable expectation of privacy), without Consent of all parties being viewed.

   **b.**    Allows third parties to observe private sexual activity from a hidden location (e.g., closet) or through electronic means (e.g., Skype or live-streaming of images) without Consent of all parties involved in the sexual activity.

   **c.**    Records or photographs private sexual activity or a person's intimate parts (including genitalia, groin, breasts, or buttocks) without Consent of all parties in the recording or photo.

   **d.**    Disseminates, shows, or posts images of private sexual activity or a person's intimate parts (including genitalia, groin, breasts, or buttocks) without prior Consent of the person depicted in the images.

   **e.**    Intentionally exposes another person to a sexually transmitted infection or virus without that person's knowledge.

   **f.**    Engages in prostituting or trafficking another person.

**Sexual Intercourse:** Any penetration, however slight, with any object or body part, by a person upon another person. Sexual Intercourse includes (a) vaginal penetration by a penis, object, tongue, or finger; (b) anal penetration by a penis, object, tongue, or finger; and (c) any contact, no matter how slight, between the mouth of one person and the genitalia of another person.

**Sexual Misconduct:** Conduct that includes, but is not limited to: Sexual or Gender-related Harassment; Non-consensual Sexual Contact (or attempts to commit the same); Non-consensual Sexual Intercourse (or attempts to commit the same); Sexual Exploitation; Bullying, hazing, or other inappropriate conduct of a sexual nature.

**Suspend**: A temporary withdrawal of rights or privileges afforded a USASF Member.

**Temporary Measures**: Steps taken in response to allegations of a USASF policy or Code violation, the USASF, at its discretion, may mandate a Member's participation in cooperative actions or supportive measures. The Member's eligibility to participate may be restricted pending final resolution.

# CONDUCT REGULATIONS

## **ARTICLE 1: JURISDICTION**

Section 1.1: <u>Jurisdiction of the USASF</u>

The USASF has Jurisdiction to investigate and resolve allegations that a Member engaged in one or more of the following:

a. Sexual Misconduct, including without limitation child sexual abuse and any misconduct that is reasonably related to an underlying allegation of Sexual Misconduct;
b. Criminal charges or dispositions involving Child Abuse or Sexual Misconduct;
c. Misconduct related to reporting, where the underlying allegation involves Child Abuse or Sexual Misconduct;
d. Aiding and abetting when it relates to the USASF's processes;
e. Misconduct related to the USASF's processes;
f. Emotional and Physical Misconduct, including stalking, Bullying behaviors, hazing, and harassment;
g. Non-sexual Child Abuse;
h. Criminal charges or dispositions not involving Child Abuse or Sexual Misconduct;
i. Other Prohibited Conduct, as outlined herein; and/or
j. Abuse Prevention Policy or other similar Proactive Policy violations.
k. Violations of the Compliance Policies

If the USASF accepts jurisdiction, it will use the resolution procedures set forth in this Code. The USASF may reassess its jurisdictional decision at any time.

Section 1.2: <u>Jurisdiction of the Member Club</u>

a. When allegations are presented to the Member Club, the Member Club should take necessary and appropriate measures, up to and including a suspension from the Club, to investigate and address any allegations of misconduct, as well as contacting the appropriate law enforcement agency, if necessary.
b. After the Member Club completes Subsection (a) above, the Member Club will immediately report to USASF the allegations of misconduct, as well as provide all documentation and/or information related to the allegations, including but not limited to contact information for all individuals/entities involved and report/case number: (1) received and/or created during the Member Club's investigation; and (2) provided to and/or received from the appropriate law enforcement agency.
c. If USASF expressly exercises jurisdiction over allegations regarding a particular Member, the USASF will issue a Notice of Investigation and Allegation (NOIA) to the Member and when applicable the Member Club, at which point the Member Club may implement any necessary safety plan(s) or Temporary Measure(s).

## ARTICLE 2: PROHIBITED CONDUCT

This Article 2 sets forth expectations for Members related to emotional, physical, and Sexual Misconduct in All Star Cheerleading and Dance, including, but not limited to, Bullying, hazing, and Harassment.

The privilege of Membership in the USASF and/or participation in a USASF Function may be subject to Temporary Measures, Sanctions, and/or Revocation of Membership, if a Member's conduct is or was inconsistent with this Code or the best interest of All Star Cheerleading and Dance and those who participate in it. It is a violation of the Code for a Member or Member Club to engage in or tolerate: (1) Prohibited Conduct, as outlined in the Code; (2) any conduct that would violate any standards promulgated by the USASF or the Member Club that are analogous to Prohibited Conduct and that existed at the time of the alleged conduct; or (3) any conduct that would violate social norms analogous to Prohibited Conduct that existed at the time of the alleged conduct, including all applicable criminal or civil laws.[1]

Section 2.1: <u>What Is Prohibited Conduct?</u>

Prohibited Conduct includes, but is not limited to:

1. Criminal Charges or Dispositions
2. Child abuse
3. Sexual Misconduct
4. Emotional and Physical Misconduct, including Stalking, Bullying, Hazing, and Harassment
5. Aiding and Abetting
6. Misconduct Related to Reporting
7. Misconduct Related to the USASF's Process
8. Other Inappropriate Conduct
9. Violation of Minor Athlete Abuse Prevention Policies / Proactive Policies

Section 2.2: <u>Criminal Charge or Disposition</u>

Criminal conduct is relevant to an individual's fitness to participate in All Star Cheerleading and Dance. The age of a criminal charge or disposition is not relevant to whether a violation of the Code occurred but may be considered for Sanctioning purposes. The USASF reviews criminal charges or dispositions involving Sexual Misconduct or Child Abuse, and any prior consideration, or finding by a Member Club, regarding a criminal disposition involving Sexual Misconduct or Child Abuse is not relevant to the USASF's determination.

---

[1] The focus of this provision is on community standards in place at the time of the alleged conduct. The question is: Would a reasonable person at the time of the alleged conduct occurred have had notice that the alleged conduct would have violated community standards and norms as those standards were generally expressed in then applicable criminal or civil statutes, or other applicable community standards? The USASF need not establish every element of a crime, nor must it apply any evidentiary standards or burdens of proof other than those provided in this Code.

a. It is a violation of the Code for a Member to have a criminal charge or disposition listed below. All Members, except for Minor Athletes, are required to report to the USASF any Criminal Charge(s) and/or Disposition(s) including but not limited to:
1. Any felony;
2. All sexual crimes, criminal offenses of a sexual nature to include but not limited to: rape, child molestation, sexual battery, lewd conduct, possession and/or distribution of child pornography, possession and/or distribution of obscene material, prostitution, indecent exposure, public indecency, and/or any sex offender registrant;
3. Harm to a Minor, including but not limited to: offenses such as child abandonment, child endangerment/neglect/abuse, contributing to the delinquency of a Minor, and DUI with a Minor;
4. Violence against a person, force, or threat of force (including crimes involving deadly weapons and domestic violence);
5. Stalking, harassment, blackmail, violation of a protection order, and/or threats;
6. Destruction of property, including arson, vandalism, and criminal mischief;
7. Animal abuse, cruelty, and/or neglect; and/or
8. Criminal offenses including "Attempted Crimes" in the above classifications.

b. Criminal Disposition:
1. It is a violation of the Code for a Member to be or have been subject to any disposition or resolution of a criminal proceeding for the items mentioned in Section 2.2(a)(1)-(8), including, but not limited to: an adjudication of guilt or admission to a criminal violation, a plea to the charge or a lesser included offense, a plea of no contest, any plea analogous to an Alford or Kennedy plea, the disposition of the proceeding through a diversionary program, deferred adjudication, deferred prosecution, disposition of supervision, conditional dismissal, juvenile delinquency adjudication, or similar arrangement.
2. Notwithstanding the provisions of Section 2.2.a.1 hereinabove, it is not a violation of the Code for a Member to be or have been subject to a resolution of a criminal proceeding that results in a not-guilty finding.

c. Criminal Charge:
1. It is a violation of the Code for a Member to have any pending criminal charge(s) or warrant(s) for arrest for the items mentioned in Section 2.2(a)(1)-(8).

d. When assessing whether conduct constitutes a criminal charge or disposition, the USASF may assess and rely upon the original charges, amended charges, and/or those to which a plea was entered.
1. If the USASF learns of any other crimes other than those listed in Section 2.2(a)(1)-(8), USASF reserves the right to consider those crimes as well as the totality of the circumstances in all cases for the fitness of Membership.

Section 2.3: Sex Offender Registry

Anyone who is currently on any state, federal, territorial, or tribal sex offender registry may not become a Member of USASF.

Section 2.4: <u>Child Abuse</u>

It is a violation of the Code for a Member to engage in Child Abuse.

Section 2.5: <u>Sexual Misconduct</u>

a. It is a violation of the Code for a Member to engage in Sexual Misconduct. Sexual Misconduct offenses include, but are not limited to:
   1. Sexual or Gender-related Harassment
   2. Non-consensual Sexual Contact (or attempts to commit the same)
   3. Non-consensual Sexual Intercourse (or attempts to commit the same)
   4. Sexual Exploitation
   5. Bullying, hazing, or other inappropriate conduct of a sexual nature.
b. Sexual or Gender-related Harassment
   1. Sexual harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise, when the conditions outlined in (i) or (ii) below are present.
   2. Sexual harassment includes harassment related to gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non- verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions outlined in (a) or (b), below, are present.
      i. Submission to such conduct is made, either explicitly or implicitly, a term or condition of any person's employment, standing in All Star Cheerleading and Dance, or participation in All Star Functions; or when submission to or rejection of such conduct is used as the basis for sporting decisions affecting the individual (often referred to as "quid pro quo" harassment); or
      ii. Such conduct creates a Hostile Environment. A "Hostile Environment" exists when the conduct is sufficiently severe, persistent, or pervasive such that it interferes with, limits, or deprives any individual of the opportunity to participate in any program, activity, Function, and/or Event. Conduct must be deemed severe, persistent, or pervasive from both a subjective and an objective perspective.
   3. Whether a Hostile Environment exists depends on the totality of known circumstances, including, but not limited to:
      i. The frequency, nature, and severity of the conduct;
      ii. Whether the conduct was physically threatening;
      iii. The effect of the conduct on the Claimant's mental or emotional state;
      iv. Whether the conduct was directed at more than one person; and
      v. Whether the conduct arose in the context of other discriminatory conduct.
   4. A Hostile Environment can be created by persistent or pervasive conduct or by a single or isolated incident that is sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a Hostile Environment, particularly if the conduct is physical. A single incident of Sexual Contact without Consent, for example, may be sufficiently severe to constitute a Hostile Environment. In contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a Hostile Environment.

c. Nonconsensual Sexual Contact: It is a violation of the Code for a Member to engage in Sexual Contact without Consent.

d. Nonconsensual Sexual Intercourse: It is a violation of the Code for a Member to engage in Sexual Intercourse without Consent.

e. Sexual Exploitation: It is a violation of the Code for a Member to engage in Sexual Exploitation.

f. Bullying, Hazing, or Other Inappropriate Conduct of a Sexual Nature: It is a violation of the Code for a Member to engage in Bullying, Hazing, and other inappropriate conduct of a sexual nature.

Section 2.6: Emotional and Physical Misconduct

a. It is a Code violation for a Member to engage in emotional or physical misconduct, when that misconduct occurs within a context that is reasonably related to All Star Cheerleading and Dance, which includes, without limitation:
   1. Emotional Misconduct;
   2. Physical Misconduct;
   3. Bullying;
   4. Hazing; and/or
   5. Harassment.

b. Emotional Misconduct
   1. Emotional misconduct includes (a) Verbal Acts, (b) Physical Acts, (c) Acts that Deny Attention or Support, (d) Criminal Conduct, or (e) Stalking. Emotional misconduct is determined by the objective behaviors, not whether harm is intended or results from the behavior.
   2. Verbal Acts: Repeatedly and excessively verbally assaulting or attacking someone personally in a manner that serves no productive training or motivational purpose.
   3. Physical Acts: Repeated or severe physically aggressive behaviors, including but not limited to, throwing equipment, water bottles or chairs at or in the presence of others, punching walls, windows, or other objects.
   4. Acts that Deny Attention or Support: Ignoring or isolating a person for extended periods of time, including routinely or arbitrarily excluding a Member from practice.
   5. Criminal Conduct: Emotional misconduct includes any act or conduct described as emotional abuse or abuse by any federal or state law.
   6. Stalking
      i. Stalking occurs when a person purposefully engages in a course of conduct directed at a specific person, and knows or should know, that the course of conduct would cause a reasonable person to (i) fear for their safety, (ii) the safety of a third person, or (iii) to experience substantial emotional distress.
      ii. "Course of conduct" means at least two or more acts, in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. "Substantial emotional distress" means significant mental suffering or anguish.

        iii. Stalking also includes "cyber-stalking," wherein a person stalks another using electronic media, such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact.

    7. Exclusions

        i. Emotional misconduct does not include professionally accepted coaching methods of skill enhancement, physical conditioning, team building, appropriate discipline, or improved Athlete performance. Emotional misconduct also does not include conduct reasonably accepted as part of All Star Cheerleading and Dance or conduct reasonably accepted as part of Member's participation.

c. Physical Misconduct

    1. Physical misconduct is any intentional contact or non-contact behavior that causes physical harm to another or causes another to reasonably believe physical harm was imminent.

    2. Examples of physical misconduct may include, without limitation:

        i. Contact violations: Punching, beating, biting, striking, strangling, or slapping another; intentionally hitting another with objects, such as sporting equipment.

        ii. Non-contact violations: Isolating a person in a confined space, such as locking an Athlete in a small space; forcing an Athlete to assume a painful stance or position for no athletic purpose (e.g., requiring an Athlete to kneel on a harmful surface); withholding, recommending against, or denying adequate hydration, nutrition, medical attention, or sleep; encouraging or knowingly permitting an Athlete to return to play prematurely following a serious injury (e.g., a concussion) without the clearance of a medical professional; providing, assisting in providing, or condoning the consumption of alcohol to a person under the legal drinking age; providing, assisting in providing, or condoning the consumption of illegal drugs or non-prescribed medications to another.

        iii. Criminal Conduct: Physical misconduct includes any act or conduct described as physical abuse or misconduct under federal or state law (e.g., Child Abuse, assault, battery).

        iv. Exclusions: Physical misconduct does not include professionally accepted coaching methods of skill enhancement, physical conditioning, team building, appropriate discipline, or improved Athlete performance. For example, hitting, punching, and kicking another are well-regulated forms of contact in combat sports, but have no place in All Star Cheer and Dance. Physical misconduct also does not include conduct reasonably accepted as part of All Star Cheerleading and Dance or conduct reasonably accepted as part of Member's participation.

d. Bullying

    1. Bullying is repeated or severe behavior(s) that are (a) aggressive, (b) directed at a Minor, and (c) intended or likely to hurt, control, or diminish the Minor emotionally, physically, or sexually.

    2. Examples of Bullying may include, without limitation, repeated or severe:

        i. Hitting, pushing, punching, beating, biting, striking, kicking, strangling, slapping, spitting at, or throwing objects (such as sporting equipment) at another person;

        ii. Ridiculing, taunting, name-calling, or intimidating another, or threatening to cause someone harm;

        iii. Cyberbullying; use of rumors or false statements about someone to diminish that person's reputation; using electronic communications, social media, or other

technology to harass, frighten, intimidate, or humiliate someone; socially excluding someone and asking others to do the same;

    iv. Ridiculing or taunting that is sexual in nature or based on gender or sexual orientation (real or perceived), gender traits or behavior, or teasing someone about their looks or behavior as it relates to sexual attractiveness.

    v. Criminal Conduct: Bullying behavior includes any conduct described as Bullying under federal or state law.

3. Exclusions

    i. Conduct may not rise to the level of Bullying behavior if it is merely rude (inadvertently saying or doing something hurtful), mean (purposefully saying or doing something hurtful, but not as part of a pattern of behavior), or arising from conflict or struggle between persons who perceive they have incompatible views or positions. Bullying does not include professionally accepted coaching methods of skill enhancement, physical conditioning, team building, appropriate discipline, or improved Athlete performance.

e. Hazing

1. Any conduct that subjects another person, whether physically, mentally, emotionally, or psychologically, to anything that may endanger, abuse, humiliate, degrade, or intimidate the person as a condition of joining or being socially accepted by a group, team, or organization. Purported Consent by the person subjected to hazing is not a defense, regardless of the person's perceived willingness to cooperate or participate.

2. Examples of Hazing include:

    i. Contact acts: Tying, taping, or otherwise physically restraining another person; beating, paddling or other forms of physical assault.

    ii. Non-contact acts: Requiring or forcing the consumption of alcohol, illegal drugs or other substances, including participation in binge drinking and drinking games; personal servitude; requiring social actions (e.g., wearing inappropriate or provocative clothing) or public displays (e.g., public nudity) that are illegal or meant to draw ridicule; excessive training requirements demanded of only particular individuals on a team that serve no reasonable or productive training purpose; sleep deprivation; otherwise unnecessary schedule disruptions; withholding of water or food; restrictions on personal hygiene.

    iii. Sexualized acts: Actual or simulated conduct of a sexual nature.

    iv. Criminal acts: Any act or conduct that constitutes hazing under applicable federal or state law.

