# Exhibit 1

EFiled:  Nov 04 2023 12:01AM EDT
Transaction ID 71330500
Case No. N23C-10-283 MAA CCLD

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VARSITY BRANDS HOLDING COMPANY, INC., VARSITY BRANDS, LLC, and VARSITY SPIRIT, LLC, | ) ) ) ) ) | |
| PLAINTIFFS, | ) ) | |
| v. | ) ) ) | C.A. No.  N23C-10-283 MAA [CCLD] |
| UNITED STATES FIDELITY AND GUARANTY COMPANY, DISCOVER PROPERTY AND CASUALTY INSURANCE COMPANY, PHILADELPHIA INDEMNITY INSURANCE COMPANY, AXIS INSURANCE COMPANY, GREENWICH INSURANCE COMPANY, ARCH INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., MARKEL AMERICAN INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY, NAVIGATORS INSURANCE COMPANY, RSUI INDEMNITY COMPANY, EVANSTON INSURANCE COMPANY, BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY, and WESTCHESTER FIRE INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **TRIAL BY JURY OF TWELVE DEMANDED** |
| DEFENDANTS. | ) ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Varsity Brands Holding Company, Inc. ("Varsity Holding"), Varsity Brands, LLC ("Varsity Brands"), and Varsity Spirit LLC ("Varsity Spirit") (collectively, "Varsity"), by and through their undersigned counsel, for their Complaint against Defendants United States Fidelity & Guaranty Company ("USF&G"), Discover Property & Casualty Insurance Company ("Discover"), Philadelphia Indemnity Insurance Company ("PIIC"), Axis Insurance Company ("Axis"), Greenwich Insurance Company ("Greenwich"), and Arch Insurance Company ("Arch") (collectively, the foregoing six insurers are the "Primary CGL Insurers"), Zurich American Insurance Company ("Zurich"), National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), Markel American Insurance Company ("Markel"), Lexington Insurance Company ("Lexington"), Navigators Insurance Company ("Navigators"), and RSUI Indemnity Company ("RSUI") (collectively, the foregoing six insurers, together with Arch, are the "Excess GL Insurers"), Evanston Insurance Company ("Evanston"), Berkshire Hathaway Specialty Insurance Company ("Berkshire"), and Westchester Fire Insurance Company ("Westchester") (collectively, the foregoing three insurers are the "EPL Insurers") (all of the Primary CGL Insurers, the Excess GL Insurers, and the EPL Insurers are, collectively, the "Insurers") allege as follows:

## PRELIMINARY STATEMENT

1.     A number of former student athletes asserted claims for sexual misconduct and abuse and, in addition to suing the individuals allegedly responsible for the claimed abuse, they included Varsity as one of several defendants, implicating Varsity's insurance policies.  The Insurers abandoned Varsity as Varsity reached a conditional, confidential settlement with the former student athletes, forcing Varsity to bring this suit.

2.     All of the Insurers, including those who had acknowledged coverage under commercial general liability policies that they issued, refused to fully fund a single one of the settlements, all of which were within the limits of the triggered policies.

3.     The Insurers employed a singular tactic:  to claim disingenuously that they were unable to assess whether the claims against Varsity should settle and for what amount, unless and until Varsity provided answers to the carriers' incessant and unnecessary questions.

4.     The Insurers further purported to impose a limitation on available coverage based on a misapplication of policy language.  In the end, the Insurers authorized funding only a fraction of the amount of the conditional settlement despite its reasonableness.

5.     Varsity accordingly brings this insurance coverage action for breach of

contract, bad faith, and declaratory relief against the Primary CGL Insurers for failing to fully defend them and for refusing, in bad faith, to accept and fund a reasonable settlement of underlying sexual abuse claims.  Varsity also seeks a declaration that its Excess GL Insurers and its EPL Insurers are required to defend them and fund a settlement of the underlying claims if Varsity is not made whole by relief from the Primary CGL Insurers.  In addition, Varsity also has alleged a separate cause of action for breach of contract against Arch for violating a standstill agreement that Varsity entered into with certain of the Insurers, including Arch.  That standstill agreement placed a moratorium on any coverage lawsuits through November 3, 2023.  In an attempt to gain a tactical advantage, Arch – the only Insurer who had agreed to the standstill agreement but violated the détente – filed a lawsuit against Varsity on October 30, 2023 in Tennessee federal court.

## **PARTIES**

6.     Varsity Brands, formerly known as Varsity Brands, Inc., is a limited liability company organized under Delaware law.  Varsity Brands is a subsidiary of Varsity Holding.

7.     Varsity Holding is an Indiana corporation with its principal place of business in Texas.

8.     Varsity Spirit, formerly known as Varsity Spirit Corporation, is a limited liability company organized under Tennessee law.  Varsity Spirit is a

subsidiary of Varsity Brands.

9.     Upon information and belief, USF&G is a corporation formed under Connecticut law with its principal place of business in Hartford, Connecticut.  Upon information and belief, USF&G is authorized to sell or write insurance in Delaware and, at all material times, has written insurance policies covering risks for Delaware citizens and/or is otherwise transacting substantial insurance business in Delaware.

10.    Upon information and belief, Discover is a corporation formed under Connecticut law with its principal place of business in Hartford, Connecticut.  Upon information and belief, Discover is authorized to sell or write insurance in Delaware and, at all material times, has written insurance policies covering risks for Delaware citizens and/or is otherwise transacting substantial insurance business in Delaware.

11.    Upon information and belief, PIIC is a corporation formed under Pennsylvania law with its principal place of business in Bala Cynwyd, Pennsylvania. Upon information and belief, PIIC is authorized to sell or write insurance in Delaware and, at all material times, has written insurance policies covering risks for Delaware citizens and/or is otherwise transacting substantial insurance business in Delaware.

12.    Upon information and belief, Axis is a corporation formed under Illinois law with its principal place of business in Alpharetta, Georgia.  Upon information and belief, Axis is authorized to sell or write insurance in Delaware and,

at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

13.     Upon information and belief, Greenwich is a corporation formed under Delaware law with its principal place of business in Stamford, Connecticut.  Upon information and belief, Greenwich is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

14.     Upon information and belief, Arch is a corporation formed under Missouri law with its principal place of business in Jersey City, New Jersey.  Upon information and belief, Arch is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

15.     Upon information and belief, Zurich is a corporation formed under New York law with its principal place of business in Schaumburg, Illinois.  Upon information and belief, Zurich is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

16.     Upon information and belief, National Union is a corporation formed under Pennsylvania law with its principal place of business in New York, New York.  Upon information and belief, National Union is authorized to sell or write insurance

in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

17.    Upon information and belief, Markel is a corporation formed under Illinois law with its principal place of business in Glen Allen, Virginia.   Upon information and belief, Markel is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

18.    Upon information and belief, Lexington is a corporation formed under Delaware law with its principal place of business in Boston, Massachusetts.   Upon information and belief, Lexington is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

19.    Upon information and belief, Navigators is a corporation formed under New York law with its principal place of business in Hartford, Connecticut.   Upon information and belief, Navigators is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

20.    Upon information and belief, RSUI is a corporation formed under New Hampshire law with its principal place of business in Atlanta, Georgia.   Upon information and belief, RSUI is authorized to sell or write insurance in Delaware

and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

21.     Upon information and belief, Evanston is a corporation formed under Illinois law with its principal place of business in Rosemont, Illinois.   Upon information and belief, Evanston is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

22.     Upon information and belief, Berkshire is a corporation formed under Nebraska law with its principal place of business in Omaha, Nebraska.   Upon information and belief, Berkshire is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

23.     Upon information and belief, Westchester is a corporation formed under Pennsylvania law with its principal place of business in Philadelphia, Pennsylvania.   Upon information and belief, Westchester is authorized to sell or write insurance in Delaware and, at all material times, has conducted and continues to conduct substantial insurance business in Delaware.

## **<u>JURISDICTION</u>**

24.     This Court has subject matter jurisdiction pursuant to Article IV, § 7 of the Delaware Constitution and 10 *Del. C.* § 541.  This matter is designated to be

heard in the Complex Commercial Litigation Division (CCLD) because the amount in controversy exceeds $1 million.

25.     This Court has personal jurisdiction over each of the Insurers because each Insurer is either a Delaware corporation or is authorized to sell or write insurance in Delaware and/or, at all material times, has conducted business within the State of Delaware.

26.     This Court has the power to declare the parties' rights and obligations under 10 *Del. C.* §§ 6501, et seq.

**FACTUAL BACKGROUND**

**The Varsity Policies**

I.      **THE VARSITY PRIMARY CGL POLICIES**

A.      **The USF&G Primary CGL Policies**

27.     For the period of October 22, 1998 to October 22, 2001, USF&G issued to Varsity Spirit a liability insurance policy that provides CGL insurance coverage ("1998-2001 USF&G Primary CGL Policy").

28.     The Varsity entities qualify as insureds on the 1998-2001 USF&G Primary CGL Policy.

29.     The 1998-2001 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."

The 1998-2001 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

30.     The 1998-2001 USF&G Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory'."

31.     The 1998-2001 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies." The 1998-2001 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

32.     The 1998-2001 USF&G Primary CGL Policy applies to "personal injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

33.     The 1998-2001 USF&G Primary CGL Policy defines "personal injury" to include "injury, other than 'bodily injury', arising out of . . . [o]ral or written publication of material that violates a person's right of privacy."

34.     For the period of October 22, 2001 to October 22, 2002, USF&G issued to Varsity Brands a liability insurance policy that provides CGL insurance coverage ("2001-2002 USF&G Primary CGL Policy").

35.     The Varsity entities qualify as insureds on the 2001-2002 USF&G

Primary CGL Policy.

36.     The 2001-2002 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2001-2002 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

37.     The 2001-2002 USF&G Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory'."

38.     The 2001-2002 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies."  The 2001-2002 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

39.     The 2001-2002 USF&G Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

40.     The 2001-2002 USF&G Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . [o]ral or written publication of material that violates a person's

right of privacy."

41.     For the period of October 22, 2002 to October 22, 2003, USF&G issued to VBR Holding Corporation a liability insurance policy that provides CGL insurance coverage ("2002-2003 USF&G Primary CGL Policy").

42.     The Varsity entities qualify as insureds on the 2002-2003 USF&G Primary CGL Policy.

43.     The 2002-2003 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2002-2003 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

44.     The 2002-2003 USF&G Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

45.     The 2002-2003 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2002-2003 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

46.     The 2002-2003 USF&G Primary CGL Policy applies to "personal and

advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

47.   The 2002-2003 USF&G Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of  . . . [o]ral or written publication of material that violates a person's right of privacy."

48.   For the period of October 22, 2003 to October 22, 2004, USF&G issued to VBR Holding Corporation a liability insurance policy that provides CGL insurance coverage ("2003-2004 USF&G Primary CGL Policy").

49.   The Varsity entities qualify as insureds on the 2003-2004 USF&G Primary CGL Policy.

50.   The 2003-2004 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2003-2004 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

51.   The 2003-2004 USF&G Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory'."

52.   The 2003-2004 USF&G Primary CGL Policy obligates USF&G to

"pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2003-2004 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

53.     The 2003-2004 USF&G Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

54.     The 2003-2004 USF&G Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . [o]ral or written publication of material that violates a person's right of privacy."

