# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| Jane Doe 1[1], Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 6, Jane Doe 7, John Doe 1, John Doe 2, and John and Jane Does 1-100, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **FIRST AMENDED COMPLAINT** **(Jury Trial Demanded)** |
| Varsity Brands, LLC; Varsity Spirit, LLC; Varsity Brands Holding Company, Inc.; U.S. All Star Federation; USA Federation of Sport Cheering d/b/a USA Cheer; Jeff Webb, Charlesbank Capital Partners, LP; Bain Capital, LP; Rockstar Cheer & Dance, Inc., Katherine Anne Foster as the personal representative of the Estate of Scott Foster; Kathy Foster individually, Kenny Feeley, Josh Guyton, Nathan Allan Plank, Christopher Hinton, Tracy a/k/a or f/k/a Traevon Black, Peter Holley, and other Unknown Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**STATEMENT OF THE CASE**

Plaintiff files this complaint by and through undersigned counsel of record against the

above-named Defendants for money damages in connection with conduct: (1) in violation of the

Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, 18

U.S.C. §2255; (2) constituting a civil conspiracy in violation of the Racketeer Influenced and

---

[1] Given the nature of the subject matter as well as the potential for harm that exists against those who come forward to inform against Defendants, the Plaintiffs in this matter will be identified only as Jane Does or John Does in conjunction with the factual underpinnings on this complaint. *See B.R. v. F.C.S.B.*, 17 F.4th 485 (4th Cir. 2021).

Corrupt Organization (RICO) Act, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §1962(c) and (d); (3) in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-20; and (4) giving rise to common law claims of gross negligence, negligent supervision, and assault/battery; and (5) constituting violations of contractual and/or equitable responsibilities owed to Plaintiffs.  As a direct and proximate result of Defendants' collective and individual conduct, Plaintiffs sustained and will continue to sustain actual and ongoing injuries and damages, and in support thereof they allege as follows:

## **INTRODUCTION**

1.      For over 20 years, Scott Foster operated, managed, and coached young cheerleaders from across the United States.

2.      On August 22, 2022, Scott Foster died of a self-inflicted gunshot wound near his home in Greenville, South Carolina.

3.      At the time of his death, Foster, along with his wife, Kathy Foster, were the owners of a pre-eminent cheerleading gym and coaching empire in the upstate of South Carolina. Upon information and belief, Mr. Foster had recently learned of a criminal investigation against him in his capacity as the owner, manager, and coach of Rockstar Greenville.

4.      Foster's death opened a deluge of allegations against not only Scott Foster, but also against his wife Kathy Foster, their gym, Rockstar Greenville (together "the Rockstar Greenville Defendants"), and other Rockstar affiliated gyms, as well as Varsity Spirit, LLC[2], its affiliated companies their parent company Bain Capital, LP and their governing bodies, the United States All-Star Federation ("USASF") and USA Cheer (collectively, "the Defendants").

---

[2] As used herein, Varsity Spirit, LLC, its affiliate entities, and its governance entities, USASF, and USA Cheer are referred to collectively as "the Varsity Defendants."

5.      Upon information and belief, at all times relevant to this complaint, Defendants established a competitive environment soliciting young athletes to cross state lines with minimal parental or adult supervision to converge at pre-scheduled locations where these athletes were then exposed to drugs, alcohol, and predatory conduct by adults, including coaches and choreographers, all while publicly representing that Defendants publicly purported to provide a culture of safety in the sport.

6.      Upon information and belief, the Rockstar Greenville Defendants, along with other gyms and coaches were empowered and placed in positions of trust and authority by the Varsity Defendants, all while the Varsity Defendants knew or should have known that these same coaches and gyms were pervasively abusing their athletes.

7.      Upon information and belief, the scheme to anoint specific coaches and disregard safety protocols was part of an elaborate plan by the Varsity Defendants to create a pipeline of young athletes, each of whom represented a significant stream of revenue for the Varsity Defendants worth billions of dollars.

8.      As set forth in this complaint, the Defendants, together and individually have created, organized, and propagated a system of young-athlete abuse against innocent victims including the John and Jane Doe Plaintiffs.

9.      This is a complaint for legal and equitable relief for the victims of this scheme.

## JURISDICTION, PARTIES, AND VENUE

10.      This action arises pursuant to, and involves questions requiring the interpretation of, the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

11.     Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

12.     At all times relevant to this complaint, Plaintiff Jane Doe 1 resided in San Diego, California.

13.     At all times relevant to this complaint, Plaintiff Jane Doe 2 resided in San Diego, California.

14.     At all times relevant to this complaint, Plaintiff John Doe 1 resided in Austel, Georgia.

15.     At all times relevant to this complaint, Plaintiff Jane Doe 3 resided in Fairview, North Carolina.

16.     At all times relevant to this complaint, Plaintiff John Doe 2 resided in Savannah, Georgia.

17.     At all times relevant to this complaint, Plaintiff Jane Doe 4 resided in Greenville, South Carolina.

18.     At all times relevant to this complaint, Plaintiff Jane Doe 5 was a citizen and resident of San Diego, California.

19.     At all times relevant to this complaint, Plaintiff Jane Doe 6 was a citizen and resident of Johns Creek, Georgia.

20.     At all times relevant to this complaint, Plaintiff Jane Doe 7 was a citizen and resident of Hendersonville, North Carolina.

21.     Scott Foster, was a resident of Greenville County, South Carolina, and co-owned and co- operated Defendant Rock Star Cheer and Dance, Inc. At all times relevant to this

complaint, Defendant Katherine Ann Foster was the duly appointed personal representative of the estate of Scott Tyler Foster, 2022-ES-23-02552, and was so appointed on September 7, 2022.

22.     Upon information and belief, at all times relevant to this complaint, Defendant Kathy Foster was a resident of Greenville County, South Carolina, and co-owned, co-operated, managed and/or controlled Defendant Rock Star Cheer and Dance, Inc.

23.     Upon information and belief, at all times relevant to this complaint, Defendant Kenny Feeley was a coach and protégé of Scott Foster, working in the course and scope of his employment with Defendant Carolina All-Stars. He is a graduate of the University of Louisville System. Currently, Feely is the founder and owner of Spring CDT, a United States based international instructional cheerleading company focusing on scholastic, collegiate, and all-star cheerleading.

24.     At all times relevant to this complaint, Defendant Josh Guyton was a coach and protégé of Defendant Scott Foster, who was working on behalf of and in the course and scope of his employment with Defendant Rockstar.

25.     At all times relevant to this complaint, Defendant Christopher Hinton was a coach and protégé of Defendant Scott Foster, who was working on behalf of and in the course and scope of his employment with Defendant Rockstar.

26.     At all times relevant to this complaint, Defendant Nathan Allan Plank was a coach and protégé of Defendant Scott Foster, who was working on behalf of and in the course and scope of his employment with Defendant Rockstar.

27.     At all times relevant to this complaint, Defendant Tracy a/k/a or f/k/a Traevon Black was a coach and protégé of Defendant Scott Foster, who was working on behalf of and in the course and scope of employment with Rockstar, Greenville. Upon information and belief,

Defendant Black was allowed to move from coaching for Rockstar Greenville into another coaching role.

28.     At all times relevant to this complaint, Defendant Peter Holley was a coach and protégé of Scott Foster working in the course and scope of his employment with Rockstar, Greenville. Upon information and belief, Defendant Holley was allowed to move from coaching for Rockstar Greenville into another coaching role.

29.     At all times relevant to this complaint, Defendant Jeff Webb was a citizen of Memphis, Tennessee created, owned, operated, and controlled Defendant Varsity Brands, LLC, Defendant Varsity Spirit, LLC, Defendant Varsity Brands Holding Company, Inc., Defendant USASF, and Defendant USA Cheer, all of which did business throughout the United States, including in Greenville County, South Carolina as alleged below in paragraphs 30-36.

30.     Defendant Rockstar Cheer and Dance, Inc. is incorporated under the laws of the State of South Carolina with its principal place of business and registered agent in Greenville County, South Carolina, and doing business in gyms located across the United States including gyms in: Greenville County, South Carolina; Kershaw County, South Carolina; Berkeley County, South Carolina; Catawba County, North Carolina; Pasquotank County, North Carolina; Wake County, North Carolina; Cherokee County, Georgia; Henry County, Georgia; Kent County, Rhode Island; Franklin County, Pennsylvania; Cuyahoga County, Ohio; and Pinal County, Arizona.

31.     At all times relevant to this complaint, Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) (hereinafter "Defendant Varsity Brands") has been a for-profit entity organized under the laws of Delaware with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation).

6

32.    At all times relevant to this complaint, Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) (hereinafter "Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee.

33.    At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. has been a for-profit entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas.

34.    At all times relevant to this Complaint, either directly or through its affiliates, including those it wholly owns and/or controls, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, and cheer camps, and competitions throughout the United States.

35.    Defendant U.S. All Star Federation, Inc. (hereinafter "Defendant USASF") is a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee. Defendant USASF is controlled and funded by the Varsity Defendants as described further herein.

36.    At all times relevant to this Complaint, Defendant USA Federation of Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer") has been a non-profit entity organized and existing in the state of Tennessee, and the governing body for sport cheering throughout the United States.

37.    At all times relevant to this Complaint, Defendants USASF, and USA Cheer either directly and/or through their affiliates, which they control, have: (a) promulgated and/or enforced rules governing competitive cheer coaching, competitive cheer training, and cheer camps and competitions throughout the United States; and (b) organized, promoted, produced, and/or managed cheer camps and competitions throughout the United States and furthered the goals and purposes of the conspiracy as set forth herein.

38.     Defendant Charlesbank Capital Partners, LP (hereinafter "Defendant Charlesbank") has been a for-profit entity organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts.

39.     Defendant Bain Capital, LP (hereinafter "Defendant Bain Capital") is a for-profit, publicly traded entity organized under the laws of Massachusetts, with its principal place of business in Boston, Suffolk County, Massachusetts.

40.     Venue is proper in the United States District Court for the District of South Carolina, Greenville Division, pursuant to 28 U.S.C. §1391 as a substantial part of the events or omissions complained of occurred within Greenville County, South Carolina.

## FACTUAL ALLEGATIONS

### The Competitive Cheer World

41.     The cheer world has two primary aspects: scholastic, or school-based cheer, and private cheer, known as "All-stars."

42.     In competitive cheer in both the private and scholastic cheer world, athletes perform routines lasting for 2 minutes and 30 seconds that incorporate gymnastics/tumbling, stunts, pyramids, tossing, cheer, and dance routines all set to music.

43.     In contrast to traditional sideline cheer, which typically coincides with and supports a larger sporting event, competitive cheer is a focus unto itself.

44.     Competitive cheer requires an extreme amount of commitment from athletes and their families, with near constant training, cross-training, and frequent competition travel through multiple seasons throughout the year.

45.     This level of dedication is costly. A single season can, at minimum, cost between $3,000 and $7,000 per team member. Some families spend $20,000 or more for transportation,

8

lodging, membership and entrance fees, as well as merchandise, uniforms, and other accessories and incidentals, incurred in connection with the numerous competitions the athletes attend throughout the year.

46.    The competitive cheer industry is enormous, comprising an estimated four million athletes throughout the United States.

47.    Given the costs of participating and competing, the competitive cheer industry is worth billions of dollars annually.

48.    In this world of competitive cheer, cheer camps, clinics, and competitions are held locally, regionally, nationally, and even worldwide, and frequently require athletes to travel across state lines. These events are hosted and conducted under the guidance, certification, and rulemaking of a group of entities created, controlled, and funded by the Varsity Defendants.

49.    At all times relevant to this complaint, the Varsity Defendants have been one of the largest purveyors of these competitions and camps, and the various expenses required to participate in them, controlling an estimated 80-90% of the market.

50.    In 2003, a group of All-Star cheerleading coaches formed an independent 501(c)(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for All-Star cheerleading. The group, which would promote both Varsity and non-Varsity events, met in Atlanta and created the first set of universal All-Star cheerleading rules.

51.    Within a week, Defendant Webb, through Defendant Varsity, founded Defendant USASF, and mandated that All-Star athletes purchase a USASF membership as a requirement to competing at Varsity-sponsored events.

52.    The NACCC found itself unable to compete with the Varsity Defendants based on this requirement. Defendant Webb proposed a merger, which informally took place in his board

room at Varsity headquarters in Memphis without the board of directors present. Reportedly, as an olive branch, NACCC would become the "rules committee" of the USASF in perpetuity. However, despite this agreement, just a few years after the merger, the NACCC arm of USASF was dissolved by Varsity with all rulemaking for All-Star cheer becoming vested in USASF.