3. Exclusions

    i. Conduct may not rise to the level of Hazing if it is merely rude (inadvertently saying or doing something hurtful), mean (purposefully saying or doing something hurtful, but not as part of a pattern of behavior), or arising from conflict or struggle between persons who perceive they have incompatible views or positions.

    ii. Hazing does not include professionally accepted coaching methods of skill enhancement, physical conditioning, team building, appropriate discipline, or improved Athlete performance.

f. Harassment

1. Whether conduct is Harassing depends on the totality of the circumstances, including the nature, frequency, intensity, location, context, and duration of the behavior.

2. Exclusions
   i. Conduct may not rise to the level of Harassment if it is merely rude (inadvertently saying or doing something hurtful), mean (purposefully saying or doing something hurtful, but not as part of a pattern of behavior), or arising from conflict or struggle between persons who perceive they have incompatible views or positions.
   ii. Harassment does not include professionally accepted coaching methods of skill enhancement, physical conditioning, team building, appropriate discipline, or improved Athlete performance.

## Section 2.7: Aiding and Abetting

a. Aiding and Abetting occurs when a Member aids, assists, facilitates, promotes, or encourages the commission of prohibited conduct by an individual, including but not limited to, knowingly:
   1. Allowing any person who has been identified as Banned, Suspended, or otherwise ineligible by the USASF to be in any way associated with or employed by a Member Organization;
   2. Providing any coaching-related activities or services, within a Member Organization's facilities or in the vicinity of other Members, to an Adult or Minor Athlete who has been identified as Banned, Suspended, or otherwise ineligible by the USASF.
   3. Allowing any person to violate the terms of their Ban, Suspension, or any other Sanctions imposed by the USASF.
b. A Member also violates the Code if someone acts on behalf of the Member to engage in Aiding or Abetting, or if the parent/guardian, family member, or other representative of a Member, including a Minor, engages in Aiding or Abetting.

## Section 2.8: Misconduct Related to Reporting and Process

a. Failure to Report: A Member who fails to report actual or suspected Sexual Misconduct or Child Abuse to the USASF and, when appropriate, to law enforcement may be subject to disciplinary action and may also be subject to federal or state penalties.
   1. The obligation to report is broader than reporting a pending charge or criminal arrest of an Adult Participant; it requires reporting to the USASF any conduct which, if true, would constitute Sexual Misconduct or Child Abuse. The obligation to report to the USASF is an ongoing one and is not satisfied simply by making an initial report.
   2. The obligation includes reporting, on a timely basis, all information of which a Member knows or becomes aware of later, including the names of witnesses, third-party reporters, Respondents, and Claimants.
   3. Members should not investigate or attempt to evaluate the credibility or validity of allegations involving Sexual Misconduct involving a Minor or Child Abuse. Members making a good faith report are not required to prove the reports are true before reporting.
b. Intentionally Filing a False Allegation
   1. In addition to constituting misconduct, filing a knowingly false allegation that a Member engaged in Prohibited Conduct may violate state criminal law and civil defamation laws. Any Member making a knowingly false allegation in a matter over which the USASF exercises Jurisdiction shall be subject to disciplinary action by the USASF.

2. An allegation is false if the events reported did not occur, and the person making the report knows the events did not occur.
3. A false allegation is different from an unsubstantiated allegation; an unsubstantiated allegation means there is insufficient supporting evidence to determine whether an allegation is true or false. Absent demonstrable misconduct, an unsubstantiated allegation alone is not grounds for a Code violation.

c. Misconduct Related to the USASF's Process
  1. The behaviors identified below constitute Prohibited Conduct and may give rise to a disciplinary action. In addition, a Member also violates the Code if someone acts on the Member's behalf and engages in any of the following Prohibited Conduct, including a Member's parent/guardian or family member of a Minor:
      i. Abuse of Process: A Member, or someone acting on behalf of a Member, violates this Code by directly or indirectly abusing or interfering with the USASF's processes by:
          A. Falsifying, distorting, or misrepresenting information, the resolution process, or an outcome;
          B. Destroying or concealing information;
          C. Discouraging or attempting to discourage an individual's proper participation in, or use of, the USASF's processes;
          D. Harassing or intimidating (verbally or physically) any person involved in the USASF's processes before, during, or following proceedings;
          E. Publicly disclosing a Claimant's identifying information;
          F. Failing to comply with a Temporary Measure or other Sanction;
          G. Distributing or otherwise publicizing materials or information created, produced, or provided during any course of action as a part of these policies or procedures, except as required by law or as expressly permitted by the USASF; or
          H. Influencing or attempting to influence another person to commit abuse of process.

d. In such a case of engaging in any of the above-referenced Prohibited Conduct, the Member, and the party acting of the Member's behalf, if such person is also a Member, may be Sanctioned.

Section 2.9: <u>Retaliation</u>

Retaliation against anyone for participating in the USASF's processes is prohibited. Retaliation may be present even where there is a finding that no violation occurred. Retaliation does not include good-faith actions lawfully pursued in response to a report of a Code violation.

Section 2.10: <u>Other Inappropriate Conduct</u>

a. Intimate Relationship: An Adult Member violates this Code by engaging in an Intimate or Romantic Relationship where a Power Imbalance exists.
b. Exposing a Minor to Sexual Content/Imagery: An Adult Member violates this Code by intentionally exposing a Minor to content or imagery of a sexual nature, including but not limited to, pornography, sexual comment(s), sexual gestures, or sexual situation(s).
  1. This provision includes the possibility that similar behavior between adults could constitute Sexual Harassment, as defined in the Code.

c.  Intentional Exposure of Private Areas: An Adult Member violates this Code by intentionally exposing breasts, buttocks, groin, or genitals, or induces another to do so, to an Adult when there is a Power Imbalance, or to a Minor.

d.  Inappropriate Physical Contact: An Adult Member violates this Code by engaging in inappropriate physical contact with a Member when there is a Power Imbalance. Such inappropriate contact includes, but is not limited to, intentionally:

   1.  Touching, slapping, or otherwise contacting the buttocks or genitals of a Member;
   2.  Excessively touching or hugging a Member; and/or
   3.  Kissing a Member.

e.  Engaging in illegal alcohol or drug use.

f.  Willful Tolerance: A Member violates this Code by willfully tolerating any form of Prohibited Conduct, when there is a Power Imbalance between that Member and the individual(s) who are being subjected to the Prohibited Conduct.

## ARTICLE 3: ABUSE PREVENTION POLICIES

It is a violation of the Code for a Member to violate any provision of this Code or other Abuse Prevention Policies adopted by USASF.

# ABUSE PREVENTION POLICIES (APP)

## INTRODUCTION

All Member Clubs must implement proactive policies designed to prevent abuse. The Member Club must have a reporting mechanism to accept reports that an Adult Participant is violating the APP. The Member Club must appropriately investigate and resolve any reports received, unless the violation is reported to the USASF and it exercises Jurisdiction over the report. This requirement is in addition to requirements to report abuse under the USASF Conduct Regulations.

### What is the APP?

The APP is a collection of proactive prevention and training policies that apply to all Member Clubs. It has three primary components:

1. An Education & Training Policy that requires training for Adult Participants within the USASF;
2. Required Abuse Prevention Policies, focused on limiting One-on-One interactions between Adult Participants and Minor Athletes, that Member Clubs of USASF must implement.
3. Recommended Prevention Policies.

The USASF adopted the APP to assist USASF Member Clubs and other individuals to whom these policies apply in meeting their obligations under the USASF Conduct Regulations. Clubs must share these policies with all Participants and with parents/guardians of Minor Athletes. Those implementing these policies should consider the physical and cognitive needs of all Athletes.

The APP focuses on just two important aspects of a much larger comprehensive abuse prevention strategy. These policies address (1) training requirements at Member Clubs and (2) limiting One-on-One interactions between adults and Minor Athletes. These policies are intended to be enforceable and reasonable, acknowledging, for example, that when a 17-year-old Athlete turns 18, they become an Adult Athlete, and a complete prohibition of One-on-One interactions may not be necessary or practical. Additionally, there may be other instances when One-on-One interactions could occur, and in those cases, these policies provide strategies so parents/guardians can provide informed Consent if they choose to allow a permitted interaction. The USASF recommends that parents first complete training on abuse prevention to be informed about potential boundary violations and concerns before Consenting to the interaction.

While the APP will help Clubs implement these policies to greatly improve Athlete safety, in no way can they guarantee Athlete safety in all circumstances, especially when the policies are not fully implemented, followed, or monitored. These policies are not comprehensive of all prevention strategies, nor are they intended to be. These policies should be implemented alongside the USASF Conduct Regulations. Additionally, other resources are available that may assist Clubs in improving Athlete safety. A Member Club may implement a policy that is more restrictive than the USASF policy. It may not be less restrictive.

**How Does the USASF Monitor Compliance with the APP?**

It is the responsibility of the USASF Members to comply with the APP. Member Clubs should take action within their Club for violations of the APP by Adult Participants. Adult Participants also have an independent responsibility to comply with these APP provisions. Violations of these provisions can result in Sanctions under the USASF Conduct Regulations.

**Is the APP Different from the USASF Conduct Regulations?**

Yes. The USASF Conduct Regulations work alongside the APP to prevent abuse. The APP includes proactive prevention policies for Clubs and individuals, while the USASF Conduct Regulations contains misconduct policies for individuals. However, violations of the APP can violate the USASF Conduct Regulations, and violators can be Sanctioned

# PART I: EDUCATION AND TRAINING POLICY

**Mandatory Child Abuse Prevention Training Components:**

Abuse Prevention Education

1. Club Owners must take the Screening and Hiring Education Course provided by Safe At All Star. To access:
   a. Visit www.SafeatAllStar.com.
   b. Click the "Training Tab" from the menu
   c. If new user to site, you must request a new password *(username is the same as USASF Coach profile email username)*
   d. Login with username and password
   e. Click the "Owners" portal box
   f. Click "Best Practices in Hiring and Screening"

Member Clubs will need to work with their legal counsel to develop their Club's screening and hiring policies that adhere to the best practices for youth serving organizations in their state. It is important to note that some states (*e.g.*, Pennsylvania, Florida, etc.) may have specific requirements for employers who provide services to Minors.

2. Member Clubs must require Adult Participants under their jurisdiction, that are <u>not</u> USASF Members to:
   a. Complete an abuse prevention training.
   b. Member Clubs must track the Adult Participants who completed such training and, upon request by USASF, provide a list of compliant Adult Participants.

3. Member Clubs with Adult Participants under their jurisdiction, that <u>are</u> USASF Members:
   c. Abuse prevention training of Adult Participants who are Members or Applicants of the USASF is tracked by USASF as part of Membership and satisfies the Member Club's obligation to USASF with respect to this training policy.
   d. Member Clubs may provide training *in addition to* the USASF required training but cannot substitute their training for the USASF required course(s) for Membership.

4. Member Clubs must, on an annual basis, offer and give training to Minor Athletes, subject to parental consent, and parents on the prevention and reporting of Child Abuse.
   e. For training to Minor Athletes and parents, the Member Club must be able to provide a description of the training and how the training was offered to Minor Athletes and parents, at USASF's request.
   f. The Member Club is not required to track individual course completions of Minor Athletes and/or parents.

The USASF offers youth and parent courses that meet the above requirement at no cost, as a Member benefit to Member Clubs, located at <u>www.SafeatAllStar.com</u>.

      i. https://safeatallstar.com/training-front-page/;
     ii. Login using their Minor Athlete's USASF email username;
    iii. Create a new password; and
    iv. Click the training tab.

<u>Mandatory Reporter Training</u>

Annually, Member Clubs must provide training to all employees and volunteers identified as Mandatory Reporters on the legal requirements and reporting procedures for their state. In addition to the annual training, Member Clubs must:

1. Provide a tool for all participants to make a confidential report to the Club if they suspect abuse and/or misconduct;
2. Provide a tool for Mandatory Reporters to immediately report suspicions of abuse; and
3. Post the legal requirements and specific reporting procedures for their state for all Coaches and Adult Participants to reference.

<u>Abuse Prevention Policy Notifications & Education</u>

Member Clubs must:
1. Post a summary of their Abuse and Prevention Policy & Procedures in a conspicuous place for all Members, parents/guardians, and Adult Participants to see;
2. Share and make available resources for parents to educate themselves and their Minor Athlete(s) on preventative measures and steps to take if they believe misconduct has occurred;
3. Disclose those persons in their facility that are not Members of the USASF to the parent(s)and legal guardian(s) of Athletes.

<u>Concussion Education</u>

Each USASF Club Member must have a concussion policy that includes its approach, policies, and procedure in connection with concussion recognition, care, and return-to-play guidelines.

1. All competitive team Adult Athlete(s) and parents or guardians of each Minor Athlete must sign the Club Member's concussion policy.
2. Parents/guardians or the signing Athlete should be given a copy of the policy.
3. All Coaches must be trained in the Club Member's concussion policy.
4. The Club Member must update their Member Profile with confirmation of completion and/or compliance of this section.

<u>Exemptions & Accommodations</u>

1) Exemptions from this Education & Training Policy may be made on a case-by-case basis for victims/survivors. Requests may be made directly to the USASF Member Conduct and Compliance Department at <u>conduct@usasf.net</u>.

2) The USASF will work with the Member Clubs on appropriate accommodations for persons with disabilities and individuals with limited English proficiency to satisfy these training requirements. Each Member Club must provide reasonable accommodations and track any exemptions for individuals with disabilities and individuals with limited English proficiency.

**Recommended Components (non-reportable offenses)**

1) Adult Participants serving in a volunteer capacity, who will not have Regular Contact with or Authority over Minor Athletes, should take a training course on abuse prevention before engaging or interacting with any Minor Athlete(s).
2) Parents/guardians of Minor Athletes are provided free online access to the USASF's parent course and are encouraged to take the training.

# PART II: ABUSE PREVENTION POLICIES

## MODEL POLICY 1: ONE-ON-ONE INTERACTION

**Mandatory Components**

One-on-One Contact is defined as interactions, meetings, and/or training between Minor Athlete and one Adult Participant (who is not the Minor Athlete's parent/guardian), which is not within an Observable and Interruptible distance from another adult. One-on-One Interactions between unrelated Adult Participants and Minor Athletes are not permitted, except as stated in this policy, and applies to all situations, including In-Program contact, Functions, and Events.

Observable and Interruptible

Contact is not One-on-One if it is conducted at a distance allowing for another adult to (1) see and/or hear the interaction and (2) easily interrupt the interaction. One Adult Participant and one Minor Athlete alone in a Member Club facility violates this policy. Closed Circuit Broadcast and/or web-based viewing is not considered Observable and Interruptible under this policy. Another adult must be in the building and able to see and/or overhear all activities.

Individual Training Sessions

Individual training sessions between an Adult Participant(s) and a Minor Athlete(s) are permitted under this policy if:

(1) the training session is Observable and Interruptible by another adult; and/or
(2) parents/guardians are allowed to observe the training session.

If the individual training session is not Observable and Interruptible by another adult, then Adult Participant(s) must obtain written consent from the Minor Athlete(s) parent or guardian prior to the training session. Such written consent must be obtained at least every six months and may be revoked at any time by the Minor Athlete(s) parent or guardian.

Massages, Rubdowns, and Other Training Modalities

Any massage, rubdown, or athletic training modality must be conducted in an Observable and Interruptible location with at least one other adult present. Written consent by a Minor Athlete's parent/ guardian shall be provided before providing each massage, rubdown, or athletic training modality on a Minor Athlete. Parents/guardians must be permitted to be in the room as an observer.

Exceptions

USASF recognizes the following exceptions to the prohibition against One-on-One Contact:

1. Emergency circumstances such as fires, medical emergencies, or Minors left without parental supervision after practice or at a competition. In all emergency circumstances, every effort must be made for the One-on-One Policy to be maintained.
2. When a Dual Relationship exists, and parent/guardian has provided written consent annually; or
3. When the Close-in-Age Exception applies; or
4. In other circumstances specifically addressed in this policy that allow for certain One-on-One Interactions if the Member Club receives parent/guardian written consent.

## MODEL POLICY 2: ELECTRONIC COMMUNICATIONS AND SOCIAL MEDIA

### ELECTRONIC COMMICATIONS

**Mandatory Components**

Electronic communication between an Adult Participant and Minor Athlete includes, but is not limited to, phone calls, video calls, text messages, social media platforms' direct messages (*e.g.*, Facebook, Twitter, Instagram, WhatsApp, Snapchat, TikTok, etc.), fitness or other mobile device applications, emails, gaming platforms, and/or direct messaging. All electronic communications between an Adult Participant and a Minor Athlete must comply with the One-on-One Policy and must be open and transparent.