55.     For the period of October 22, 2004 to October 22, 2005, USF&G issued to VBR Holding Corporation a liability insurance policy that provides CGL insurance coverage ("2004-2005 USF&G Primary CGL Policy").

56.     The Varsity entities qualify as insureds on the 2004-2005 USF&G Primary CGL Policy.

57.     The 2004-2005 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2004-2005 USF&G Primary CGL Policy also obligates USF&G to "defend the

insured against any 'suit' seeking those damages."

58.     The 2004-2005 USF&G Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

59.     The 2004-2005 USF&G Primary CGL Policy obligates USF&G to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2004-2005 USF&G Primary CGL Policy also obligates USF&G to "defend the insured against any 'suit' seeking those damages."

60.     The 2004-2005 USF&G Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

61.     The 2004-2005 USF&G Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of  . . . "[o]ral or written publication of material that violates a person's right of privacy."

**B.     The Discover Primary CGL Policy**

62.     For the period of October 22, 2005 to October 22, 2006, Discover issued to VBR Holding Corporation a liability insurance policy that provides CGL insurance coverage ("2005-2006 Discover Primary CGL Policy").

63.     The Varsity entities qualify as insureds on the 2005-2006 Discover Primary CGL Policy.

64.     The 2005-2006 Discover Primary CGL Policy obligates Discover to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2005-2006 Discover Primary CGL Policy also obligates Discover to "defend the insured against any 'suit' seeking those damages."

65.     The 2005-2006 Discover Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

66.     The 2005-2006 Discover Primary CGL Policy obligates Discover to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2005-2006 Discover Primary CGL Policy also obligates Discover to "defend the insured against any 'suit' seeking those damages."

67.     The 2005-2006 Discover Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

68.     The 2005-2006 Discover Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury',

arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

### C.  The PIIC Primary CGL Policies

69.    For the period of October 22, 2006 to October 22, 2007, PIIC issued to VBR Holding Corporation a liability insurance policy that provides CGL insurance coverage ("2006-2007 PIIC Primary CGL Policy").

70.    The Varsity entities qualify as insureds on the 2006-2007 PIIC Primary CGL Policy.

71.    The 2006-2007 PIIC Primary CGL Policy obligates PIIC to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2006-2007 PIIC Primary CGL Policy also obligates PIIC to "defend the insured against any 'suit' seeking those damages."

72.    The 2006-2007 PIIC Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

73.    The 2006-2007 PIIC Primary CGL Policy obligates PIIC to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2006-2007 PIIC Primary CGL Policy also obligates PIIC to "defend the insured against any

'suit' seeking those damages."

74.     The 2006-2007 PIIC Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

75.     The 2006-2007 PIIC Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

76.     For the period of October 22, 2007 to October 22, 2008, PIIC issued to VBR Holding Corporation a liability insurance policy that provides CGL insurance coverage ("2007-2008 PIIC Primary CGL Policy").

77.     The Varsity entities qualify as insureds on the 2007-2008 PIIC Primary CGL Policy.

78.     The 2007-2008 PIIC Primary CGL Policy obligates PIIC to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2007-2008 PIIC Primary CGL Policy also obligates PIIC to "defend the insured against any 'suit' seeking those damages."

79.     The 2007-2008 PIIC Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes

place in the 'coverage territory."

80.     The 2007-2008 PIIC Primary CGL Policy obligates PIIC to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2007-2008 PIIC Primary CGL Policy also obligates PIIC to "defend the insured against any 'suit' seeking those damages."

81.     The 2007-2008 PIIC Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

82.     The 2007-2008 PIIC Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

**D.     The Axis Primary CGL Policies**

83.     For the period of October 22, 2008 to October 22, 2009, Axis issued to Varsity Brands a liability insurance policy that provides CGL insurance coverage ("2008-2009 Axis Primary CGL Policy").

84.     The Varsity entities qualify as insureds on the 2008-2009 Axis Primary CGL Policy.

85.     The 2008-2009 Axis Primary CGL Policy obligates Axis to "pay those

-18-

sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2008-2009 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

86.    The 2008-2009 Axis Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

87.    The 2008-2009 Axis Primary CGL Policy obligates Axis to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2008-2009 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

88.    The 2008-2009 Axis Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

89.    The 2008-2009 Axis Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

90.    For the period of October 22, 2009 to October 22, 2010, Axis issued to

Varsity Brands a liability insurance policy that provides CGL insurance coverage ("2009-2010 Axis Primary CGL Policy").

91.     The Varsity entities qualify as insureds on the 2009-2010 Axis Primary CGL Policy.

92.     The 2009-2010 Axis Primary CGL Policy obligates Axis to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2009-2010 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

93.     The 2009-2010 Axis Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory.'"

94.     The 2009-2010 Axis Primary CGL Policy obligates Axis to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2009-2010 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

95.     The 2009-2010 Axis Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

96.    The 2009-2010 Axis Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

97.    For the period of October 22, 2010 to October 22, 2011, Axis issued to Varsity Brands a liability insurance policy that provides CGL insurance coverage ("2010-2011 Axis Primary CGL Policy").

98.    The Varsity entities qualify as insureds on the 2010-2011 Axis Primary CGL Policy.

99.    The 2010-2011 Axis Primary CGL Policy obligates Axis to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2010-2011 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

100.   The 2010-2011 Axis Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

101.   The 2010-2011 Axis Primary CGL Policy obligates Axis to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2010-2011

Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

102.   The 2010-2011 Axis Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

103.   The 2010-2011 Axis Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

104.   For the period of October 22, 2011 to July 31, 2013, Axis issued to Varsity Brands a liability insurance policy that provides CGL insurance coverage ("2011-2013 Axis Primary CGL Policy").

105.   The Varsity entities qualify as insureds on the 2011-2013 Axis Primary CGL Policy.

106.   The 2011-2013 Axis Primary CGL Policy obligates Axis to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2011-2013 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

107.   The 2011-2013 Axis Primary CGL Policy applies to "bodily injury"

that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

108.   The 2011-2013 Axis Primary CGL Policy obligates Axis to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2011-2013 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

109.   The 2011-2013 Axis Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

110.   The 2011-2013 Axis Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

111.   For the period of July 31, 2013 to July 31, 2014, Axis issued to Varsity Brands a liability insurance policy that provides CGL insurance coverage ("2013-2014 Axis Primary CGL Policy").

112.   The Varsity entities qualify as insureds on the 2013-2014 Axis Primary CGL Policy.

113.   The 2013-2014 Axis Primary CGL Policy obligates Axis to "pay those

-23-

sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2013-2014 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

114.   The 2013-2014 Axis Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

115.   The 2013-2014 Axis Primary CGL Policy obligates Axis to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2013-2014 Axis Primary CGL Policy also obligates Axis to "defend the insured against any 'suit' seeking those damages."

116.   The 2013-2014 Axis Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

117.   The 2013-2014 Axis Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of  . . . "[o]ral or written publication of material that violates a person's right of privacy."

## E.     The Greenwich Primary CGL Policies

118.   For the period of July 31, 2014 to July 31, 2015, Greenwich issued to Varsity Brands a liability insurance policy that provides CGL insurance coverage ("2014-2015 Greenwich Primary CGL Policy").

119.   The Varsity entities qualify as insureds on the 2014-2015 Greenwich Primary CGL Policy.

120.   The 2014-2015 Greenwich Primary CGL Policy obligates Greenwich to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2014-2015 Greenwich Primary CGL Policy also obligates Greenwich to "defend the insured against any 'suit' seeking those damages."

121.   The 2014-2015 Greenwich Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

122.   The 2014-2015 Greenwich Primary CGL Policy obligates Greenwich to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2014-2015 Greenwich Primary CGL Policy also obligates Greenwich to "defend the insured against any 'suit' seeking those damages."

123.   The 2014-2015 Greenwich Primary CGL Policy applies to "personal

and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

124.   The 2014-2015 Greenwich Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

125.   For the period of July 31, 2015 to July 31, 2016, Greenwich issued to Varsity Holding a liability insurance policy that provides CGL insurance coverage ("2015-2016 Greenwich Primary CGL Policy").

126.   The Varsity entities qualify as insureds on the 2015-2016 Greenwich Primary CGL Policy.

127.   The 2015-2016 Greenwich Primary CGL Policy obligates Greenwich to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2015-2016 Greenwich Primary CGL Policy also obligates Greenwich to "defend the insured against any 'suit' seeking those damages."

128.   The 2015-2016 Greenwich Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

129.   The 2015-2016 Greenwich Primary CGL Policy obligates Greenwich

to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2015-2016 Greenwich Primary CGL Policy also obligates Greenwich to "defend the insured against any 'suit' seeking those damages."

130.    The 2015-2016 Greenwich Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

131.    The 2015-2016 Greenwich Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of  . . . "[o]ral or written publication of material that violates a person's right of privacy."

132.    For the period of July 31, 2016 to July 31, 2017, Greenwich issued to Varsity Holding a liability insurance policy that provides CGL insurance coverage ("2016-2017 Greenwich Primary CGL Policy").

133.    The Varsity entities qualify as insureds on the 2016-2017 Greenwich Primary CGL Policy.

134.    The 2016-2017 Greenwich Primary CGL Policy obligates Greenwich to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2016-2017 Greenwich Primary CGL Policy also obligates Greenwich to

"defend the insured against any 'suit' seeking those damages."

135.   The 2016-2017 Greenwich Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

136.   The 2016-2017 Greenwich Primary CGL Policy obligates Greenwich to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2016-2017 Greenwich Primary CGL Policy also obligates Greenwich to "defend the insured against any 'suit' seeking those damages."

137.   The 2016-2017 Greenwich Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

138.   The 2016-2017 Greenwich Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

### F.   The Arch Primary CGL Policies

139.   For the period of July 31, 2017 to July 31, 2018, Arch issued to Varsity Holding a liability insurance policy that provides CGL insurance coverage ("2017-2018 Arch Primary CGL Policy").

140.   The Varsity entities qualify as insureds on the 2017-2018 Arch Primary CGL Policy.

141.   The 2017-2018 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2017-2018 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

142.   The 2017-2018 Arch Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

143.   The 2017-2018 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2017-2018 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

144.   The 2017-2018 Arch Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

145.  The 2017-2018 Arch Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury',

arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

146.   For the period of July 31, 2018 to July 31, 2019, Arch issued to Varsity Holding a liability insurance policy that provides CGL insurance coverage ("2018-2019 Arch Primary CGL Policy").

147.   The Varsity entities qualify as insureds on the 2018-2019 Arch Primary CGL Policy.

148.   The 2018-2019 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2018-2019 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

149.   The 2018-2019 Arch Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

150.   The 2018-2019 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2018-2019 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

151.   The 2018-2019 Arch Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

152.   The 2018-2019 Arch Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

153.   For the period of July 31, 2019 to July 31, 2020, Arch issued to Varsity Holding a liability insurance policy that provides CGL insurance coverage ("2019-2020 Arch Primary CGL Policy").

154.   The Varsity entities qualify as insureds on the 2019-2020 Arch Primary CGL Policy.

155.   The 2019-2020 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2019-2020 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

156.   The 2019-2020 Arch Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

157.   The 2019-2020 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2019-2020 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

158.   The 2019-2020 Arch Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

159.   The 2019-2020 Arch Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

160.   For the period of July 31, 2020 to July 31, 2021, Arch issued to Varsity Holding a liability insurance policy that provides CGL insurance coverage ("2020-2021 Arch Primary CGL Policy").