53.    At the same time, as of 2006, Defendant Varsity promoted certain All-Star member gyms as being "USASF Certified", a seal that, in the industry, was purportedly synonymous with a warranty that the gym, its coaches, and its choreographers were deemed safe, and that the gym followed best practices related to athlete safety.

54.    Cheerleaders buy their uniforms, accessories, and other apparel from their gym. Varsity requires gyms to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity for buying their merchandise and for sending the gym's athletes to Varsity events.

55.    The Varsity Defendants control every aspect of cheerleading at every level in the United States. Varsity even owns a number of gyms and cheer programs.

56.    All-Star athletes competing on behalf of Varsity-associated gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees.

57.    Gyms and coaches likewise pay monthly or annual fees to USASF, USA Cheer and the Varsity Defendants.

58.    At all times relevant to this complaint, the Varsity Defendants and their co-conspirators use these private All Star cheer gyms, like Defendant Rockstar, to gain access to paying athletes and their families, marketing that membership in a USASF Certified gym will provide the athlete with access to the highest echelon competitions in the sport and under strict safety standards.

59.    Meanwhile, membership in USASF, and with a Varsity-affiliated gym mandates

competing in a specified number of annual varsity events.

60.    Varsity encourages its gyms to attend a minimum number of events annually in exchange for cash rebates.

61.    When attending a Varsity event, members and their families are required to purchase rooms at a designated Varsity-chosen hotel at what many families complain are inflated prices. This scheme is referred to in the cheer community as a "stay-to-play" system. Failure to utilize the Varsity specified room rate subjects the athlete to disqualification from the Varsity competition.

62.    Most of these events take cash-only payments at the door to attend as a spectator, and even to enter an exhibition hall selling Varsity Cheer apparel and equipment, as well as the goods and services of other cheer vendors.

63.    In addition to mandating exclusive participation in Varsity events, once young athletes join Varsity-supported, USASF All Star cheer gyms, coaches and other gym staff begin suggesting one-on-one coaching time, or closed choreography time where the parent is not allowed to attend.  This intensive personal training is offered with the promise to help the athlete rise to the next level, compete in higher divisions, win prestige and celebrity status that will enable them to cheer at the collegiate level, and possibly become coaches themselves one day. This system of promoting intensive one-on-one time with the athletes gives coaches and staff increased access to young and impressionable athletes, and corresponds to a pipeline of young athletes to fund the Varsity Defendants' system of camps and competitions, and to create future generations of Varsity coaches and Varsity-backed gyms.

64.    Varsity and its certified gyms encourage members to pay these fees, dues, and other expenses via auto-draft or credit card.

65.    The success and celebrity status promised to these athletes who agree to pay their coaches for extra instruction was further monetized in 2011 with the creation of "Cheerlebrity" by Scott Foster, which became the impetus behind the Netflix show "Cheer" that shot Jerry Harris to fame. Cheerlebrity was a Varsity competition created in the image of American Idol which sought to promote cheer, Varsity, and All-Star gyms through a social media presence by its participating cheerleaders. Scott Foster was Varsity's brand manager for this program, and he had a Varsity email address for promoting Cheerlebrity to offer fame to cheerleaders who would join the program.

66.    To further perpetuate this connection between athletes and Varsity-backed coaches, such as Defendant Scott Foster, upon information and belief, Varsity encouraged parents to allow their children to travel to camps and competitions with only the coaches, choreographers, and gym owners.

67.    Allowing child athletes to travel with adults they have been groomed into trusting like family relieves the family of an immense financial burden related to their own travel expenses.

68.    The Varsity Defendants, Defendant USA Cheer and Defendant USASF tout the safety and security of their competitions and camps to lull parents into comfort whereby parents have no fear for the safety of their children traveling out of state to hotels for competitions throughout the year.

69.    The Varsity gym network also encourages athletes to relocate to sponsor or host families who are either coaches, gym owners, or live near top-ranked Varsity sponsored gyms.

70.    The system is designed to disassociate the athletes from their families, and foster closeness with the Varsity-sponsored gyms, and gym owners.

71.    Thus, to perpetuate their scheme to create an unending pipeline of new athletes, coaches, and gym owners, the Varsity Defendants, Defendant USA Cheer and Defendant USASF

rely heavily upon the network of coaches, going so far as to host conferences specifically for the coaches, providing tips and training in fundraising, athlete development, and business management.

72.    At these conferences, upon information and belief, coaches are encouraged to drink alcohol and engage in debaucheries, and are inundated with promises of gifts, and financial gain if the coaches continue to produce young member-athletes and promote the Varsity brand.

73.    When Scott and Kathy Foster created the World Spirit Federation brand of events, which was later purchased by Varsity, they touted that they were getting rid of identification/entry tags for the children's shoes while at the competition in favor of just providing a special coach's credential that permitted entry to a "coaches lounge" at events which provided "food, drinks, and massages." They also touted that at their events, unlike others, anybody could walk in off the street and pay cash to come watch the cheerleaders, a move which was heavily criticized due to concerns for athlete safety from predators.

74.    Varsity purchased this competition model from the Fosters and, upon information and belief, replicated it at other competitions to create and foster a party atmosphere at what were essentially children's events.

75.    Upon information and belief, and at all times relevant to this complaint, the Varsity Defendants' affiliated gyms and coaches, including the Rockstar Greenville Defendants, contracted with school districts to provide clinics and coaching services in schools.

76.    This access to schools provided gyms and coaches an additional stream of young athletes to come train at their gyms, to join USASF, to buy Varsity merchandise, and to pay competition and camp fees.

77.    At all times relevant to this complaint, and upon information and belief, these schools were members of and/or abided by the regulatory framework established and administered

13

through USA Cheer.

78.     By representing a safe and superior competitive environment, Defendants collectively sought to create a revolving door of young athletes to perpetuate the organization for years, spending tens of thousands of dollars per athlete for coaching, uniforms, camps, training, competitions, and other merchandise, until the athletes either came of age or became coaches and gym owners.

## The Organizational Structure

79.     In 1971, Defendant Webb began his work in cheerleading as an employee at the National Cheerleaders Association he created to operate cheer camps working for Lawrence Herkimer, known as the original pioneer of cheer,.

80.     In 1974, Defendant Webb left Herkimer and formed his own group, which he similarly named the Universal Cheerleaders Association.

81.     As with Herkimer's association, Varsity began as a provider of cheer camps. The company would quickly expand into apparel, organizing competitions, and operating sanctioning boards in addition to the camps.

82.     At all times relevant to this complaint, Defendant Webb exercised control over all aspects of All-Star cheer, including rulemaking. He was at the forefront of the conception and execution of the alleged unlawful conspiracy as set forth herein.

83.     At all times relevant to this complaint, under the direction and control of Defendant Webb, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer have relied upon access to child athletes who compete at Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

84.     Jackie Kennedy, Varsity Spirit's VP of marketing, said of Defendant Webb in January of 2019, "Jeff is still teaching and leading camps alongside our summer camp instructors. His passion permeates into all of the people here at Varsity Spirit, and Jeff cares about every single employee. He takes the time to meet every new employee. He learns their name, where they are from and what they are passionate about."

85.     The Varsity Defendants created Defendant USASF through a $1.8 million interest-free loan. The 2004 non-profit charter certificate lists USASF's address to be Varsity's address.

86.     At its inception, USASF was purportedly established to be the "sanctioning body" that would regulate All-Star cheer by setting guidelines, policies, procedures, and processes to ensure an environment that was safe for young athletes in the private gym sector.

87.     In 2006, Defendant USASF began "certifying" All-Star cheer gyms with a special seal of approval that indicated the gym and its coaching staff could be trusted for cheerleader safety.

88.     Defendant Webb would tell a blog years later that his best marketing advice was, "to differentiate your products from your competitors and develop a strong and trusting relationship with your customers. **The best branding results usually come from building and sustaining a culture that people trust.** It is also about consistency and authenticity." (Emphasis added.)

89.     In 2007, Defendant Webb and Varsity formed USA Cheer, which was also established to provide guidelines, policies, procedures, and processes to ensure an environment safe for young athletes throughout the cheer industry, including the All-Star competitive cheer sector.

90.     In 2010, in Cheer Coach & Advisor Magazine, for which Defendant Webb served on the editorial advisory board and which, upon information and belief, was owned by Varsity, USASF was officially quoted as saying, "Through credentialing, coaches are made aware of expectations as teachers and role models. It is the goal of the USASF to infuse good decisions into

each and every credentialed coach so that they may expand the positive life experience of All-Star cheerleading and dance into the lives of the youth they encourage. USASF is recognized as the baseline of education for each individual coach and also expect these standards to be met."

91.    USA Cheer was also created with an interest-free loan from Varsity. The director of education and programs, Jim Lord, has listed USA Cheer's address to be the same as Varsity's.

92.    As part of this responsibility, USASF and USA Cheer were responsible for enforcing guidelines, policies, procedures, and processes.

93.    Varsity, through USASF and USA Cheer, can and does enforce bans of athletes, coaches, and teams in its competitions for minor rule infractions like the size of hairbows and the use of glitter.

94.    Defendant Varsity's founder Jeff Webb, has publicly stated that teams performing at Varsity Competitions who wore a full uniform and accessories branded by Varsity received higher scores.

95.    Upon information and belief, this structure meant that the Varsity Defendants were entirely self-regulated and were not answerable to any independent entity.

96.    The Varsity Defendants controlled Defendant USASF from inception. The Varsity Defendants submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF."

97.    Defendant Varsity Spirit, LLC was listed as the owner.

98.    For at least the first 15 years of its existence, and upon information and belief, Defendant USASF's offices were located at Varsity's corporate address, a Varsity representative answered the phone for USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

99.    During the operative timeframe of this complaint, the Varsity Defendants also controlled the Board of Directors for Defendant USASF. The USASF board is empowered to set policy for USASF. The Board is composed of 13 voting members, one seat each for the seven cheer competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of the USASF's founding event producers, it has continued to expand its control of the USASF Board. Presently, the Varsity Defendants have control of 75% of the seats on the Board of Directors. The seats that Varsity does not control do not have voting rights.

100.    Defendant USASF's website is located at www.usasf.net, a URL which was once openly owned by the Varsity Defendants.

101.    The Varsity Defendants eventually began concealing ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

102.    In 2007, Defendant Varsity founded Defendant USA Cheer.

103.    As with Defendant USASF, Defendant USA Cheer listed Defendant Varsity's Tennessee headquarters as its own headquarters, and Defendant USA Cheer's board included six Varsity employees.

104.    Under Defendant USA Cheer's bylaws, its thirteen-member board must include members from the following seven organizations: The Universal Cheerleaders Association, CheerSport, National Cheerleaders Association, United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest.

17

105.    Each of the seven aforementioned associations is owned by Defendant Varsity Spirit.

106.    John Patterson, a former staffer of the Nonprofit Risk Management Center who consulted on youth sports safety, said he has never heard of an arrangement quite like the one between Varsity and these non-profit governing bodies. He said Varsity's control of USASF meant, "whatever Varsity wants, Varsity can get" in terms of rules and regulation of the cheer world.

107.    From 2014 to 2018, Defendant Charlesbank wholly owned the Varsity Defendants and/or Defendant USA Cheer and USASF, and provided capital to the Varsity Defendants and Defendants USA Cheer and USASF for the purpose of building the network of Varsity-affiliated private gyms and coaches throughout the United States.

108.    During this same timeframe, Defendant Charlesbank, as well as the Varsity Defendants, reaped massive financial benefits associated with the growing network of families who came into Varsity-affiliated gyms, and who believed the Varsity Defendants' representations that they were providing safe and protective environments for families.

109.    In 2018, Defendant Bain Capital purchased the Varsity Defendants from Charlesbank for roughly $2.5 billion. At the time of the sale, Defendant Charlesbank made a new investment in Varsity alongside Defendant Bain and retained a minority stake in the business.

110.    Related to its purchase, Defendant Bain Capital stated: "This new partnership presents Varsity Brands with an exciting opportunity to continue to expand and improve our products and services while remaining steadfast to our commitment to improving student life and overall engagement…. Bain Capital's extensive consumer and technology experience and their

commitment to our mission of empowering young people will help us accelerate our growth to a new level."[3]

111.    In addition, Defendant Bain represented: "For over 50 years, Varsity Brands has served as an essential force for good as part of the academic and athletic student experience…We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[4]

112.    Upon information and belief, Defendant Bain's accelerated growth model for the Varsity Defendants depended upon access to an ever-expanding network of young athletes who would not only purchase Varsity branded merchandise, but who would continue to attend Varsity events. In that regard, during the operative timeframe, the Varsity Defendants issued annual invoices to members, including coaches, gyms, and athletes, payment of which was mandatory and ultimately profited Defendant Bain and its minority partner Defendant Charlesbank.