1. Open and transparent means that the Adult Participant copies or includes the Minor Athlete's parent/guardian, another adult family member of the Minor Athlete, or another Adult Participant.
2. All electronic communication must be professional in nature.
3. Only platforms that allow for open and transparent communications may be used to communicate with Minor Athletes.
4. Communication platforms must be able to record or maintain the message.
5. If a Minor Athlete communicates with the Adult Participant first, the Adult Participant must either not respond or must include the Minor Athlete's parent or guardian or another Adult Participant in the response.
   a. If a Minor Athlete initiates communication with an Adult Participant for the purposes of seeking counsel or the Minor Athlete is in distress, the safety of the Minor Athlete and addressing the situation that initiated the contact must be the focus of the communication. Adult Participants who are not trained or equipped to mitigate the situation at hand are advised to seek professional assistance.
6. Electronic communications to an entire team or any number of Minor Athletes on a team must include at least one other Adult Participant or the Minor Athletes' parents/guardians if any team member is a Minor Athlete.
7. Any communication between Adult Participants and Minor Athletes involving the following is prohibited:
   a. Drug or alcohol use;
   b. Sexual content;
   c. Explicit content; or
   d. Adult Participant discussing their personal or social life outside of the professional environment (*e.g.*, discussing relationships or personal problems).

Any Member Clubs that are made aware of any of the prohibited communications mentioned in above must report such communications to USASF via the online reporting form at www.usasf.net/reporting.

Adult Participants are not permitted to maintain private social media connections with Minor Athletes; for example, this includes, but is not limited to, accepting or allowing Minor Athletes to "friend," "follow," or otherwise join a private social media site or similar online community that is not observable or open to the Minor Athlete's parent/guardian as well.

Note: Public fan pages are excluded from these restrictions. Private, direct, or instant messaging to Minor Athletes is not excluded.

A parent/guardian may request in writing that a Minor Athlete not be contacted through electronic communications, including via social media. Requests that a Minor Athlete not be contacted electronically must be honored.

The aforementioned includes all communications unless the following exceptions exist:
1. When a Dual Relationship exists; or
2. When the Close-in-Age Exception applies.

**Recommended Components (non-reportable offenses)**

1) Any electronic communications to Athletes and parents should only be sent between the hours of 8:00 a.m. and 8:00 p.m. local time for the location of the recipients, except for travel, competition, or emergency circumstances.

## SOCIAL MEDIA POSTS

Social Media is a voluntary communication platform and not required for participation in the sport thus outside of USASF's Jurisdiction to monitor, control and mitigate in lieu of a parent/guardian's choice to provide their Minor with the mode and means to access. The USASF strongly recommends parents/guardians limit access to and monitor their Minors' social media accounts as several platforms have minimum age requirements for account holders.

Although the following fall outside of USASF scope and Jurisdiction, the USASF Member Club may choose to have policies that prohibit their participants from:

1. Posting rude, negative or critical remarks or actions
2. Participating in Anonymous "anon"/Troll accounts
3. Displaying seemingly unsportsmanlike behavior that is not predatory or does not rise to the level of Bullying or Harassment as defined in the Code, but rather ungracious and immature.

The above should be reported to the Club Owner. *If USASF receives reports of such material, it will be referred to the Club Owner to address.*

USASF will review reports of alleged social media policy violations that (1) are produced/posted by a verified Member's social media account and (2) the material in question is publicly accessible and includes:

1. USASF confidential documents or private communications without prior specific permission from the USASF Executive Director;
2. Pornographic material in conjunction with anything specifically related to All Star Cheer and/or Dance;
3. Depictions of a Member violating state or federal law;
4. Depictions of any and all copyrighted USASF documents, in violation of Copyright laws, including the actual document and/or images of the document.

# MODEL POLICY 3: LOCKER ROOM

**Mandatory Components**

Observable and Interruptible
Adult Participants must ensure that all One-on-One In-Program Contact with Minor Athlete(s) in a locker room, changing area, or similar space where Minor Athlete(s) are present is Observable and Interruptible, except if:
1) A Dual Relationship exists; or
2) The Close-in-Age Exception applies.

Conduct in Locker Rooms, Changing Areas, and Similar Spaces
1) No Adult Participant or Minor Athlete can use the photographic or recording capabilities of any device in locker rooms, changing areas, or any other area designated as a place for changing clothes or undressing.
2) Adult Participants must not change clothes or behave in a manner that intentionally or recklessly exposes their breasts, buttocks, groins, or genitals to a Minor Athlete.
3) Adult Participants must not shower with Minor Athletes.
4) Parents/guardians may request in writing that their Minor Athlete(s) not change in the vicinity of an Adult Participant(s) during In-Program Contact.
   a) The Member Club and the Adult Participant(s) must abide by this request.

Availability and Monitoring of Locker Rooms, Changing Areas, and Similar Spaces
1) The Member Club must provide a private or semi-private place for Minor Athletes that need to change clothes or undress at facilities under the USASF's Jurisdiction.
2) The Member Club must monitor, with random sweeps, the use of locker rooms, changing areas, and similar spaces to ensure compliance with this policy at facilities under the USASF's Jurisdiction.

**Recommended Components (non-reportable offenses)**
1) Member Clubs should post locker room policies specific to their facility.
2) Member Clubs are encouraged to post rules related to Athlete behavior in the locker room to minimize Bullying and harassment.

# MODEL POLICY 4: LODGING

**Mandatory Components**

<u>Overnight and Other Sleeping Arrangements</u>

1) All In-Program Contact at a hotel or lodging site between an Adult Participant and a Minor Athlete must be Observable and Interruptible, and an Adult Participant shall not share a hotel room or otherwise sleep in the same room with a Minor Athlete(s), except if:
   a) A Dual Relationship Exists, and the non-related Minor Athlete's parent/guardian has provided the Member Club with prior written consent for the lodging arrangement; or
   b) The Close-in-Age Exception applies, and the Minor Athlete's parent/guardian has provided the Member Club with advance, written consent for the lodging arrangement.
2) At least annually, written consent from a Minor Athlete's parent/guardian must be obtained for prior to the Minor Athlete's participation in all In-Program Functions requiring overnight or hotel stays.

<u>Monitoring or Room Checks During In-Program Travel</u>

If the Member Club performs room checks during In-Program lodging, the One-on-One Interaction Policy must be followed and at least two adults must be present for the room checks.

<u>Additional Requirements for Lodging Authorized by Member Clubs</u>

1) Adult Participants traveling with the Member Club must agree to and sign the Member Club's lodging policy at least annually.
2) Adult Participants that travel overnight with Minor Athlete(s) are assumed to have Authority over Minor Athlete(s) and thus must comply with the USASF's Education & Training Policy.
3) Athletes are permitted to make and receive regular check-in telephone calls to and from parents/guardians. Member Club Personnel will allow any calls that do not interfere with team Functions, such as training sessions or meetings. Emergency calls will be permitted regardless of team schedule or Functions.

<u>Billeting</u>

USASF does not provide or promote a billeting program. If, however, any Member Club hosts a billeting program, in which an Athlete leaves home to participate in a program, the Member Club must have a policy designed to protect Athletes from misconduct and abuse that requires a signed acknowledgement by an Adult Athlete between 18 and 20 years old or a Minor Athlete's parent/guardian.

# MODEL POLICY 5: TRANSPORTATION

**Mandatory Components**

Transportation Policy
This policy applies to all instances where travel or transportation by someone other than the Minor Athlete(s) parent/guardian is involved—regardless of distance (including but not limited to carpooling to practice or transportation to competitions via car or airplane).

1) Parents/guardians of a Minor Athlete are responsible for making, coordinating, and/or consenting to all transportation arrangements.
2) Absent emergency situations, an Adult Participant shall not transport a Minor Athlete One-on-One during In-Program transportation, except if:
   a) A Dual Relationship exists;
   b) The Close-in-Age Exception applies;
   c) The Adult Participant and/or Member Club received prior written consent to transport the Minor Athlete One-on-One obtained at least annually from the Minor Athlete's parent/guardian; and/or
   d) The Adult Participant is accompanied by another Adult Participant and/or at least two Minors.
3) Minor Athlete(s) or their parent/guardian may withdraw consent at any time.

**Recommended Components (not reportable offenses)**

Shared Travel or Carpool Arrangement

Parents/guardians are encouraged to pick up their Minor Athlete first and drop off their Minor Athlete last in any shared travel or carpool arrangement.

Parent Training

Parents/guardians should receive the Safe-at-All Star education and training on Child Abuse prevention before providing consent for their Minor Athlete to travel One-on-One with an Adult Participant.

# PART III: RECOMMENDED POLICIES

Out-of-Program Contact

Adult Participants who neither meet the Close-in-Age Exception nor have a Dual Relationship with a Minor Athlete should not have Out-of-Program Contact with Minor Athlete(s) without parent/guardian consent, even if the Out-of-Program contact is not One-on-One.

Gifting

Adult Participants who neither meet the Close-in-Age Exception nor have a Dual Relationship with a Minor Athlete should not give personal gifts to Minor Athlete(s). Equally distributed gifts to all Athletes that serve a motivational or education purpose are permitted.

Photography/Video

1) Photographs or videos of Athletes may only be taken in public view and must observe generally accepted standards of decency.
2) Adult Participants should not publicly share or post photos or videos of Minor Athlete(s) if the Adult Participant has not obtained the consent of the Minor Athlete(s) parent/guardian and the Minor Athlete(s).

Addressing Bullying Policy

Bullying is repeated and severe behavior(s) that are (a) aggressive, (b) directed at a Minor, and (c) intended or likely to hurt, control, or diminish the Minor emotionally, physically, or sexually. Bullying-like behaviors directed at adults are addressed under other forms of misconduct, such as hazing or harassment.

The USASF provides a recommended Addressing Bullying Policy and action plan for Club Owners to implement within their Member Clubs. It can be found online at USASF's website under Member resources and Club Owners are encouraged to review the policy and action plan with everyone in their Member Club, including Athletes, parents/guardians, Coaches, and Adult Participants.

# COMPLIANCE POLICIES

## ARTICLE 1: MEMBERSHIP AGREEMENTS

All Members of the USASF must comply with the provisions set out in their Membership Agreement. In addition to complying with the provisions of the Membership Agreement, Members must comply with the following criteria.

Section 1.1: <u>Club Membership</u>

a. All Club Owners take on the responsibility of any and all requirements for the Member Club (e.g., roster creation and verification, compliance coversheet, etc.).
b. All Club Owners must have an active and eligible Coach Membership for the current Membership term.
c. The Member Club must maintain and provide proof of commercial general liability insurance that includes, at a minimum, participant legal liability and participant excess accident medical insurance.
   1. Such insurance may be through a single policy or individual policies.
   2. All locations associated with the Member Club must be listed and covered.
   3. The certificate of insurance must list the legal entity name as it appears on all legal documents and/or state or federal filings. The legal entity name on the certificate of insurance must match how the Member Club has entered its legal entity name in the USASF Club Member Profile.
   4. The Club Owner must upload the Member Club's insurance declaration page to its USASF Club Member Profile. When the Member Club's insurance coverage expires or is renewed, the Club Owner must update the USASF Club Member Profile accordingly.
   5. USASF recommends the Club Owner confirm the aforementioned information with the Member Club's insurance company to ensure the insurance coverage is valid and current.
d. The Member Club must maintain and keep current all appropriate state and local business licensing and/or filing requirements.
e. Club Owners must disclose those Adult Participants in their facility that are not Members of the USASF to the parent(s)/legal guardian(s) of Athletes.

Section 1.2: <u>Individual Memberships</u>

a. All Coach, Personnel, Adult Athlete, and Minor Athlete Members must upload a recent headshot photograph to their Member Profile. Such photograph must be updated annually.
b. All Athletes must upload a document providing a proof-of-age to their USASF Member Profile, including but not limited to a birth certificate, driver's license, etc.
c. Adult Athletes must complete a background screening and Minor abuse prevention training.

Section 1.3: <u>Member Club Owners</u>

   a. Club Owners must verify their Athletes' dates of birth with government issued documentation and report any discrepancies to the USASF.
   b. Prior to the required background screening, Club Owners must verify their Coaches' information in their Membership profile is accurate with some form of government issued identification.
   c. Club Owners may allow an individual under the age of 18 years old to coach if (1) the individual is either a Junior Personnel or Athlete Member and (2) the individual is always under the direct supervision of an Adult Coach.

Section 1.4: <u>Event Producer Members</u>

   a. Event Producers must ensure that every team competing at its USASF sanctioned Event has a roster associated to that Event.
   b. During their USASF sanctioned Event, the Event Producer must, to the best of their ability, investigate, address, and resolve any reports of non-compliance.
      1. Omission, whether intentional or accidental, of an Athlete on the roster constitutes non-compliance and the Event Producer must disqualify the noncompliant team at the USASF sanctioned Event for which the roster was associated.
      2. Within 72 hours after the conclusion of the Event Producer's Event, the Event Producer must report to the USASF any compliance infractions or violations that resulted in a warning and/or disqualification.
         i. If the Event Producer disqualifies any Member, the Event Producer must follow the Disqualification Guidelines.
      3. It is the obligation of the Event Producer to notify the USASF if the actions that resulted in disqualification are so objectively egregious that further disciplinary review is necessary.
   c. Within 72 hours after the conclusion of the Event Producer's Event, the Event Producer must complete close out reports and World bid assignments, if applicable.
   d. Event Producers must ensure their USASF sanctioned Event stays a **NO RECRUITING ZONE**.

Section 1.5: <u>All Members</u>

   a. All Members, regardless of Membership category:
      1. Are responsible for updating and maintaining their Member profile with current, accurate information.
      2. Must comply with all USASF policies, guidelines, and rules, including but not limited to the USASF:
         i. Age Grid (for Cheer and/or Dance);
         ii. General rules (for Cheer and/or Dance);
         iii. Club Definition;
         iv. Membership Agreement (applicable to the specific Member's category and which the Member executed as part of the USASF Membership application process);
         v. Sanctioning Guidelines; and/or

        vi.  Athletic Performance Standards.
    3.  Must promptly report violations of any of the policies, guidelines, and rules to the USASF.
  b.  A copy of the policies, guidelines, and rules may be found in the attached appendices.
  c.  Misrepresentation of or related to the following is strictly prohibited:
    1.  Membership;
    2.  Credentialing;
    3.  USASF Membership profiles; and/or
    4.  Policies or action of the USASF and/or its authorized representatives.

## ARTICLE II: SANCTIONED EVENTS

Section 2.1: <u>Rosters</u>

  a.  Prior to the Event lock date, the Member Club must associate the Official USASF roster(s), through its USASF Member profile, for all the Member Club's teams attending a USASF sanctioned Event.
    1.  By associating the roster as indicated above, the Member Club and Club Owner implicitly agree to and is responsible for the terms of the Compliance Cover Sheet.
  b.  The Member Club must ensure that the information on each roster is accurate.
    1.  Club Owners and Coaches are responsible for the accuracy of their roster for a USASF sanctioned Event—regardless of who they may delegate to create and associate such rosters.
  c.  All Members associated with a team attending a USASF sanctioned Event must be listed on the roster.
    1.  Only those persons listed on the roster are permitted in the warm-up room with the team.
    2.  Omission, whether intentional or accidental, of an Athlete on the roster constitutes non-compliance and will result in disqualification at the USASF sanctioned Event for which the roster was associated.
  d.  The Member Club must monitor and enforce the USASF sanctioned Event warm-up room requirements within their Club for all Club Owners, Coaches, Personnel, and Athletes.
  e.  Adult Participants must bring a form of government-issued identification to prove the information on the identification matches the information on the associated roster.
  f.  The Member Club must notify the Event Producer for the USASF sanctioned Event of any roster changes made (1) after the Event locks or (2) after the team checked in and before the team takes the floor.
    1.  The Event Producer must make such changes to locked rosters to which they were notified.
    2.  If an Athlete not listed on the roster associated with the USASF sanctioned Event takes the floor, the team is considered noncompliant, which will result in disqualification at such Event.

Section 2.2: Soliciting and/or Recruiting

    a. All USASF sanctioned Events are **NO RECRUITING** zones.
        1. Members may not participate in or allow soliciting/recruiting of Athletes to other Member Clubs while attending a USASF sanctioned Event.
    b. For the purposes of this Section, soliciting and/or recruiting includes, but is not limited to:
        1. Any display of general brand-promotional items with the intent to solicit and/or recruit the Athlete to join a different Member Club;
            i. For example: T-shirts, banners, pop-up displays, or tents that provide Member Club contact information (i.e., phone number, website, social media information);
        2. Distributing any type of advertising, such as business cards, brochures, T-shirts, banners, or flyers;
        3. Advertising another specific Event that would attract Athletes from Member Clubs (e.g., printed or digital material that includes the phone number, website, social media information, Event date, and/or location of other Event);
        4. Communicating (including text and/or social media messaging) with an Athlete and/or their parent/guardian, while at a USASF sanctioned Event, with the intent to solicit and/or recruit them to a different Member Club.