161.   The Varsity entities qualify as insureds on the 2020-2021 Arch Primary CGL Policy.

162.   The 2020-2021 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2020-

2021 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

163.   The 2020-2021 Arch Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

164.   The 2020-2021 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2020-2021 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

165.   The 2020-2021 Arch Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

166.   The 2020-2021 Arch Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

167.   For the period of July 31, 2021 to July 31, 2022, Arch issued to Varsity Holding a liability insurance policy that provides CGL insurance coverage ("2021-2022 Arch Primary CGL Policy").

168.   The Varsity entities qualify as insureds on the 2021-2022 Arch Primary CGL Policy.

169.   The 2021-2022 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2021-2022 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

170.   The 2021-2022 Arch Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

171.   The 2021-2022 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2021-2022 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

172.   The 2021-2022 Arch Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

173.   The 2021-2022 Arch Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury',

-34-

arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

174.   For the period of July 31, 2022 to July 31, 2023, Arch issued to Varsity Holding a liability insurance policy that provides CGL insurance coverage ("2022-2023 Arch Primary CGL Policy").

175.   The Varsity entities qualify as insureds on the 2022-2023 Arch Primary CGL Policy.

176.   The 2022-2023 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The 2022-2023 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

177.   The 2022-2023 Arch Primary CGL Policy applies to "bodily injury" that occurs during the policy period and is caused by an "'occurrence' that takes place in the 'coverage territory."

178.   The 2022-2023 Arch Primary CGL Policy obligates Arch to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." The 2022-2023 Arch Primary CGL Policy also obligates Arch to "defend the insured against any 'suit' seeking those damages."

179.  The 2022-2023 Arch Primary CGL Policy applies to "personal and advertising injury" that is caused by an offense arising out of a named insured's business that is committed during the policy period and in the coverage territory.

180.  The 2022-2023 Arch Primary CGL Policy defines "personal and advertising injury" to include "injury, including consequential 'bodily injury', arising out of . . . "[o]ral or written publication of material that violates a person's right of privacy."

## II.  THE VARSITY UMBRELLA AND EXCESS POLICIES

### A.  The Zurich Excess Policy

181.  Upon information and belief, for the period of October 22, 2006 to October 22, 2007, Zurich issued to Varsity Brands an excess liability insurance policy, policy number AUC 591682300 ("2006-2007 Zurich Excess Policy").  Upon information and belief, the 2006-2007 Zurich Excess Policy contains terms similar to the underlying 2006-2007 PIIC Primary CGL Policy.

### B.  The National Union Umbrella Policies

182.  For the period of October 27, 2007 to October 22, 2008, National Union issued to VBR Holding Corporation an umbrella liability insurance policy ("2007-2008 National Union Umbrella Policy").

183.  The Varsity entities qualify as insureds on the 2007-2008 National Union Umbrella Policy.

184.   The 2007-2008 National Union Umbrella Policy obligates National Union to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage, or Personal Injury and Advertising Injury to which this insurance applies . . . ."

185.   The 2007-2008 National Union Umbrella Policy defines "Retained Limit" to mean "1. the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or 2. The Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured."

186.   The pertinent Scheduled Underlying Insurance on the 2007-2008 National Union Umbrella Policy is the 2007-2008 PIIC Primary CGL Policy.

187.   The 2007-2008 National Union Umbrella Policy applies to Bodily Injury occurring during the policy period that is caused by an Occurrence and Personal Injury and Advertising Injury that is caused by an Occurrence that was committed during the policy period.

188.   The 2007-2008 National Union Umbrella Policy obligates National Union to "defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy,

even if the Suit is groundless, false or fraudulent when: . . . the damages sought because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury would not be covered by Scheduled Underlying Insurance or any applicable Other Insurance, even if the total applicable limits of either the Scheduled Underlying Insurance or any applicable Other Insurance had not been exhausted by the payment of Loss."

189.   The 2007-2008 National Union Umbrella Policy defines "Personal Injury and Advertising Injury" to include "oral or written publication, in any manner, that violates a person's right of privacy."

190.   For the period of October 27, 2008 to October 22, 2009, National Union issued to VBR Holding Corporation an umbrella liability insurance policy ("2008-2009 National Union Umbrella Policy").

191.   The Varsity entities qualify as insureds on the 2008-2009 National Union Umbrella Policy.

192.   The 2008-2009 National Union Umbrella Policy obligates National Union to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage, or Personal Injury and Advertising Injury to which this insurance applies . . . ."

193.   The 2008-2009 National Union Umbrella Policy defines "Retained

-38-

Limit" to mean "1. the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or 2. The Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured."

194.   The pertinent Scheduled Underlying Insurance on the 2008-2009 National Union Umbrella Policy is the 2008-2009 Axis Primary CGL Policy, which is incorrectly identified in the 2008-2009 National Union Umbrella Policy as having been issued by "American Specialty."

195.   The 2008-2009 National Union Umbrella Policy applies to Bodily Injury occurring during the policy period that is caused by an Occurrence and Personal Injury and Advertising Injury that is caused by an Occurrence that was committed during the policy period.

196.   The 2008-2009 National Union Umbrella Policy obligates National Union to "defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false or fraudulent when: . . . the damages sought because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury would not be covered by Scheduled Underlying Insurance or any applicable Other Insurance, even if the total applicable limits of either the Scheduled

-39-

Underlying Insurance or any applicable Other Insurance had not been exhausted by the payment of Loss."

197.   The 2008-2009 National Union Umbrella Policy defines "Personal Injury and Advertising Injury" to include "oral or written publication, in any manner, that violates a person's right of privacy."

198.   For the period of October 27, 2009 to October 22, 2010, National Union issued to VBR Holding Corporation an umbrella liability insurance policy, policy number BE 21462803 ("2009-2010 National Union Umbrella Policy").

199.   Upon information and belief, the Varsity entities qualify as insureds on the 2009-2010 National Union Umbrella Policy.

200.   Upon information and belief, the 2009-2010 National Union Umbrella Policy contains the same terms as the 2008-2009 National Union Umbrella Policy.

201.   For the period of October 27, 2010 to October 22, 2011, National Union issued to VBR Holding Corporation an umbrella liability insurance policy, policy number BE 35063225 ("2010-2011 National Union Umbrella Policy").

202.   Upon information and belief, the Varsity entities qualify as insureds on the 2010-2011 National Union Umbrella Policy.

203.   Upon information and belief, the 2010-2011 National Union Umbrella Policy contains the same terms as the 2008-2009 National Union Umbrella Policy.

204.   For the period of October 27, 2011 to October 22, 2013, National Union

issued to VBR Holding Corporation an umbrella liability insurance policy, policy number BE 03833865 ("2011-2013 National Union Umbrella Policy").

205.   Upon information and belief, the Varsity entities qualify as insureds on the 2011-2013 National Union Umbrella Policy.

206.   Upon information and belief, the 2011-2013 National Union Umbrella Policy contains the same terms as the 2008-2009 National Union Umbrella Policy.

207.   For the period of October 27, 2013 to October 22, 2014, National Union issued to VBR Holding Corporation an umbrella liability insurance policy, policy number BE 038255393 ("2013-2014 National Union Umbrella Policy").

208.   Upon information and belief, the Varsity entities qualify as insureds on the 2013-2014 National Union Umbrella Policy.

209.   Upon information and belief, the 2013-2014 National Union Umbrella Policy contains the same terms as the 2008-2009 National Union Umbrella Policy.

210.   For the period of October 27, 2014 to October 22, 2015, National Union issued to VBR Holding Corporation an umbrella liability insurance policy, policy number BE 11244654 ("2014-2015 National Union Umbrella Policy").

211.   Upon information and belief, the Varsity entities qualify as insureds on the 2014-2015 National Union Umbrella Policy.

212.   Upon information and belief, the 2014-2015 National Union Umbrella Policy contains the same terms as the 2008-2009 National Union Umbrella Policy.

213.   For the period of July 31, 2015 to July 31, 2016, National Union issued to Varsity Holding an umbrella liability insurance policy ("2015-2016 National Union Umbrella Policy").

214.   The Varsity entities qualify as insureds on the 2015-2016 National Union Umbrella Policy.

215.   The 2015-2016 National Union Umbrella Policy obligates National Union to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage, or Personal Injury and Advertising Injury to which this insurance applies . . . ."

216.   The 2015-2016 National Union Umbrella Policy defines "Retained Limit" to mean "1. the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or 2. The Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured."

217.   The pertinent Scheduled Underlying Insurance on the 2015-2016 National Union Umbrella Policy is the 2015-2016 Greenwich Primary CGL Policy.

218.   The 2015-2016 National Union Umbrella Policy applies to Bodily Injury occurring during the policy period that is caused by an Occurrence and

Personal Injury and Advertising Injury that is caused by an Occurrence that was committed during the policy period.

219.   The 2015-2016 National Union Umbrella Policy obligates National Union to "defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false or fraudulent when: . . . the damages sought because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury would not be covered by Scheduled Underlying Insurance or any applicable Other Insurance, even if the total applicable limits of either the Scheduled Underlying Insurance or any applicable Other Insurance had not been exhausted by the payment of Loss."

220.   The 2015-2016 National Union Umbrella Policy defines "Personal Injury and Advertising Injury" to include "oral or written publication, in any manner, that violates a person's right of privacy."

221.   For the period of July 31, 2016 to July 31, 2017, National Union issued to Varsity Holding an umbrella liability insurance policy ("2016-2017 National Union Umbrella Policy").

222.   The Varsity entities qualify as insureds on the 2016-2017 National Union Umbrella Policy.

223.   The 2016-2017 National Union Umbrella Policy obligates National

-43-

Union to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage, or Personal Injury and Advertising Injury to which this insurance applies . . . ."

224.   The 2016-2017 National Union Umbrella Policy defines "Retained Limit" to mean "1. the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or 2. The Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured."

225.   The pertinent Scheduled Underlying Insurance on the 2016-2017 National Union Umbrella Policy is the 2016-2017 Greenwich Primary CGL Policy.

226.   The 2016-2017 National Union Umbrella Policy applies to Bodily Injury occurring during the policy period that is caused by an Occurrence and Personal Injury and Advertising Injury that is caused by an Occurrence that was committed during the policy period.

227.   The 2016-2017 National Union Umbrella Policy obligates National Union to "defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false or fraudulent when: . . . the damages sought

-44-

because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury would not be covered by Scheduled Underlying Insurance or any applicable Other Insurance, even if the total applicable limits of either the Scheduled Underlying Insurance or any applicable Other Insurance had not been exhausted by the payment of Loss."

228.    The 2016-2017 National Union Umbrella Policy defines "Personal Injury and Advertising Injury" to include "oral or written publication, in any manner, that violates a person's right of privacy."

229.    For the period of July 31, 2017 to July 31, 2018, National Union issued to Varsity Holding an umbrella liability insurance policy ("2017-2018 National Union Umbrella Policy").

230.    The Varsity entities qualify as insureds on the 2017-2018 National Union Umbrella Policy.

231.    The 2017-2018 National Union Umbrella Policy obligates National Union to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage, or Personal Injury and Advertising Injury to which this insurance applies . . . ."