113.    Meanwhile, at the time of Defendant Bain's acquisition, the Varsity Defendants were embroiled in very public litigation arising not only out of the Varsity Defendants alleged anti-competitive tactics in acquiring gyms and curbing other event-companies, but also related to allegations of sexual misconduct by Varsity-affiliated coaches.

---

[3] *See* "Varsity Brand, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity," June 19, 2018, available at: Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity | Bain Capital.
[4] *Id.*

114.    In 2020, former Varsity-affiliated coach and "Cheerlebrity" Jerry Harris, star of the Netflix series "Cheer," was accused of soliciting sex from two children during the 2019 Varsity-competition season.

115.    In July 2022, a warrant was issued against another Varsity-affiliated coach, Erick Christiansen, who was accused of exposing himself to his minor athletes.

116.    In August, 2022, Varsity-affiliated coach Scott Foster committed suicide amidst an ongoing investigation into allegations that he engaged in sexual misconduct with his minor athletes.

117.    Foster had previously been suspended by USASF when video-evidence came to light showing Foster drinking with his underage athletes.

118.    Despite his suspension, Foster was nevertheless openly allowed to continue coaching at his Greenville gym, and elsewhere, and was never barred from attending any Varsity-sponsored event.

119.    Though Varsity purportedly reported Harris to legal authorities, upon information and belief, the Varsity Defendants made few if any modifications to the internal screening process for coaches, and made no modifications to the competition environment.

120.    Upon information and belief, during the interim of the allegations set forth above, the Varsity Defendants, in conjunction with Defendant USASF and Defendant USA Cheer have hosted multiple competitive events throughout the United States, during which time affiliated teams from across the country converge at a pre-selected location, and using hotels, premises, and businesses hand-selected by the Varsity Defendants.

121.    Upon information and belief, during these events, underage student-athletes would comingle with other teams, including their coaches and choreographers, either without chaperones or minimally chaperoned, and would be exposed to environments where drugs and alcohol were

readily available, and where the student athletes were subject to rampant solicitation and inappropriate sexual conduct, and innuendoes, including by coaches such as Jerry Harris, Erick Kristianson and Scott Foster.

122.    At the same time, individual gyms and coaches would receive substantial benefits from affiliation with the Varsity Defendants, including the reputational benefits of being affiliated with USASF, USA Cheer, the Varsity Defendants' brands, and monetary benefits directly linked to the number of competitions in which a gym participated as well as the number of athletes the gym brough to the competition.

123.    In this way, the Varsity Defendants and the gyms and coaches had a symbiotic relationship, where the gyms and coaches supplied the Varsity Defendants with hundreds of millions of dollars of revenue from under-age athletes, and the coaches and gyms used the Varsity Defendants' reputation in order to bolster their own reputation with student athletes.

124.    Upon information and belief, the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital relied upon the gyms and coaches to offer an ever-expanding group of underage athletes, and future coaches, and gym owners, to provide a guaranteed stream of revenue.

125.    As such, and upon information and belief, it was contrary to the Varsity Defendants' business model to ban coaches and gyms from their system, as every coach and gym represented a pipeline of current and future revenue.

126.    Rather, when allegations about a specific coach, or Varsity affiliate were made, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer either ignored the allegations, determined the allegations were not "credible" based upon arbitrary criteria, or allowed the would-be abuser to quietly exit the Varsity-affiliated program, with the result that the accused could

relocate to a new gym or facility without parents knowing about the allegations of misconduct against minors.

127.    For instance, Peter Holley, one of John Doe 2's assailants, was allowed to leave from Rockstar Greenville, and relocate to a gym in the Columbia, South Carolina area, where Holley is still in regular contact with minor athletes.

128.    As an additional example, Defendant Kenny Feeley, who abused and raped Plaintiff Jane Doe 3, moved away from his coaching role as Scott Foster's protégé and has since launched his own cheering empire, which, upon information and belief, supplies Defendant Varsity with significant revenue streams by way of athletes, competition fees, uniforms, merchandise, and other fees.

129.    At all times relevant to this complaint, and upon information and belief, Defendants Bain Capital, LLC and Defendant Charlesbank knew or should have known that the Varsity Defendants, Defendant USASF, and Defendant USA Cheer were not appropriately enforcing policies, processes, and procedures related to athlete safety, and that the Varsity Defendants were hosting events without regard for and in contravention to the safety of student athletes.

130.    Moreover, and upon information and belief, to incentivize coaches and gyms, the Varsity Defendants offered significant monetary benefits to increase participation in events, including by providing cash rebates, as well as in creating event environments that comingled child-athletes with adult coaches, gym owners, and choreographers, while providing these same child-athletes with access to drugs and alcohol with minimal parental or adult supervision.

131.    Upon information and belief, this environment fostered and contributed to the sexual, mental, and physical abuse meted upon the athletes, and gave predators such as Scott Foster, Erick Kristianson, Jerry Harris, and many more an easy avenue to find victims.

132.    Upon information and belief, this competition environment was the brainchild of Jeff Webb, who used the competitions as a mechanism for his companies to establish dominance in the cheer market.

133.    During the timeframe relevant to this complaint, Plaintiffs are informed and believe that employees of the Varsity Defendants resigned their positions because of the abuse and systemic failures they saw within the system, including failures to uniformly apply policies and procedures related to athlete safety, rampant drug use within the leadership of the Varsity Defendants, as well as alcohol and drug use by athletes during competitions, and general favoritism and promotion of teams that chose to endorse or affiliate with the Varsity Defendants, disadvantaging independent teams.

134.    Scott Foster was a cheerleader at the University of Louisville and began coaching young cheerleaders in Kentucky in 1996.

135.    The University of Louisville is a pre-eminent name in the world of competitive cheerleading. Athletes who come out of the Louisville program have huge name recognition in the industry allowing them to easily recruit other young athletes.

136.    In fact, gym owners who are also alumni of the University of Louisville program have the ability to recruit athletes from across the country regardless of where their gym is located. Athletes regularly travel, or move, to be close to a premier gym and coach going so far as to enroll in home school to provide additional hours for training.

137.    Defendant Scott Foster moved to Greenville, South Carolina in 1999 and shortly thereafter began operating an All-Star cheer gym, along with his wife, Defendant Kathy Foster.

138.    Defendant Scott Foster and Defendant Kathy Foster created World Spirit Federation (WSF) for competition cheering before ultimately selling WSF to Defendant Varsity Brands in 2006.

139.    In 2007, Defendant Scott Foster and Defendant Kathy Foster started Rockstar Cheer & Dance, Inc., a gym to coach competition cheer.

140.    Rockstar's mission was: "To provide a structured environment of competitive cheerleading while accomplishing our goals […] to teach dedication, commitment, self-confidence, teamwork, discipline, responsibility, and leadership in a family-friendly, safe and fun environment."

141.    Defendant Rockstar's cheer gym was certified by Defendant USASF as meeting All-Star standards with respect to coach credentials, program quality, and athlete safety.

142.    As such, at all times relevant to this complaint, the Varsity Defendants warranted to athletes and families that Rockstar Greenville and its coaches could be trusted based on standards established by Varsity and USASF and recognized throughout the Varsity and USASF competition cheer world.

143.    One of Defendant Rockstar's team, Beatles, was known as one of the best teams in the country, and Defendants Scott and Kathy Foster were able to recruit athletes nationwide on Beatles' success.

144.    In 2018, Beatles won Defendant Varsity's coveted World Championship title. This further elevated Rockstar's status and made the team one of the most lucrative to the Varsity Defendants.

145.    At all times relevant to this complaint, Defendant Rockstar remained in lock step with the Varsity Defendants, competing at the Varsity Defendants' events, purchasing the Varsity

Defendants' merchandise, participating in the Varsity University training conferences, and, by virtue of competing in Varsity events, mandating that Defendant Rockstar athletes become members of Defendant USASF, including paying USASF annual dues.

146.    To provide the Varsity Defendants with a continuous supply of new athletes, as well as to ensure that Defendant Rockstar had a rotation of new athletes, and commensurate revenue, Defendants Scott Foster and Kathy Foster also offered their coaching services to local schools in the Greenville community.

147.    By so doing, and upon information and belief, Defendant Scott Foster would find a new class of victims, all while ensuring that he had the requisite number of new athletes to meet his agreements with the Varsity Defendants for competition attendance.

148.    Meanwhile, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and, by virtue of their acquisition, ownership, and control, Defendant Bain Capital, were made aware of serious and disturbing allegations related to many of the Varsity coaches including Defendant Scott Foster.

149.    For instance, in 2017, video footage emerged of Defendant Scott Foster drinking alcohol with his underage athletes.

150.    In addition, during this same timeframe, Defendant Scott Foster was also paying for an apartment for his athletes where some of them would live, and where minor athletes would gather to do drugs and drink alcohol with and without Defendants Scott and Kathy Foster.

151.    Defendant Scott Foster also used his position of power within the Varsity Defendants' network to message underage athletes and to arrange meet-ups with these athletes at the Varsity competitions.

152.    During at least two of these competitions, Defendant Scott Foster engaged in illicit sexual acts with underage athletes who were not old enough to provide consent.

153.    Defendant Scott Foster's conduct was not isolated, nor unknown to the Varsity Defendants, Defendant USASF, Defendant USA Cheer, or Defendant Bain Capital.

154.    Defendant Webb is currently Chairman of the board of directors of Varsity Brands, LLC. He was previously Varsity's president but resigned in 2020 amid the Jerry Harris sex abuse scandal.

155.    During the operative timeframe of this complaint, Defendant USASF received numerous reports and allegations related to Defendant Foster as well as other coaches, choreographers, videographers, and music directors. Upon information and belief, the general response from Defendant USASF was to disregard these reports and accusations as attempts by disgruntled athletes and parents to get coaches and gyms in trouble if the athletes did not receive coveted team positions.

156.    In a 2020 investigative series by journalists Marisa Kwiatkowski and Tricia L. Nadolny for USA Today revealed scores of repeat sex offenders active within in USASF certified gyms and preferred vendor lists.[5] Some of the cases of which Defendants had knowledge included:

a.    A Virginia gym owner was convicted of sexual battery and assault and placed on the sex offender registry after three girls he coached at his Virginia gym came forward. As of 2020, this coach was still listed as the gym's owner and was still USASF certified. Varsity continues to invite his gym to competitions. One of his

---

[5] https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/

https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

victims had to stop cheering competitively because her convicted abuser was allowed to stay involved around children and in proximity to her.

b. A Charlotte coach who was arrested for two counts of sexual assault of a minor and lost his middle school teaching job continued to have access to minors afterward. Though the gym's owners claimed he was told he was no longer welcome to work with the gym's athletes after his arrest, he continued to appear in official social media accounts of the gym, was connected by the gym director to parents for private lessons and attended a Varsity event in Florida where he was photographed posing next to the gym's athletes in a gym uniform with the word "Coach" on his shorts.

c. A coach who had been fired from a gym and charged with child pornography was discovered to still be working in the cheer industry by the gym owner who had originally fired him. The gym owner called Varsity, who told her his background check was fine. After she went to the courthouse to get the records of his conviction and sent them to Varsity, months passed and the man continued coaching children at Varsity events through USASF gyms.

d. A Washington gym owner was not banned by USASF until more than a year after the organization received reports in 2018 that he had been accused of sexual misconduct with minors.

157. Defendant USASF has said that not all reports of child sexual abuse warrant placing a person on USASF's public list of suspended or banned adults. Instead, they made internal note of it but failed to warn parents or the cheer community of the potential danger of allowing their children around such persons without supervision.

158.    Upon information and belief, USASF has received hundreds of complaints against coaches, choreographers, videographers, and others accused of sexual misconduct.

159.    Until recently, however, USASF failed to dedicate fulltime staff to managing investigation of these complaints.

160.    Defendant USASF has been excruciatingly slow to develop policies and procedures for keeping athletes safe from sexual abuse in an industry rife with it.

161.    According to its own website: "USASF is the U.S. All Star Federation. It's about safety standards. It's about coaches' education. It's about providing a safe environment to allow for the continued growth of All-Star cheerleading and dance across the country. **It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care**. It's about standardization of rules from one competition to the next. It's about time." (Emphasis added).