Section 2.3: Worlds Release

Any Athlete who has taken the floor with a Member Club ("Primary Club") at a USASF sanctioned Event during The Cheerleading Worlds™ or The Dance Worlds ™ (collectively, "Worlds™") competitive season (the "Worlds™ Season") will need a USASF Worlds Club Release Waiver ("Waiver") to compete with a different Member Club ("Secondary Club") at Worlds™.

    a. The Worlds™ Season begins November 1st and ends on May 1st.
    b. This requirement applies to all Athletes regardless of level, category, or tier.
    c. This requirement does not apply if an Athlete moves from dance to cheer or vice versa.
    d. The Primary and Secondary Club Owners must sign the Waiver.
    e. The completed and signed Waiver must be submitted via uploading the Waiver as part of the roster verification form submission process prior to the roster verification process.
    f. The original Waiver must be available at Worlds™ upon request.

Section 2.4: Drugs and/or Alcohol at Sanctioned Events

    a. Any Member perceived to be under the influence of alcohol or illegal drugs at a USASF Sanctioned Event may be immediately removed from the Event. If any Member is removed under this provision, the Event Producer Member must report such removal to USASF's Conduct and Compliance Director with 72 hours of the removal.

# APPENDICES

**REPORTING, RESPONSE, AND RESOLUTION PROCEDURES FOR
CONDUCT REGULATIONS & ABUSE PREVENTION POLICIES**

The USASF is a membership organization who sets standards and expectations for its Members as outlined in this Code of Conduct and Compliance (the "Code"). These Reporting, Response, and Resolution Procedures (the "Procedures") apply to any alleged violation of the Code's Conduct Regulations or Abuse Prevention Policies (collectively, referred to as the "Conduct Regulations") reported to USASF. These Procedures do not prevent any Member Club from implementing higher safety standards or from making lawful employment-related decisions, even prior to the conclusion of any process outlined in these Procedures. These Procedures replace all previously published procedures and apply to all matters arising out of reports made on or after the effective date of these Procedures, regardless of when the incident of Prohibited Conduct occurred.

These Procedures do not apply to violations of the USASF Compliance Policies or USASF background screenings, unless the allegation is directly related to and includes a violation of Conduct Regulations.

## ARTICLE I – REPORTING CONDUCT REGULATIONS VIOLATIONS

Section 1.1: Legal Obligations and General Requirements

1. USASF will follow state and federal law when presented with any report of Child Abuse or criminal activity, including immediate referral to law enforcement. Nevertheless, a report filed with USASF does not release the Reporter from any other legal obligation to report. Reports must also be made to relevant state and federal agencies as required by law. Adult Participants and Member Organizations must know their reporting requirements under the Conduct Regulations and state and federal law. Lack of knowledge about a reporting obligation is not a defense.
2. Nothing in this document shall be construed to require a victim of Child Abuse or other misconduct to self-report.
3. Adult Participants are required to immediately report allegations or suspicions of Child Abuse or other Conduct Regulations violations involving a Minor to USASF and/or another appropriate official. Reporting may not be delayed to gather information, evaluate the credibility, or assess the validity of any allegation.
4. The reporting requirements under this Article are an individual obligation of each Adult Participant. Reporting to a supervisor or peer does not relieve an Adult Participant of the obligations to report as specified under this Article.
5. Adult Participants must report even if they believe someone else has already reported.

Section 1.2: Reporting Requirements

1. Child Abuse and Sexual Misconduct: An Adult Participant who learns of information and reasonably suspects that a Member has committed or attempted to commit (i) Child Abuse, including sexual abuse, or (ii) Sexual Misconduct, shall immediately make a report of the

suspected abuse to both law enforcement and the USASF, and comply with any other applicable state or federal laws.

    a. How to report to law enforcement:
        i. Report to the agency designated by the Attorney General, consistent with federal requirements set forth in section 226 of the Victims of Child Abuse Act of 1990 (34 U.S.C. §20341), or any applicable predecessors or amendments thereto.
        ii. Report to applicable state or local law enforcement agencies including but not limited to, police departments, sheriff's departments, child protective services, etc.
            1. Learn more about this requirement by visiting: https://www.childwelfare.gov/topics/responding/reporting/how/.

    b. How to report to USASF[1]:
        i. A report may be made through USASF's online reporting form at: https://www.usasf.net/reporting; or
        ii. A report may be made by phone between the hours of 8:00 a.m. and 8:00 p.m. Eastern Time at 720-282-1744.

    c. Any other form or reporting (*i.e.,* in-person verbal, email, or social media) does not satisfy reporting requirements under this Article. As such, Reporters must use one of the aforementioned options to report to USASF.

    d. Reporting such conduct to the USASF, alone, does not satisfy an Adult Participant's obligation to report to law enforcement or any other appropriate authority, as defined by law.

    e. Child Abuse includes incidents that involved a victim who was a Minor at the time of the alleged incident, even if the victim is now an adult.

    f. The reporting requirement for Sexual Misconduct applies regardless of whether the suspected victim is an adult or Minor.

2. <u>Emotional and Physical Misconduct</u>: All Members, with the exception of Minor Athletes, are required to report any emotional or physical misconduct (including Bullying, stalking, hazing, and Harassment) prohibited under the Conduct Regulations committed or attempted by a Member to the Member Organization and/or other organization, entity, and/or program with which such Member is associated.

    a. If a report is submitted to the applicable organization, as described above, a report must also be submitted to USASF via USASF's online reporting form (https://www.usasf.net/reporting).

3. <u>Criminal Charge and Disposition</u>: All Members, except for Minor Athletes, are required to report to the USASF any Criminal Charge(s) and/or Disposition(s) including but not limited to:

    a. Any felony;

    b. All sexual crimes, criminal offenses of a sexual nature to include but not limited to: rape, child molestation, sexual battery, lewd conduct, possession and/or distribution of child pornography, possession and/or distribution of obscene

---

[1] For Reports that do not fall under the jurisdiction of USASF (e.g., workplace or employee harassment; situations in which a power imbalance is not present; etc.), in the sole discretion of the USASF, USASF reserves the right to refer such Reports to the respective Member Club for response and resolution.

material, prostitution, indecent exposure, public indecency, and/or any sex offender registrant;

    c. Harm to a minor, including, but not limited to, offenses such as child abandonment, child endangerment/neglect/abuse, contributing to the delinquency of a minor, and DUI with a minor;

    d. Violence against a person, force, or threat of force (including crimes involving deadly weapons and domestic violence);

    e. Stalking, harassment, blackmail, violation of a protection order, and/or threats;

    f. Destruction of property, including arson, vandalism, and criminal mischief;

    g. Animal abuse, cruelty, or neglect; and/or

    h. Criminal offenses including "Attempted Crimes" in the above classifications.

4. <u>Misconduct Related to the USASF's Processes</u>: All Members, except for Minor Athletes, are required to report to the USASF any suspected incident(s) of:

    a. Aiding and Abetting;

    b. Abuse of Process; and/or

    c. Retaliation.

## Section 1.3: Anonymous Reports and Confidentiality

1. <u>Anonymous Reports</u>: Reports may be made anonymously to USASF.

    a. Anonymity means the USASF will not know the personally identifying information of the Reporter.

    b. Anonymity does not mean that the underlying information in a report will be protected.

    c. An anonymous report may limit the USASF's ability to investigate and respond to a report because it may not be possible to confirm the reported information.

2. <u>Confidentiality</u>: To extent allowed by law and governing policy, at the request of the Reporter, the USASF will not disclose the identifying information of the Reporter to any party in the investigation and the report will be treated as a confidential submission.

## Section 1.4: Intake

1. USASF will review all reports to determine if allegations or circumstances:

    a. Mandate reporting to law enforcement or child protective services;

    b. Are governed by the Conduct Regulations; and/or

    c. Require imposition of Temporary Measures.

2. Matters involving more than one Claimant, or more than one Respondent, may in the discretion of USASF, be consolidated into a single matter.

3. USASF, in its discretion, may allow reports of isolated violations of the Conduct Regulations to be resolved informally by USASF or the Member Club. Any informal resolution by the Member Club must include notice to the parent(s)/guardian(s) of the affected Minor Athlete. Should a Member Club obtain additional information related to the previously-reported violation, physical, emotional or Child Abuse, and/or any Sexual Misconduct the Club shall promptly report that information to USASF

4. USASF, in its discretion, will utilize this Procedure for any report it determines to be inappropriate for informal resolution by the Member Club, for example, reports of multiple and/or severe USASF Conduct Regulations. Notice will be given to the parent(s)/guardian(s) of any affected Minor Athlete.

## **ARTICLE II – RESPONSE**

### Section 2.1: Initiating Response

When the USASF receives a report of allegations that fall within its Jurisdiction, it will begin the USASF Response and Resolution Process ("the Process") by notifying the relevant Member(s), conducting a preliminary inquiry, and if appropriate, undertaking an investigation to determine whether a Member violated the Conduct Regulations.

### Section 2.2: Participant Rights

1. A Claimant has the right to:
    a. Submit a Report anonymously;
    b. Receive notice of Temporary Measures imposed by USASF;
    c. Participate in the investigation and resolution without publicly disclosing their identity or experiences, except as required by the USASF Process; and
    d. Have their parent or guardian present for any interviews, if Claimant is a Minor.
    e. Receive notification of the resolution of the matter
2. A Witness has the right to:
    a. Choose whether to participate in the investigation and resolution; and
    b. Participate in the investigation and resolution without publicly disclosing their identity or experiences, except as required by the USASF Process.
3. A Respondent has the right to:
    a. Receive written Notice of Investigation and/or Allegations;
    b. Have an opportunity to be heard during the investigation; and
    c. Upon issuance of a decision to Ban or Suspend the Respondent, the Respondent has ten (10) business days to request an appeal before the USASF.

### Section 2.3: Temporary Measures
1. Temporary Measures are intended to:
    a. Ensure the safety and well-being of the All Star community;
    b. Prevent conduct or participation detrimental to the sport;
    c. Prevent escalation of a reported policy or Code violation; and
    d. Restrict or monitor the participation of a Respondent.
2. When imposing a Temporary Measure, USASF evaluates the appropriateness of a measure based on:
    a. The allegations, facts, and circumstances of the case provided;
    b. The need to maintain the safety or well-being of members or the community; and
    c. Whether the allegations against Respondent are sufficiently serious to warrant imposition of a Temporary Measure during further review of the allegations.

3. USASF may impose Temporary Measures at any time after a report of violations of USASF policies or Code is received by USASF.
   a. A Temporary Measure shall be effective immediately upon notice to Respondent, unless stated otherwise.
   b. Temporary Measures will remain in effect until expressly removed by USASF.
4. USASF will notify the Member Club of any Temporary Measure imposed on any Member associated with that Member Club.
   a. The Member Club is responsible for enforcing the Temporary Measure and notifying the Club's Adult Participants and/or parent(s)/guardian(s) of Minor Athletes, as necessary.
   b. The Member Club may impose any additional measures it deems necessary.
   c. USASF may notify Members of the Temporary Measure if it has reason to believe a Member Club has failed to enforce or provide notice of the Temporary Measure.
   d. USASF reserves the right to notify additional individuals on a need-to-know-basis, as determined by USASF, to ensure athlete safety.

Section 2.4: Substantive Standards and Procedural Rights

USASF may apply any substantive standards effective at the time of the alleged conduct, including applicable policies or laws. Nevertheless, in all cases, USASF will investigate and resolve matters using the procedures and processes described herein, regardless of when the alleged conduct occurred.

Section 2.5: Standard of Proof

1. USASF bears the burden of gathering sufficient evidence to reach a determination, based on the preponderance of the evidence, in USASF's sole discretion, that a Member violated the Conduct Regulations.
2. A "preponderance of the evidence" in this Section means "more likely than not."

Section 2.6: Statute of Limitations or Other Time Bars

There are no statute of limitations or other time bars of any kind on Conduct Regulations violations.

Section 2.7: Related Proceedings

1. Effect of Related Criminal or Civil Proceedings
   a. Because the standards for finding a violation of criminal law are different from the standards for finding a violation of the Conduct Regulations, the resolution of a criminal proceeding without a conviction is not determinative of (but may be relevant to) whether a violation of the Conduct Regulations has occurred.
      i. Conduct may violate the Conduct Regulations even if the Respondent is not charged, prosecuted, or convicted for the same underlying conduct.

    b.  Aside from the application of the Conduct Regulations as it relates to criminal charge(s) and disposition(s), the status or outcome of criminal or civil proceedings shall have no bearing on the USASF's Process.

2.  <u>No Waiver of Other Legal Remedies</u>
    a.  Participating in the Process does not extend or restrict a person's right to file charges or claims regarding the underlying allegations with any agency, law enforcement, or court.

## Section 2.8: Coordinating with Law Enforcement

USASF may contact any law enforcement agency to coordinate the investigations by USASF and that agency. At the request of law enforcement, USASF may delay its investigation temporarily while a law enforcement agency completes its investigation. USASF may resume its investigation when notified that law enforcement has completed its investigation. USASF may also provide some or all of its case information, documentation, or evidence to law enforcement.

## Section 2.9: Investigation

If USASF deems a report necessitates an investigation, USASF will conduct, at its discretion, such investigation in accordance with the following general investigative process:

1.  Respondent is provided a Notice of Investigation and/or Allegation.
2.  If applicable, following the notice to Respondent, a notice may be provided to the Member Club in which Respondent is employed, or was employed at the time of the alleged misconduct.
3.  A USASF investigator, or an investigator working on behalf of USASF, will contact the Claimant, Reporter, any identified witnesses, and Respondent to request and gather statements or interviews.
4.  If any party to the matter declines to participate in the investigation, USASF may, in its sole discretion, choose not to proceed or may respond to the report in limited or general ways.
5.  Any party or witness may consult with an advisor or attorney. A party or witness involved in the matter, or an employee of, board member of, or legal counsel for USASF cannot serve as an advisor during the Process. While the advisor may provide support and advice throughout the Process, they may not speak on behalf of the Claimant or Respondent, or otherwise participate in the Process except as provided herein. Only an attorney may speak on behalf of a Claimant or Respondent client.
    a.  If a Minor is involved, the Minor's parent(s)/guardian(s) may be present during and participate in any interview involving the Minor.
6.  All information gathered, including investigator's notes, are confidential and privileged work product of USASF. Disclosure of information necessary to facilitate USASF's Process is not a subject matter waiver of any privilege.
7.  Following the investigation, USASF will determine, in its sole discretion, the appropriate resolution of the matter.

Section 2.10: Impartiality

1. USASF's Process is intended to be independent from conflicts of interest, personal bias, or undue influence from any one person or role. Members of the USASF Board of Directors and employees of USASF, other than the Chief Legal Officer, Director of Membership, and the USASF Member Conduct & Compliance Department, generally, will not be involved in decisions regarding or relating to the Process or have access to the USASF Member Conduct & Compliance case management system, except as provided below:

    a. The USASF Executive Director or members of the USASF Board of Directors, may be apprised of otherwise confidential outcomes of USASF Member Conduct & Compliance matters for purposes of making business decisions and making necessary decisions on behalf of the USASF regarding process and strategy.

    b. The USASF Board of Directors and USASF Member Conduct & Compliance Department may receive anonymized or aggregated data to evaluate trends and allocate resources.

Section 2.11: Confidentiality

1. The Bylaws and the Conduct Regulations provide some protections for confidentiality during the Process. They do not, and cannot, guarantee absolute confidentiality.

2. Documents or evidence related to the Process must remain confidential, in that they may not be disclosed outside of the Process, except as may be required by law or authorized by USASF. Violation of this provision, including by an advisor or attorney for any person involved in the Process, constitutes Abuse of Process under the Conduct Regulations. Any advisor or attorney who violates this confidentiality provision may be permanently barred from further participation in any response and resolution process, regardless of whether they are a Member or Adult Participant.

3. USASF may disclose the outcome of the matter to those persons or organizations with a need to know, in USASF's sole discretion, so that the outcome can be properly effectuated or understood.

4. A Claimant may publicly discuss the incident, their participation in the Process, or the outcome of the Process. A Claimant may not discuss the participation of others in the Process.

5. A Respondent may publicly discuss the incident, their participation in the Process, or the outcome of the Process. However, a Respondent, or any advisor or attorney for a Respondent, may not disclose any Claimant's or Adult Participant's identifying information, including without limitation names and contact information.

6. If any person or entity misrepresents the Process, the underlying facts, or the outcome of a matter, USASF may publicly correct the record.

7. USASF may be required to disclose information contained in a Report or learned during an investigation. Reasons for disclosure include, but are not limited to, the following:

    a. Relevant state and/or federal law;

    b. Mandatory reporting related to Child Abuse and/or Sexual Misconduct; and

    c. USASF's right, as allowed by the Conduct Regulations, to publicly correct any misrepresentation related to the Process.

8. Each person involved in the Process is responsible for understanding what legal confidentiality requirements, if any, apply to their conduct.