232.    The 2017-2018 National Union Umbrella Policy defines "Retained Limit" to mean "1. the total applicable limits of Scheduled Underlying Insurance

and any applicable Other Insurance providing coverage to the Insured; or 2. The Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured."

233.   The pertinent Scheduled Underlying Insurance on the 2017-2018 National Union Umbrella Policy is the 2017-2018 Arch Primary CGL Policy.

234.   The 2017-2018 National Union Umbrella Policy applies to Bodily Injury occurring during the policy period that is caused by an Occurrence and Personal Injury and Advertising Injury that is caused by an Occurrence that was committed during the policy period.

235.   The 2017-2018 National Union Umbrella Policy obligates National Union to "defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false or fraudulent when: . . . the damages sought because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury would not be covered by Scheduled Underlying Insurance or any applicable Other Insurance, even if the total applicable limits of either the Scheduled Underlying Insurance or any applicable Other Insurance had not been exhausted by the payment of Loss."

236.   The 2017-2018 National Union Umbrella Policy defines "Personal

-46-

Injury and Advertising Injury" to include "oral or written publication, in any manner, that violates a person's right of privacy."

237.   For the period of July 31, 2018 to July 31, 2019, National Union issued to Varsity Holding an umbrella liability insurance policy ("2018-2019 National Union Umbrella Policy").

238.   The Varsity entities qualify as insureds on the 2018-2019 National Union Umbrella Policy.

239.   The 2018-2019 National Union Umbrella Policy obligates National Union to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage, or Personal Injury and Advertising Injury to which this insurance applies . . . ."

240.   The 2018-2019 National Union Umbrella Policy defines "Retained Limit" to mean "1. the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or 2. The Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured."

241.   The pertinent Scheduled Underlying Insurance on the 2018-2019 National Union Umbrella Policy is the 2018-2019 Arch Primary CGL Policy.

242.   The 2018-2019 National Union Umbrella Policy applies to Bodily Injury occurring during the policy period that is caused by an Occurrence and Personal Injury and Advertising Injury that is caused by an Occurrence that was committed during the policy period.

243.   The 2018-2019 National Union Umbrella Policy obligates National Union to "defend any Suit against the Insured that seeks damages for Bodily Injury, Property Damage or Personal Injury and Advertising Injury covered by this policy, even if the Suit is groundless, false or fraudulent when: . . . the damages sought because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury would not be covered by Scheduled Underlying Insurance or any applicable Other Insurance, even if the total applicable limits of either the Scheduled Underlying Insurance or any applicable Other Insurance had not been exhausted by the payment of Loss."

244.   The 2018-2019 National Union Umbrella Policy defines "Personal Injury and Advertising Injury" to include "oral or written publication, in any manner, that violates a person's right of privacy."

## C.   The RSUI Excess Policies

245.   For the period of October 22, 2012 to July 31, 2013, RSUI issued to VBR Holding Corporation an excess liability insurance policy ("2012-2013 RSUI Excess Policy").

246.   The Varsity entities qualify as insureds on the 2012-2013 RSUI Excess Policy.

247.   The 2012-2013 RSUI Excess Policy obligates RSUI to "pay those sums in excess of the limits shown in Item 6 of the Declarations, Schedule Of Underlying Insurance, that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the 'Underlying Insurance' also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance."

248.   The pertinent "Underlying Insurance" on the 2012-2013 RSUI Excess Policy is the 2012-2013 National Union Umbrella Policy.

249.   The 2012-2013 RSUI Excess Policy states that "[t]his insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "Underlying Insurance", except: a. We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and b. With respect to any provisions to the contrary contained in this insurance."

250.   The 2012-2013 RSUI Excess Policy states that RSUI "will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the 'Underlying Insurance' has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit."

251.   For the period of July 31, 2013 to July 31, 2014, RSUI issued to Varsity Brands an excess liability insurance policy ("2013-2014 RSUI Excess Policy").

252.   The Varsity entities qualify as insureds on the 2013-2014 RSUI Excess Policy.

253.   The 2013-2014 RSUI Excess Policy obligates RSUI to "pay those sums in excess of the limits shown in Item 6 of the Declarations, Schedule Of Underlying Insurance, that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the 'Underlying Insurance' also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance."

254.   The pertinent "Underlying Insurance" on the 2013-2014 RSUI Excess Policy is the 2013-2014 National Union Umbrella Policy.

255.   The 2013-2014 RSUI Excess Policy states that "[t]his insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "Underlying Insurance", except: a. We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and b. With respect to any provisions to the contrary contained in this insurance."

256.   The 2013-2014 RSUI Excess Policy states that RSUI "will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the 'Underlying

Insurance' has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit."

257.   For the period of July 31, 2014 to July 31, 2015, RSUI issued to Varsity Brands an excess liability insurance policy ("2014-2015 RSUI Excess Policy").

258.   The Varsity entities qualify as insureds on the 2014-2015 RSUI Excess Policy.

259.   The 2014-2015 RSUI Excess Policy obligates RSUI to "pay those sums in excess of the limits shown in Item 6 of the Declarations, Schedule Of Underlying Insurance, that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the 'Underlying Insurance' also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance."

260.   The pertinent "Underlying Insurance" on the 2014-2015 RSUI Excess Policy is the 2014-2015 National Union Umbrella Policy.

261.   The 2014-2015 RSUI Excess Policy states that "[t]his insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the "Underlying Insurance", except: a. We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and b. With respect to any provisions to the contrary contained in this insurance."

262.   The 2014-2015 RSUI Excess Policy states that RSUI "will have the right to participate in the defense of claims or suits against you seeking damages

-51-

because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the 'Underlying Insurance' has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit."

### D. The Arch Excess Policies

263. For the period of July 31, 2019 to July 31, 2020, Arch issued to Varsity Holding an excess liability insurance policy ("2019-2020 Arch Excess Policy").

264. The Varsity entities qualify as insureds on the 2019-2020 Arch Excess Policy.

265. The 2019-2020 Arch Excess Policy obligates Arch to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage' to which insurance provided under this Coverage Part applies."

266. The 2019-2020 Arch Excess Policy defines "Ultimate net loss" to mean "the total sum, after reduction for recoveries, or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of: a. Settlements, judgments, binding arbitration; or b. Other binding alternate dispute resolution proceeding entered into with our consent."

267. The 2019-2020 Arch Excess Policy defines "Retained Limit" to mean "the available limits of 'controlling underlying insurance' applicable to the claim."

268. The pertinent Controlling Underlying Insurance on the 2019-2020 Arch

Excess Policy is the 2019-2020 Arch Primary CGL Policy.

269.   The 2019-2020 Arch Excess Policy states that "[i]f the 'controlling underlying insurance' requires, for a particular claim, that the 'injury or damage' occur during its policy period in order for that coverage to apply, then this insurance will only apply to that 'injury or damage' if it occurs during the policy period of this Coverage Part. If the 'controlling underlying insurance' requires that the 'event' causing the particular 'injury or damage' takes place during its policy period in order for that coverage to apply, then this insurance will apply to the claim only if the 'event' causing that 'injury or damage' takes place during the policy period of this Coverage Part."

270.   The 2019-2020 Arch Excess Policy obligates Arch to "defend the insured against any suit seeking damages for such 'injury or damage' when the applicable limits of 'controlling underlying insurance' have been exhausted in accordance with the provisions of such 'controlling underlying insurance'."

271.   The 2019-2020 Arch Excess Policy defines "injury or damage" to mean "any injury or damage, covered in the applicable 'controlling underlying insurance' arising from an 'event'." The 2019-2020 Arch Excess Policy defines "event" to mean "an occurrence, offense, accident, act, or other event, to which the applicable 'controlling underlying insurance' applies."

272.   For the period of July 31, 2020 to July 31, 2021, Arch issued to Varsity

Holding an excess liability insurance policy ("2020-2021 Arch Excess Policy").

273.   The Varsity entities qualify as insureds on the 2020-2021 Arch Excess Policy.

274.   The 2020-2021 Arch Excess Policy obligates Arch to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage' to which insurance provided under this Coverage Part applies."

275.   The 2020-2021 Arch Excess Policy defines "Ultimate net loss" to mean "the total sum, after reduction for recoveries, or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of: a. Settlements, judgments, binding arbitration; or b. Other binding alternate dispute resolution proceeding entered into with our consent."

276.   The 2020-2021 Arch Excess Policy defines "Retained Limit" to mean "the available limits of 'controlling underlying insurance' applicable to the claim."

277.   The pertinent Controlling Underlying Insurance on the 2020-2021 Arch Excess Policy is the 2020-2021 Arch Primary CGL Policy.

278.   The 2020-2021 Arch Excess Policy states that "[i]f the 'controlling underlying insurance' requires, for a particular claim, that the 'injury or damage' occur during its policy period in order for that coverage to apply, then this insurance will only apply to that 'injury or damage' if it occurs during the policy period of this Coverage Part. If the 'controlling underlying insurance' requires that the 'event'

causing the particular 'injury or damage' takes place during its policy period in order for that coverage to apply, then this insurance will apply to the claim only if the 'event' causing that 'injury or damage' takes place during the policy period of this Coverage Part."

279.   The 2020-2021 Arch Excess Policy obligates Arch to "defend the insured against any suit seeking damages for such 'injury or damage' when the applicable limits of 'controlling underlying insurance' have been exhausted in accordance with the provisions of such 'controlling underlying insurance'."

280.   The 2020-2021 Arch Excess Policy defines "injury or damage" to mean "any injury or damage, covered in the applicable 'controlling underlying insurance' arising from an 'event'." The 2020-2021 Arch Excess Policy defines "event" to mean "an occurrence, offense, accident, act, or other event, to which the applicable 'controlling underlying insurance' applies."

281.   For the period of July 31, 2021 to July 31, 2022, Arch issued to Varsity Holding an excess liability insurance policy ("2021-2022 Arch Excess Policy").

282.   The Varsity entities qualify as insureds on the 2021-2022 Arch Excess Policy.

283.   The 2021-2022 Arch Excess Policy obligates Arch to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage' to which insurance provided under this Coverage Part applies."

-55-

284.   The 2021-2022 Arch Excess Policy defines "Ultimate net loss" to mean "the total sum, after reduction for recoveries, or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of: a. Settlements, judgments, binding arbitration; or b. Other binding alternate dispute resolution proceeding entered into with our consent."

285.   The 2021-2022 Arch Excess Policy defines "Retained Limit" to mean "the available limits of 'controlling underlying insurance' applicable to the claim."

286.   The pertinent Controlling Underlying Insurance on the 2021-2022 Arch Excess Policy is the 2021-2022 Arch Primary CGL Policy.

287.   The 2021-2022 Arch Excess Policy states that "[i]f the 'controlling underlying insurance' requires, for a particular claim, that the 'injury or damage' occur during its policy period in order for that coverage to apply, then this insurance will only apply to that 'injury or damage' if it occurs during the policy period of this Coverage Part. If the 'controlling underlying insurance' requires that the 'event' causing the particular 'injury or damage' takes place during its policy period in order for that coverage to apply, then this insurance will apply to the claim only if the 'event' causing that 'injury or damage' takes place during the policy period of this Coverage Part."

288.   The 2021-2022 Arch Excess Policy obligates Arch to "defend the insured against any suit seeking damages for such 'injury or damage' when the

applicable limits of 'controlling underlying insurance' have been exhausted in accordance with the provisions of such 'controlling underlying insurance'."