162.    In the years following this public representation, however, USASF's gym and coach training has focused almost exclusively on avoiding physical injury to the athletes.

163.    In fact, USASF's "Athletic Performance Standards" dealt only with things like hair accessories, makeup, uniforms, choreography, and music.

164.    In 2011, USASF touted a "Gym Certification" system stating, "The welfare of all-star cheerleaders and dancers is a paramount concern for the USASF. Since its inception, efforts have been made to offer the latest and best-known practices in safety, education and ethics."

165.    In 2012, USASF reiterated their "image and appearance policy" to address "the increasing criticism about the general appearance of our athletes during competition and the unflattering media stories that have focused on how our sport is presenting its athletes, particularly those in the younger age groups."

166.    At the same time, USASF began offering, but not requiring, a $1 million sexual abuse/sexual molestation policy to gym owners through K&K Insurance.

167.    It took until 2015 for the USASF to implement background checks on certified coaches and gym owners. However, there was a discrepancy surrounding to whom this applied..

168.    USASF also created the "Triple A" challenge as part of its response to the SafeSport Act that became law in 2018, which shifted the responsibility for abuse and exploitation to minors and their families by telling them they should ask when posting photos to social media: "Is it Athletic? Is it Age Appropriate? What does it Amplify?" They asked for "thoughtful" social media posts to be hashtagged with "#ThisIsAllStar and "#usasfATHLETES1st" as part of their safety plan.

169.    USASF has failed to follow its own procedures, allowing complaints to stall or delaying action when their policies clearly call for a person to be suspended or banned.

170.    At other times, USASF's policies have contradicted each other. In its complaint resolution process, USASF said its jurisdiction was only over members. But in its SafeSport policy manual, it said it had authority and jurisdiction to investigate anyone employed by a USASF program even if they were not a member.

171.    Jim Lord, USA Cheer's director of education and programs, said in 2020 that the organization's banned list is one of the tools they use to keep athletes safe. The manner in which this oversight was performed, according to Lord, was that he had it on his "weekly checklist" to visit search engines and use terms like "cheer coach", "athlete abuse, and "sexual assault" to find people to ban. Between June and September that year, Lord had identified five (5) names. Investigative reporters with USA Today managed to find 180 people during that same time frame.

More than 140 of those had been convicted of a child sex crime and more than half of those were registered sex offenders.

172.    In 2020, W. Scott Lewis, partner at legal and risk management firm TNG criticized USASF's handling of reports and complaints in that they often sat on their hands and did nothing, assuming law enforcement had been contacted by someone else. He said it was not typical for organizations to wait for law enforcement action before taking their own action unless they've explicitly been asked to do so. He said, "You don't want to be on the sideline saying, 'Well, we can't do anything because law enforcement's doing it,'" Lewis said. "You want them to have the ability to engage in interim measures or your own investigation, or both." In May of 2021, USASF hired TNG to consult on its athlete safety practices.

173.    Well after the very public conviction of Jerry Harris, USASF and USA Cheer finally began to put measures in place to attempt to ensure athlete safety from predators previously certified by them.

174.    However, to obtain training from the Varsity Defendants' safety and risk management course, coaches, cheerleaders, and their families have to pay a fee for access.

175.    USASF also began "requiring" that all member programs "have clear, written guidelines that prohibit adults who have contact with minors from engaging in conduct that is either inappropriate and/or illegal."

176.    USASF failed however, to provide oversight on reviewing or approving those policies, or even verifying that gyms had, in fact, enacted guidelines.

177.    USASF further undertook to create an online reporting mechanism for receiving complaints. Experts have raised concerns over the burden of this reporting process. When printed, the required forms are over 15 pages long.

178.    Moreover, the reporter must cite to the alleged rule or regulation their attacker violated, referring to a slew of different sources.  In doing so, USASF shifted its mandatory duty to report child abuse to protective authorities and law enforcement to the victim and their family.

179.    Kelli Hughes, the director of the Center for Child Policy, found USASF's reporting process to be unnecessarily complicated and burdensome.

180.    For the 2021 USASF Worlds at Disney World in Florida held in May of 2021, the organization sent out an information packet which contained athlete conduct rules but did not address coach conduct. The policy mandated one (1) adult chaperone, defined as anyone 21 of years of age or older, for every nine (9) child athletes.

181.    Webinars on athlete safety listed at the site in November 2021 included topics like "tumbling drills", "coed stunting", "building transitions", "choreography", "twisting skills theory", and "flyer stability and flexibility". Conspicuously absent at this crucial time was any training on preventing or reporting child sexual abuse or molestation.

182.    In short, the Varsity Defendants, through USASF and USA Cheer, have created an elaborate illusion of a safe system in to draw more members in so they could sell more merchandise and collect more fees for events and camps, knowing their young vulnerable members were at risk and that they were doing nothing about removing the criminal coaches and gym owners known to be creating that risk.

183.    As a direct and proximate result of Defendants' conduct, set forth herein and above, young athletes were imperiled, incurred significant damages, and will continue to incur damages for the foreseeable future.

## The Enterprise

184.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

185.    The unlawful acts alleged against Defendants Webb, Varsity, USASF, and USA Cheer, and vicariously against Defendant Charlesbank and Defendant Bain Capital in this Complaint were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

186.    The unlawful acts alleged against Defendant Rockstar, Defendant Scott Foster, Defendant Kathy Foster, Defendant Feely, Defendant Guyton, Defendant Plank, Defendant Black, and Defendant Holley, and other Unknown Defendants who coached and owned gyms and perpetrated abuse upon minor athletes were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

187.    The officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals.

188.    Each Defendant, and its respective subsidiaries, affiliates and agents operated as a single unified entity with the common goal of taking millions of dollars from minor athletes who wanted to be a part of the competitive cheer world Defendants oversee, as well as to perpetuate a pipeline of new child-athletes, coaches and gyms. Defendants' Enterprise functioned as a continuing unit throughout the conspiracy and continues its operation through the filing of this Complaint.

189.    At all times relevant to the complaint, Defendants possessed and continue to possess an ongoing organizational structure with sufficient continuity related to the Enterprise.

190.    Each Defendant participated in the operation and management of the Enterprise.

191.    The Enterprise is separate and distinct from the pattern of racketeering activity as set forth below.

192.    Whenever in this Complaint reference is made to any act, deed, or transaction of any organization, the allegation means that the Defendants and each of them engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

193.    Individuals alleged to have engaged in misconduct in violation of the laws pleaded herein are alleged to have done so on behalf of all members of the enterprise between the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, Defendant Bain Capital, and Defendant Rockstar. The athletes who paid to enter the competition cheer world did not know or did not distinguish between the corporate affiliations of different individuals. These organizations all affirmatively and collectively represent themselves as one All-Star family, rather than separate parents and subsidiaries.

194.    Defendants' unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate commerce in the United States through the certification of private gyms and their coaches, as well as the organizing, promoting, and managing cheer competitions throughout the United States.

195.    The conduct alleged herein is tied to billions of dollars of interstate commerce, with the Varsity Defendants, their governing bodies, and their parents controlling at least 80% of the competitive cheer market through membership fees, gym and coaching fees, competition fees, insurance, apparel, and travel for training and competition events all over the United States and the world.

196.     During its ownership period from 2014-2018, Defendant Charlesbank conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the competitive cheer world with the promise of a safe and superior coaching experience by joining a certified gym. Defendant Charlesbank has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so. When it sold to Defendant Bain Capital in 2018, rather than walk away from the Enterprise, Defendant Charlesbank made the conscious business decision to reinvest and retain an ownership interest in the Varsity Defendants in order to continue reaping the financial benefits of Varsity's Enterprise with the Rockstar Defendants.

197.     Once ownership transferred to Defendant Bain Capital in 2018, Defendant Bain Capital conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity universe of competitive cheer with the promise of a safe and superior coaching experience by USASF and USA Cheer certified gyms, coaches, and instructors.

198.     Defendant Bain Capital has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so through Varsity, USASF, and USA Cheers business Enterprise with the Rockstar Defendants and continues to do so as set forth herein.

199.     All Defendants were co-conspirators in a scheme to get as many families as possible to entrust their child athletes to these private gyms and coaches in a scheme to generate massive revenue from these athletes all while Defendants were: (a) failing to properly vet the coaches by investigating backgrounds; (b) failing to properly investigate complaints of inappropriate and criminal sexual conduct by the coaches against minors; (c) failing to report complaints of

inappropriate and criminal sexual conduct against minors; (d) failing to enforce rules and regulations for chaperoning and supervision of minors; (e) failing to enforce ineligibility due to complaints regarding athlete safety; (f) taking minor athletes across state lines for the purpose or with a reckless disregard for whether the athletes would be subjected to sexual and/or physical abuse; (g) taking minor athletes across state lines and then plying them with alcohol and drugs; (h) gathering at predetermined locations to discuss and exchange notes and information related to the Enterprise including how to lure additional minor athletes and how to maximize profits; (i) creating images and videos of children under the influence of drugs and alcohol, and engaging in sex; (j) sending said images over the mails and wires; (k) sending and collecting bills and invoices across the mails and wires despite the fraud perpetrated by Defendants; and (l) disseminating fraudulent misrepresentations through mail and wire as to the safety they guaranteed through a sham certification process.

### **The Abuse**

a.    *John Doe 1*

200.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

201.    Plaintiff John Doe 1 began to cheer in sixth grade for his All-Star team in California.

202.    In addition to his gym fees, beginning in his sixth-grade year, John Doe 1 was also responsible for paying an annual competition fee to the Varsity Defendants as well as an annual NSASF fee.

203.    During his 2017 to 2018 season, Plaintiff John Doe 1 moved to Las Vegas, where he joined a Level 4 BlackJacks team.

204.    During this season, Plaintiff John Doe 1's team won a number of competitions.

205.    During this same timeframe, Plaintiff John Doe 1 was aware of Scott Foster, through Foster's reputation in the Defendant Varsity community.

206.    Specifically, Defendant Varsity promoted Defendant Foster and his gym on social media, encouraging young athletes to seek out Defendant Foster, and to aspire to be like Defendant Foster.

207.    Plaintiff John Doe 1 followed Defendant Scott Foster on social media.

208.    At the time, Plaintiff John Doe 1 was 15 years-old going on 16.

209.    Defendant Scott Foster followed Plaintiff John Doe 1 back, and began to directly message Plaintiff John Doe 1.

210.    Plaintiff John Doe 1 and Defendant Scott Foster exchanged messages for about one month before Defendant Varsity's NCA tournament. Sometime prior to the tournament, Defendant Scott Foster asked Plaintiff John Doe 1 for his phone number, and thereafter began to message Plaintiff John Doe 1 about meeting up at the NCA tournament.

211.    From the tone and tenor of the communications, Plaintiff John Doe 1 understood that Defendant Scott Foster was asking for Plaintiff John Doe 1 to engage in sexual acts.

212.    Plaintiff John Doe 1 felt uncomfortable with the exchange but also felt uncomfortable ceasing communications with such an important figure in the competitive cheer community.

213.    As the NCA tournament approached, Defendant Scott Foster asked Plaintiff John Doe 1 to send photographs of various parts of Plaintiff's body including Plaintiff's genitalia.

214.    Defendant Scott Foster also sent Plaintiff John Doe 1 pictures of Defendant's body, including his penis.

215.    The Varsity tournaments, including NCA and Summit, are hosted around the country, and the Varsity Defendants set the entire agenda for the conferences including where the athletes stay when they are not competing.

216.    In fact, athletes must receive a special exemption from Defendant Varsity if they choose not to stay at the pre-selected locations, and may even be disqualified from competition by Defendant Varsity if they choose to stay elsewhere.

217.    In this way, Defendant Varsity maintains complete control over the movement of athletes during Varsity competitions, and can expose the athletes to Defendant Varsity merchandise, brand content, and accessories.

218.    During Defendant Varsity's NCA tournament in 2019 Defendant Scott Foster and Plaintiff John Doe 1 had their first sexual encounter.

219.    In May of 2019, when Plaintiff John Doe 1 was sixteen years old and attending the Varsity Defendants' Summit competition in Florida, Defendant Scott Foster once again solicited sex from Plaintiff John Doe 1.

220.    When Plaintiff John Doe 1 traveled to Summit, he did not feel he could say no to Defendant Scott Foster. He performed oral sex on Defendant Scott Foster during the Summit Conference, and also received oral sex from Defendant Scott Foster.

221.    Plaintiff was sixteen years old when these incidents occurred.

222.    Following these incidents, Plaintiff John Doe Continued to attend Defendant Varsity's events, during which drugs and alcohol have always been readily available.