USASF CODE APPENDIX –
REPORTING, RESPONSE, & RESOLUTION PROCEDURES                    7

## **ARTICLE III – RESOLUTION**

Section 3.1: Resolution Process

1. USASF may resolve a matter by:
   a. Dismissing matters not governed by the Conduct Regulations.
   b. Administratively closing matters governed by the Conduct Regulations for which there is insufficient information to determine that a violation occurred;
   c. Issuing an Official Warning;
   d. Imposing Sanctions, including, but not limited to:
      i. Educational requirements;
      ii. Parent surveys;
      iii. Club audit;
      iv. Self-assessment;
      v. Probation with reporting requirements, restrictions, or supervision;
      vi. No contact directive;
      vii. Suspension;
      viii. Revocation of Membership; and/or
      ix. Banishment.
2. The outcome of a matter does not restrict, limit, or impede any rights of the Claimant, Reporter, witnesses, or others harmed by the Conduct Regulations violation, misconduct or abuse.
3. USASF will give Notice of Outcome or Notice of Decision to Respondent(s) and Claimant(s) or Reporting Party, if applicable.
4. "Suspension" or "Revocation of Membership" prohibits, until further notice, participation in any capacity, in any program, Function, or Event sponsored by, organized by, or sanctioned by USASF or a Member Organization.
5. "Banishment" prohibits participation, in any capacity, in any program, Function, or Event sponsored by, organized by, or sanctioned by USASF or a Member Organization.
6. Any Suspended or Banned individual or entity will be placed on a publicly available list.
   a. USASF will not publish names of Minors involved in any misconduct.
7. Member Clubs must enforce or adhere to any Sanctions imposed by USASF.
8. USASF reserves the right to notify any individual or entity of Sanctions on a need-to-know-basis, at USASF's sole discretion, to ensure Athlete safety.

Section 3.2: Appeal Process

1. USASF will notify the Respondent of USASF's decision to suspend, revoke, or ban Respondent's membership within fifteen (15) days of such Sanction going into effect.
2. The Respondent may request an opportunity to be heard by submitting a written appeal of any suspension, revocation, or banishment imposed by USASF for violations of Conduct Regulations (the "Appeal") through the USASF Conduct & Compliance Department within ten (10) business Days of the date on the Notice of Decision.
3. An Appeal must include the following items:

      a. A written statement indicating the Respondent's reason for the appeal (*i.e.*, why should USASF reconsider implementing the Sanction imposed on Respondent?); and

      b. Any documentation not previously submitted by Respondent to USASF.

4. The Appeal may be submitted via the procedure outlined in the Notice of Decision sent to Respondent.

5. Within five (5) business Days of receipt of an Appeal, USASF will review the Appeal and determine whether to alter the previously prescribed Sanction. All Appeal determinations by USASF are final.

6. Failure to comply with the Appeal Process described herein will be deemed a waiver by Respondent.

# Exhibit "2"

**Amended & Restated Bylaws**

**&**

**Rules of Governance & Operation**

**USA Federation for Sport Cheering**

## ARTICLE 1—DEFINITIONS

The following definitions apply for purposes of these Bylaws:

1.1 "Actively Engaged Athlete Representative" means an Athlete who qualifies as a 10 Year or 10 Year+ Athlete, or who has been actively engaged in Amateur Athletic Competition in Cheer within the preceding twenty-four (24) months prior to election/selection, which may include events that categorize entrants in age-restricted classifications. At such time as USA Cheer is recognized by the USOPC as the NGB for Cheer, "Actively Engaged Athlete Representative" means the definition set forth in the USOPC Bylaws.

1.2 "Active Paralympic Athlete" means any individual who, at the time of election/selection has either: (i) demonstrated that, within the prior ten (10) years, he or she represented the United States in World Paralympic Competition in Cheer, or (ii) demonstrated that, within the preceding twenty-four (24) months, he or she was actively engaged in Amateur Athletic Competition in Cheer by demonstrating that he or she finished in the top half of the national championships or team selection competition for World Paralympic Competition in Cheer, participated as a member of USA Cheer's national team in World Paralympic Competition, or for purposes of satisfying the requirement set forth in Section 8.5.4 of the USOPC Bylaws only, within ten (10) years preceding election/selection, represented the United States in the World Paralympic Competition in Cheer.

1.3 "Amateur Athletic Competition" shall have the same meaning as "amateur athletic competition" as set forth in the USOPC Bylaws. At the time of entering into these Bylaws, "Amateur Athletic Competition" means a contest, game, meet, match, tournament, regatta, or other event in which Athletes compete.

1.4 "Amateur Sports Act" means the Ted Stevens Olympic and Amateur Sports Act adopted on November 8, 1978, amended on July 8, 1980 and October 21, 1998, codified at 36 U.S.C. § 220501 through § 220529 of the United States Code, as amended from time to time.

1.5 "Athlete," until such time as USA Cheer is recognized by the USOPC as the NGB for Cheer, means an Athlete who (i) is eligible under ICU rules to compete in International Amateur Athletic Competition sanctioned by ICU, or (ii) is eligible to participate in one or more of the disciplines of Cheer, including (without limitation) All-Star, Scholastic, STUNT, Adaptive, and Youth/Recreational. At such time as USA Cheer is recognized by the USOPC as the NGB for Cheer, "Athlete" shall mean the definition set forth for "amateur athlete" in the USOPC Bylaws.

1.6 "Athlete Representative" means any Athlete elected or appointed to meet the Athlete Representative Requirement.

1.7 "Athlete Representative Requirement" means those standards set forth in Section 10.1.

1.8 "Cheer" means sport cheering.

1.9 "Cheer Community" means all those individuals, groups, and organizations that have an association with or interest in Cheer.

1.10 "Code" means the Internal Revenue Code of 1986, as amended.

1.11 "Delegation Event" means, individually or collectively as applicable, the Olympic Games, the Olympic Winter Games, the Paralympic Games, the Paralympic Winter Games, the Pan American Games, and the Parapan American Games.

1.12 "Designated Committee" shall have the same meaning as "Designated Committee" as set forth in the USOPC Bylaws. At the time of entering into these Bylaws, "Designated Committee" means any committee that makes recommendations or decisions directly impacting elite Athletes, including at least the following (by name or by function): (i) allocation of USOPC- and/or NGB-provided resources (if any), (ii) audit, (iii) Budget/Finance, (iv) Compensation, (v) Ethics, (vi) Judicial and any hearing panel affecting any individual's participation in Protected Competition, (vii) Nominating and Governance (including Bylaws amendments), and (viii) selection of athletes, coaches, and/or staff for Protected Competition, including development, approval, and implementation of selection criteria.

1.13 "GAISF" means the Global Association of International Sports Federations (formerly known as SportAccord).

1.14 "ICU" means the International Cheer Union, a nonprofit corporation and the international federation for Cheer, as recognized by the IOC and GAISF.

1.15 "Independent Director" means an individual defined in Section 6.5.

1.16 "International Amateur Athletic Competition" shall have the same meaning as "international amateur athletic competition" as set forth in USOPC Bylaws. At the time of entering into these Bylaws, "International Amateur Athletic Competition" means Amateur Athletic Competition between any Athlete or Athletes representing the United States, either individually or as part of a team, and any Athlete or Athletes representing any foreign country.

1.17 "IOC" means the International Olympic Committee.

1.18 "IPC" means the International Paralympic Committee.

1.19 "National Governing Body" or "NGB" means a National Sports Organization that is recognized by the USOPC under Section 220521 of the Amateur Sports Act.

1.20 "National Sports Organization" means a nonprofit corporation, club, federation, union, association, or other group organized in the United States that sponsors or arranges any Amateur Athletic Competition, instruction, events, or other services associated with Cheer.

1.21   "NFHS" means the National Federation of State High School Associations.

1.22   "PASO" means the Pan American Sport Organization.

1.23   "Protected Competition" shall have the same meaning as "Protected Competition" as set forth in the USOPC Bylaws, except as provided below in this Section. At the time of entering into these Bylaws, "Protected Competition" means: (i) any Delegation Event, (ii) any international competition between Athlete(s) officially designated by the appropriate NGB as representing the United States, either individually or as part of a team, and any Athlete(s) representing any foreign country where the terms of such competition require that the entrants be individuals or teams representing their respective nations; and the athlete(s) representing the United States are organized and sponsored by the appropriate NGB in accordance with a defined selection or tryout procedure that is open to all and publicly announced in advance except for domestic amateur athletic competition, which, by its terms, requires that entrants be expressly restricted to members of a specific class of athletes such as those referred to in Section 220526(a) of the Amateur Sports Act (i.e., high school students, college students, members of the Armed Forces, or similar groups or categories); or (iii) any domestic competition or event (i.e., a camp, tryout, or trials event) organized and conducted by an NGB or PSO in its selection procedure and publicly announced in advance as a competition or event directly qualifying each successful competitor as an athlete representing the United States in a Delegation Event or protected international competition as defined in (ii) above.

Notwithstanding the langue above in this Section, until such time as Cheer is an Olympic Sport, "Protected Competition" shall also include the World Championships sanctioned by ICU.

1.24   "PSO" means a Para Sport Organization that is an amateur sports organization recognized and certified as an NGB in accordance with the USOPC Bylaws;

1.25   "STUNT" means the sport of STUNT developed by USA Cheer, which shall include any substantially similar sport (i.e., competitive sport cheer in California).

1.26   "TBOC" means the Texas Business Organizations Code, as amended.

1.27   "USA Cheer" means USA Federation for Sport Cheering.

1.28   "USADA" means the U.S. Anti-Doping Agency.

1.29   "USASF" means the United States All Star Federation.

1.30   "USOPC" means the United States Olympic & Paralympic Committee. USA Cheer shall make a reasonable effort to comply with all USOPC requirements referenced herein; until such time as USA Cheer is recognized by the USOPC as the NGB for Cheer, where compliance is determined to be impractical or not possible, USA Cheer shall comply as substantially as practical or possible, as determined in its sole discretion.

1.31    "USOPC Bylaws" means those Bylaws adopted by the USOPC, as amended from time to time. At the time of entering into these Bylaws, the USOPC Bylaws were most recently amended on March 11, 2021. USA Cheer shall make a reasonable effort to comply with all sections of the USOPC Bylaws referenced herein; until such time as USA Cheer is recognized by the USOPC as the NGB for Cheer, where compliance is determined to be impractical or not possible, USA Cheer shall comply as substantially as possible, as determined in its sole discretion.

1.32    "WADA" means the World Anti-Doping Agency.

1.33    "World Paralympic Competition" means the Paralympic or Parapan American Games or an IPC-recognized World Championship in events on the Paralympic Games program.

1.34    "10 Year Athlete" means an Athlete who has represented the United States in a Delegation Event (if any), World Championships, or another event designated by the USOPC and USA Cheer as an elite-level event for purposes of this definition, within the previous ten (10) years. For purposes of meeting the 10 Year Athlete Requirement, Athletes may not be drawn from events that categorize entrants in age-restricted classifications commonly known as "Juniors," Masters," "Seniors," "Veterans," or other similarly designated age-restricted competition; this restriction on age-restricted categories is not intended to exclude from eligibility Athletes who compete in an event for which the IOC or ICU has established an age restriction but whom otherwise meet the standard set forth in this Section.

1.35    "10 Year+ Athlete" means an Athlete who has represented the United States in a Delegation Event (if any), World Championships, or another event designated by the USOPC and USA Cheer as an elite-level event for purposes of this definition, but not within the previous ten (10) years.

## ARTICLE 2—OFFICES; GENERAL PURPOSES

2.1    <u>Name and Purpose</u>. The name of this corporation shall be "USA Federation for Sport Cheering" (hereinafter referred to as "USA Cheer"). USA Cheer is formed exclusively as an exempt organization within the meaning of Section 501(c)(3) of the Code to (i) act as the National Governing Body for Cheer in the United States (or, if no National Governing Body for Cheer is recognized in the United States, act in a manner which accomplishes a similar goal), (ii) be recognized as such by the USOPC, and (iii) act as the United States member in the ICU. At such time as it becomes eligible therefor and except as otherwise provided herein, USA Cheer shall (i) comply with the applicable requirements for recognition as a National Governing Body and (ii) perform all other applicable obligations and duties as set forth in the Amateur Sports Act and as mandated by the USOPC (if and as applicable), as such requirements, obligations, and duties are promulgated or revised from time to time. Specifically, as the Governing Body for Cheer, USA Cheer has the following primary purposes:

a.      Foster Amateur Athletic Competition in Cheer and International Amateur Athletic Competition in Cheer;

b.      Develop and grow interest and participation in Cheer throughout the United States;

c.      Achieve sustained competitive excellence by the United States in Cheer in Olympic, Paralympic, Pan American, and Parapan American competition, as well as other Amateur Athletic Competition and International Amateur Athletic Competition, as applicable;

d.      Encourage and support safety in Cheer, including (i) providing and coordinating technical information on physical training, equipment design, coaching, and performance analysis in Cheer; and (ii) encouraging and supporting research, development, and dissemination of information in the areas of sports medicine and sports safety in Cheer;

e.      Sanction Amateur Athletic Competition in Cheer, in accordance with the provisions of these Bylaws, and coordinate Athlete participation in such competition; and

f.      Coordinate the representation of the United States in International Amateur Athletic Competition for Cheer.

Pursuant to such purposes, USA Cheer may engage in the following activities, without limitation:

a.      Be responsible to the persons and National Sports Organizations, including other Cheer organizations, which are active in Cheer.

b.      Minimize, through coordination with other National Sports Organizations and other Cheer organizations, conflicts in the scheduling of all practices and competitions in Cheer.

c.      Keep Athletes active in Cheer informed of policy matters and reasonably reflect the views of such Athletes in the policy decisions of USA Cheer.

d.      Disseminate and distribute to Athletes, coaches, trainers (including, without limitation, athletic trainers and non-medical personnel), managers, administrators, and officials in a timely manner the applicable rules and any changes to such rules of USA Cheer, the USOPC, the ICU, the IOC, the IPC, and PASO.

e.      Allow an Athlete to compete in any Amateur Athletic Competition conducted by any National Sports Organization or person, unless USA Cheer establishes that its denial is based on evidence that the organization or person conducting the competition does not meet the requirements stated in <u>Section 220525 of the Amateur Sports Act.</u>

f. Coordinate and provide for participation by Athletes in national Amateur Athletic Competition in Cheer, in accordance with the provisions of USA Cheer's Certificate of Formation, as amended, or these Bylaws.

g. Provide equitable support and encouragement for participation in Cheer.

h. Encourage and support athletic programs in Cheer for disabled individuals and the participation of individuals with disabilities in amateur athletic activity, including, where feasible, the expansion of opportunities for meaningful participation by individuals with disabilities in programs of Amateur Athletic Competition.

i. Be committed to equal opportunity and fair treatment providing for equal opportunity to all applicants for employment and to employees without regard to race, color, religion, national origin, age, disability, sex, sexual orientation, gender identity, gender expression, or marital status, and actively involve minorities and women, and similarly encourage its members (as defined in these Bylaws) towards such involvement, to occupy positions at all levels of USA Cheer including the Board of Directors, committees, and administrative staff.

j. Follow and support the programs that are endorsed by the IOC, the IPC, and the USOPC ( as applicable) pursuant to the rules and regulations of WADA, USADA, and all those similar rules that are consistent with the best interest of the Athletes involved with Cheer.

2.2 <u>Support of School Environment</u>. USA Cheer acknowledges and appreciates the unique role that Cheer has historically played as an educational, leadership, sportsmanship, and team-building activity in the high schools and institutions of higher education of the United States. While USA Cheer supports the competitive aspects and activities of Cheer, which function more as a sport, USA Cheer is also committed to maintaining and supporting the traditional role of Cheer (i.e., game day Cheer) in the school environment.

2.3 <u>Non-Interference with the Sport; Surplus Funds</u>. USA Cheer acknowledges and appreciates the unique manner in which Cheer has developed in the United States, with myriad organizations engaging in activities that further develop Cheer and enhance and increase the available opportunities to participate in Cheer on all levels. USA Cheer further recognizes that its role as a governing body should, to the extent possible, seek to enhance the existing Cheer Community, rather than create unnecessary restriction or bureaucracy. USA Cheer also acknowledges that its funds and assets should be used to such purpose, and that it should avoid in all possible events, the temptation to create additional administrative or bureaucratic positions that unnecessarily increase cost.

At the end of each fiscal year, USA Cheer shall determine the amount of revenue in excess of expenses for such fiscal year, taking into consideration the operating budget for the succeeding year, as approved by the Board of Directors (the "***Surplus***"). The Board of Directors may allocate all or any portion of such Surplus as an operating reserve. Unless two-thirds (2/3rds) of the Board of Directors determines otherwise due to extenuating

circumstances, the remaining Surplus shall be used for the following specific purposes: (i) encouraging and supporting the growth of Cheer in areas lacking resources (including, without limitation, equipment grants and college scholarships), and (ii) funding safety studies and initiatives and related projects.