289.   The 2021-2022 Arch Excess Policy defines "injury or damage" to mean "any injury or damage, covered in the applicable 'controlling underlying insurance' arising from an 'event'." The 2020-2021 Arch Excess Policy defines "event" to mean "an occurrence, offense, accident, act, or other event, to which the applicable 'controlling underlying insurance' applies."

290.   For the period of July 31, 2022 to July 31, 2023, Arch issued to Varsity Holding an excess liability insurance policy ("2022-2023 Arch Excess Policy").

291.   The Varsity entities qualify as insureds on the 2022-2023 Arch Excess Policy.

292.   The 2022-2023 Arch Excess Policy obligates Arch to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'injury or damage' to which insurance provided under this Coverage Part applies."

293.   The 2022-2023 Arch Excess Policy defines "Ultimate net loss" to mean "the total sum, after reduction for recoveries, or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of: a. Settlements, judgments, binding arbitration; or b. Other binding alternate dispute resolution proceeding entered into with our consent."

294.    The 2022-2023 Arch Excess Policy defines "Retained Limit" to mean "the available limits of 'controlling underlying insurance' applicable to the claim."

295.    The pertinent Controlling Underlying Insurance on the 2022-2023 Arch Excess Policy is the 2022-2023 Arch Primary CGL Policy.

296.    The 2022-2023 Arch Excess Policy states that "[i]f the 'controlling underlying insurance' requires, for a particular claim, that the 'injury or damage' occur during its policy period in order for that coverage to apply, then this insurance will only apply to that 'injury or damage' if it occurs during the policy period of this Coverage Part. If the 'controlling underlying insurance' requires that the 'event' causing the particular 'injury or damage' takes place during its policy period in order for that coverage to apply, then this insurance will apply to the claim only if the 'event' causing that 'injury or damage' takes place during the policy period of this Coverage Part."

297.    The 2022-2023 Arch Excess Policy obligates Arch to "defend the insured against any suit seeking damages for such 'injury or damage' when the applicable limits of 'controlling underlying insurance' have been exhausted in accordance with the provisions of such 'controlling underlying insurance'."

298.    The 2022-2023 Arch Excess Policy defines "injury or damage" to mean "any injury or damage, covered in the applicable 'controlling underlying insurance' arising from an 'event'." The 2022-2023 Arch Excess Policy defines "event" to

mean "an occurrence, offense, accident, act, or other event, to which the applicable 'controlling underlying insurance' applies."

### E.   The Markel Excess Policies

299.   For the period of July 31, 2019 to July 31, 2020, Markel issued to Varsity Holding an excess liability insurance policy ("2019-2020 Markel Excess Policy").

300.   The Varsity entities qualify as insureds on the 2019-2020 Markel Excess Policy.

301.   The 2019-2020 Markel Excess Policy obligates Markel to "pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the 'underlying insurance' also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance."

302.   The pertinent "Underlying Insurance" on the 2019-2020 Markel Excess Policy is the 2019-2020 Arch Excess Policy.

303.   The 2019-2020 Markel Excess Policy states that "[t]his policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except: a. We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and b. With respect to any provisions to the contrary contained in this policy."

304.   The 2019-2020 Markel Excess Policy states that Markel "will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit."

305.   For the period of July 31, 2020 to July 31, 2021, Markel issued to Varsity Holding an excess liability insurance policy ("2020-2021 Markel Excess Policy").

306.   The Varsity entities qualify as insureds on the 2020-2021 Markel Excess Policy.

307.   The 2020-2021 Markel Excess Policy obligates Markel to "pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the 'underlying insurance' also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance."

308.   The pertinent "Underlying Insurance" on the 2020-2021 Markel Excess Policy is the 2020-2021 Arch Excess Policy.

309.   The 2020-2021 Markel Excess Policy states that "[t]his policy is subject to the same terms, conditions, agreements, exclusions and definitions as the

"underlying insurance", except: a. We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and b. With respect to any provisions to the contrary contained in this policy."

310.   The 2020-2021 Markel Excess Policy states that Markel "will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit."

311.   For the period of July 31, 2021 to July 31, 2022, Markel issued to Varsity Holding an excess liability insurance policy ("2021-2022 Markel Excess Policy").

312.   The Varsity entities qualify as insureds on the 2021-2022 Markel Excess Policy.

313.   The 2021-2022 Markel Excess Policy obligates Markel to "pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this insurance applies, provided that the 'underlying insurance' also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance."

314.   The pertinent "Underlying Insurance" on the 2021-2022 Markel Excess

Policy is the 2020-2021 Arch Excess Policy.

315.   The 2021-2022 Markel Excess Policy states that "[t]his policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except: a. We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and b. With respect to any provisions to the contrary contained in this policy."

316.   The 2021-2022 Markel Excess Policy states that Markel "will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit."

317.   For the period of July 31, 2022 to July 31, 2023, Markel issued to Varsity Holding an excess liability insurance policy ("2022-2023 Markel Excess Policy").

318.   The Varsity entities qualify as insureds on the 2022-2023 Markel Excess Policy.

319.   The 2022-2023 Markel Excess Policy obligates Markel to "pay those sums in excess of the limits shown in the Schedule Of Underlying Insurance that you become legally obligated to pay as damages because of injury to which this

insurance applies, provided that the 'underlying insurance' also applies, or would apply but for the exhaustion of its applicable Limits Of Insurance."

320.   The pertinent "Underlying Insurance" on the 2022-2023 Markel Excess Policy is the 2022-2023 Arch Excess Policy.

321.   The 2022-2023 Markel Excess Policy states that "[t]his policy is subject to the same terms, conditions, agreements, exclusions and definitions as the "underlying insurance", except: a. We will have no obligation under this policy with respect to any claim or suit that is settled without our consent; and b. With respect to any provisions to the contrary contained in this policy."

322.   The 2022-2023 Markel Excess Policy states that Markel "will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "underlying insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit."

**F.   The Lexington Excess Policies**

323.   For the period of July 31, 2019 to July 31, 2020, Lexington issued to Varsity Brands an excess liability insurance policy ("2019-2020 Lexington Excess Policy").

324.   The Varsity entities qualify as insureds on the 2019-2020 Lexington

Excess Policy.

325.    The 2019-2020 Lexington Excess Policy is a "quota share" policy that shares a per occurrence and aggregate limit with Navigators.

326.    The 2019-2020 Lexington Excess Policy obligates Lexington to pay its "share of those sums that the Insured becomes legally obligated to pay as Loss Amounts in excess of the Underlying Limits by reason of exhaustion of such limits and to which this insurance applies, subject to: 1. The terms and conditions of the Followed Policy, and 2. The Limits of Insurance Shown in the Declarations."

327.    The "Followed Policy" on the 2019-2020 Lexington Excess Policy is the 2019-2020 Markel Excess Policy.

328.    The 2019-2020 Lexington Excess Policy states that "[e]xcept with regard to: (1) the premium, (2) limits of insurance, (3) our defense obligations, (4) any endorsement changing the terms of this policy, and (5) other terms or conditions of this policy inconsistent with the Followed Policy, the provisions of the Followed Policy are incorporated as part of this policy."

329.    The 2019-2020 Lexington Excess Policy states that Lexington "[s]hall have the right and duty to defend any Claim seeking damages to which this insurance applies upon the exhaustion of the Underlying Limits."

330.    The 2019-2020 Lexington Excess Policy defines "Underlying Limits" to mean "any underlying policies, including the Followed Policy."

331.   For the period of July 31, 2020 to July 31, 2021, Lexington issued to Varsity Brands an excess liability insurance policy ("2020-2021 Lexington Excess Policy").

332.   The Varsity entities qualify as insureds on the 2020-2021 Lexington Excess Policy.

333.   The 2020-2021 Lexington Excess Policy is a "quota share" policy that shares a per occurrence and aggregate limit with Navigators.

334.   The 2020-2021 Lexington Excess Policy obligates Lexington to pay its "share of those sums that the Insured becomes legally obligated to pay as Loss Amounts in excess of the Underlying Limits by reason of exhaustion of such limits and to which this insurance applies, subject to: 1. The terms and conditions of the Followed Policy, and 2. The Limits of Insurance Shown in the Declarations."

335.   The "Followed Policy" on the 2020-2021 Lexington Excess Policy is the 2020-2021 Markel Excess Policy.

336.   The 2020-2021 Lexington Excess Policy states that "[e]xcept with regard to: (1) the premium, (2) limits of insurance, (3) our defense obligations, (4) any endorsement changing the terms of this policy, and (5) other terms or conditions of this policy inconsistent with the Followed Policy, the provisions of the Followed Policy are incorporated as part of this policy."

337.   The 2020-2021 Lexington Excess Policy states that Lexington "[s]hall have the right and duty to defend any Claim seeking damages to which this insurance applies upon the exhaustion of the Underlying Limits."

338.   The 2020-2021 Lexington Excess Policy defines "Underlying Limits" to mean "any underlying policies, including the Followed Policy.

339.   For the period of July 31, 2021 to July 31, 2022, Lexington issued to Varsity Brands an excess liability insurance policy ("2021-2022 Lexington Excess Policy").

340.   The Varsity entities qualify as insureds on the 2021-2022 Lexington Excess Policy.

341.   The 2021-2022 Lexington Excess Policy is a "quota share" policy that shares a per occurrence and aggregate limit with Navigators.

342.   The 2021-2022 Lexington Excess Policy obligates Lexington to pay its "share of those sums that the Insured becomes legally obligated to pay as Loss Amounts in excess of the Underlying Limits by reason of exhaustion of such limits and to which this insurance applies, subject to: 1. The terms and conditions of the Followed Policy, and 2. The Limits of Insurance Shown in the Declarations."

343.   The "Followed Policy" on the 2021-2022 Lexington Excess Policy is the 2021-2022 Arch Excess Policy.

344.   The 2021-2022 Lexington Excess Policy states that "[e]xcept with

regard to: (1) the premium, (2) limits of insurance, (3) our defense obligations, (4) any endorsement changing the terms of this policy, and (5) other terms or conditions of this policy inconsistent with the Followed Policy, the provisions of the Followed Policy are incorporated as part of this policy."

345.   The 2021-2022 Lexington Excess Policy states that Lexington "[s]hall have the right and duty to defend any Claim seeking damages to which this insurance applies upon the exhaustion of the Underlying Limits."

346.   The 2021-2022 Lexington Excess Policy defines "Underlying Limits" to mean "any underlying policies, including the Followed Policy.

347.   For the period of July 31, 2022 to July 31, 2023, Lexington issued to Varsity Brands an excess liability insurance policy ("2022-2023 Lexington Excess Policy").

348.   The Varsity entities qualify as insureds on the 2022-2023 Lexington Excess Policy.

349.   The 2022-2023 Lexington Excess Policy is a "quota share" policy that shares a per occurrence and aggregate limit with Navigators.

350.   The 2022-2023 Lexington Excess Policy obligates Lexington to pay its "share of those sums that the Insured becomes legally obligated to pay as Loss Amounts in excess of the Underlying Limits by reason of exhaustion of such limits and to which this insurance applies, subject to: 1. The terms and conditions of the

Followed Policy, and 2. The Limits of Insurance Shown in the Declarations."