223.    Meanwhile, every year, Plaintiff John Doe 1 has continued to pay his membership to Defendant USASF, and has further paid his annual competition fees to the Varsity Defendants. For instance, during the 2016 season, Plaintiff John Doe 1's expenses, including tuition,

registration, and competition fees, totaled in excess of $2,699, and included fees for choreography, music and camps.

224.    These fees increased on an annual basis.

225.    In or around 2019, an incident came to light involving Jerry Harris, a former coach of a Varsity affiliated gym, where Harris, a Coach, was accused of soliciting sex from two fourteen-year-old cheerleaders.

226.    Following this incident, the Varsity Defendants required any member of Defendant USASF over the age of eighteen to submit to a Varsity-sanctioned background check and watch a thirty-minute video on safety during competitions.

227.    Yet no other policies, processes, or procedures, changed. The competitions remained expositions putting together minor children with adult coaches, in unchaperoned environments with copious access to drugs and alcohol.

*b. John Doe 2*

228.    Plaintiff John Doe 2 began cheering in or around 2013 when he was in eighth grade.

229.    In 2014, Plaintiff John Doe 2 moved to Greenville, where he joined Defendant Rockstar.

230.    Almost immediately after Plaintiff John Doe 2 began to cheer for Defendant Rockstar, two coaches, Defendants Tracy a/k/a or f/k/a Traevon "Trey" Black, and Peter Holley, began making inappropriate and vulgar comments to him.

231.    When Plaintiff John Doe 2 was sixteen, the conduct escalated to the point where Defendants Black and Holley, who were at all times under Scott Foster's control, pressured Plaintiff John Doe 2 to send nude photographs.

232.    Eventually, Plaintiff John Doe 2 relented and sent the photos.

233.    In addition, Plaintiff John Doe 2 received nude photographs from one of the coaches.

234.    After this, Defendant Rockstar's coaches also began to pressure Plaintiff John Doe 2 to come to the "Rockstar house," which was a house paid for by Defendant's Scott and Kathy Foster.

235.    Upon information and belief, the Rockstar house was funded in part through rebates and cash Defendant's Scott and Kathy Foster received from the copious funds paid to the Varsity Defendants by the Rockstar Greenville athletes.

236.    At all times relevant to this complaint, and to the extent of Plaintiff John Doe 2's knowledge, the Rockstar athletes and coaches, including Defendants Scott and Kathy Foster, used the "Rockstar House" to host parties, do drugs, and drink alcohol with the minor athletes.

237.    On the one occasion when Plaintiff John Doe 2 went to the Rockstar House at the request of a coach, the coach tried to engage in oral sex with Plaintiff John Doe 2 and forced Plaintiff John Doe 2 to watch pornographic videos.

238.    Plaintiff John Doe 2 was just sixteen at the time.

239.    In addition to the encounter at the Rockstar House, and receiving nude photographs from one of Defendant Scott Foster's coaches, another Rockstar coach who was at least twice Plaintiff John Doe 2's age would often invite Plaintiff John Doe 2 over and offer marijuana and alcohol.

240.    Plaintiff John Doe 2 is informed and believes that Defendants Scott Foster and Kathy Foster knew and condoned this behavior and that this behavior was actually encouraged as a way of ensuring that the athletes remained at Rockstar.

241.    In addition to the sexual abuse Plaintiff John Doe 2 endured, he also had to undergo sadistic and brutal conditioning work-outs any time that his team did not perform to the caliber that Defendant Kathy Foster expected. These work-outs would last for hours, and would leave Plaintiff John Doe 2 physically weak.

242.    These conditioning work-outs were so severe that Plaintiff John Doe 2 and his team members performed in constant fear of making Defendant Kathy Foster angry.

243.    At the same time that  Plaintiff John Doe 2 was improperly solicited and subjected to sexual and physical abuse, he continued to pay his annual competition fees and membership dues to the Varsity Defendants and Defendant USASF.

c. *Plaintiff Jane Doe 1*

244.    Plaintiff Jane Doe 1 began cheering in the seventh grade with Carolina All-stars.

245.    When Plaintiff Jane Doe 1 turned 15, Defendant Scott Foster came to work at Carolina All-Stars.

246.    Plaintiff Jane Doe 1 was on Defendant Scott Foster's team and he immediately began grooming her. Defendant Scott Foster would sit with Plaintiff Jane Doe 1 in his gym for hours talking to her about other athletes' sex lives. Defendant Scott Foster also asked Plaintiff Jane Doe 1 whether she had ever or had any interest in engaging in certain sexual activity, including anal sex. These sexual discussions made Plaintiff Jane Doe 1 extremely uncomfortable, but at the same time created an artificial sense of closeness with Defendant Scott Foster.

247.    When Plaintiff Jane Doe 1 was seventeen, Defendant Scott Foster told Plaintiff Jane Doe 1 he wanted to use his connections to facilitate her recruitment by University of Louisville.

248.     Before a Varsity competition, Plaintiff Jane Doe 1 traveled to University of Louisville a day early with Defendants Scott Foster and Kathy Foster.

249.    Defendants Scott Foster, Kathy Foster, and Plaintiff Jane Doe 1 arrived at the hotel a day earlier than the rest of the team. When Plaintiff Jane Doe 1 realized she forgot to pack a toothbrush, she called Defendant Scott Foster, who brought a toothbrush to her room. He then entered her room and proceeded to sit on her bed and come onto Plaintiff Jane Doe 1.

250.    During the entirety of this timeframe, Plaintiff Jane Doe 1 continued to pay competition fees to the Varsity Defendants, and fees for tuition, merchandise and other costs.

d. *Plaintiff Jane Doe 2*

251.    Plaintiff Jane Doe 2 has cheered since she was 5 years old.

252.    In the 2018 season, while Varsity's World Championship Event, fifteen-year-old Plaintiff Jane Doe 2 was introduced to a male coach who was over eighteen years old.

253.    Throughout the competition, the male coach repeatedly attempted to force Plaintiff Jane Doe 2 to engage in sexual acts with him, despite the fact that she was clearly underage, and despite the fact that she repeatedly told him no.

254.    During the 2018 to 2019 season, when she was 16 years old, Plaintiff Jane Doe 2 moved to Georgia to join Stingrays and began home-schooling to keep up with her rigorous training schedule.

255.    In 2019, Plaintiff Jane Doe 2 moved to North Carolina, and began to commute to train at Rockstar Greenville.

256.    During one of her earliest practices, Plaintiff Jane Doe 2 trained with Defendant Scott Foster, who complimented her on her looks, and began almost immediately to touch her inappropriately.

257.    In the months that followed, Defendant Scott Foster, with Defendant Kathy Foster's knowledge, began to invite Plaintiff Jane Doe 2 to his house. Ultimately Plaintiff Jane Doe 2 spent

the night twice. Each time, Defendant Scott Foster gave Plaintiff Jane Doe 2, a minor, drugs and alcohol.

258.    Plaintiff Jane Doe 2 was provided alcohol and drugs on numerous occasions while she cheered with Rockstar, including during competitions hosted by the Varsity Defendants and overseen by Defendant USASF.

259.    During one NCA competition, Plaintiff Jane Doe 2 recalls going to a party with other athletes at the penthouse of one of the Varsity-selected hotels. At the party, Plaintiff Jane Doe 2 drank alcohol with Defendant Scott Foster, and the other athletes, all of whom were under-age.

260.    While Plaintiff Jane Doe 2 was cheering with Defendant Rockstar, Defendant Scott Foster and his other coaches commonly gave underage athletes drugs and alcohol. This created an environment where the athletes' inhibitions were down, and also created a sense of sexual availability between the adult coaches and the child-athletes.

261.    In 2021, Plaintiff Jane Doe 2 returned to Stingrays.

262.    During the entirety of her time cheering with Defendant Rockstar, and while she was supplied alcohol and drugs by Defendant Scott Foster, she was a member of Defendant USASF, and competed at competitions sponsored, organized, and overseen by the Varsity Defendants.

263.    At no point during any Varsity competition has Plaintiff Jane Doe 2 ever been made aware of where or to whom she should go to report conduct that makes her feel unsafe or uncomfortable.

264.    Even in instances where Plaintiff Jane Doe 2 is aware of a victim making a report, the general response by the Varsity Defendants has been to dismiss the report as lacking sufficient foundation.

265.    In Plaintiff Jane Doe 2's experience, the attitude from the Varsity Defendants has been to ignore or discount victims who come forward.

266.    At all times relevant to this complaint, Plaintiff Jane Doe 2 was a member of Defendant USASF, and paid dues of at least $50 annually via credit card.

e. *Plaintiff Jane Doe 3*

267.    Plaintiff Jane Doe 3 began cheering for Carolina All-Stars when she was roughly 9 years old.

268.    Beginning around the age of 11, Defendant Scott Foster became Plaintiff Jane Doe 3's coach.

269.    The abuse that is the subject of this complaint began around the time Plaintiff Jane Doe 3 was 15 or 16 years old.

270.    Plaintiff Jane Doe 3 recalls one competition where Defendant Scott Foster arranged transportation to the hotel for certain members of the team.

271.    When the team arrived at the hotel the night before the competition, Plaintiff Jane Doe 3 recalls that multiple people stayed in a single room per Defendant Scott Foster's arrangement.

272.    One such person assigned to stay in Plaintiff Jane Doe 3's room was an adult coach, Defendant Kenny Feeley, who climbed into bed with Plaintiff Jane Doe 3 and groped and fondled her, and digitally penetrated her. She was 16 years old at the time.

273.    Thereafter Defendant Scott Foster arranged for Plaintiff Jane Doe 3 to receive a private lesson from Defendant Feeley.

274.    Instead of training, however, Defendant Feeley took Plaintiff Jane Doe 3 to his apartment, where he gave her alcohol and marijuana, before transporting Plaintiff Jane Doe 3 to a secondary location, where he raped her.

275.    Plaintiff Jane Doe 3 did not try out the next season and ultimately dropped out of the sport because of these incidents.

276.    After she was raped by one of Defendant Foster's coaches, Defendant Foster would comment on the rape while Plaintiff Jane Doe 3 trained at the gym, insinuating that Defendant Foster knew what happened.

277.    Although Defendant Foster was Plaintiff Jane Doe 3's gym owner, he did nothing to report the rape, or otherwise protect Plaintiff Jane Doe 3 from harm.

278.    While Plaintiff Jane Doe 3 was still cheering for Defendant Foster, she would regularly spend time at the home of Defendants Scott and Kathy Foster, where they would all get in a hot tub together and the Fosters would provide Plaintiff Jane Doe 3 with alcohol.

279.    Plaintiff Jane Doe 3 also recalls parties that took place at the Varsity competitions where she and the other young athletes were given alcohol.

280.    Plaintiff Jane Doe 3 recalls that USASF was created while she was cheering and that she received materials related to the USASF function, as well as to support the annual membership fee. Plaintiff Jane Doe 3 paid this annual membership fee.

f. *Plaintiff Jane Doe 4*

281.    Plaintiff Jane Doe 4 was 9 years old when she started cheer.

282.    Around 2019, when Plaintiff Jane Doe 4 was 18 years old, she left her smaller gym in Alabama to try out for Rockstar Greenville.

283.    Plaintiff Jane Doe 4 first became familiar with Rockstar Greenville because of its success at the Varsity tournaments.

284.    Varsity promoted Rockstar on its social media platforms through photos, and videos of the athletes, and interviews with coaches from the gym.

285.    When she first arrived at Rockstar Greenville, Plaintiff Jane Doe 4 she was placed on a Worlds' level team.

286.    Plaintiff Jane Doe 4 attended her first competition on behalf of Rockstar Greenville, Varsity's Battle Under the Bigtop, in December of 2019 when she traveled from Greenville to Atlanta.

287.    During these events, Defendant Varsity usually assigns each gym specific blocks of rooms at a given hotel.

288.    After the first day of the competition, Defendant Scott Foster approached Plaintiff Jane Doe 4 and asked her to go back to his hotel room, where he proceeded to serve Plaintiff alcohol.

289.    On the last night of the competition, Plaintiff Jane Doe 4 once again returned to Defendant Scott Foster's room, this time accompanied by Rockstar staff as well as other underage athletes. Defendant Scott Foster served alcohol to all of the underage athletes.

290.    At some point, Defendant Foster asked Plaintiff Jane Doe 4 to go outside with him to smoke a cigarette. When they were on the staircase going outside, Defendant Foster kissed Plaintiff Jane Doe 4.