2.4    Principal Office. The principal office of USA Cheer shall be located in the State of Texas, City of Dallas, County of Dallas. USA Cheer may have such other offices, either within or without the State of Texas, as the Board of Directors may determine or as the affairs of USA Cheer may require from time to time.

2.5    Registered Office and Registered Agent. USA Cheer shall have and continuously maintain in the State of Texas a registered office, and a registered agent whose office is identical with such registered office, as required by the TBOC. The registered office may be, but need not be, identical with the principal office of USA Cheer in the State of Texas, and the address of the registered office may be changed from time to time by the Board of Directors, the President, or the Executive Director.

## **ARTICLE 3—AUTHORITY**

The powers of USA Cheer shall not violate the restrictions imposed under Section 501(c)(3) or other relevant provisions of the Code, but shall otherwise include, without limitation, the following powers:

a.    Represent the United States in the ICU.

b.    Establish national goals and encourage the attainment of those goals in Cheer.

c.    Serve as the coordinating body for athletic activity of Cheer in the United States.

d.    Exercise jurisdiction over international athletic activities as relevant, including sanctioning International Amateur Athletic Competition in Cheer held in the United States, and sanctioning the sponsorship of International Amateur Athletic Competition in Cheer held outside the United States, in accordance with the provisions of these Bylaws.

e.    Conduct and/or sanction Amateur Athletic Competition in Cheer, including national championships and International Amateur Athletic Competition in the United States, and establish procedures for the determination of eligibility standards for participation in such competitions, except for restricted competition referred to in underline paragraph g of this Article 3.

f.    If and when appropriate, recommend to the USOPC or other governing bodies individuals and teams to represent the United States in the Olympic or Paralympic Games, or other such designated international events, in Cheer.

g.    Designate individuals and teams to represent the United States in International Amateur Athletic Competition in Cheer (including, without limitation, the World Championship conducted by ICU or any championship conducted by a continental

alliance) and certify, in accordance with the rules of ICU, the eligibility of such individuals and teams; provided, however that any National Sports Organization which conducts Amateur Athletic Competition, participation in which is restricted to a specific class of Athletes (such as high school students, college students, members of the USASF or similar groups or categories), shall have exclusive jurisdiction over such competition.

## ARTICLE 4—AUTONOMY

USA Cheer shall be autonomous in its governance of Cheer within the United States and as set forth in USA Cheer's Certificate of Formation, as amended, and these Bylaws, in that it independently shall determine and control all matters central to such governance, shall not delegate such determination and control, and shall be free from outside restraint. This provision shall not be construed as preventing USA Cheer from contracting with third parties for administrative assistance and support, or other such support deemed appropriate and necessary by the President, Executive Director, or Board of Directors.

## ARTICLE 5—MEMBERSHIP

Membership in USA Cheer shall be a privilege and not a right. Members shall not be considered voting or non-voting members as defined in the TBOC, and members shall not have voting rights of any kind.

5.1     Members. Membership shall be open to individual cheerleaders, coaches, trainers (including, without limitation, athletic trainers and non-medical personnel), managers, administrators, and officials. Membership benefits shall be determined by the Executive Director.

5.2     Dues and Assessments. The Executive Director, President, or Board of Directors may set annual dues (if any) for each membership category and may alter dues and assess members for additional amounts, as appropriate. Dues notices (if any) shall be distributed according to a schedule determined by the Executive Director, compliance with which shall determine whether a member is in good standing. Except as otherwise determined by the Executive Director, only members in good standing are entitled to the rights, services, and benefits of membership in USA Cheer.

5.3     Meetings of the Members. Meetings of the members of USA Cheer may be called by the President. At any meeting of the members, the members shall receive a report from the President or Executive Director concerning activities of USA Cheer , as well as advisement on any other relevant matters of USA Cheer at the discretion of the Executive Director, President, or Board of Directors.

5.4     Removal or Suspension of Member. USA Cheer may suspend or remove a member for cause.

## ARTICLE 6—BOARD OF DIRECTORS

6.1   <u>General Powers</u>. The affairs of USA Cheer shall be governed and conducted by the Board of Directors. Directors need not be residents of Texas but shall be residents of the United States. Actions taken by the Board of Directors shall constitute the acts of USA Cheer and have full binding effect.

6.2   <u>Number, Election, Tenure, and Qualification</u>.

    6.2.1   The Board of Directors shall consist of fifteen (15) persons. The Board of Directors may not increase or decrease the number of directors without amending these Bylaws, and in no event shall the number of directors ever be less than three (3).

    6.2.2   <u>Election</u>. Directors shall be appointed or elected, as the case may be, to meet the following categories, subject to the additional limitations set forth in this <u>Section 6.2.2</u>, as applicable.

| | |
|---|---|
| * 10 Year Athletes | 5 directors |
| * All Star | 1 director |
| * Scholastic | 1 director |
| * STUNT | 1 director |
| * Adaptive | 1 director |
| * Youth/Recreational | 1 director |
| * NFHS | 1 director |
| * At Large | 4 directors |

    Each director shall serve for a term of four (4) years and shall have no limitation as to the number of additional terms served. The terms of the directors shall be staggered such that approximately one-half (1/2) of the directors' terms expire every two (2) years. A director shall hold office until his or her successor shall have been elected or appointed, as the case may be, and qualified, or until his or her earlier death, resignation, or removal.

    6.2.2.1   <u>10 Year Athletes</u>. The 10 Year Athletes, as identified pursuant to <u>Section 10.1.1.2</u>, shall elect five (5) directors in the manner prescribed under <u>Section 10.1.1</u>, at least three (3) of whom must be 10 Year Athletes and the remainder of whom must be either 10 Year Athletes or 10 Year+ Athletes; <u>provided, however</u>, that preference should be given so that a representative number of directors are elected from the current or former national teams; <u>further provided</u> that, wherever possible, preference should be given so that all disciplines of Cheer are represented by the directors elected under this <u>Section 6.2.2.1</u>.

    6.2.2.2   <u>All Star Cheer</u>. One (1) director shall be appointed by USASF and confirmed by the Board of Directors of USA Cheer.

6.2.2.3      <u>Scholastic Cheer</u>. The coach and college coach membership of USA Cheer shall be invited to present candidates representing Scholastic Cheer to the Nominating and Governance Committee, which shall recommend an individual for election to the Board of Directors.

6.2.2.4      <u>STUNT</u>. The STUNT Coaches' Association shall be invited to present candidates representing STUNT to the Nominating and Governance Committee, which shall recommend an individual for election to the Board of Directors.

6.2.2.5      <u>Adaptive Cheer</u>. The director representing Adaptive Cheer shall be elected by the Board of Directors from among individuals recommended by the Nominating and Governance Committee.

6.2.2.6      <u>Youth and Recreational Cheer</u>. The director representing Youth and Recreational Cheer shall be elected by the Board of Directors from among individuals recommended by the Nominating and Governance Committee.

6.2.2.7      <u>NFHS</u>. One (1) director shall be appointed by NFHS and confirmed by the Board of Directors of USA Cheer; <u>provided, however</u>, that the director appointed under this <u>Section 6.2.2.7</u> shall be an Independent Director as defined under <u>Section 6.5</u>.

6.2.2.8      <u>At Large</u>. Four (4) At Large Directors shall be elected by the Board of Directors from among individuals recommended by the Nominating and Governance Committee; <u>provided, however</u>, that each director elected under this <u>Section 6.2.2.8</u> shall be an Independent Director as defined under <u>Section 6.5</u>. <u>Further provided</u>, that to the extent expertise in one or more of the following areas is not otherwise represented on the Board of Directors, preference shall be given to candidates with such expertise: law, medicine, and finance.

6.2.3    <u>Athlete Representative Requirement</u>. The composition of the Board of Directors shall at all times meet the Athlete Representative Requirement as set forth in <u>Article 10</u>. There shall be no limitation on the number of terms any Athlete Representative may serve as a director, provided he or she meets the Athlete Representative definition at the time of such subsequent election and the other elements of the Athlete Representative Requirement are met.

6.2.4    <u>Vacancies</u>. If a vacancy occurs on the Board of Directors, it shall be filled by the same manner in which that director was elected or appointed, as the case may be, prior to the occurrence of such vacancy, and the person elected or appointed to fill

the vacancy shall serve for the remaining unexpired portion of the term in question or until his or her earlier death, resignation, or removal.

6.2.5    <u>Removal</u>. A director may be removed in either of the following manners: (i) by a two-thirds (2/3) vote of the other directors, or (ii) at the direction of the organization that appointed the director (as applicable, and as set forth in <u>Section 6.2.2</u>); <u>provided however</u>, that if any such organization (i) directs the removal of more than one (1) director in a six-month (6-month) period or (ii) directs the removal of a director in the six-month (6-month) period preceding the Summer Olympic Games in which Cheer is on the Olympic program, such removal shall only be effective upon approval by a majority of the other directors. Any vacancy due to removal shall be filled pursuant to <u>Section 6.2.4</u>.

6.2.6    <u>Ex-Officio and Non-Voting Advisory Directors</u>. The Board of Directors may designate any number of persons as ex-officio (non-voting) directors or non-voting advisory directors, and each such category or classification shall have such rights and privileges (other than voting rights) as the Board of Directors may determine.

6.2.7    <u>No Discrimination</u>. Members of the Board of Directors shall be selected without regard to race, color, religion, national origin, age, disability, sex, sexual orientation, gender identity, gender expression, or marital status.

6.3    <u>Meetings</u>.

6.3.1    <u>Annual and Regular Meetings</u>. The Board of Directors shall have at least two (2) meetings annually, and one (1) such meeting shall be designated as its annual meeting. The President or Executive Director shall provide at least seven (7) days written notice of any regular meeting of the Board of Directors. The Board of Directors shall approve a budget for each fiscal year at such time or times as it is recommended by the Executive Director.

6.3.2    <u>Special Meetings</u>. Special meetings of the Board of Directors may be called by the President, individually, or by either the President or the Secretary at the request of at least eight (8) directors. No special meeting of the Board of Directors may be called with less than ten (10) days written notice.

6.3.3    <u>Manner of Acting</u>. Except as otherwise provided in these Bylaws, in the exercise of any of the powers herein given to the directors, a majority of directors present at a meeting at which a quorum is present shall have authority to make determinations and to act, and all actions of the directors shall be taken either by resolution at a meeting or by written record without a meeting.

6.3.4    <u>Proxies</u>. A director may vote by proxy executed in writing by the director. A proxy expires three (3) months after the date of its execution. A proxy is revocable unless otherwise provided by the proxy or made irrevocable by law.

6.3.5 <u>Quorum</u>. A majority of the Board of Directors shall constitute a quorum for the transaction of business at any regular or special meeting of the Board; but if less than a majority of the directors are present at said meeting, a majority of the directors present may adjourn the meeting from time to time without further notice. <u>Further provided</u>, a director present by proxy shall not be counted towards a quorum.

6.3.6 <u>Public Meetings, Executive Session</u>. There may be a portion of each Board of Directors meeting that shall be open to the public. Prior to such meeting, the contents of that portion of the meeting shall be presented by the President or Executive Director to the Board of Directors for their approval. No one other than members of the Board of Directors shall be in attendance when the Board of Directors meets in executive session. For this purpose, "executive session" means meetings of the Board of Directors which the Board of Directors determines, in its discretion, shall relate to confidential or otherwise sensitive issues. Examples of confidential or otherwise sensitive issues include, without limitation, the discussion of salaries, employment issues, and legal matters.

6.4 <u>Compensation</u>. Directors shall serve without compensation, and no director shall receive any pecuniary benefit from USA Cheer in his or her capacity as a director except reimbursement for actual expenses incurred in connection with the business of USA Cheer, to the extent such expenses are determined to be reasonable.

6.5 <u>Independent Directors</u>. The Board of Directors, upon recommendation by the Nominating and Governance Committee, shall affirmatively make a determination as to the independence of each Independent Director. An Independent Director shall have no material relationship with USA Cheer, either directly, or through any organization that has a material relationship with USA Cheer. A relationship is material if, in the judgment of Board of Directors, it would interfere with the director's independent judgment. In determining whether a director is independent, the guidelines set forth below shall apply on a case-by-case basis. A director shall not be considered independent if, at any time during the term as a director or at any time during the two (2) years preceding commencement of such term, (i) the director or a Family Member (defined below) of the director was employed by or held any governance position (whether a paid or volunteer position) with USA Cheer; (ii) the director was affiliated with or employed by USA Cheer's outside auditor or outside counsel; (iii) a Family Member of the director was affiliated with or employed by USA Cheer's outside auditor or outside counsel as a partner, principal, or manager; (iv) the director received compensation from USA Cheer, whether directly or indirectly (other than as reimbursement for expenses incurred related to the performance of the duties of a USA Cheer director or officer); (v) the director or a Family Member of the director is an executive officer, controlling shareholder, or partner of a corporation, partnership, or other business entity that has a material business relationship with USA Cheer; (vi) the director or a Family Member of the director had any relationship or affiliation or engaged in any activity, employment, or other role that, in the judgment of the Board of Directors, could interfere with the director's independent judgment. For purposes of this <u>Section 6.5</u>, a "Family Member" of a director shall include the following,

whether by whole or half blood or adoption: a director's spouse, descendants, and the spouses of descendants.

Notwithstanding anything to the contrary contained herein, active involvement by an individual or an individual's Family Member, including, without limitation, as a member of the Board of Directors or an officer of USA Cheer shall not, in and of itself, undermine an individual's independence for purposes of this Section 6.5.

The Nominating and Governance Committee shall review the independence of the Independent Directors at least annually.

## ARTICLE 7—OFFICERS

7.1     The officers of USA Cheer shall be a President, two (2) Vice Presidents, a Secretary, a Treasurer, and such other officers as shall be elected by the Board of Directors. The President shall concurrently be a member of the Board of Directors. The Board may elect one (1) or more Assistant Treasurers and one (1) or more Assistant Secretaries, as it shall deem desirable, such officers to have the authority and perform the duties prescribed, from time to time, by the Board of Directors.

No person who is an officer of another National Governing Body (recognized as such by the USOPC) shall be eligible to be elected as an officer of USA Cheer. No one (1) individual on the Board of Directors may serve in more than one (1) capacity as an officer, except that the offices of Secretary and Treasurer may be held by the same person.

7.2     Officers shall have specific responsibilities, obligations, and duties associated with their positions. Their titles, duties, obligations, and other responsibilities, shall include, without limitation, the following:

     7.2.1    President. The President shall preside at all meetings of the Board of Directors and shall be the principal executive officer of USA Cheer. The President shall have the responsibility to supervise and manage the organization's business and conduct such business as deemed necessary and appropriate by the Board of Directors. As set forth in Sections 14.2 and 14.3, the President may sign, with other proper officers of USA Cheer as authorized by the Board of Directors, any deeds, mortgages, bonds, contracts, or other instruments which the Board of Directors has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws or by statute to some other officer or agent of USA Cheer; and in general he or she shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Directors from time to time.

     7.2.2    Vice President. In the absence of the President or in the event of his or her inability or refusal to act, the Vice Presidents, together, shall perform the duties of the President, and when so acting shall have all the powers of and be subject to all the restrictions upon the President. In the event the Vice Presidents, while acting in the

absence of the President, fail to come to a consensus on how to act, the Board of Directors shall determine the manner in which the Vice Presidents shall proceed. Any Vice President shall perform such other duties as from time to time may be assigned by the President or Board of Directors.

7.2.3    <u>Secretary</u>. The Secretary shall, with the assistance of other employees and agents of USA Cheer, (i) keep the minutes of the meetings of the Board of Directors, (ii) supervise the distribution of the minutes and any reports, (iii) give all notices in accordance with the provisions of these Bylaws or as required by law, (iv) be custodian of the corporate records, and (v) in general, perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned by the President or by the Board of Directors.

7.2.4    <u>Treasurer</u>. If required by the Board of Directors, the Treasurer (if any) shall give a bond for the faithful discharge of his or her duties in such sum and with such surety or sureties as the Board of Directors shall determine. The Treasurer shall, with the assistance of other employees and agents of USA Cheer, (i) have charge and custody of and be responsible for all funds and securities of USA Cheer, (ii) receive and give receipts for moneys due and payable to USA Cheer from any source whatsoever, and deposit all such moneys in the name of USA Cheer in such banks, trust companies, or other depositories as shall be selected, and (iii) in general perform all the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to him or her by the President or the Board of Directors. The Treasurer shall make a written report of the finances of USA Cheer at each regular meeting of the directors, and at such other time as the directors shall require or as requested by the Executive Director or President.

7.2.5    <u>Assistant Treasurers and Assistant Secretaries</u>. If required by the Board of Directors, any Assistant Treasurer shall give a bond for the faithful discharge of his or her duties in such sums and with such sureties as the Board of Directors shall determine. Any Assistant Treasurer or Assistant Secretary shall, in general, perform such duties as shall be assigned by the Treasurer or the Secretary or by the President or the Board of Directors.