351.   The "Followed Policy" on the 2022-2023 Lexington Excess Policy is the 2022-2023 Arch Excess Policy.

352.   The 2022-2023 Lexington Excess Policy states that "[e]xcept with regard to: (1) the premium, (2) limits of insurance, (3) our defense obligations, (4) any endorsement changing the terms of this policy, and (5) other terms or conditions of this policy inconsistent with the Followed Policy, the provisions of the Followed Policy are incorporated as part of this policy."

353.   The 2022-2023 Lexington Excess Policy states that Lexington "[s]hall have the right and duty to defend any Claim seeking damages to which this insurance applies upon the exhaustion of the Underlying Limits."

354.   The 2022-2023 Lexington Excess Policy defines "Underlying Limits" to mean "any underlying policies, including the Followed Policy.

### G.   The Navigators Excess Policies

355.   For the period of July 31, 2019 to July 31, 2020, Navigators issued to Varsity Holding an excess liability insurance policy ("2019-2020 Navigators Excess Policy").

356.   The Varsity entities qualify as insureds on the 2019-2020 Navigators Excess Policy.

357.   The 2019-2020 Navigators Excess Policy is a "quota share" policy that

shares a per occurrence and aggregate limit with Lexington.

358.   The 2019-2020 Navigators Excess Policy obligates Navigators to pay "'loss' to which the 'controlling underlying insurance' applies, or would apply, but for the exhaustion of an Aggregate Limit and to which the policy or policies shown below in the Schedule of Layer Participants apply . . . ."

359.   The 2019-2020 Navigators Excess Policy defines "loss" to mean "bodily injury, property damage, personal and advertising injury or other loss defined by and to which the 'underlying insurance' applies."

360.   The 2019-2020 Navigators Excess Policy defines "Underlying insurance" to mean "the 'controlling underlying insurance' and its underlying insurance policies, if any, including their renewals or replacements."   The "controlling underlying insurance" on the 2019-2020 Navigators Excess Policy is the 2019-2020 Markel Excess Policy.

361.   The 2019-2020 Navigators Excess Policy states that Navigators shall "have the right but not the duty to associate with the insured or any other insurer in the investigation of claims or defense of suits to which this insurance could be reasonably expected to apply. We will have the duty to investigate such claims or defend such suits only if: 1. the "controlling underlying insurance's" expressed duty to investigate or defend ends because it has paid the full limit of insurance in

judgments or settlement of claim; and 2. All carriers shown below in the Schedule of Layer Participants have a duty to investigate such claims or defend such suits."

362.   For the period of July 31, 2020 to July 31, 2021, Navigators issued to Varsity Holding an excess liability insurance policy ("2020-2021 Navigators Excess Policy").

363.   The Varsity entities qualify as insureds on the 2020-2021 Navigators Excess Policy.

364.   The 2020-2021 Navigators Excess Policy is a "quota share" policy that shares a per occurrence and aggregate limit with Lexington.

365.   The 2020-2021 Navigators Excess Policy obligates Navigators to pay "'loss' to which the 'controlling underlying insurance' applies, or would apply, but for the exhaustion of an Aggregate Limit and to which the policy or policies shown below in the Schedule of Layer Participants apply . . . ."

366.   The 2020-2021 Navigators Excess Policy defines "loss" to mean "bodily injury, property damage, personal and advertising injury or other loss defined by and to which the 'underlying insurance' applies."

367.   The 2020-2021 Navigators Excess Policy defines "Underlying insurance" to mean "the 'controlling underlying insurance' and its underlying insurance policies, if any, including their renewals or replacements."    The

"controlling underlying insurance" on the 2020-2021 Navigators Excess Policy is the 2020-2021 Markel Excess Policy.

368.    The 2020-2021 Navigators Excess Policy states that Navigators shall "have the right but not the duty to associate with the insured or any other insurer in the investigation of claims or defense of suits to which this insurance could be reasonably expected to apply. We will have the duty to investigate such claims or defend such suits only if: 1. the "controlling underlying insurance's" expressed duty to investigate or defend ends because it has paid the full limit of insurance in judgments or settlement of claim; and 2. All carriers shown below in the Schedule of Layer Participants have a duty to investigate such claims or defend such suits."

369.    For the period of July 31, 2021 to July 31, 2022, Navigators issued to Varsity Holding an excess liability insurance policy ("2021-2022 Navigators Excess Policy").

370.    The Varsity entities qualify as insureds on the 2021-2022 Navigators Excess Policy.

371.    The 2021-2022 Navigators Excess Policy is a "quota share" policy that shares a per occurrence and aggregate limit with Lexington.

372.    The 2021-2022 Navigators Excess Policy obligates Navigators to pay "'loss' to which the 'controlling underlying insurance' applies, or would apply, but

for the exhaustion of an Aggregate Limit and to which the policy or policies shown below in the Schedule of Layer Participants apply . . . ."

373.    The 2021-2022 Navigators Excess Policy defines "loss" to mean "bodily injury, property damage, personal and advertising injury or other loss defined by and to which the 'underlying insurance' applies."

374.    The 2021-2022 Navigators Excess Policy defines "Underlying insurance" to mean "the 'controlling underlying insurance' and its underlying insurance policies, if any, including their renewals or replacements."    The "controlling underlying insurance" on the 2021-2022 Navigators Excess Policy is the 2021-2022 Markel Excess Policy.

375.    The 2021-2022 Navigators Excess Policy states that Navigators shall "have the right but not the duty to associate with the insured or any other insurer in the investigation of claims or defense of suits to which this insurance could be reasonably expected to apply. We will have the duty to investigate such claims or defend such suits only if: 1. the "controlling underlying insurance's" expressed duty to investigate or defend ends because it has paid the full limit of insurance in judgments or settlement of claim; and 2. All carriers shown below in the Schedule of Layer Participants have a duty to investigate such claims or defend such suits."

376.    For the period of July 31, 2022 to July 31, 2023, Navigators issued to Varsity Holding an excess liability insurance policy ("2022-2023 Navigators Excess

Policy").

377.   The Varsity entities qualify as insureds on the 2022-2023 Navigators Excess Policy.

378.   The 2022-2023 Navigators Excess Policy is a "quota share" policy that shares a per occurrence and aggregate limit with Lexington.

379.   The 2022-2023 Navigators Excess Policy obligates Navigators to pay "'loss' to which the 'controlling underlying insurance' applies, or would apply, but for the exhaustion of an Aggregate Limit and to which the policy or policies shown below in the Schedule of Layer Participants apply . . . ."

380.   The 2022-2023 Navigators Excess Policy defines "loss" to mean "bodily injury, property damage, personal and advertising injury or other loss defined by and to which the 'underlying insurance' applies."

381.   The 2022-2023 Navigators Excess Policy defines "Underlying insurance" to mean "the 'controlling underlying insurance' and its underlying insurance policies, if any, including their renewals or replacements."   The "controlling underlying insurance" on the 2022-2023 Navigators Excess Policy is the 2022-2023 Markel Excess Policy.

382.   The 2022-2023 Navigators Excess Policy states that Navigators shall "have the right but not the duty to associate with the insured or any other insurer in the investigation of claims or defense of suits to which this insurance could be

reasonably expected to apply. We will have the duty to investigate such claims or defend such suits only if: 1. the "controlling underlying insurance's" expressed duty to investigate or defend ends because it has paid the full limit of insurance in judgments or settlement of claim; and 2. All carriers shown below in the Schedule of Layer Participants have a duty to investigate such claims or defend such suits."

## III.   THE VARSITY EPL POLICIES

### A.   The Evanston EPL Policy

383.   For the period of April 28, 2022 to April 28, 2023, Evanston issued to BCPE Hercules Holdings, LP a management liability policy, which includes an employment practices and third party discrimination liability coverage part (the "Evanston EPL Policy").

384.   The Varsity entities qualify as insureds on the Evanston EPL Policy.

385.   In pertinent part, the Evanston EPL Policy provides coverage for "all Loss which the Insureds become legally obligated to pay on account of any Third Party Discrimination Claim first made against the Insureds during the Policy Period or during the Extended Reporting Period, if purchased, for a Wrongful Act taking place before or during the Policy Period."

386.   The Evanston EPL Policy defines "Loss" to include, among other things, damages, settlements, and defense expenses.

387.   The Evanston EPL Policy defines "Third Party Discrimination Claim"

as a Claim "which is brought by or on behalf of any natural person who is a customer or client of the Company and who is not an Insured Person or an applicant for employment with the Company, for a Wrongful Act or Wrongful Internet Activity either of which constitutes an actual or alleged violation of any law or public policy concerning actual or alleged discrimination or sexual harassment."

388.   The Evanston EPL Policy defines "Wrongful Act" to include "[a]ny actual or alleged error, neglect, statement, misstatement, misleading statement, act, omission, neglect, or breach of fiduciary or other duty by any of the Insured Persons in their capacity as such solely by reason of his or her status as such or in an Outside Position, or by the Company . . . ."

### B.    The Berkshire Excess EPL Policy

389.   For the period of April 28, 2022 to April 28, 2024, Berkshire issued to BCPE Hercules Holdings, LP an excess policy, which provides coverage above the Evanston EPL Policy (the "Berkshire Excess EPL Policy").

390.   The Varsity entities qualify as insureds on the Berkshire Excess EPL Policy.

391.   This Berkshire Excess EPL Policy states that it "shall provide coverage in accordance with the same terms, conditions and limitations of the Followed Policy, or any more restrictive provisions of the Underlying Excess Policies, except as otherwise set forth in this policy."  The "Followed Policy" is the Evanston EPL

Policy.

392.   The Berkshire Excess EPL Policy states that "[t]he coverage obligations under this policy shall attach to the Insurer only after all Underlying Insurance has in fact been exhausted by payment, in legal currency, of loss by or on behalf of the insurers of the Underlying Insurance, or by or on behalf of the Insured(s)." The "Underlying Insurance" is the Evanston EPL Policy.

### C.     The Westchester Excess EPL Policy

393.    For the period of April 28, 2022 to April 28, 2023, Westchester issued to BCPE Hercules Holdings, LP an excess policy, which provides coverage above the Berkshire Excess Policy (the "Westchester Excess EPL Policy").

394.   The Varsity entities qualify as insureds on the Westchester Excess EPL Policy.

395.   The Westchester Excess EPL Policy states that "the Insurer agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy, except as may be modified by endorsement(s) attached hereto and forming part of the policy." The "Followed Policy" is the Evanston EPL Policy.

396.   The Westchester Excess EPL Policy states that "[i]t is agreed the Insurer shall pay on behalf of the Insured as defined in the Followed Policy for Loss by reason of exhaustion by payments of all Underlying Policy Limits of all

underlying policies by the underlying insurers issuing such underlying policies and/or the Insureds, subject to i) the terms and conditions of the Followed Policy as in effect the first day of the Policy Period; ii) the Limit of Liability as stated in Item 6 of the Declarations; and iii) the terms and conditions of, and the endorsements attached to, this Policy. In no event shall this policy grant broader coverage than would be provided by the Followed Policy." The Underlying Policy Limits are the combined limits of the Evanston EPL Policy and Berkshire Excess EPL Policy.