291.    Within several months, Defendant Foster and Plaintiff Jane Doe 4 were seeing one another several times a week during which time Defendant Foster would serve Plaintiff Jane Doe 4 alcohol and have sex.

292.    During this time, Defendant Scott Foster regularly solicited sex from Plaintiff Jane Doe 4, including when the team traveled across state lines for Varsity competitions. On numerous occasions, Plaintiff Jane Doe 4 would go into Defendant Scott Foster's hotel room and they would engage in sex.

293.    At the same time, Plaintiff Jane Doe 4 felt that she could not deny Defendant Foster sex, or she would be punished professionally. For instance, in one text message sent shortly before Defendant Foster's death, when Jane Doe 4 declined to travel out of town with Defendant Foster, he threatened to change her employment status from salary to hourly.

294.    This type of threat to Plaintiff Jane Doe 4's professional livelihood happened on more than one occasion.

295.    As such, Plaintiff's financial well-being was intrinsically linked with giving in to Defendant Scott Foster's demands, including engaging in sexual conduct with him.

296.    During nearly every encounter Plaintiff had with Defendant Foster outside of the gym, including during the time she was not yet 21, Defendant Scott Foster served her alcohol.

297.    In addition, Plaintiff Jane Doe 4 regularly saw Defendant Scott Foster serve alcohol to minor athletes.

298.    During the entire time that Plaintiff Jane Doe 4 was cheering and working for Defendant Scott Foster, and competing at the Varsity Defendants' events, she was a member of the USASF and paid an annual fee to USASF via credit card. The fee increased once Plaintiff Jane Doe 4 turned eighteen, and needed to undergo a background check.

g. *Plaintiff Jane Doe 5*

299.    When Plaintiff Jane Doe 5 was 15 years old, she cheered at Rockstar in Greenville, South Carolina.

300.    At the time, Josh Guyton was an adult, co-ed stunter and tumbling coach at Rockstar Greenville.

301.    While Plaintiff Jane Doe 5 was at the gym at practice, Josh Guyton would often touch her inappropriately. On one occasion at the gym, Josh Guyton put his hands on Jane Doe 5's upper thighs and questioned her about whether she shaved her bikini area.

302.    Josh Guyton would often invite Jane Doe 5 to his apartment across the street from the gym so that she could work on her homework in a quiet place nearby.

303.    On one occasion when Jane Doe 5 was at Josh Guyton's home, Josh Guyton lured Jane Doe 5 to his bedroom where he proceeded to touch Jane Doe 5 in a sexual and inappropriate way, tickling her and attempting to "cuddle" her.

304.    The predatory, grooming behavior of Josh Guyton was so normalized and so frequent that Jane Doe 5 perceived it as normal. Jane Doe 5 did not immediately recognize the sexual touching and comments from her adult coach as inappropriate. It was only after Jane Doe 5 confided in her mother about Josh Guyton's behavior that Jane Doe 5 recognized it as abuse.

305.    During the entirety of the time she cheered for Rockstar, Plaintiff Jane Doe 5 was a USASF member and paid annual dues via credit card.

h. *Plaintiff Jane Doe 6*

306.    Plaintiff Jane Doe 6 met Defendant Scott Foster when she was 18 years old.

307.    After meeting Defendant Foster, Plaintiff Jane Doe 6 received an invitation to travel to Miami for a cheer skills camp. While on this trip, Defendant Foster gave Plaintiff Jane Doe 6 a capful of liquid. When Jane Doe 6 inquired about what it was, Defendant Foster told her it was "G" and instructed her to drink it.

308.    Defendant Foster described "G" as a substance used by body builders to make them look more muscular before a competition. Plaintiff Jane Doe 6 did not realize that "G" was a drug until years later.

309.    The same night that Defendant Foster gave Plaintiff Jane Doe 6 the "G". he took Plaintiff Jane Doe 6 to a nightclub, where they spent time in a VIP section.

310.    Plaintiff Jane Doe 6 was eighteen years old at the time.

311.    At some point during her time at the nightclub, Plaintiff Jane Doe 6 recalls holding on to one of the railings in the VIP section, looking over and hearing someone behind her say, "Oh shit, it hit her." After that, Plaintiff Jane Doe 6 has limited memory of the evening.

312.    Plaintiff Jane Doe 6 was told by other members of her team that she passed out on the couch in the VIP section, vomited on several occasions in several locations, and had to be showered. Plaintiff Jane Doe 6 woke up the following morning with bruising all across her chest. Plaintiff Jane Doe 6 was told that the others with her that night performed "sternal rubs" on her and that this may be the source of the bruising.

313.    On another occasion the same weekend, while at a hotel, Defendant Foster provided Plaintiff Jane Doe 6 with a half-capful of "G," which she drank at Defendant Foster's direction, despite the fact that she did not want to take it. After consuming the liquid, Plaintiff Jane Doe 6 sat down on a hotel bed and thereafter has no further memory from the evening.

314.    Plaintiff Jane Doe 6 now recognizes that the capfuls of liquid Scott Foster provided her and referred to as "G" were likely Gamma-hydroxybutyrate or "GHB," a prescription sedative commonly known as "the date rape drug."

315.    Plaintiff Jane Doe 6 recalls one occasion during the weekend when Scott Foster attempted to bribe a bouncer at a nightclub in Miami, Florida in order to get Plaintiff Jane Doe 6 into the club. Plaintiff Jane Doe 6 was only 18 years old at the time. Scott Foster offered the bouncer a sum of cash, at one point offering him as much as $200 in exchange for letting Plaintiff Jane Doe 6 into the club.

316.     During this entire timeframe, Plaintiff Jane Doe 6 paid dues to her gym and fees to the Varsity Defendants.

i. *Plaintiff Jane Doe 7*

317.     Plaintiff Jane Doe 7 began cheering at Rockstar Cheer in Greenville, South Carolina when she was thirteen (13) years old.

318.     While at Rockstar, Plaintiff Jane Doe 7 witnessed a culture of rampant drug use, underage alcohol consumption, sexual harassment and abuse.

319.     During her time at Rockstar, Plaintiff Jane Doe 7 became close with Defendant Scott Foster and his family.

320.     Defendant Kathy Foster coached Plaintiff Jane Doe 7. Plaintiff Jane Doe 7 recalls abusive behavior by Kathy Foster, including withholding water from athletes, excessive physical punishment and conditioning, and verbal abuse. Plaintiff Jane Doe 7 recalls Kathy Foster bullying and body shaming young athletes, including Plaintiff Jane Doe 7.

321.     While at Rockstar, Plaintiff Jane Doe 7 came into contact with several other coaches, including Defendant Nathan Alan Plank.

322.     On numerous occasions, Defendant Plank, an adult male around twenty-four (24) years old, requested Plaintiff Jane Doe 7 send nude photos of herself, but Plaintiff Jane Doe 7 consistently refused.

323.     Defendant Plank also sent Plaintiff Jane Doe 7 nude photos of himself.

324.     On numerous occasions, Nathan Alan Plank sent Plaintiff Jane Doe 7 videos of himself masturbating.

325.     Defendant Plank was well aware that Plaintiff Jane Doe 7 was only thirteen years old at the time he sent the photos and videos.

326.     Defendant Plank would often grope and touch Plaintiff Jane Doe 7 in an inappropriate way during stunting.

327.     Defendant Plank's nude photos, masturbation videos and groping were unwelcomed, unsolicited, and unreciprocated by Plaintiff Jane Doe 7.

328.     Plaintiff Jane Doe 7 recalls feeling powerless to stop Defendant Plank's behavior, for fear that she would be demoted in the program or otherwise punished in a way that would negatively impact her cheer career.

329.     Around the time Plaintiff Jane Doe 7 was fourteen (14), she was approached by Defendant Christopher Hinton, who was approximately twenty-five (25) years old at the time.

330.     One night, Defendant Hinton asked Plaintiff Jane Doe 7 to watch a movie with him. During the movie, Hinton began to question Plaintiff Jane Doe 7 about her sex life. Plaintiff Jane Doe 7 recalls feeling uncomfortable, but conflicted as to how to respond. Plaintiff Jane Doe 7 saw the coach as an authority figure in the gym, a coach and a person with a large social media presence and following. Plaintiff Jane Doe 7 feared that upsetting the coach may lead to being targeted by other coaches or "blackballed" in the gym.

331.     That same night, Defendant Hinton forced Plaintiff Jane Doe 7 to perform oral sex on him. Plaintiff Jane Doe 7 was fourteen (14) years old.

332.     Plaintiff Jane Doe 7 worried that if she reported the assault to her mother or anyone else, that coaches or others at Rockstar would target Plaintiff Jane Doe 7's younger sister, who was also an athlete at Rockstar.

333.     Plaintiff Jane Doe 7 eventually reported Plank's conduct to her mother and sought counseling.

334.    Plaintiff Jane Doe 7's mother reported the abuse of Plaintiff Jane Doe 7 to the Greenville County Sheriff's Department, and Defendants USASF and Varsity.

335.    Plaintiff Jane Doe 7's mother's complaints were dismissed as an attempt to manipulate her daughter's position on the cheer team and in the gym. Plaintiff Jane Doe 7's mother was told that if she did not like what she was seeing or experiencing at Rockstar, she could "find another gym."

336.    Plaintiff Jane Doe 7 quit cheer and left Rockstar when she was fourteen (14) years old.

337.    Plaintiff Jane Doe 7 suffers from anxiety, depression and PTSD as a result of the sexual, physical and mental abuse she suffered at Rockstar. She reports having difficulty trusting anyone, especially older men, and has experienced significant academic disruption.

338.    During this entire timeframe, Plaintiff Jane Doe 7 continued to pay dues to her gym, and was a member of USASF paying an annual fee via credit card.

## JOINT AND SEVERAL LIABILITY

339.    Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiffs, as Defendants' individual and collective actions and omissions actually and proximately caused Plaintiffs' past, present, and ongoing injuries.  Plaintiffs are entitled to damages pursuant to the laws of the State of South Carolina and the United States of America, including but not limited to the following:

      a.  Compensatory, actual, and consequential damages;

      b.  Statutory damages;

      c.  Punitive damages;

      d.  Reasonable attorneys' fees and costs;

e.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

**COUNT I**
**VIOLATION OF THE PROTECTING YOUNG VICTIMS**
**FROM SEXUAL ABUSE ACT, 18 U.S.C. §2255**
**(ALL DEFENDANTS)**

340.    Plaintiff hereby realleges the preceding paragraphs as if repeated verbatim herein.

341.    This claim is brought against all Defendants, with the specific acts complained of performed against minors by Defendant Scott Foster and other Unknown Defendants, with the specific knowledge and aid of Defendant Kathy Foster, and enabled by the ongoing certification and ratification of the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital.

342.    Under the statute, a covered individual means an adult who is authorized by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization."

343.    Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

344.    Defendant Scott Foster, Defendant Kathy Foster, and the other Unknown Defendants, qualify as covered individuals and the facts of this case bear out that abuse occurred at events defined by the statute.

345. Defendant Scott Foster and Defendant Kathy Foster were held out by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital as being part of a network of safe and trustworthy cheer coaching gyms.

346. Plaintiffs were minors at the time they were sexually abused and assaulted, sexually exploited, transported across state lines for illegal sexual activity, and used in creating illegal and obscene digital materials in contravention of 18 U.S.C §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223, thus constituting violations of 18 U.S.C. §2255.

347. Plaintiffs have suffered personal injuries as a result of these violations of law.

348. Plaintiffs are entitled to damages pursuant to the laws of United States of America, including but not limited to the following:

  a. Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

  b. Reasonable attorneys' fees and costs;

  c. Punitive damages; and

  d. Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

**COUNT II**
**FOR CIVIL CONSPIRACY IN VIOLATION OF THE RICO ACT PURSUANT TO 18 U.S.C. §1962(c) and §1962(d)**
**(ALL DEFENDANTS)**

349. Plaintiffs hereby reallege the preceding paragraphs as if repeated verbatim herein.

350. This count is brought against all Defendants.

351. United States law makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…" 18 U.S.C. §1962(c).

352.    Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each of them is capable of holding, and does hold, "a legal or beneficial interest in property."

353.    Defendants' activities include at least two (2) acts of racketeering activity since at least 2003. Accordingly, Defendants' conduct constitutes a pattern of racketeering activity. 18 U.S.C. § 1961(5).

354.    The racketeering activity is set forth in paragraphs 36-48; 49-96; 97-110; 111-201 and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud[6]), and 18 U.S.C §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223 (sexual exploitation of minors and creating obscene materials) as set forth in paragraph 185.