7.3    <u>Election</u>. Election of officers shall be conducted by the Board of Directors from candidates recommended by the Nominating and Governance Committee. Each officer shall hold office for a term of four (4) years, or until his or her successor shall have been duly elected and qualified, or until his or her earlier death, resignation, or removal.

7.4    <u>Vacancies</u>. The Board of Directors shall fill any officer vacancies for any unexpired terms, subject to the limitations on eligibility contained in this <u>Article 7</u>.

7.5    <u>Removal</u>. Any officer may be removed by a two-thirds (2/3) vote of the Board of Directors whenever in its judgment the best interests of USA Cheer would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the officer so

removed. Any vacancy due to removal under this <u>Section 7.5</u> shall be filled pursuant to <u>Section 7.4</u>.

7.6  <u>Compensation</u>. Officers shall serve without compensation, although there shall be no prohibition against such an individual receiving compensation for services provided in another capacity. Officers may receive reimbursement for actual expenses incurred in connection with the business of USA Cheer, to the extent such expenses are determined to be reasonable by the Board of Directors.

7.7  <u>No Discrimination</u>. Officers shall be elected without regard to race, color, religion, national origin, age, disability, sex, sexual orientation, gender identity, gender expression, or marital status.

## ARTICLE 8—EXECUTIVE DIRECTOR

8.1  <u>Generally</u>. The Board of Directors shall have the right to employ an Executive Director as the principal administrator of the affairs of USA Cheer. The Executive Director shall be responsible to the Board of Directors for the performance of such managerial and administrative duties as shall be assigned by the President and Board of Directors and as set forth in these Bylaws.

8.2  <u>Duties</u>. The Executive Director shall, among his or her other duties, cause an annual proposed budget (with the assistance of the Treasurer, if any, and in conjunction with the Finance & Accounting Committee, if any) for USA Cheer to be prepared, and shall submit such budget to the Board of Directors. Once the budget has been approved by the Board of Directors, the budget may be revised upon action by the Board of Directors. If no Executive Director is employed, the Treasurer (if any) shall be responsible for preparing and submitting a budget (in conjunction with the Finance & Accounting Committee, if any).

8.3  <u>Additional Personnel</u>. Subject to the approval of the Board of Directors, the Executive Director shall employ such additional administrative personnel as are necessary to carry out the affairs of USA Cheer.

## ARTICLE 9—COMMITTEES

9.1  <u>Committees of Directors</u>. In addition to those committees described in these Bylaws, a majority of the Board of Directors then acting may, by affirmative vote, designate and appoint one (1) or more committees, the majority of the members of which shall be directors, which committees, to the extent provided by the Board, shall have and exercise the authority of the Board of Directors in the management of USA Cheer. However, no such committee shall have the authority of the Board of Directors in reference to altering, amending, repealing, replacing, or restating the Bylaws; electing, appointing, or removing any member of any such committee or any director or officer of USA Cheer; altering, amending, repealing, replacing, or restating the Certificate of Formation; adopting a plan of merger or adopting a plan of consolidation with another corporation; authorizing the sale, lease, exchange, or mortgage of all or substantially all of the property and assets of

USA Cheer; authorizing the voluntary winding up and termination of USA Cheer or revoking proceedings therefor; adopting a plan for the distribution of the assets of USA Cheer; or altering, amending, repealing, replacing, or restating any resolution of the Board of Directors which by its terms provides that it shall not be altered, amended, repealed, replaced, or restated by such committee. The designation and appointment of any such committee and the delegation thereto of authority shall not operate to relieve the Board of Directors, or any individual director, of any responsibility imposed on it or him or her by law. Committees shall at all times remain subject to the control and supervision of the Board of Directors.

The Executive Director shall determine whether any committee established under this Section 9.1 shall be treated as a Designated Committee, in which event such committee shall, at all times, follow the selection process for Athlete Representatives on Designated Committees set forth in Section 10.1.2.

9.2    Other Committees. In addition to those committees described in these Bylaws, other committees not having and exercising the authority of the Board of Directors in the management of USA Cheer may be designated by the Board of Directors. Except as otherwise provided by the Board of Directors, members of each such committee shall be appointed by the President of USA Cheer. Any members thereof may be removed by the person or persons authorized to appoint such member whenever in their judgment the best interests of USA Cheer shall be served by such removal.

9.3    Sport and Safety Committees. In addition to those committees described in this Article 9, USA Cheer shall have the following Sport and Safety Committees, with charters to be approved by the Executive Director and President: All Star Committee, College Committee, School Committee, STUNT Committee, Youth Committee, and Safety Council.

The Executive Director shall determine whether each committee described in this Section shall be treated as a Designated Committee, in which event such committee shall, at all times, follow the selection process for Athlete Representatives on Designated Committees set forth in Section 10.1.2.

9.4    Nominating and Governance Committee. The Nominating and Governance Committee shall assist the Board of Directors regarding governance matters, including the Bylaws, and in identifying and recommending candidates for the Board of Directors and other roles.

The Nominating and Governance Committee shall consist of three (3) to five (5) members, and its members shall be recommended by the President, approved by the Nominating and Governance Committee, and appointed by the Board of Directors; provided, however, that at all times the Nominating and Governance Committee shall follow the selection process for Athlete Representatives on Designated Committees set forth in Section 10.1.2.

The President shall designate a Chair of the Nominating and Governance Committee. Only the President or Board of Directors may remove members of the Nominating and

17

Governance Committee. Each member of the committee shall have one (1) vote and the Chair shall only vote in the case of a tie. The Nominating and Governance Committee shall meet at least quarterly and shall hold additional meetings as needed to fulfill its responsibilities.

The Nominating and Governance Committee shall solicit or independently gather recommendations of prospective candidates to fill positions, including for the Board of Directors and officers, as required under these Bylaws and at the direction of the Executive Director, President, or Board of Directors. The Nominating and Governance Committee shall review candidates and make recommendations for consideration and election or appointment, as applicable, and shall prepare information regarding the qualification and identification of candidates.

9.5     Ethics Committee. The Board of Directors may establish an Ethics Committee in its discretion. If established by the Board of Directors, the President, with approval of the Board of Directors, has the authority to appoint the members of the Ethics Committee; provided, however, that at all times the Ethics Committee shall follow the selection process for Athlete Representatives on Designated Committees set forth in Section 10.1.2.

The Ethics Committee shall have no less than five (5) members and at least one (1) member shall be a member of the Board of Directors. No more than two (2) members of the Board of Directors shall serve on the Ethics Committee. Ethics Committee selection should be made from individuals from various areas of the Cheer Community who are respected, trusted, and whose names are associated with the highest levels of integrity and moral worth.

The Ethics Committee shall make recommendations to the President or the Board of Directors should it determine any areas of controversy or questionable activity by a member, a group, a federation or an officer, employee, or any other individual or group related to, involved in, or transacting business with USA Cheer. Penalties and sanctions may include, without limitation, reprimands, suspensions, removals, and terminations of members, organizations, or other individuals or groups. Provided however, no procedure initiated by the Ethics Committee shall be in conflict with the Conflict of Interest Policy adopted by the Board of Directors, except to the extent specifically authorized by the Board of Directors.

The Ethics Committee may create and publish a "Code of Conduct," based upon similar policies, guidelines, and standards associated with international sport. This document shall be reviewed at regular intervals by the Ethics Committee.

9.6     Adaptive Committee. The Board of Directors may establish an Adaptive Committee in its discretion. If established, the Adaptive Committee shall study, evaluate, and represent the interests of the disabled populations that wish to have an involvement with Cheer. The Adaptive Committee shall make recommendations and present ideas to the Board of Directors for action to create ways that disabled individuals may participate in Cheer activities, including competition. The Adaptive Committee should also engage, as

18

appropriate, in communication with the USOPC's Disabled Sports Organization, as well as groups such as Special Olympics or Wheelchair Sports USA.

The Executive Director shall determine whether the Adaptive Committee shall be treated as a Designated Committee, in which event, the Adaptive Committee shall, at all times, follow the selection process for Athlete Representatives on Designated Committees set forth in Section 10.1.2.

9.7     Finance & Accounting Committee. The Board of Directors may establish a Finance & Accounting Committee in its discretion. If established, the Finance & Accounting Committee shall oversee the finance and accounting practices of USA Cheer. The Finance & Accounting Committee shall work with the Treasurer (if any), as well as the President and any administrative staff, to review and evaluate the financial status of USA Cheer. The committee shall also assist with and help produce an annual budget, as well as make suggestions and recommendations on managing the budget. The committee may recommend certain accounting practices and oversee the implementation of such recommendations.

At all times, the Finance & Accounting Committee shall follow the selection process for Athlete Representatives on Designated Committees set forth in Section 10.1.2.

9.8     Public Relations/Marketing Committee. The Board of Directors may establish a Public Relations/Marketing Committee in its discretion.

9.9     Athlete Representative Requirement. Each committee shall at all times meet the Athlete Representative Requirement and shall follow the applicable selection process for Athlete Representatives set forth in Section 10.1 for either a Designated Committee or a committee other than a Designated Committee, as applicable.

9.10    Composition; Governance; Rules; Chair. Except as otherwise provided in this Article 9, committees may have the composition, size, governance, and responsibilities as prescribed either in these Bylaws or in the discretion of the Board of Directors. Each committee may adopt rules for its own governance not inconsistent with these Bylaws or with rules adopted by the Board of Directors. The Board of Directors may modify such rules in its discretion.

Except as otherwise provided in this Article 9, the President shall appoint the Chair of each committee and the Executive Director, President, or Board of Directors may appoint or remove committee members.

9.11    Term of Office. Unless otherwise provided in these Bylaws, each member of a committee shall serve a two-year (2-year) term and shall remain in such position until his or her successor is appointed, unless (i) the committee shall be sooner terminated, (ii) such member shall be removed from such committee, or (iii) such member shall cease to qualify as a member thereof.

There shall be no limitation on the number of terms any committee member may serve; provided, however, that an Athlete Representative must meet the Athlete Representative definition at the time of such subsequent election or appointment and the other elements of the Athlete Representative Requirement must be met.

9.12   Vacancies. Vacancies in the membership of any committee may be filled by appointments made in the same manner as provided in the case of the original appointments.

9.13   Proxies. A committee member may vote by proxy executed in writing by the committee member. A proxy expires three (3) months after the date of its execution. A proxy is revocable unless otherwise provided by the proxy or made irrevocable by law.

9.14   Quorum; Manner of Acting. Unless otherwise provided by the Board of Directors when designating a committee, a majority of the whole committee shall constitute a quorum and the act of a majority of the members present at a meeting at which a quorum is present shall be the act of the committee.

## ARTICLE 10—ATHLETE REPRESENTATIVES; ATHLETES' ADVISORY COUNCIL; PARALYMPIC ATHLETES

10.1   Athlete Representative Requirement. Athletes shall represent at least thirty-three and one-third percent (33 1/3%) of the voting power and membership of the Board of Directors, other governing boards (if any), Designated Committees, and all other committees (if any) within the governance and administrative structure of USA Cheer.

   10.1.1   Athlete Representatives on Boards.

      10.1.1.1   Eligibility. The Athlete Representatives on any governing board (including the Board of Directors and any other governing boards) shall meet the following standards: (i) at least twenty percent (20%) of the total number of directors or other governing board members, as applicable, shall be 10 Year Athletes, (ii) the remaining Athlete Representatives on the governing board (equaling thirteen percent (13%) of the total number of directors or other governing board members, as applicable) shall be either 10 Year or 10 Year+ Athletes, and (iii) at least one-half (1/2) of the Athlete Representatives shall have obtained 10 Year or 10 Year+ Athlete Representative eligibility through competing at an event that, at the time of election/selection, is on a Delegation Event program (or, until such time as USA is recognized by the USOPC as the NGB for Cheer, a Protected Competition program).

      10.1.1.2   Selection. The Athlete Representatives on governing boards (including the Board of Directors and any other governing boards) shall be elected by the Athletes serving on the Athletes' Advisory Council who meet the requirements as 10 Year Athletes. At such

time as USA Cheer is recognized by the USOPC as the NGB for Cheer, the Athletes' Advisory Council and USA Cheer Nominating and Governance Committee shall develop a process to jointly identify and vet candidates to serve as the 10 Year and 10 Year+ Athletes and meet any additional USOPC requirements.

10.1.2 <u>Athlete Representatives on Designated Committees</u>.

10.1.2.1 <u>Eligibility</u>. The Athlete Representatives on Designated Committees shall meet the following standards, as applicable: (i) at least twenty percent (20%) of the total members of the Designated Committee shall be 10 Year Athletes, (ii) the remaining Athlete Representatives shall be either 10 Year or 10 Year+ Athletes, and (iii) in the case of any committee overseeing selection of Athletes, coaches, and/or staff for a Para sport Protected Competition, at least one-half of the Athlete Representatives (10 Year and 10 Year+) shall have obtained 10 Year or 10 Year+ Athlete Representative eligibility through competing in a Para sport event.

10.1.2.2 <u>Selection</u>. The Athlete Representatives on Designated Committees shall be elected by the Athletes' Advisory Council. At such time as USA Cheer is recognized by the USOPC as the NGB for Cheer, the Athletes' Advisory Council and USA Cheer Nominating and Governance Committee shall develop a process to jointly identify and vet candidates to serve as the 10 Year and 10 Year+ Athletes and meet any additional USOPC requirements.

10.1.3 <u>Athlete Representatives on Other Committees</u>.

10.1.3.1 <u>Eligibility</u>. The Athlete Representatives on committees other than Designated Committees shall be Actively Engaged Athlete Representatives.

10.1.3.2 <u>Selection</u>. The Athlete Representatives on committees other than Designated Committees shall be selected by the Athletes' Advisory Council. At such time as USA Cheer is recognized by the USOPC as the NGB for Cheer, the Athletes' Advisory Council and USA Cheer Nominating and Governance Committee shall develop a process to jointly identify and vet candidates to serve as Actively Engaged Athlete Representatives and meet any additional USOPC requirements.

10.1.4 <u>Weighted Vote</u>. If necessary, in the Board of Directors' discretion and to the extent it complies with USOPC requirements (if and as applicable), one (1) or more Athlete Representative(s) on any board, committee, or decision-making body may

have a weighted vote sufficient to fulfill the Athlete Representative Requirement for such board, committee, or decision-making body.

10.1.5   <u>Role of Athlete Representatives</u>. In addition to the duties of any particular role to which he or she is elected, each Athlete Representative shall participate in and represent the Athletes that participate in Cheer. Athlete Representative(s) shall attend meetings, serve on committees, and be familiar with the operation and management of USA Cheer. Athlete Representative(s) shall also create and encourage communication with the Athlete populations in order to properly and accurately speak and represent the Athletes in Cheer. It is preferred that Athlete Representatives also be active in the Athletes' Advisory Council.

10.2   <u>Athletes' Advisory Council</u>.

10.2.1   <u>Generally</u>. Athletes shall be elected to serve on the Athletes' Advisory Council as set forth in this <u>Article 10</u>.

10.2.2   <u>Membership on Athletes' Advisory Council</u>. The Athletes' Advisory Council shall consist of Athletes nominated and elected in accordance with <u>Section 10.2.4</u>, except as otherwise provided therein.

The members of the Athletes' Advisory Council shall be selected with the intention that they represent a broad spectrum of Athletes in Cheer in the United States. The Athletes' Advisory Council shall include, in the determination of the Board of Directors, a proportionate and representative number of Active Paralympic Athletes. At such time as USA Cheer is recognized by the USOPC as the NGB for Cheer, USA Cheer shall begin to restructure the Athletes' Advisory Council to comply with the provisions of the USOPC Bylaws in place at such time with respect to the group of Athletes required.

Athletes who are members of the Athletes' Advisory Council shall remain members of the Athletes' Advisory Council until such time as they die, resign, no longer qualify as Athletes, or are removed by the Board of Directors.

In the event an Athlete Representative is unable to complete the term of a position to which he or she has been duly elected, the Athletes' Advisory Council shall appoint a replacement for the remainder of the un-expired term, and shall comply with any requirements applicable to such position at such time.

10.2.3   <u>Function; Voting</u>. The primary function of the Athletes' Advisory Council is to (i) elect Athlete Representatives to positions in USA Cheer, as set forth in these Bylaws, (ii) collaborate with the USA Cheer Nominating and Governance Committee to develop a process to jointly identify and vet candidates to serve as 10 Year Athletes, 10 Year+ Athletes, and Actively Engaged Athlete Representatives, and (iii) collaborate with the USA Cheer Nominating and Governance Committee to identify and maintain an ongoing record of eligible 10 Year Athletes.

Except as otherwise provided in these Bylaws, the Athletes' Advisory Council shall act by simple majority vote and each Athlete who is a member of the Athletes' Advisory Council shall have one (1) vote.