### The Underlying Actions and Claims[1]

A.    **The South Carolina Federal Action**

397.   Beginning in August 2022, attorneys for a number of all star cheer athletes announced that they were filing a lawsuit in federal court in South Carolina asserting claims for alleged sexual abuse perpetrated by employees of the team-affiliated gyms and other individuals starting when the claimants were minors (the "South Carolina Federal Action").  Varsity and other entities also were included as defendants in that action.

398.   The plaintiffs in the South Carolina Federal Action (the "Doe Plaintiffs") allege that Varsity created and controlled the U.S. All Star Federation ("USASF") and the USA Federation for Sport Cheering ("USA Cheer"), which

---

[1] The civil actions and unfiled claims described in subparts A through C below are collectively referred to as the "Underlying Actions and Claims."

purportedly established the "sanctioning body" that was purportedly responsible for regulating all star cheer and ensuring a safe environment for young athletes through guidelines, policies, procedures, and processes.

399.   The Doe Plaintiffs also allege that USASF began to certify all star cheer gyms "with a special seal of approval" that indicated that the gym and its coaching staff could be trusted for cheerleader safety.

400.   According to the Doe Plaintiffs, Varsity, in conjunction with USASF and USA Cheer, hosted multiple competitive events throughout the United States. During these competitions, teams from across the country converged at a pre-selected location, and used hotels, premises, and businesses allegedly hand-selected by Varsity.

401.   Thus, despite the fact that most of the alleged perpetrators had no employment relationship with Varsity, the Doe Plaintiffs alleged that, among other things, because they supposedly suffered abuse at the locations of Varsity-sponsored competitive events and off-site locations allegedly affiliated with those events, Varsity is liable for their injuries.

402.   The Doe Plaintiffs also contend that Varsity, through USASF and USA Cheer, helped to the impression that system was safe to draw in more athletes, despite its alleged knowledge that young athletes were at risk for drug and alcohol abuse and/or for sexual abuse.

403.   The majority of Doe Plaintiffs allege that, whether at the student athletes' homes or during national competitions, when various teams allegedly participated in parties together, drugs and alcohol were directly provided to the athletes by their choreographers and coaches.

404.   These allegations of drug and alcohol abuse are separate and apart from additional allegations of sexual harassment, assault, and abuse that sometimes did not occur until the athletes were older.

405.   Several of the Doe Plaintiffs also claim that there were texts and videos taken of them drinking or taking drugs that, in many instances, were posted on social media and would have constituted an invasion or violation of their privacy.

406.   Each of the Doe Plaintiffs also alleges various instances of being subjected to sexual innuendos, sexual harassment, solicitation, inappropriate sexual conduct, sexual abuse and/or sexual assault carried out by various coaches, choreographers, or gym members.

407.   None of the Doe Plaintiffs alleges that Varsity participated in any form of drug and alcohol distribution or sexual impropriety.

408.   The Doe Plaintiffs sought recovery from Varsity based on alleged violations of The Protecting Young Victims From Sexual Abuse Act, Civil Conspiracy in violation of the RICO Act, violation of the South Carolina Unfair Trade Practices Act, Gross Negligence, Negligent Supervision, Breach of Contract,

Unjust Enrichment, Fraud, Negligent Security, and Civil Conspiracy.

409.   On June 20, 2023, the Court granted Varsity's motion to dismiss with respect to all of the Doe Plaintiffs' claims except gross negligence, unjust enrichment, and negligent security.  Among other things, the court held that Varsity could **<u>not</u>** be held liable for negligent supervision, because Varsity had no employment relationship with the alleged abusers.  However, the court allowed the gross negligence claims (among a few others) to proceed on the ground that if the Doe Plaintiffs could prove the allegations in the relevant complaint, Varsity could be held liable for bringing about conditions that resulted in the plaintiffs' alleged sexual abuse.  As South Carolina law permits for joint and several liability, this creates the risk that Varsity could be held liable for the entire damages awarded to a plaintiff, even if its proportional responsibility was minimal relative to that of its co-defendants.

### B.    Other Actions Filed Against Varsity

410.   Similar negligence-based claims as those made by the Doe Plaintiffs also have been asserted against Varsity in other jurisdictions, just as in South Carolina, alongside allegations against the individuals and gyms who purportedly perpetrated the alleged abuse.

411.   For example, in a North Carolina federal court action, in addition to claims against alleged perpetrators and employers, a plaintiff asserted allegations

against Varsity and others that are substantially similar to the allegations and claims asserted in the South Carolina Federal Action.

412.   In a Florida federal court action, a plaintiff alleged that a cheer coach engaged in sexually explicit behavior, including purportedly exposing himself to the minor plaintiff at her home, at the gym, and at social events.  The alleged perpetrator was subsequently arrested.   Varsity and other entities also are included as defendants.

413.   In a South Carolina state court action, a plaintiff alleged that she sent and received explicit messages from a cheer coach while she was a minor, was allegedly provided alcohol, and was persuaded into performing various sexual acts with the coach.  In addition to the coach and gym, Varsity and other entities are included as defendants.

414.   In a Georgia federal court action, a plaintiff alleged that he was raped by a coach as a minor and also received unwanted photos of another adult cheerleader's genitals.

415.   Similarly, in a Tennessee federal court action, one of the minor plaintiffs alleged that he received sexually explicit messages, photos, and videos from a coach, used drugs with the coach, and engaged in sexual acts with the coach. The other minor plaintiff also alleged that the same coach sent nude photos and engaged in sexual acts with the minor plaintiff.

416.   In an Ohio federal court action, a minor plaintiff alleged that two coaches began to exchange messages and pressed the minor plaintiff to visit the coach's hotel room.  At the hotel room, the coaches allegedly offered the minor plaintiff alcohol and then purportedly proceed to have sex with the minor plaintiff.

417.   In a California federal court action, a minor plaintiff alleged that a coach began implementing unusual stunt spotting techniques, which resulted in inappropriate touching.  The minor plaintiff alleged that the coach's conduct progressed to grouping, fondling, and other unwanted touching.  The minor plaintiff further alleged that the coach engaged in sexual acts with the plaintiff.

418.   In each action, in addition to claims against the alleged perpetrators and their employer/gyms, Varsity is among the several other entities named as defendants.

### C.   Unfiled Claims Against Varsity

419.   In addition to the filed lawsuits, there are a number of additional all star cheer-related sexual abuse claimants in multiple states represented by the same firm as the one in the South Carolina Federal Action, who have asserted allegations that are similar in various respects to those set forth in the filed lawsuits and involve various alleged perpetrators.   These claims, which pose a risk to Varsity, will be filed if they are not resolved as part of the overall conditional global settlement negotiated by Varsity.

**The Insurers' Refusal to Fund the Reasonable Conditional Settlement**

420.   As the sexual abuse claims against Varsity began to pour in starting in 2022, Varsity promptly notified its Insurers and requested a defense.  Not a single one of the Primary CGL Insurers that owed Varsity a defense met its obligations.

421.   Only a few of the Primary CGL Insurers agreed to defend Varsity but then only as to certain of the claims, and with improper conditions placed upon the staffing and hourly rates.  At least one of those carriers has since withdrawn its defense of several of the claims.  However, the majority of the other Insurers unreasonably disclaimed any right to coverage, thereby purporting to avoid their defense obligations and leaving Varsity to fend for itself without any insurer-paid defense as to some of the claims.

422.   In August 2023, the South Carolina federal court ordered mediation. All but a few of the claimants, through counsel, and Varsity engaged in a lengthy series of mediation sessions in September and October 2023.  The result was a conditional settlement demand from the claimants' counsel to Varsity that was reasonable in amount.  The claimants' counsel and Varsity agreed that Varsity would have three weeks to determine if it could obtain funding for this amount.  Varsity also faced significant pressure to resolve the claims quickly because, shortly after the expiration of the three weeks, Varsity would be required to engage in expedited and extensive discovery, including providing discovery responses in the federal

South Carolina case, which could further impact the ability to resolve the Doe Plaintiffs' claims.

423.   Varsity notified the Insurers of the demand and its desire to accept the demand, and it requested approval and funding.  Varsity had adequate insurance to fund the entire settlement, if the Insurers construed their policies reasonably.  In addition, both before and after the demand, Varsity supplied the Insurers with copious information and documentation about the underlying claims.  Yet the Insurers dragged their feet, making unnecessary and unrealistic demands for information that appeared more designed to make a record for their refusal to fund the settlements fully than to fairly adjust the claims.

424.   At the end of the three weeks, the Insurers refused to fund the settlement up to their applicable policy limits.  They have wrongfully claimed, among other things, that Varsity's liability for individual claimants' injuries for sexual abuse was not covered based on application of a Sexual Abuse and Molestation Endorsement and the timing of the start of the abuse.  This position was taken in bad faith.  The settlement amounts were reasonable and, by not settling within policy limits, the Insurers were and are exposing Varsity to a significant risk of liability in the form of severe jury verdicts.

## <u>FIRST CAUSE OF ACTION</u>
### (Breach of Contract - Duty to Defend: Primary CGL Insurers)

425.   Varsity repeats and realleges the allegations contained in paragraphs 1

through 424 above as if fully set forth herein.

426.   Varsity has incurred, and will continue to incur, substantial costs for its defense of the Underlying Actions and Claims, for which the Primary CGL Insurers are jointly and severally liable under the terms of their respective Primary CGL policies that they issued to Varsity (collectively, the "Primary CGL Policies").

427.   The Primary CGL Policies constitute valid and enforceable contracts for the provision of a defense of Varsity against the Underlying Actions and Claims.

428.   Varsity has satisfied any applicable conditions under the Primary CGL Policies that have not been excused or waived.

429.   Each of the Primary CGL Insurers has failed or otherwise refused to accept or perform its legal obligations under the Primary CGL Policies with respect to payment of legal fees and expenses that Varsity incurred in some or all of the Underlying Actions and Claims.

430.   The failure or refusal of the Primary CGL Insurers to defend Varsity with respect to the Underlying Actions and Claims constitutes a breach of the Primary CGL Policies.

431.   As a result of the Primary CGL Insurers' breaches of their duties to defend, Varsity has been injured and will continue to be injured if it is unable to settle the underlying claims, and is entitled to judgment awarding it damages for breach of the Primary CGL Policies in an amount to be determined on summary

judgment or at trial, plus pre-judgment interest, attorneys' fees, and any consequential damages arising from the Primary CGL Insurers' breaches.

## SECOND CAUSE OF ACTION
### (Breach of Contract - Duty to Indemnify:
### Primary CGL Insurers)

432.   Varsity repeats and realleges the allegations contained in paragraphs 1 through 424 above as if fully set forth herein.

433.   Varsity has incurred and will continue to incur damages in the form of costs to pay settlements and/or judgments in the Underlying Actions and Claims for which the Primary CGL Insurers are responsible pursuant to the terms of their respective Primary CGL policies that they issued to Varsity.

434.   The Primary CGL Policies constitute valid and enforceable contracts for the provision of insurance coverage for damages and settlements incurred by Varsity in the Underlying Actions and Claims.

435.   Varsity has complied with all terms, conditions and prerequisites to coverage under the Primary CGL Policies, or are excused from doing so based on the Primary CGL Insurers' coverage declinations and/or other conduct.

436.   Each of the Primary CGL Insurers refused to accept its legal obligations to provide coverage for Varsity in response to some or all of the Underlying Actions and Claims.