355.    In or around 2003, the Varsity Defendants, Defendant USASF, Defendant Rockstar, Defendant Scott Foster, and Defendant Kathy Foster formed an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4).

356.    Defendant Charlesbank and Defendant Bain Capital agreed to facilitate this Enterprise by funding its ongoing operation in order to obtain financial benefit of its revenues.

357.    This Enterprise as previously described in this Complaint, consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiffs as minor athletes by exposing them to illegal sexual abuse and

---

[6] The allegations set forth herein and above at paragraphs 45, 51, 56, 57, 58, 59, 61, 63, 65, 66, 67, 68, 70, 76, 78, 87-90, 108-112, 124, 128, 146-149, 152, 161, 182, 195, 202, 223, 225, 226, 243, 246, 250, 262, 266, 280, 298, 303, 316, 335, 338 constitute fraud committed via the mails and wires, and further constitute predicate acts.

exploitation of children while assuring their parents they were particularly safe in order to take their money.

358.    The Defendants, and all of them in concert with the Enterprise, were engaging in misleading and fraudulent messaging to children and their families which they knew or should have known was endangering children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

359.    In 2014, Defendant Charlesbank funded the purpose of this Enterprise.

360.    In 2018, Defendants Bain Capital took over a role in funding the purpose of this Enterprise in place of Defendant Charlesbank.

361.    The Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the Rockstar Defendants acted in concert to commit the predicate acts of child sexual exploitation, kidnapping, dealing in obscene materials involving minors, mail fraud and wire fraud as set forth in the preceding paragraphs.

362.    The funding, materials, and premises provided by the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital and the communication of particular trust and safety carried out by Defendant USASF facilitated the commission of these predicate acts by Defendant Rockstar, Defendant Scott Foster, Defendant Kathy Foster, and other Unknown Defendants in the commission of crimes against children.

363.    The Defendants knew or should have known that inappropriate contact was occurring between coaches and minor athletes based on the one-on-one coaching being marketed and the travel of these children across state lines with the coaches who stayed in hotel rooms with

them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

364.    The Defendants owed a duty to the minor Plaintiffs, and their families, to disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

365.    The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

366.    The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

367.    The fraudulent mail and/or wire messages include, for specificity, but are not limited to the following:

a.    USASF Athlete Protection Messaging at the website and via email on November 16, 2017.

b.    In 2021, USASF's website falsely claimed that they were requiring background checks in 2015 of "all coaches and adult members". However, this was untrue. Background checks were only required for entry into the "warm up room" at competitions. It was never implemented with respect to coaching children or being around them in any capacity outside their competition routine.

c.    At this same time on their website in 2021, USASF also falsely claimed that "two years earlier" in 2017 they made SafeSport's athlete protection education a mandatory requirement for all coaches and adult members. However, this is impossible since the SafeSport Act was not signed into law until February of 2018.

d.  Consecutively, on May 10, 2018 and May 16, 2019, the period just before Worlds at Disney, USASF disseminated the following messaging: "Athlete Safety is our #1 Priority! Our mission includes 'strive for a safe environment for our athletes.' To the USASF, safety extends beyond our Cheer or Dance safety rules for performance. We're committed to helping our members create the safest overall environment for every All Star athlete, so we've made resources available for use in gyms and studios."

e.  However, in these resources, USASF continued to provide messaging that child sexual abuse and exploitation by predators was an outside problem that could be prevented by paying more attention to how cheerleaders were presenting themselves on social media.

f.  USASF, in a tired and outdated sexist trope disseminated in July of 2019, shifted the blame to child athletes warning them the "risk and responsibility" of sexual exploitation and objectification required them to "make better choices" about their appearance to "minimize the risk[.]" It did this with full knowledge of repeated reports that the industry was rife with abuse among its own coaching and gym owner ranks and that they were actively concealing these predators so that they could continue to feed the revenue stream.

g.  USASF's athlete protection messaging continued at this time to primarily address athlete safety from sexual exploitation and abuse from the perspective of how athletes were presenting themselves through appearance and how that might affect the brand's image through an "image and appearance policy".

368.    Plaintiffs had a property interest in their membership dues paid as set forth above and in the continued ability to cheer competitively, which Defendants had repeatedly enticed them to do in order to obtain social media fame which they could monetize, obtain scholarships to cheer and/or stunt at the college level, to become cheer coaches themselves and obtain the "legend status" their coaches boasted of, to become gym owners, or to become event promoters themselves.

369.    Plaintiffs were falsely imprisoned by their abusers, who threatened them if they would not continue allowing the abuse or reported it that their abusers would tell their parents, their teammates, and others in the cheer community what they had done.

370.    Plaintiffs' abuse caused them damage that prevented them from realizing these future financial and business opportunities they and their families invested in under the promise of financial reward because they can no longer continue to cheer.

371.    Plaintiffs, as described above, were retaliated against, bullied, harassed, assaulted, and ostracized from their gyms, and their reputations intentionally damaged by USASF gym owners and coaches and their staff in retaliation for reporting sexual abuse, in direct contravention of USASF and USA Cheer rules.

372.    Any Plaintiffs who were able to continue to cheer were forced to drive hours to another safe gym to practice and compete, causing them additional financial damage.

373.    The actions of the Enterprise and its conspirators were the direct and proximate cause of these injuries to the Plaintiffs.

374.    But for the fraudulent assurances to their parents that the gyms and coaches were certified safe, the abuse would not have occurred causing the injuries described above.

375.    Plaintiffs are entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

    e.   Compensatory, actual, and consequential damages, trebled in accordance with the statute;

    f.   Reasonable attorneys' fees and costs;

    g.   Punitive damages; and

    h.   Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

### COUNT III
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. §39-5-20**
**(VARSITY DEFENDANTS, DEFENDANT USA CHEER, DEFENDANT USASF, DEFENDANT ROCKSTAR, DEFENDANT SCOTT FOSTER, AND DEFENDANT KATHY FOSTER)**

376.    Plaintiffs hereby reallege the preceding paragraphs as if repeated verbatim herein.

377.    At all times relevant to this complaint, the above-named Defendants entered into a contractual relationship with the Plaintiffs and their families, taking fees for membership, training, competition and travel, while promising safe environments and vetted coaches.

378.    The safety and trust touted by these Defendants to Plaintiffs and their families was material to Defendants' business model, causing Plaintiffs and their families to pay copious fees for years, all while their children were knowingly being sexually abused and exploited.

379.    When the Defendants obtained knowledge of complaints about certain inappropriate or illegal activity with minors, they failed to report those acts or to take corrective actions while continuing to tout safety and trust to support an ongoing stream of financial benefit from child athletes who were being sexually abused and exploited.

380.    S.C. Code Ann. § 39-5-20 prohibits unfair or deceptive acts related to consumers.

381.    The conduct set forth above and herein is capable of repetition, as evidenced by the fact that numerous Plaintiffs have come forward with similar information related to Defendants'

conduct, failures, acts, and/or omissions in overseeing, enforcing, and providing a secure and safe environment for Plaintiffs and other child-athletes.

382.    The foregoing constitutes deceptive acts under the Unfair Trade Practices Act statute.

383.    Plaintiff is entitled to damages pursuant to the laws of the State of South Carolina, including but not limited to the following:

      i.    Compensatory, actual, and consequential damages, trebled in accordance with the statute;

      j.    Reasonable attorneys' fees and costs;

      k.    Punitive damages; and

      l.    Any and all other and further relief as this Court may deem appropriate including pre and post-judgment interest.

## COUNT IV
## GROSS NEGLIGENCE
## (ALL DEFENDANTS)

384.    Plaintiffs hereby reallege the preceding paragraphs as though repeated verbatim herein.

385.    Plaintiffs bring this claim for gross negligence against all Defendants.

386.    At all times relevant to this Complaint, Defendants have been responsible for the safety, health, and welfare of the minor athletes who were members of Defendants USASF, and USA Cheer, participants in Defendant Varsity events, and under the care, custody, and control of each of the Defendants, respectively.

387.    Defendants are aware that there are dangers associated with training by coaches of minor athletes, including risks associated with inappropriate, and non-consensual sexual touching, emotional, and physical abuse.

388.    At all times relevant to this Complaint, Defendants have created rules specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches, and adults who come into contact with the athletes by virtue of the adults' position of power.

389.    Despite this, at all times relevant to this Complaint, Defendants have been aware that violations to their internal policies, processes, procedures, and guidelines related to athlete safety, and, in particular, safety against harm from sexual, physical, and emotional abuse and exploitation has happened on a regular and continuous basis by and through USASF and USA Cheer certified coaches at private gyms.

390.    Defendants know, in fact, that one-on-one coaching is an enhanced feature of private gym cheer coaching that generates a great deal of money for all Defendants in the enterprise with the promise of greater success for the minor athlete.

391.    Defendants are also aware of the close personal relationships many of these coaches form with the minor athletes who the coaches gain access to by virtue of their USASF and USA Cheer certification.

392.    Defendants are further aware that, despite the known dangers, coaches routinely travel alone with minors across state lines, even staying in the same hotel rooms with no other chaperone, during these moneymaking cheer competition events which enrich the enterprise.

393.    And when complaints or reports have surfaced, or social media images and videos circulate depicting illegal activity with minors, the Defendants sweep it under the rug, do not report

to any agencies, do not strip coaches of their eligibility, and often rally around coaches who have been accused of illegal conduct with minors, even ostracizing families who have complained or reported.

394.    Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiffs, and actually and proximately contributed to and/or caused damages.

395.    Defendants' actions and omissions as described above, by and through authorized agents, were in violation of Defendants' own policies.

396.    Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

397.    Plaintiff is entitled to damages pursuant to the laws of South Carolina, including but not limiting to the following:

  a.  Compensatory, actual, and consequential damages;

  b.  Punitive damages; and

  c.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT V
## NEGLIGENT SUPERVISION
### (VARSITY DEFENDANTS, DEFENDANT USA CHEER, DEFENDANT USASF, DEFENDANT ROCKSTAR, DEFENDANT KATHY FOSTER)

398.    Plaintiff hereby realleges the foregoing paragraphs as though repeated verbatim herein.

399.    This claim is brought on behalf of the individual Plaintiffs who have been subjected to sexual abuse, assault and battery, and who were transported across state lines for the purpose of sexual exploitation.

400.    Despite claiming to conduct background checks and remove eligibility certification from coaches or gyms where complaints or reports of the foregoing conduct have been made, Defendants continue to let these gyms and coaches operate in order to generate income for the enterprise.

401.    Furthermore, Defendants failed to report these criminal activities to law enforcement agencies in favor of preserving the reputation of the enterprise so that trust in its safety continues to generate income for the enterprise.

402.    Defendants' business model relies upon certifying private gyms and coaches pursuant to the USASF standard, which purports to place athlete health and safety above all else.

403.    In perpetuating a business model built on trust and athlete safety, Defendants specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network Defendants oversaw.

404.    Defendants breached this duty in a number of particulars including by failing to act or otherwise disregarding reports of abuse of minors going so far as to allow coaches who were accused of such conduct to remain working with minor athletes or to transfer to other gyms without notifying their current gym of the allegations.

405.    In addition, and upon information and belief, at all times relevant to this complaint, Defendant USASF allowed gyms to unilaterally change owners when an athlete safety issue was reported. Defendant USASF further failed to follow up on who was actually operating the gym, and whether or not a noneligible coach, even one under criminal investigation, was continuing to work with minor cheer competitors.

406.     Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein directly and proximately caused Plaintiffs' injuries.

407.     As a direct and proximate result of Defendants' conduct, the Plaintiffs have been damaged.

408.     Plaintiffs are therefore entitled to a judgment against Defendants, and for such actual and consequential damages in an amount to be determined by a jury trial.

## COUNT VI
## RESPONDEAT SUPERIOR
### (AS TO DEFENDANTS CAROLINA ALL-STARS, ROCKSTAR, KATHY FOSTER INDIVIDUALLYAND KATHERINE ANNE FOSTER AS THE PERSONAL REPRESENTATIVE FOR THE ESTATE OF SCOTT FOSTER)

409.     Plaintiffs hereby reallege the foregoing paragraphs as though repeated verbatim herein.

410.     At all times relevant to this complaint, Defendants Carolina All-Stars, Rockstar Greenville, Kathy Foster, and Katherine Anne Foster as the personal representative of the estate of Scott Foster, employed and retained Defendants Nathan Allan Plank, Kenny Feeley, Peter Holley, Tracy a/k/a or f/k/a Traevon "Trey" Black, Josh Guyton, and Miguel Martinez, as coaches who were allowed access to minor athletes including the John and Jane Doe Plaintiffs set forth herein.