10.2.4  Nomination and Election of Athletes.

    10.2.4.1   Nomination. Except as otherwise provided herein, the Nominating and Governance Committee shall nominate Athletes for positions in USA Cheer, including without limitation the Athletes' Advisory Council and those positions set forth in Section 10.1, but excluding the Athletes elected pursuant to Section 10.1.1.2.

    10.2.4.2   Election. Except as otherwise provided herein, the Athletes' Advisory Council shall vote on the nominated Athletes.

    10.2.4.3   USOPC Rules. If USA Cheer is recognized by the USOPC as the NGB for Cheer, the nomination and election of Athletes shall be conducted in accordance with the requirements, qualification, and election procedures set forth in the USOPC Bylaws at such time.

10.2.5  Cooperation. USA Cheer shall work with the Athletes' Advisory Council to best manage and facilitate the voting and selection process in order to best serve the Athletes' rights. The President, in his or her discretion, may appoint a liaison or a committee to evaluate and execute this process.

10.3   Paralympic Athlete Committee. A Paralympic Athlete Committee shall be established to prepare, approve, and implement the selection of Athletes for any team competing in a Para sport Protected Competition.

## ARTICLE 11—ICU MEMBERSHIP, SANCTIONING, AND ELIGIBILITY

11.1   USA Cheer shall carry out the responsibilities of the ICU membership, as they may be defined from time to time by the ICU governing bodies. International Amateur Athletic Competition in Cheer shall be conducted in accordance with the terms of Article VII, Section 2 of the USOPC Constitution, if and as applicable. USA Cheer shall not be a member of more than one (1) international sports federation which is recognized by the IOC or the IPC.

11.2   Equal Opportunity. USA Cheer shall provide an equal opportunity to Athletes, coaches, trainers (including, without limitation, athletic trainers and non-medical personnel), managers, administrators, and officials to participate in Amateur Athletic Competition without discrimination on the basis of race, color, religion, national origin, age, disability, sex, sexual orientation, gender identity, gender expression, or marital status.

11.2.1  Before declaring any Athlete, coach, trainer, manager, administrator, or official ineligible to participate in any Amateur Athletic Competition, USA Cheer shall

provide the affected individual with written notice of the alleged grounds of ineligibility and of the individual's right to a hearing on the matter.

11.3   <u>No More Restrictive</u>. USA Cheer shall not adopt eligibility criteria relating to amateur status or participation in the Olympic, Pan American, Paralympic, or Parapan American Games that are more restrictive than those of the ICU, the IOC, or the IPC.

## ARTICLE 12—INTERNAL GRIEVANCE PROCEDURE

12.1   <u>Filing of Grievance</u>. Any member of USA Cheer may file a written grievance with the President or Executive Director (if any) pertaining to any matter within the cognizance of USA Cheer and alleging a violation of any provision of these Bylaws, the Amateur Sports Act, the USOPC Constitution (as applicable), or the USOPC Bylaws (as applicable). <u>Provided</u>, <u>however</u>, that no grievance shall be filed with USA Cheer that addresses a violation which is alleged to have occurred at and is related to an event which USA Cheer sanctions, but which is administered and/or coordinated by another organization. If the Board of Directors determines that a grievance filed with USA Cheer should be handled by another organization, the Board of Directors shall forward the grievance to the appropriate organization and provide notice of the same to the member that filed the grievance.

12.1.1   Any grievance shall be signed and allege with particularity the nature of the grievance and each claimed violation of the aforementioned documents by reference to specific sections thereof, stating in concise language how, when, and where the alleged violation occurred.

12.2   <u>Treatment of Grievance</u>. Upon receipt of a grievance, the Executive Director (if any) shall refer it to the President and the Board of Directors. If the President determines that the grievance can be resolved informally (and the Board of Directors does not direct the President otherwise), he or she shall make an effort to resolve the grievance himself or herself. If the President cannot resolve the grievance informally or if the President has a conflict of interest in reviewing or addressing the grievance, he or she shall refer it to the Board of Directors.

If the grievance is referred to the Board of Directors or, in the event that the member filing a grievance is not satisfied with the resolution of the matter reached by informal methods by the President, the member shall be entitled to be heard before the Board of Directors at its next scheduled meeting. Procedures for hearing of the grievance shall be the same as are set forth in <u>Section 12.3</u>. The Board of Directors' determination of the matter shall be final, except as provided in the arbitration provisions of <u>Article 13</u>.

12.3   <u>Procedures for Hearing</u>. Unless the President determines that a hearing before the Board of Directors would result in unnecessary delay, the hearing shall be held before the Board of Directors at its next scheduled meeting. The affected individual shall be notified of the time and place of the hearing, his or her right to appear personally and/or through an attorney, and his or her right to present evidence and argument relating to his or her eligibility. USA

24

Cheer shall also have the right to present evidence and argument at the hearing, either through the Executive Director (or if none, the President) or his or her designee. The hearing shall be informal, with all parties being given reasonable opportunity to examine the pertinent evidence and to exchange views. At the request and expense of the affected individual, a transcript of the proceedings may be taken by a certified court reporter. Otherwise, the Secretary shall keep minutes of the hearing. Following the close of the hearing, the Board of Directors shall render its written decision, citing the principal grounds therefore, and a copy thereof shall be provided to the affected individual. There shall be no right of an appeal within USA Cheer from a decision of the Board of Directors (except as provided in the arbitration provisions in <u>Article 13</u>).

If the President determines that a hearing before the Board of Directors would result in unnecessary delay, he or she shall promptly appoint, from among the Board of Directors, one (1) or more disinterested hearing officer(s) to conduct the initial eligibility hearing, and the same procedures set forth in this <u>Section 12.3</u> shall apply to a hearing before the hearing officer(s), except that he or she, rather than the Secretary, shall keep the minutes of the hearing. If the decision of the hearing officer(s) is adverse to the affected individual, he or she shall have the right to appeal to the Board of Directors at its next scheduled meeting. Such an appeal shall consist of a de novo proceeding as provided above in this <u>Section 12.3</u>, except that the transcript or minutes of the hearing before the hearing officer(s) shall automatically be included in the evidence before the Board of Directors.

## ARTICLE 13—BINDING ARBITRATION

USA Cheer shall, subject to exhaustion of any internal remedies set forth in these Bylaws, submit to binding arbitration conducted in accordance with the Commercial Rules of the American Arbitration Association if required by the USOPC Bylaws and the Amateur Sports Act.

## ARTICLE 14—CONTRACTS, CHECKS, DEPOSITS, AND FUNDS

14.1    <u>Powers</u>. No director, officer, employee, or agent of USA Cheer (other than the President and Executive Director, as set forth below in this <u>Section 14.1</u>) shall have the power to incur any indebtedness on behalf of USA Cheer in excess of Five Hundred Dollars ($500.00) without advance authorization to do so by the Board of Directors.

The President shall have the power to incur indebtedness on behalf of USA Cheer in excess of Five Hundred Dollars ($500.00) for any one (1) transaction, but shall not have the power to incur indebtedness on behalf of USA Cheer in excess of Fifty Thousand Dollars ($50,000.00) for any one (1) transaction or series of related transactions without advance authorization to do so by the Board of Directors.

The Executive Director shall have the power to incur indebtedness on behalf of USA Cheer in excess of Five Hundred Dollars ($500.00) for any one (1) transaction, but shall not have the power to incur indebtedness on behalf of USA Cheer in excess of Five Thousand Dollars ($5,000.00) for any one (1) transaction or series of related transactions without advance authorization to do so by the Board of Directors.

Directors, officers, employees, and agents of USA Cheer shall comply with any additional policy(ies) adopted by USA Cheer regarding expenditures and/or approval and execution of contracts or agreements, if any, then in effect.

14.2  <u>Contracts</u>. The Board of Directors may authorize any officer or officers, agent or agents of USA Cheer, in addition to the officers so authorized by these Bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of USA Cheer. Such authority may be general or confined to specific instances, and it may be set forth in one or more additional policies. In the absence of such determination by the Board of Directors, any such instruments approved by the Board of Directors, as contemplated by USA Cheer's budget process or otherwise, may be signed by the Executive Director or President and any instrument with financial obligations over $50,000 shall require the signature of both the President and the Executive Director.

Provided, however, that any such instrument may only be signed as set forth in this <u>Section 14.2</u> to the extent the expenditure has been approved by the Board of Directors, as contemplated by USA Cheer's budget process or otherwise.

14.3  <u>Checks and Drafts</u>. All checks, drafts, or orders for the payment of money, notes, or other evidences of indebtedness issued in the name of USA Cheer shall be signed by such officer or officers, agent or agents of USA Cheer and in such manner as shall from time to time be determined by the Board of Directors. Such authority may be general or confined to specific instances, and it may be set forth in one or more additional policies. In the absence of such determination by the Board of Directors, an instrument may be signed by the President or the Executive Director so long as it does not exceed $5,000; any instruments exceeding $5,000 shall require signatures from any two (2) of the following: the President, the Executive Director, or the Assistant Treasurer.

Provided, however, that any such instrument may only be signed as set forth in this <u>Section 14.3</u> to the extent the expenditure has been approved by the Board of Directors, as contemplated by USA Cheer's budget process or otherwise.

The Executive Director (or, if none, the President) and Treasurer shall each conduct a monthly audit of all bank records.

14.4  <u>Deposits</u>. All funds of USA Cheer shall be deposited from time to time to the credit of USA Cheer in such banks, trust companies, or other depositaries as the Board of Directors may select or authorize to be selected.

14.5  <u>Gifts</u>. The Board of Directors may accept on behalf of USA Cheer any contribution, gift, bequest, or devise for the general purposes or for any special purpose of USA Cheer.

## **ARTICLE 15—INDEMNIFICATION**

15.1  <u>Extent of Indemnification and Advancement of Expenses</u>. Except as provided below in <u>Section 15.2</u>, USA Cheer shall indemnify and advance expenses to any person who (i) is

or was a director or officer of USA Cheer or (ii) while serving as a governing person, is or was serving at the request of USA Cheer as a representative of another enterprise, another organization, or an employee benefit plan, to the fullest extent that a corporation may or is required to grant indemnification to a director under the TBOC; notwithstanding the foregoing, however, USA Cheer may indemnify and advance expenses to an officer, employee, or agent, or any person who is identified in Section 15.1(ii) and who is not a director, to such extent, consistent with law, as may be provided by USA Cheer's Certificate of Formation, these Bylaws, general or specific action of the Board of Directors, by contract, or as otherwise permitted or required by common law.

15.2    Limitation on Extent of Indemnification in Derivative Suits. In case of a suit by or in the right of USA Cheer against a person named in Section 15.1(i) or (ii) by right of his or her holding a position named in Section 15.1(i) or (ii), USA Cheer shall only indemnify such person for reasonable expenses (including attorneys' fees, but excluding amounts paid in settlement) actually and reasonably incurred by him or her in connection with the defense or settlement of the suit.

15.3    Indemnification of Other Persons. This Article 15 shall not limit the right of USA Cheer to the extent and in the manner authorized or permitted by law to indemnify and to advance expenses to persons other than persons identified in Section 15.1(i) and (ii). Without limiting the foregoing, USA Cheer may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification and the advancement of expenses to any person who is or was an employee or agent of USA Cheer to the same extent that it may indemnify and advance expenses to persons identified in Section 15.1(i) and (ii) and to any such further extent as may be authorized or permitted by law.

15.4    Non-Exclusive. The indemnification provided by this Article 15 shall not be exclusive of any other rights to which a person may be entitled by law, these Bylaws, agreement of disinterested directors, or otherwise.

15.5    Continuation. Any right of indemnification or advance payment as provided by this Article 15 shall continue as to a person who has ceased to hold a position named in Section 15.1 or Section 15.3, as applicable, and such right shall inure to his or her heirs, executors, and administrators.

15.6    Insurance. USA Cheer may purchase and maintain insurance or make other arrangements, at its expense, to protect itself and any such person as specified in Section 15.1 and Section 15.3, against any such expense, liability, or loss, to the extent permitted by the TBOC and without regard to whether or not USA Cheer would have the power to indemnify such person against such expense, liability, or loss under the TBOC.

15.7    Reports. Indemnification payments, advance payments, and insurance payments made under this Article 15 shall be reported in writing to the Board of Directors with the next notice of annual meeting, or within six (6) months, whichever is sooner.

# ARTICLE 16—MISCELLANEOUS PROVISIONS

16.1  Communication Procedures. USA Cheer shall use all the means available to it in order to best communicate and disseminate information among the Board of Directors. With prior consent and approval of the Board of Directors, electronic mail and other electronic communication may be normal and considered an acceptable method and manner to deliver information to the Board of Directors.

16.2  Affiliation. USA Cheer reserves the right to create relationships with and may affiliate with other organizations that are determined to be beneficial and in the best interests of USA Cheer, its Athletes, and programs. At the same time, USA Cheer also reserves the right to oppose and not accept any associations and affiliations that the Board of Directors determines to be detrimental, debilitating, or to have a negative influence on Cheer, its Athletes, or programs.

16.3  Books and Records. USA Cheer shall keep correct and complete books and records of account and shall also keep minutes of the proceedings of its Board of Directors and committees having any of the authority of the Board of Directors.

16.4  Fiscal Year. The fiscal year of USA Cheer shall begin on the first day of January and end on the last day in December in each year.

16.5  Notice. Any notice required under these Bylaws shall be given by written notice which may be delivered personally or sent by mail, email, or facsimile to the applicable director or committee member at his or her address as shown by the records of USA Cheer. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed with postage thereon prepaid. If notice be given by email or facsimile, notice shall be deemed to be delivered upon confirmation of receipt. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting, unless specifically required by law or by these Bylaws.

16.6  Waiver of Notice. Whenever any notice is required to be given under the provisions of the TBOC or under the provisions of the Certificate of Formation or the Bylaws of USA Cheer, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. All such written waivers shall be filed with the minutes of such meeting. The attendance of a director or committee member at any meeting shall constitute a waiver of notice of such meeting, except where a director or committee member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

16.7  Meetings by Telephone and Other Means. Any meeting described in these Bylaws may be held by means of a remote electronic communications system, including but not limited to conference telephone, videoconference, or internet, so long as the system provides access to the meeting in a manner or using a method by which each person participating in the

meeting can communicate concurrently with each other participant. Such participation shall constitute presence in person at the meeting for purposes of a quorum and voting. If voting is to take place at a meeting held by means of a remote electronic communications system, USA Cheer shall implement reasonable measures to verify that every person voting at the meeting by means of remote communications is sufficiently identified, and keep a record of any vote or other action taken.

16.8    Informal Action.

16.8.1    Unanimous Consent. Any action required by law to be taken at a meeting of directors or committee members, or any action which may be taken at a meeting of directors or committee members, may be taken without a meeting if a consent or consents in writing setting forth the action so taken shall be signed by all of the directors or committee members, as applicable.

16.8.2    Less Than Unanimous Consent. Any action required by law to be taken at a meeting of directors or committee members, or any action which may be taken at a meeting of directors or committee members, may be taken without a meeting if a consent or consents in writing setting forth the action so taken shall be signed by a sufficient number of individuals as would be necessary to take that action at a meeting at which all persons entitled to vote on the action were present and voted. Prompt notice of the taking of any action without a meeting by less than unanimous written consent of the individuals entitled to vote on the action shall be given to those individuals who did not consent in writing to the action.

16.8.3    Execution and Transmission. A consent permitted in this Section 16.8 may be executed and transmitted in the form of: (i) an original signed writing or a reliable reproduction thereof, including but not limited to a photocopy, scan, or facsimile; or (ii) an electronic transmission, provided that the transmission contains or is accompanied by information from which it can be determined that it was transmitted by or on behalf of the relevant individual, and such individual's approval of the matter at issue is clearly stated.

16.9    Electronic Signatures. Any consent or action required to be taken in writing by these Bylaws or otherwise may be executed by electronic signature. Acceptable forms of electronic signature include but are not limited to: (i) a scanned or photographic image of a written signature, and (ii) a typed name adopted by the signatory with the intent to sign the writing. USA Cheer may adopt other methods for capturing electronic signatures, such as software applications designed for that purpose. Where a signature is transmitted by electronic means, it should include or be accompanied by information from which it can be determined that the electronic transmission was sent by or on behalf of the relevant individual.

## ARTICLE 17—ADOPTION AND AMENDMENT OF BYLAWS

These Bylaws may only be altered, amended, repealed, replaced, or restated by the affirmative vote of two-thirds (2/3$^{rds}$) of the directors present at any regular meeting or at any special meeting of the Board of Directors of USA Cheer, if at least seven (7) days' written notice is given of such intention to alter, amend, repeal, replace, or restate these Bylaws at such meeting. The Board of Directors may amend any other operating procedures of USA Cheer, to the extent not inconsistent with the terms herein.

The undersigned, as Secretary of USA Cheer, does hereby certify that the foregoing are the Bylaws of USA Cheer as approved and adopted at a meeting of the Board of Directors held on the 30th day of March, 2022.

*Christa G Sanford*, Secretary

CHRISTA SANFORD, Secretary