437.   Each of the Primary CGL Insurers' failure to indemnify Varsity fully

for a settlement of the Underlying Actions and Claims constitutes a breach of the Primary CGL Policies.

438.   As a result of the Primary CGL Insurers' breaches of their duties to indemnify Varsity, Varsity has been injured, and is entitled to judgment awarding it damages for breach of the Primary CGL Policies in an amount to be determined on summary judgment or at trial, plus pre-judgment interest, its attorneys' fees, and any consequential damages arising from the Primary CGL Insurers' breaches.

### <u>THIRD CAUSE OF ACTION</u>
**(Bad Faith Refusal to Settle:<br>Primary CGL Insurers)**

439.   Varsity repeats and realleges the allegations contained in paragraphs 1 through 424 above as if fully set forth herein.

440.   Among other things, each of the Primary CGL policies issued by the Primary CGL Insurers contains an implied duty of good faith and fair dealing.

441.   The duty of good faith and fair dealing requires to settle claims within their respective policy limits where recovery in excess of those limits is substantially likely.

442.   The duty of good faith and fair dealing also precludes the Primary CGL Insurers from elevating their own interests above those of Varsity.

443.   The Primary CGL Insurers have received a reasonable offer to settle most of the Underlying Actions and Claims asserted against Varsity within the

applicable limits of the respective policies.

444.   Varsity has advised the Primary CGL Insurers that it faces reasonably certain and significant liability in connection with these claims and that any recovery is substantially likely to exceed the applicable limits of the Primary CGL Policies.

445.   The Primary CGL Insurers know or reasonably should know that there are no legitimate grounds for disagreement over coverage for the Underlying Actions and Claims, and that the extensive and obstructionist requests for ever more detailed information about particular claimants' allegations about the timing and impact of the drug and alcohol abuse and/or sexual abuse were neither reasonable nor necessary in the context of authorizing and funding a reasonable settlement of those claims.

446.   Indeed, the Primary CGL Insurers' unfounded delay in authorizing settlements and their varying degrees of refusal to fund (including in some Primary CGL Insurers' cases a wholesale refusal to contribute *any* monies), constitutes conscious wrongdoing considering the Primary CGL Insurers knew, or should have known, the unnecessary and potentially significant risks to which they are exposing Varsity in refusing to fund settlement of the Underlying Actions and Claims.

447.   The Primary CGL Insurers knew or reasonably should have known that the claims to be settled by Varsity fall within the scope of coverage of the policies issued by the Primary CGL Insurers, but despite this fact: took unreasonable

positions with respect to how much coverage, if any, was available; unreasonably demanded that Varsity postpone attending a court-ordered mediation even after the South Carolina federal court indicated it was sanctioning USASF after its insurer-appointed defense counsel made a similar request (and has since ordered sanctions); insisted on a level of detailed information with respect to the Underlying Actions and Claims that simply does not exist in the context of sexual abuse cases or was not obtainable prior to engaging in formal discovery; unreasonably ignored or discounted the risk of the Underlying Actions and Claims proceeding to discovery and trial; refused to acknowledge or otherwise behaved in a way that ignored that it is better where possible (as it was here) to settle these types of Underlying Actions and Claims prior to engaging in extensive discovery; intentionally breached the parties' standstill agreement; and behaved in such an unreasonable and dilatory way as to have threatened even the possibility of negotiating a conditional settlement agreement with the majority of the underlying claimants.

448.   The Primary CGL Insurers' behavior towards Varsity—and ultimately to the underlying claimants—was no mere mistake.  Upon information and belief, each of the Primary CGL Insurers is very experienced in settling these types of claims and, upon further information and belief, has settled thousands if not tens of thousands of such claims over the years.  Against this backdrop of experience, the Primary CGL Insurers adopted a deliberate strategy of delaying and avoiding

funding a reasonable settlement so as to allow the risk of litigation and the pressure to settle to build against both Varsity and the underlying claimants to the point where the possibility to settle was jeopardized.  Moreover, the Primary CGL Insurers' delay and refusal to fund a settlement were for the purpose of trying to force Varsity to use its own monies, rather than the coverage dollars it had paid decades' worth of premium for, as time ran out on the conditional settlement offer and discovery—and then trials—became unavoidable.  The Primary CGL Insurers were motivated to expose their insured to this type of risk because it had the benefit of shifting the financial burden to Varsity, and protecting—and elevating—the Primary CGL Insurers' own interests above those of Varsity.

449.   The Primary CGL Insurers' conduct constitutes bad faith by any measure.

450.   As a result of the Primary CGL Insurers' deliberate bad faith conduct, Varsity has been injured and will continue to be injured, and is entitled to judgment awarding it damages in an amount to be determined, plus pre-judgment interest, attorneys' fees, and all other categories of damages arising from the Primary CGL Insurers' breaches to which Varsity is entitled under common law and/or statute.

## <u>FOURTH CAUSE OF ACTION</u>
### (Declaratory Judgment: All Insurers)

451.   Varsity repeats and realleges the allegations contained in paragraphs 1 through 424 above as if fully set forth herein.

452.   An actual and justiciable controversy exists between Varsity and all of the Insurers, as well as between the Insurers, regarding the Insurers' respective obligations to Varsity under each of the policies listed above and the construction of those individual policies.  That controversy will not be resolved even if Varsity were to prevail on its First Cause of Action for Breach of Contract and Second Cause of Action for Breach of Contract against the Primary CGL Insurers because of, among other things, the need to allocate liability among the various Insurers.

453.   Pursuant to the terms of the Primary CGL Policies, the Primary CGL Insurers are each obligated to pay for damages, settlements, and defense expenses incurred by Varsity in the Underlying Actions and Claims.

454.   The Primary CGL Insurers dispute their legal obligations to pay for damages, settlements, and defense expenses incurred by Varsity in the Underlying Actions and Claims.

455.   Pursuant to the terms of the Excess GL Policies, the Excess GL Insurers are each obligated, upon the attachment of their individual Excess GL Policies, to pay for damages, settlements, and defense expenses incurred by Varsity in the Underlying Actions and Claims.

456.   Upon information and belief, the Excess GL Insurers dispute their legal obligations to pay for damages, settlements, and defense expenses incurred by Varsity in the Underlying Actions and Claims.

457.   Pursuant to the terms of the EPL Policies, the EPL Insurers are each obligated, upon the attachment of their individual EPL Policies, to pay for damages, settlements, and defense expenses incurred by Varsity in the Underlying Actions and Claims.

458.   Upon information and belief, the EPL Insurers dispute their legal obligations to pay for damages, settlements, and defense expenses incurred by Varsity in the Underlying Actions and Claims.

459.   Pursuant to 10 *Del. C.* §§ 6501, et seq., the Court should enter a declaratory judgment determining all of the parties' rights, duties and obligations to Varsity and as between the Insurers.

460.   The issuance of declaratory relief by this Court will terminate the existing controversy among the parties.

## FIFTH CAUSE OF ACTION
### (Breach of Standstill Agreement: Arch)

461.   Varsity repeats and realleges the allegations contained in paragraphs 1 through 424 above as if fully set forth herein.

462.   Pursuant to an October 13, 2023 email exchange, Varsity and Arch agreed to, among other things, a three-week standstill period to give Varsity and Arch time to work through any coverage issues relating to a potential settlement of the Underlying Claims and Actions (the "Standstill Agreement").

463.   Under the Standstill Agreement, the three-week standstill period

would expire at the end of the day on November 3, 2023.

464.   Despite its agreement to the contrary, Arch filed a lawsuit against Varsity in the U.S. District Court for the Western District of Tennessee on October 30, 2023.  Arch's lawsuit seeks a declaration of its coverage obligations to Varsity in connection with the Underlying Claims and Actions.

465.   Arch has refused to dismiss or otherwise withdraw the complaint it filed prior to the expiration of the three-week standstill period contained in the Standstill Agreement.

466.   The Standstill Agreement constitutes a valid and enforceable contract.

467.   Varsity has satisfied any applicable conditions under the Standstill Agreement that have not otherwise been excused or waived.

468.   Arch failed to uphold its obligations under the Standstill Agreement when it filed suit against Varsity prior to the expiration of the three-week standstill period.

469.   Arch's conduct constitutes a breach of the Standstill Agreement.

470.   As a result of Arch's breach of the Standstill Agreement, Varsity has been injured and will continue to be injured, and is entitled to judgment awarding it damages for breach of the Standstill Agreement in an amount to be determined on summary judgment or at trial, plus pre-judgment interest, attorneys' fees, and any consequential damages arising from Arch's breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Varsity prays for judgment as follows:

A.     On the First Cause of Action, Varsity requests that this Court enter judgment in favor of Varsity and against each of the Primary CGL Insurers awarding Varsity damages for the costs it incurred in defending against the Underlying Actions and Claims, together with attorneys' fees and costs and pre-judgment interest;

B.     On the Second Cause of Action, Varsity requests that this Court enter a judgment in favor of Varsity and against each of the Primary CGL Insurers, and award compensatory damages in an amount to be determined at trial, as well as pre-judgment and post-judgment interest on those amounts of indemnity that each of the Primary CGL Insurers wrongfully refused to pay Varsity, together with attorneys' fees and costs and pre-judgment interest;

C.     On the Third Cause of Action, Varsity requests that this Court enter a judgment in favor of Varsity and against the Primary CGL Insurers, and award compensatory, consequential, and all other damages to which Varsity is entitled in an amount to be determined at trial (whether in law, equity, or under statute), as well as pre-judgment and post-judgment interest on those amounts the CGL Insurers wrongfully refused to pay Varsity, together with attorneys' fees and costs and pre-judgment interest;

D.      On the Fourth Cause of Action, Varsity requests that the Court enter a declaratory judgment in favor of Varsity and against the Insurers, declaring the rights and obligations of the parties with respect to the Insurers' obligations to defend and indemnify Varsity in connection with the Underlying Actions and Claims;

E.      On the Fifth Cause of Action, Varsity requests that this Court enter judgment in favor of Varsity and against Arch, awarding Varsity compensatory, consequential, and all other damages to which Varsity is entitled in an amount to be determined at trial, as well as pre-judgment and post-judgment interest on those amounts, together with attorneys' fees and costs; and

F.      Varsity requests such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Varsity hereby demands a trial by a jury of twelve on all triable issues and claims raised by this Complaint.

Dated: November 4, 2023

**BLANK ROME LLP**

/s/ David A. Dorey
David A. Dorey (No. 5283)
James G. Gorman III (No. 6284)
1201 N. Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6431
Facsimile: (302) 425-6464
David.Dorey@blankrome.com
James.Gorman@blankrome.com

*Of counsel (pro hac vice applications forthcoming)*:

Natasha Romagnoli
Hannah K. Ahn
BLANK ROME LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000 (Tel.)
Natasha.Romagnoli@BlankRome.com
Hannah.Ahn@BlankRome.com

David A. Thomas
BLANK ROME LLP
2029 Century Park East
Los Angeles, CA 90067
(424) 239-3434 (Tel.)
David.Thomas@BlankRome.com

Seth Lamden
Jason Frye
BLANK ROME LLP
444 West Lake St., Suite 1650
Chicago, IL 60606
(312) 776-2524 (Tel.)
Seth.Lamden@BlankRome.com
Jason.Frye@BlankRome.com