411.     At all times relevant to this complaint, the above-named Defendant coaches were acting in the course and scope of their employment, and were authorized representatives of Defendants.

412.     As such, at all times relevant to this complaint, Defendants Carolina All-Stars, Rockstar Greenville, Kathy Foster individually, and Katherine Anne Foster as the personal

representative for the estate of Scott Foster were as responsible for the actions of the Defendant coaches as though they undertook the actions of the Defendant coaches themselves.

413.    As set forth herein, each of the Defendant Coaches, including Scott Foster, committed unspeakable acts against the Jane and Joe Doe Defendants including physical, mental, and emotional abuse, rape, assault, and other battery.

414.    This conduct directly and proximately caused Plaintiffs to sustain continuing and ongoing injuries, including physical and emotional damages.

415.    Plaintiffs therefore seek an order from this court against Defendants, and are further entitled to actual, consequential, and such additional damages, including punitive damages as this court deems just and proper.

**COUNT VII**
**ASSAULT/BATTERY**
**(DEFENDANT ROCKSTAR, KATHERINE ANNE FOSTER AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SCOTT FOSTER, DEFENDANT FEELY, DEFENDANT PLANK, DEFENDANT BLACK, DEFENDANT GUYTON, DEFENDANT MARTINEZ, DEFENDANT HOLLEY, AND UNKNOWN DEFENDANTS)**

416.    Plaintiffs hereby reallege the foregoing paragraphs as though repeated verbatim herein.

417.    Defendant Scott Foster, as owner and operator of Defendant Rockstar, along with Defendants Plank, Black, Guyton, Feeley, Martinez, Holley, and other Unknown Defendants who did illegally commit unwanted and nonconsensual sexual touching of the Plaintiffs and others.

418.    Said touching constituted sexual assault and sexual battery on these named Plaintiffs and others.

419.    As a direct and proximate result of these Defendants' conduct, set forth more expressly above, Plaintiffs experienced bodily injury, physical pain and suffering, and mental

anguish and are entitled to an award of actual damages in an amount to be determined through a trial of this matter.

<u>COUNT VIII</u>
**BREACH OF CONTRACT**
**(AS TO THE VARSITY DEFENDANTS AND DEFENDANTS USASF)**

420.    Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

421.    At all times relevant to this complaint, Plaintiffs had duly executed contracts with the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiffs, Defendants agreed to provide a competitive environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

422.    As set forth herein, during the course of these contractual agreements, Plaintiffs were subjected to severe and oppressive abuse, physically and mentally, including during competitions hosted by the Varsity Defendants under the governance of Defendant USASF.

423.    During the term of these agreements, the Varsity Defendants and Defendant USASF failed to provide Plaintiffs with a safe and secure environment, including by enforcing the policies, procedures, and policies expressly adopted by Defendant USASF.

424.    These failures on the parts of the Varsity Defendants and Defendant USASF constitute violations of the fundamental and material terms of the agreements between Plaintiffs, and the Varsity Defendants and Defendant USASF.

425.    The Varsity Defendants' and Defendant USASF's failures were so egregious and unconscionable as to render the agreements null and void.

426.    As such, Plaintiffs seek an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants' and Plaintiffs, rescinding said contracts, and remitting the valuable consideration Plaintiffs paid to Defendants during the

relevant timeframe, as well as for all such attorney's fees, costs, and interest to which Plaintiff's

may be entitled.

### COUNT IX
### UNJUST ENRICHMENT
### (AS TO DEFENDANTS ROCKSTAR, VARSITY, BAIN CAPITAL, USA CHEER
### AND USASF)

427.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

428.    As set forth herein, the cheer industry represents a multi-billion-dollar enterprise

where each young athlete spends tens of thousands of dollars during the length of his or her

student-athlete career toward gym memberships, private lessons, uniforms, accessories,

competition fees, and membership with USA Cheer and USASF.

429.    At all times relevant to this complaint, Plaintiffs conferred non-gratuitous benefits

upon Defendants including annual competition and membership fees, as well as continuous

revenue toward uniforms, accessories, private training, and other monetary benefits.

430.    Defendants realized the value of these benefits, including steady annual revenue

per athlete.

431.    To date, none of the benefits Defendants realized have been returned or otherwise

disgorged.

432.    Under the circumstances set forth herein and above, it would be inequitable for

Defendants to retain the benefits conferred by Plaintiffs including through Plaintiffs' annual

membership fees and competition fees.

433.    Plaintiffs are therefore entitled as a matter of equity to recover these benefits from

Defendants and for all such additional relief as this Court deems proper.

### COUNT X
### FRAUD

**(AS TO DEFENDANTS ROCKSTAR, THE VARSITY DEFENDANTS, AND
DEFENDANT USASF, AND DEFENDANT USA CHEER)**

434. Plaintiff realleges the preceding paragraphs as though repeated verbatim.

435. At all times relevant to this complaint, Plaintiffs were parties to numerous annual contracts whereby Plaintiffs agreed to pay Defendants annual and recurring fees in exchange for a safe competitive environment and training facility.

436. As part of the agreements, Defendants represented to Plaintiffs that Defendants would be responsible for ensuring a safe environment for Plaintiffs including an environment free from sexual, physical, and mental harm and exploitation.

437. Defendants' promises were material to Plaintiffs' agreements, without which no agreements would have existed.

438. Plaintiffs had a right to rely upon Defendants' promises and did so rely.

439. As set forth herein, even at the time they entered into the agreements with Plaintiff, Defendants knew or had a reckless disregard for whether the environment they provided at competitions was safe and free from harm and sexual, physical and mental abuse.

440. In fact, at all times relevant to this complaint, Defendants knew that the environment they provided actually facilitated access to underage athletes by predators, including coaches, choreographers, and other adults.

441. Yet, with knowledge or a reckless disregard for whether Defendants were providing safe environments for child athletes, Defendants nevertheless entered into the agreements and began collecting fees from Plaintiff.

442. Upon information and belief, Defendants' misrepresentations included, without limitation:

a. Certifying to Plaintiffs that they were responsible for providing safe competitive environments;

b. Certifying to Plaintiffs and their families that the adults involved in the competitions, including coaches who were allowed to participate in competitions, had been duly vetted;

c. Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior, such as providing alcohol and drugs to minors;

d. Facilitating an unchaperoned environment for child-athletes;

e. Fostering a party culture for child athletes, including an environment where alcohol and drugs were readily available;

f. Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

g. Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

h. Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

i. Such additional conduct as may be revealed during discovery and the trial of this case.

443.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain significant injuries and damages.

444.    Plaintiffs now seek an order from this court setting aside the agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiffs for the

physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

### COUNT XI
### (NEGLIGENT SECURITY)
### AS TO THE VARISTY DEFENDANTS, DEFENDANT BAIN, DEFENDANT CHARLESBANK, DEFENDANT ROCKSTAR, DEFENDANTS USASF, AND DEFENDANT USA CHEER

445.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

446.     At all times relevant to this complaint, the Varsity Defendant, Defendant Bain, and Defendant Charlesbank were sponsored, created, hosted, and oversaw camps, and competitions where young adult athletes would converge at pre-determined locations, established and governed by Defendants, and under the supervision of Defendants.

447.     At all times relevant to this complaint, if athletes competed at the camps and competitions hosted by the Varsity Defendants, and Defendants Bain Capital and Charlesbank, the athletes had no meaningful choice but to attend at the locations, and under conditions, established by Defendants.

448.     The Varsity Defendants, and Defendants Bain Capital and Charlesbank received substantial revenue from these events.

449.     As part of their promotion of these events, the Varsity Defendants, and Defendants Bain Capital and Charlesbank undertook a responsibility to ensure that the events were safe for attendees, minor athletes who were present at the competitions with minimal adult supervision, and who were likely to encounter adult coaches, choreographers, videographers, and attendees.

450.     The Varsity Defendants, and Defendants Bain Capital and Charlesbank violated their responsibility to provide safe premises free from harm from third parties in one or more of the following particulars:

   a.  Disparate enforcement of policies, procedures, and guidelines related to coaching suspension, with the result that coaches such as Scott Foster were still allowed to attend Varsity Competitions;

   b.  Failure to provide adequate monitoring at the events;

   c.  Failure to provide sufficient background checks, with the result that hundreds of potential threats were allowed to attend Varsity events and gain access to underage athletes;

   d.  Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol while attending Varsity events;

   e.  Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic images while attending Varsity events;

   f.  Failing to ensure that adult coaches were not forcing themselves upon minor athletes at hotels hand selected by these Defendants for the Varsity events;

   g.  Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults during Varsity events;

   h.  Such additional conduct as may be revealed during discovery.

451.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained and will continue to sustain significant injuries and damages.

452.    Plaintiffs now seek an order from this court setting aside the agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiffs for the

physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## COUNT XII
### (CIVIL CONSPIRACY)
### AS TO ALL DEFENDANTS

452.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

453.    At all times relevant to this complaint, Defendants were a collective group of individuals working in concert and individually toward a common plan.

454.    As described more fully herein, Defendants, acting as a collective group and individually, and at all times relevant to this complaint, were engaged in the process of of recklessly, intentionally, and willfully endangering the Plaintiffs as minor athletes by exposing them to illegal substance abuse, sexual abuse and exploitation while assuring the children and their parents Defendants were providing safe conditions and premises for the athletes to compete.

455.    As described more fully herein, Defendants' conduct included misleading and fraudulent messaging to children and their families which Defendants knew or should have known would endanger children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

456.    At all times relevant to this complaint, Defendants were motivated by the substantial revenue, profits, and funding paid by the athletes and their families in exchange for the fraudulent messages and misrepresentations made by Defendants.

457.    In 2014, Defendant Charlesbank funded this scheme, providing additional capital for Defendants to perpetuate their misrepresentations.

458.    In 2018, Defendants Bain Capital took over the primary role in funding the purpose this scheme. Defendant Charlesbank retained an interest however in the misrepresentations and resultant monetary benefits.

459.    Defendants acted in concert to perpetuate this scheme.

460.    In addition, Defendants knew or should have known that the funding, materials, and premises provided by Defendants were material to the abuses and harm suffered by the minor athletes, as well as the continued perpetuation of revenue from these athletes.

461.    The Defendants knew or should have known that inappropriate contact was occurring between coaches, choreographers, videographers, and other adults and minor athletes based on the one-on-one coaching being marketed and the travel of children across state lines with their coaches who stayed in hotel rooms with them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

462.    The Defendants owed a duty to the minor Plaintiffs, and their families, to disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

463.    The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

464.    The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

465.    But for the fraudulent assurances to their parents that the gyms and coaches were certified safe, the abuse would not have occurred, and Plaintiffs would not have suffered continued economic harm derived from paying substantial dues and fees predicated in large part on promises of a safe environment for the minor athletes.

466.    As a direct and proximate result of Defendants' conduct, Plaintiffs are entitled to damages including but not limited to the following:

      a.    Compensatory, actual, and consequential damages, trebled in accordance with the statute;

      b.    Punitive damages; and

      c.    Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court award the following damages, jointly and severally against Defendants, as provided by United States law and South Carolina law, including but not limited to the following:

     a.      Compensatory, actual, and consequential damages to Plaintiffs, trebled where permitted by statute;

     b.      Alternatively, liquidated damages as to Count I;

     c.      Costs of this action and attorneys' fees to Plaintiffs;

     d.      Punitive damages where permitted by statute; and,

     e.      Any and all other and further relief as this Court may deem appropriate.

## **TRIAL BY JURY**

WHEREFORE, Plaintiffs hereby demand a trial by jury on all issues so triable.

**STROM LAW FIRM, LLC**

*s/ Bakari T. Sellers*

Bakari T. Sellers (SC Fed. ID No. 11099)

Joseph Preston Strom (SC Fed. ID No. 4354)

Mario A. Pacella (SC Fed. ID No. 7538)

Amy E. Willbanks (SC Fed. ID No. 13537)

Jessica L. Fickling (SC Fed. ID No. 11403)

Alexandra Benevento (SC Fed. ID No. 10734)

6923 N. Trenholm Road, Suite 200

Columbia, South Carolina 29206

Phone: (803) 252-4800

Email: bsellers@stromlaw.com

petestrom@stromlaw.com

mpacella@stromlaw.com

awillbanks@stromlaw.com

jfickling@stromlaw.com

abenevento@stromlaw.com

*Attorneys for Plaintiffs*

September 15, 2022